**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jane Doe, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 1:25-cv-08520-JSR |
| v. | |
| Bank of America, N.A., | |
| Defendant. | |
| Jane Doe, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 1:25-cv-08525-JSR |
| v. | |
| The Bank of New York Mellon Corporation, | |
| Defendant. | |

**THE BANK OF NEW YORK MELLON CORPORATION'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

ARGUMENT ........................................................................................................................5

I.  THE COMPLAINT DOES NOT PLEAD A TVPA CLAIM ...............................6

    A.  The Complaint Fails To Plead TVPA Participation Liability Under
        18 U.S.C. § 1591(a)(2) (Count I) ..............................................................6

        1.  The complaint does not allege facts showing BNY's participation
            in a sex-trafficking venture ..........................................................6

        2.  The complaint does not allege facts showing that BNY had
            knowledge of a sex-trafficking venture ....................................11

        3.  The complaint does not allege facts showing that BNY received
            any benefit in relation to a sex-trafficking venture ..................14

    B.  The Complaint Fails To Plead TVPA Perpetrator Liability Under
        18 U.S.C. § 1591(a)(1) (Count II)............................................................17

    C.  The TVPA Does Not Provide For Aiding-And-Abetting Liability (Count
        III) ............................................................................................................18

    D.  The Complaint Fails To Plead TVPA Obstruction (Count IV) ............................18

II. THE COMPLAINT FAILS TO PLEAD NEGLIGENCE (COUNTS V AND VI) ..........21

    A.  Any Negligence Claim Is Time-Barred ....................................................21

    B.  The Complaint Does Not Allege Facts Suggesting That BNY Owed A
        Duty To Plaintiff....................................................................................21

    C.  The Complaint Does Not Plausibly Allege That BNY Proximately Caused
        Plaintiff's Injuries ..................................................................................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*,
  356 F. Supp. 3d 379 (S.D.N.Y. 2019)..............................................................10, 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................2, 5, 17

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..............................................................................4

*B.C. v. G6 Hospitality Property LLC*,
  2025 WL 1837620 (W.D. Wash. July 3, 2025) ......................................................10

*Barrell v. Glen Oaks Village Owners, Inc.*,
  814 N.Y.S.2d 276 (App. Div. 2006) ...................................................................21

*C.L. v. County of Oneida*,
  212 N.Y.S.3d 533 (Sup. Ct. 2024).....................................................................21

*City of Pontiac Police & Fire Retirement System v. BNP Paribas Securities Corporation*,
  92 F.4th 381 (2d Cir. 2024) ........................................................................5, 15

*Corradino v. Liquidnet Holdings Inc.*,
  2021 WL 2853362 (S.D.N.Y. July 8, 2021) .........................................................15

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024)........................................................................7, 8

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
  671 F. Supp. 3d 387 (S.D.N.Y. 2023)....6, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24

*Doe 1 v. Twitter, Inc.*,
  148 F.4th 635 (9th Cir. 2025) .......................................................................15

*Doe (G.N.C.) v. Uniquest Hospitality, LLC*,
  2024 WL 4149251 (S.D.N.Y. Sept. 11, 2024).......................................................12

*Doe (K.E.C.) v. G6 Hospitality, LLC*,
  750 F. Supp. 3d 719 (E.D. Tex. 2024)................................................................10

*Doe v. Fitzgerald*,
  2022 WL 425016 (C.D. Cal. Jan 6, 2022) ...........................................................19

*Doe v. Grindr Inc.*,
   128 F.4th 1148 (9th Cir. 2025) ........................................................................7, 16

*E.S. v. Best Western International, Inc.*,
   510 F. Supp. 3d 420 (N.D. Tex. 2021) ...................................................................10

*Eckhart v. Fox News Network, LLC*,
   2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021).............................................................6

*Elmaliach v. Bank of China Limited*,
   971 N.Y.S.2d 504 (App. Div. 2013).........................................................22, 23, 24

*Francis v. Kings Park Manor, Inc.*,
   992 F.3d 67 (2d Cir. 2021) (en banc)..................................................................5, 7

*Geiss v. Weinstein Company Holdings LLC*,
   383 F. Supp. 3d 156 (S.D.N.Y. 2019)...............................................................15, 16

*Hain v. Jamison*,
   68 N.E.3d 1233 (N.Y. 2016).....................................................................................24

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 118 (2d Cir. 2013).....................................................................................22

*In re Terrorist Attacks on September 11, 2001*,
   740 F. Supp. 2d 494 (S.D.N.Y 2010).......................................................................23

*Jang Ho Choi v. Beautri Realty Corporation*,
   22 N.Y.S.3d 431 (App. Div. 2016).............................................................................21

*Jones v. Combs*,
   2025 WL 896829 (S.D.N.Y. Mar. 24, 2025) ..........................................................15

*Kitler v. Church of Jesus Christ of Latter-Day Saints*,
   2025 WL 2209870 (N.D.N.Y. Aug. 4, 2025) .....................................................6, 20

*Levin v. Sarah Lawrence College*,
   747 F. Supp. 3d 645 (S.D.N.Y. 2024).............................................................6, 15, 16

*Licci v. American Express Bank Limited*,
   704 F. Supp. 2d 403 (S.D.N.Y. 2010) ....................................................................24

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   672 F.3d 155 (2d Cir. 2012)....................................................................................22

*Meyer v. Seidel*,
   89 F.4th 117 (2d Cir. 2023) ..................................................................................5, 9

*Mia v. Kimberly-Clark Corporation*,
2025 WL 752564 (D.D.C. Mar. 10, 2025)...............................................................8

*Mueller v. Deutsche Bank Aktiengesellschaft*,
777 F. Supp. 3d 329 (S.D.N.Y. 2025)........................................................6, 7, 8, 9

*Noble v. Weinstein*,
335 F. Supp. 3d 504 (S.D.N.Y. 2018).........................................................6, 7, 9

*Polselli v. Internal Revenue Service*,
598 U.S. 432 (2023).............................................................................................18

*Purdy v. Public Administrator of Westchester*,
526 N.E.2d 4 (N.Y. 1988).....................................................................................22

*Rothstein v. UBS AG*,
647 F. Supp. 2d 292 (S.D.N.Y. 2009)...................................................................25

*S.J. v. Choice Hotels International, Inc.*,
473 F. Supp. 3d 147 (E.D.N.Y. 2020) ..................................................................12

*Solomon ex rel. Solomon v. City of New York*,
489 N.E.2d 1294 (N.Y. 1985)...............................................................................21

*Taylor v. CPLG FL Properties LLC*,
2024 WL 4825814 (M.D. Fla. Nov. 19, 2024) ....................................................10

*Tesla Wall Systems, LLC v. Related Companies, L.P.*,
2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017) ......................................................21

*United States v. Farah*,
766 F.3d 599 (6th Cir. 2014) ...............................................................................19

*Unknown Parties v. Google LLC*,
2024 WL 1892291 (N.D. Cal. Apr. 29, 2024) .......................................................8

*Velez v. Sanchez*,
693 F.3d 308 (2d Cir. 2012)..................................................................................19

*Villalobos v. Telemundo Network Group LLC*,
2025 WL 2687948 (S.D.N.Y. Sept. 19, 2025).................................................12, 13

*Wang v. TD Ameritrade Holding Corp.*,
216 N.Y.S.3d 885 (Sup. Ct. July 24, 2024) .........................................................22

*Winkler v. Battery Trading, Inc.*,
934 N.Y.S.2d 199 (App. Div. 2011)......................................................................23

## DOCKETED CASES

*Doe v. Bank of America, N.A.*, No. 25-cv-08520 (S.D.N.Y.) ........................................................3

## STATUTES, RULES, AND REGULATIONS

18 U.S.C.
    § 1591.................................................................................................6, 11, 17, 18
    § 1595..........................................................................................................18

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008,
    Pub. L. No. 110-457, 122 Stat. 5044 ......................................................19

N.Y. C.P.L.R. § 214....................................................................................................21

## OTHER AUTHORITIES

The Bank of New York Mellon Corporation, Annual Report (Form 10-K) (Feb.
    26, 2010), available at https://www.bny.com/corporate/global/en/investor-
    relations/regulatory-filings.html ...........................................................4, 8

The Bank of New York Mellon Corporation, Quarterly Report (Form 10-Q) (Oct.
    31, 2015), available at https://www.bny.com/corporate/global/en/investor-
    relations/regulatory-filings.html. ...............................................................4

## INTRODUCTION

The complaint in this action provides a lengthy description of abhorrent crimes by infamous sex offender Jeffrey Epstein.  What the complaint does not include is a single plausible allegation that The Bank of New York Mellon Corporation ("BNY") had anything to do with those crimes.  Across 216 paragraphs, the complaint never identifies a single BNY employee, or even a division of BNY, with whom Epstein supposedly dealt.  Indeed, the vast majority of the allegations in the complaint are generic assertions that are (aside from the defendant's name) word-for-word identical to a complaint that the same lawyers filed against an entirely different bank on the same day they filed this case.  There are precisely four paragraphs in the entire complaint that contain factual allegations unique to BNY, none of which alleges that Epstein ever opened or held accounts at BNY or was otherwise a customer of BNY.  These razor-thin allegations fail to state a claim, and the complaint should be dismissed in its entirety.

Count I, which asserts that BNY violated the Trafficking Victims Protection Act ("TVPA") by knowingly participating in Epstein's alleged sex-trafficking venture, is inadequate in multiple independent ways.  First, the complaint does not allege that BNY provided *any* services *to* Epstein, much less the kind of non-routine, client-tailored services that would be necessary to establish a plausible inference of specific conduct in furtherance of sex trafficking.  Second, the complaint does not plausibly allege that BNY knew or should have known about any participation in sex trafficking, because there is not a single allegation of warning signs or red flags that would have been available to BNY in connection with any alleged Epstein-related transactions.  Third, the complaint fails to plausibly allege that BNY benefitted from any supposed participation in a sex-trafficking venture because it does not allege that BNY received anything of value relating to Jeffrey Epstein, let alone anything that bore any relationship to the sex trafficking itself.

1

Counts II, III, and IV assert additional theories under the TVPA, but none fares any better. Count II outrageously asserts that BNY itself committed sex-trafficking offenses without the support of even one factual allegation. Count III claims that BNY aided and abetted Epstein's alleged sex-trafficking violations, but the TVPA does not create civil liability for aiding and abetting as a matter of law. And Count IV asserts that BNY obstructed enforcement of the TVPA, but there is no private right of action for TVPA obstruction, and in any event, the complaint does not allege that BNY ever was aware of an effort to enforce the statute, let alone that BNY engaged in any conduct to intentionally obstruct enforcement.

The final two counts (Counts V and VI) purport to assert negligence claims, but they are both time-barred. On the merits, moreover, it is well established under New York law that banks do not owe non-customers (like Plaintiff) a duty to protect them from the intentional torts of others (like Epstein). That is especially true where (as here) the bank is alleged to have provided nothing more than routine services. And, even if BNY had owed a duty to Plaintiff, there are no allegations suggesting that the limited conduct in which BNY allegedly engaged was a proximate cause of Plaintiff's injuries. The complaint should be dismissed with prejudice in its entirety.

## BACKGROUND[1]

According to the complaint, Epstein "ran a sex-trafficking venture" and "used means of force [and] coercion … to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them." Compl. ¶ 24. The complaint seeks to hold BNY liable for allegedly facilitating those crimes, but is unable to allege any factual connection between BNY and Epstein's activities. Indeed, the vast majority of the allegations in the complaint are not

---

[1] For purposes of this motion only, BNY accepts the factual allegations in the complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

even specific to BNY at all; they are (apart from the defendant's name) copied verbatim from the conclusory claims in a different complaint filed by the same lawyers against another bank on the same day they filed this case.[2]

These generic assertions include the following:  The complaint states conclusorily that BNY "assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture," but does not allege any facts about the nature of the services that BNY allegedly provided, the "financial structure" that supposedly resulted, or even a single communication, agreement, or other interaction between Epstein and BNY.  Compl. ¶ 70.  Similarly, the complaint asserts that certain Epstein associates "communicated with BNY directly in highly suspicious manners," yet fails to allege any actual facts about the nature, substance, time period, or frequency of those communications or the identities of any alleged BNY participants.  *Id.* ¶ 63.  And the complaint cites a 2020 consent order entered by the New York Department of Financial Services against *another bank* to assert that "Epstein … was carrying out similar suspicious activity through BNY as well"—without ever describing BNY's alleged activity.  *Id.*

The complaint never identifies a single BNY employee, or even a division of the bank, that supposedly served Epstein or allegedly was aware of a sex-trafficking venture.  Of the 216 paragraphs in the complaint, there are exactly four unique allegations specific to BNY.  According to three of those paragraphs, a modeling agency run by someone other than Epstein, called MC2, "had a banking relationship with BNY," and "[t]he funds from that banking relationship were used to fund Epstein's sex-trafficking operation."  Compl. ¶ 67.  The only service that BNY purportedly provided to MC2 is "a line of credit," and the complaint fails to allege that BNY provided MC2

---

[2] *Compare, e.g.*, Compl. ¶¶ 1-2, 4-7, 8-52, 54-65, 69-71, 72-96, 97-216, *with* Compl. ¶¶ 1-2, 4-7, 9-53, 68-79, 80-81, 84-108, 110-229, *Doe v. Bank of America, N.A.*, No. 25-cv-08520 (S.D.N.Y. Oct. 15, 2025), ECF No. 1.

any non-standard services or that BNY was even aware of MC2's alleged connection to Epstein (much less any connection to sex trafficking), nor does the complaint provide any facts concerning MC2's supposed role in Epstein's crimes.  *See id.* ¶¶ 67-69.[3]  The fourth paragraph specific to BNY includes one isolated assertion that BNY "processed $378 million in payments to women trafficked by" Epstein (*id.* ¶ 3), but the complaint never describes what "process[ing]" would entail in this context, never alleges that it would have required any kind of customer relationship with Epstein, and contains no supporting facts whatsoever (such as transaction numbers or amounts, time periods, or identities or number of recipients).  The absence of such allegations is significant because a central aspect of BNY's business is the provision of clearing, custody, correspondent, and additional funds transfer services for *other financial institutions*.[4]  Moreover, this allegation is a clear distortion of a news article stating that BNY had a connection to $378 million in transactions related to Epstein, but never stated that *any* of those transactions were payments to trafficking victims.[5]  Apart from the one inflammatory sentence, the complaint itself never mentions the $378 million again and never alleges any additional facts about any supposed payments processed by BNY that went to Epstein's victims.

---

[3] Notably, BNY sold the entity that provided the alleged MC2 line of credit in January 2010.  *See* The Bank of New York Mellon Corporation, Annual Report (Form 10-K) (Feb. 26, 2010), at 11, available at https://www.bny.com/corporate/global/en/investor-relations/regulatory-filings.html. The Court "may consider … legally required public disclosure documents filed with the SEC" when ruling on a motion to dismiss.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[4] *See, e.g.*, The Bank of New York Mellon Corporation, Quarterly Report (Form 10-Q) (Oct. 31, 2015), at 18, available at https://www.bny.com/corporate/global/en/investor-relations/regulatory-filings.html.

[5] M. Goldstein, *In Epstein Case, Follow the Money, Democratic Senator Says*, N.Y. Times (July 19, 2025), https://www.nytimes.com/2025/07/17/business/epstein-banks-wyden-trump.html.

Similarly absent are allegations suggesting that BNY had actual or constructive knowledge of sex trafficking. The complaint asserts that "everyone knew or should have known at least after 2006 that Epstein was running a sex-trafficking scheme" because he was arrested that year in Florida and ultimately pleaded guilty to prostitution charges. Compl. ¶ 85; *id.* ¶ 30. The complaint neglects, however, to include any facts indicating that BNY knew or should have known, at any point in time, that *its services* were being used to facilitate sex trafficking. There are no allegations, for example, that BNY was informed of or asked to assist a law-enforcement investigation involving Epstein. Nor does the complaint specify any particular red flags related to any Epstein-related transactions of which BNY would have been aware. The complaint also claims that "BNY financially benefitted" from its alleged connection to Epstein, *id.* ¶ 78, yet it fails to describe any such benefits apart from general revenue and profits. Indeed, although the complaint states that BNY benefitted through "connections" with Epstein's "wealthy friends and associates," *id.* ¶ 101, it does not actually identify one such connection—and none exists.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This means that the complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[C]onclusory allegations" are not acceptable and "are not entitled to the assumption of truth." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc). A plaintiff "cannot rely on mere 'labels and conclusions,' or 'naked assertions' absent 'further factual enhancement,'" *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 390 (2d Cir. 2024), "especially when there may be an 'obvious alternative explanation,'" *Meyer v. Seidel*, 89

F.4th 117, 139 (2d Cir. 2023).  Applying this standard here, all six counts in the complaint must be dismissed.

## I.    THE COMPLAINT DOES NOT PLEAD A TVPA CLAIM

### A.    The Complaint Fails To Plead TVPA Participation Liability Under 18 U.S.C. § 1591(a)(2) (Count I)

In Count I, the complaint asserts TVPA participation liability (or, as the complaint labels it, "knowing beneficiary" liability) under 18 U.S.C. § 1591(a)(2).  To plead such a claim, the plaintiff must allege that the defendant (1) "participated in a commercial sex trafficking venture," (2) "kn[ew] (or recklessly disregarded) that force, fraud, or coercion would be used in the sex-trafficking venture," and (3) "benefited from its participation in the venture."  *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 405 (S.D.N.Y. 2023).  Failure to plausibly allege any one of these three elements subjects the claim to dismissal.  *See, e.g.*, *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 679-680 (S.D.N.Y. 2024) (dismissing TVPA participation claim for failure to plead benefit); *Eckhart v. Fox News Network, LLC*, 2021 WL 4124616, at *11 (S.D.N.Y. Sept. 9, 2021) (dismissing TVPA participation claim for failure to plead knowledge), *reconsidered in part on other grounds*, 2022 WL 4579121 (S.D.N.Y. Sept. 29, 2022).  The complaint in this case fails to plausibly allege all three of them.

#### 1.    The complaint does not allege facts showing BNY's participation in a sex-trafficking venture

With respect to the first element (participation), the complaint alleges—at most—that BNY merely provided "routine financial services to allegedly [Epstein]-connected customers," which is well short of what the law requires.  *Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329, 338 (S.D.N.Y. 2025).  Although "[t]he Second Circuit has not conclusively determined the meaning of 'participation'" under the TVPA, courts in this circuit and elsewhere have "generally required more than allegations of 'passive facilitation.'"  *Kitler v. Church of Jesus Christ of Latter-*

*Day Saints*, 2025 WL 2209870, at *12 (N.D.N.Y. Aug. 4, 2025). "[A]ssociation alone" is not enough. *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018). Neither is merely "turning a blind eye to trafficking that may occur." *Doe v. Grindr Inc.*, 128 F.4th 1148, 1155 (9th Cir. 2025). And allegations that a supposed beneficiary knew or should have known of a sex-trafficking venture, and then provided its normal routine business services, do not suffice. *See Mueller*, 777 F. Supp. 3d at 338-339; *Doe 1 v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024) ("something more than engaging in an ordinary buyer-transaction is required to establish 'participation'"). Instead, a plaintiff must plausibly allege that the defendant engaged in "specific conduct that furthered the sex trafficking venture"—that is, "some participation in the sex trafficking act itself." *Noble*, 335 F. Supp. 3d at 524.

The complaint here falls woefully short. The only "allegations" of non-routine or specialized services are nothing more than naked assertions that the Court need not credit. *See, e.g.*, *Francis*, 992 F.3d at 72. The complaint alleges that BNY "assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture" (Compl. ¶ 70) and that two Epstein associates "communicated with BNY directly in highly suspicious manners" (*id.* ¶ 63), but the complaint provides no factual enhancement whatsoever—nothing about the identities of the BNY employees or divisions that supposedly participated; the nature or substance of the communications (including what rendered them "highly suspicious"); the nature of the services that BNY supposedly provided; or the improper "financial structure" that was supposedly established. Indeed, even many of the allegations of normal business services are nothing more than conclusory statements: According to the complaint, BNY engaged in "affirmative conduct" by "opening up accounts at BNY for Epstein, his related entities, and associates" (*id.* ¶ 116), but

the complaint never provides even a scintilla of factual information about those supposed accounts. These threadbare, boilerplate statements are of no value on a motion to dismiss.

The minimal allegations about a line of credit to MC2 do not change the calculus. Those allegations identify only one type of service that BNY provided: a line of credit, which is exactly the sort of "routine financial service[]" that does not amount to TVPA "participation." *Mueller*, 777 F. Supp. 3d at 338. The complaint does not allege any facts suggesting that BNY "provided services or support that was tailored" to MC2 "in any way." *Id.*; *see Apple*, 96 F.4th at 415 (no participation where defendant was engaged in ordinary "arms-length transaction"); *Mia v. Kimberly-Clark Corp.*, 2025 WL 752564, at *4 (D.D.C. Mar. 10, 2025) (no participation where defendant was "alleged only to have provided [alleged trafficker] with off-the-shelf materials and machinery"); *Unknown Parties v. Google LLC*, 2024 WL 1892291, at *2 (N.D. Cal. Apr. 29, 2024) (no participation where "[t]he only allegation suggesting a business relationship" was "a standard advertising revenue agreement that [defendant] offer[ed] to many content creators"). Moreover, the complaint conveniently fails to mention that BNY sold the entity that provided the alleged line of credit almost *sixteen years* ago.[6] The alleged line of credit was also provided at least *two years before* Epstein pleaded guilty to prostitution charges and *many years before* any public allegations that MC2 was involved with Epstein's sex trafficking.

A similar analysis applies to the complaint's isolated allegation about the $378 million in transactions. Compl. ¶ 3. That paragraph alleges merely that BNY "processed" those payments— which appears to be a reference to the routine clearing or correspondent services that BNY provides for *other banks* involving the funds of *those banks'* customers. *See supra* p.4 & n.4. This

---

[6] *See* The Bank of New York Mellon Corporation, Annual Report (Form 10-K) (Feb. 26, 2010), at 11, available at https://www.bny.com/corporate/global/en/investor-relations/regulatory-filings.html ("MUNB [Mellon United National Bank] was sold on Jan. 15, 2010.").

stray allegation that BNY *processed* funds—a word carefully chosen by Plaintiff—does not give rise to a plausible inference that BNY itself had a direct relationship with Epstein or any Epstein-controlled entity, let alone the type of tailored relationship that would be required to plead anything other than non-actionable routine banking services.  Instead, there is an "obvious alternative explanation," *Meyer*, 89 F.4th at 139, which is that BNY provided routine clearing and correspondent services for *its* institutional customers; those institutional customers, in turn, are alleged to have transacted with Epstein-related funds.  Such an attenuated nexus cannot amount to "specific conduct that furthered the sex trafficking venture" or "participation in the sex trafficking act itself."  *Noble*, 335 F. Supp. 3d at 524.

*Mueller* is illustrative.  There, "[t]he complaint allege[d] that the defendants [a German bank and its American affiliate] earned commissions, fees, and interest from providing financial services to people and organizations that were assisting or controlled by ISIS."  777 F. Supp. 3d at 332.  In particular, the defendants purportedly "allow[ed] the transfer and laundering of proceeds from tax fraud schemes" and "provid[ed] dollar-clearing and other services to banks in areas of Iraq seized and controlled by ISIS."  *Id.* at 333.  The plaintiffs alleged that "these services allowed ISIS to access the legitimate, international financial system and obtain substantial funding … that it otherwise could not," which it then used to perpetrate various crimes.  *Id.* at 332.  These allegations were insufficient to establish participation under the TVPA because "nothing in the complaint suggest[ed] that the defendants provided anything other than routine financial services to allegedly AQI- or ISIS-connected customers, that the defendants shared in any common enterprise (and associate[d] risk or profit) with them, or that they provided services or support that was tailored to those customers in any way."  *Id.* at 338.  "Without having interacted with their allegedly ISIS-connected accountholders any more or differently than they would with their many

other customers, the defendants cannot be said to have 'taken part or shared in an enterprise or undertaking' with them." *Id.* (brackets omitted).  The same reasoning applies here.

Finally, the complaint's allegations that BNY "fail[ed] to follow AML [anti-money-laundering] requirements" and "failed to timely file required SARs [suspicious-activity reports]" are not plausible allegations of participation.  Compl. ¶¶ 117-118.  These vague and speculative assertions are entirely unsupported by any facts specific to BNY.  Indeed, the only AML-related allegations concern a consent order entered against another bank—*not* BNY.  *See id.* ¶ 63.  And as for SARs, the complaint "does not offer a single non-conclusory example of" such a filing, *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 398 (S.D.N.Y. 2019), much less provide facts about the timing of any such filing or the timing or nature of the underlying allegations.  Absent such facts, the complaint's conclusory accusation of delay cannot be credited. Moreover, even crediting the truth of these threadbare AML- or SAR-related assertions, they are not enough to plausibly allege participation:  The TVPA "does not require [defendants] to affirmatively stop or monitor trafficking," *B.C. v. G6 Hosp. Prop. LLC*, 2025 WL 1837620, at *4 n.3 (W.D. Wash. July 3, 2025), and "a plaintiff who merely alleges that the [defendant] failed to intervene, alert authorities, improve awareness, or prevent sexual exploitation insufficiently alleges direct participation in a venture," *Doe (K.E.C.) v. G6 Hosp., LLC*, 750 F. Supp. 3d 719, 734 (E.D. Tex. 2024); *see E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 427-428 (N.D. Tex. 2021) (allegations that defendants failed to "properly intervene" to prevent sex trafficking were insufficient); *Taylor v. CPLG FL Props. LLC*, 2024 WL 4825814, at *5 (M.D. Fla. Nov. 19, 2024) (same).

The allegations against BNY are noticeably, and importantly, different than allegations in prior cases that have been held sufficient at the pleading stage.  In 2022, alleged victims of Epstein

10

filed lawsuits against two financial institutions that had provided banking services to Epstein, seeking to hold those defendants "liable for their alleged facilitation of [] Epstein's sex crimes," and this Court dismissed certain of the claims but allowed others to proceed. *Doe 1*, 671 F. Supp. 3d at 396, 416-417. The complaints in those cases contained allegations that the banks "enabled Epstein to access the large quantities of cash that fueled his operation"; "assisted Epstein with 'structuring' his cash withdrawals so as to elude suspicion"; initiated "thousands of transactions … totaling more than $1 billion, including payments to dozens of women, often with Eastern European surnames"; and, through a subsidiary, "transported young women and girls from Florida to Epstein in New York, on the company's private jet." *Id.* at 397. There were also allegations that the banks "opened and funded more than 40 accounts" for Epstein and related entities; that Epstein used those accounts to "withdraw cash to pay off his victims and associates"; that Epstein "solicited [the bank's] advice about how to structure his withdrawals so as to evade notice"; and that "Epstein's personal attorney withdrew over $800,000 in cash on Epstein's behalf over a four-year period, on multiple occasions asking about the maximum amount that could be withdrawn without triggering a reporting requirement." *Id.* at 399-400. Crediting these allegations as true at the pleading stage as required by Rule 12(b)(6), this Court found that the complaints alleged conduct "beyond merely providing [the banks'] usual services." *Id.* at 406. Here, by contrast, there is not a single specific allegation of non-routine services provided by BNY.

### 2. The complaint does not allege facts showing that BNY had knowledge of a sex-trafficking venture

The complaint also fails to allege participation under § 1591(a)(2) because it does not allege that BNY possessed knowledge of a sex-trafficking venture. "To satisfy this element, it is not enough for the defendant to have only an abstract awareness of sex trafficking in general." *Doe 1*, 671 F. Supp. 3d at 406 (quotation marks omitted). "Instead, the defendant must have

known, or recklessly disregarded, that force, fraud, or coercion was used in the *particular* sex-trafficking venture that it is alleged to have participated in." *Id.*   Critically, the plaintiff must plausibly allege (at a minimum) that the defendant "'should have known' of sex trafficking, not merely that it 'might have been able to guess' about sex trafficking." *Doe (G.N.C.) v. Uniquest Hosp., LLC*, 2024 WL 4149251, at *3 (S.D.N.Y. Sept. 11, 2024); *accord S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020).   Thus, "[c]ases where a plaintiff has sufficiently pleaded a defendant's awareness of sex trafficking under the TVPA generally have involved allegations of warning signs of sex trafficking in particular." *Villalobos v. Telemundo Network Grp. LLC*, 2025 WL 2687948, at *4 (S.D.N.Y. Sept. 19, 2025).

The complaint here is entirely bereft of allegations that BNY knew or should have known about warning signs related to Epstein's alleged sex-trafficking venture.   There are no allegations that any "risk management division" within BNY "discussed … allegations against Epstein" or that any BNY personnel "prepared a memorandum which noted various risks posed by a relationship with … Epstein." *Doe 1*, 671 F. Supp. 3d at 398-399.   The complaint alludes to Know Your Customer ("KYC") obligations (Compl. ¶¶ 58-59), but fails to allege that BNY had a customer relationship with Epstein that would have given rise to those obligations with respect to him.  *See supra* pp.4, 7-9.   Moreover, even if such a relationship were plausibly alleged, the complaint fails to provide any facts suggesting that a KYC review would have uncovered a connection between any BNY-provided services and sex trafficking by Epstein.

Instead of providing those specific facts, the complaint asserts that "everyone"—not just BNY—"knew or should have known at least after 2006 that Epstein was running a sex-trafficking scheme" because at that point, Epstein had been arrested in Florida on a prostitution charge. Compl. ¶ 85; *see id.* ¶ 30.   While this broad conclusion may have some initial appeal with the

benefit of hindsight, it is unsupported by any factual allegations indicating universal, contemporaneous knowledge of ongoing sex trafficking simply by virtue of Epstein's arrest and his ultimate guilty plea approximately two years later on solicitation of prostitution charges. Prior criminal activity does not, standing alone, provide reason to be aware of *continuing* criminal activity in the future. And in any event, Epstein was not charged with (and did not plead guilty to) sex trafficking in 2008. *Supra* p.5. At most, the 2006 arrest and 2008 guilty plea could give rise to a "general awareness of sexual misconduct" by Epstein, which "is insufficient to establish the more specific awareness of sex trafficking that is required for a TVPA violation." *Villalobos*, 2025 WL 2687948, at *4.

The complaint's nominal discussion of MC2 does not fare any better. The complaint alleges that the business was run by someone other than Epstein, and it does not plead facts about any role Epstein played at all, let alone one that would or could have been uncovered by BNY. *See* Compl. ¶¶ 66-68. Although the complaint briefly references "press reports"—from unidentified sources and an unidentified time period—about how the agency "brought 'young girls … often from Eastern Europe'" to the United States (*id.* ¶ 91), there is no further factual enhancement suggesting that BNY had a customer relationship with Epstein during this unidentified time period, was aware of the unidentified press articles at that time, or knew or should have known that MC2's activities (by an entity conducting a seemingly legitimate business) amounted to sex trafficking involving "force, fraud, or coercion." *Doe 1*, 671 F. Supp. 3d at 406.

The allegations against BNY here are again nothing like allegations that were deemed sufficient to survive a motion to dismiss in prior cases. In those cases, banks were alleged to have "ignored numerous red flags associated with Epstein's accounts" that "suggested that … Epstein operated a sex-trafficking venture" and had been raised by internal risk-management departments.

*Doe 1*, 671 F. Supp. 3d at 407-408.  For example, "Epstein and/or his associates [were] alleged to have made significant cash withdrawals" from accounts "with no known payee." *Id.* at 398.  There were allegations that accounts "in the name of Epstein's affiliated charitable organizations made payments without a clear connection to this organizations' charitable purposes," including to "young women." *Id.*  And Epstein allegedly used his "accounts to send wire transfers to collaborators in his sex-trafficking operation," even after those "names and alleged collaborative activity had … been made public." *Id.* at 408.  On top of these allegations of red flags, the complaints also identified, by name, bank executives that were alleged to have personally "observed victims in Epstein's home." *Id.* at 407-408.  Here, no comparable warning signs are alleged against BNY, and not a single BNY officer or employee is identified in the complaint, much less alleged to have personally met with or even spoken with Epstein or observed suspicious activity.  Count I should be dismissed for failure to plausibly allege BNY's knowledge of Epstein's trafficking venture.

### 3. The complaint does not allege facts showing that BNY received any benefit in relation to a sex-trafficking venture

Even if the complaint had alleged plausible participation and knowledge, Count I still must be dismissed because it fails to allege that BNY "benefitted" from the alleged participation in a sex-trafficking venture.  The complaint does not contain a *single* non-conclusory allegation concerning a benefit to BNY.  The only allegations concerning supposed benefits are further examples of boilerplate statements entirely disconnected from BNY's alleged conduct.  *See* Compl. ¶¶ 100-101, 126.  For example, the complaint asserts that "[a]mong the financial benefits [BNY] received were the deposit of funds that Epstein and Epstein-controlled entities made to BNY" (*id.* ¶ 126; *see also id.* ¶ 101)—but there is no allegation that Epstein or his associates ever actually made any deposits at BNY.  Again, at most, the only services alleged to have been

provided by BNY are the line of credit to MC2 (with which Epstein had no alleged ownership or management role) at an unidentified period of time and the unspecified "process[ing] of transactions," neither of which would have entailed deposits at BNY by Epstein or his affiliates. *See supra* pp.4, 7-9. Likewise, the complaint makes the conclusory statement that BNY received benefits in the form of "connections with Jeffrey Epstein, his co-conspirators, and his wealthy friends and associates" (Compl. ¶ 101), but never actually identifies even one such "connection" or what that would mean in this context. These "naked assertions" unaccompanied by any "further factual enhancement" are not entitled to the assumption of truth and cannot be invoked to defeat a motion to dismiss. *City of Pontiac*, 92 F.4th at 390. On that basis alone, Count I fails to plausibly allege the benefit element.

But even if these generic statements could be considered, they are insufficient to state a claim. To satisfy the benefit element, courts have consistently held that there must be plausible allegations of "a causal relationship between affirmative conduct furthering the sex-trafficking venture and [the defendant's] receipt of a benefit." *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169-170 (S.D.N.Y. 2019); *see also, e.g.*, *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 644 (9th Cir. 2025); *Jones v. Combs*, 2025 WL 896829, at *9 (S.D.N.Y. Mar. 24, 2025); *Corradino v. Liquidnet Holdings Inc.*, 2021 WL 2853362, at *4 (S.D.N.Y. July 8, 2021). Under this standard, it is not enough to allege that the defendant's connection to the sex trafficker "generated revenue" of some kind. *Weiss*, 383 F. Supp. 3d at 169-170. Rather, the benefits allegedly received must themselves bear a "relationship to the alleged sex and labor trafficking venture." *Levin*, 747 F. Supp. 3d at 679.

Here, even if the complaint's vague, conclusory statements were credited, they would not give rise to a plausible inference that BNY received benefits *because of* Epstein's alleged sex-

trafficking venture.  At its most specific, the complaint generically asserts that "BNY earned interest, commissions, service fees and other financial benefits directly from its connection with Epstein."  Compl. ¶ 100.  That is precisely the kind of standard revenue that courts have consistently held does not satisfy the TVPA benefit requirement.  For example, in *Grindr*, the complaint "allege[d] that Grindr turned a blind eye to sex trafficking on [Grindr's] App and generally benefitted from sex traffickers' use of the App."  128 F.4th at 1156.  Yet the complaint "d[id] not plausibly allege that Grindr benefitted from the alleged sex trafficking beyond generally receiving advertising revenues," and it did not "causally connect Grindr's advertising revenues with any affirmative conduct by Grindr that furthered the sex-trafficking venture alleged in this case."  *Id.* at 1155-1156.  Likewise, in *Geiss*, the Weinstein Company "undoubtedly benefited" because Harvey Weinstein's "movies and influence generated revenue," some of which flowed to the company's officers and directors.  383 F. Supp. 3d at 169-170.  But the complaint still failed because it did not plausibly allege that any of those benefits were provided to the Weinstein Company because of its facilitation of Weinstein's sexual misconduct.  *Id.*  And in *Levin*, the complaint alleged that the defendant college "benefitted from payment of tuition, including housing, for what it knew and should have known was a sex and labor trafficking venture," yet there was no allegation "that the tuition payments and housing fees … charged bore any relationship to the alleged … venture."  747 F. Supp. 3d at 679.  The complaint failed, in other words, to plausibly allege that the college "would not have received those payments in the absence of the alleged sex or labor trafficking."  *Id.*

The exact same reasoning applies here.  At most, BNY is alleged to have provided limited banking services to entities that bore some connection to Epstein, and to have received standard market compensation for those services.  As in *Grindr*, *Geiss*, and *Levin*, there is no basis to infer

that BNY would not have received this alleged compensation in the absence of the sex-trafficking venture. That is yet another reason this case is different than *Doe 1*, where the allegations, taken as true, were deemed sufficient at the pleading stage. In those cases, the Court relied upon allegations that the bank's "relationship with Epstein" was so extensive and "lucrative" that "it would lose a lot of money if it fired Epstein as [a] client." *Doe 1*, 671 F. Supp. 3d at 408. Another bank was alleged to have "establish[ed] accounts for entities affiliated with Jeffrey Epstein, not personal accounts in Epstein's name, to help conceal both [the bank's] participation in Epstein's sex-trafficking venture and the existence of that venture." *Id.* The allegations here against BNY are not remotely similar. Count I should be dismissed.

### B. The Complaint Fails To Plead TVPA Perpetrator Liability Under 18 U.S.C. § 1591(a)(1) (Count II)

In Count II, the complaint asserts that BNY itself committed sex trafficking, in violation of 18 U.S.C. § 1591(a)(1). This outlandish claim should be readily dismissed. A "direct perpetrator" for purposes of § 1591(a)(1) "is someone who knowingly 'recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits' an underage person to engage in a commercial sex act or does the same to an adult by means of force, fraud, or coercion." *Doe 1*, 671 F. Supp. 3d at 409-410. There are no factual allegations whatsoever that BNY engaged in such conduct. The complaint baselessly asserts that "BNY knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Jane Doe," Compl. ¶ 137, but that kind of "[t]hreadbare recital[] of the elements … do[es] not suffice," *Iqbal*, 556 U.S. at 678. Nor is it enough for the complaint to state that "BNY intentionally paid for" and "facilitated … Epstein's violations" of the statute. Compl. ¶ 139. Even if that conclusory statement were accepted as true (and it should not be), an allegation that a bank provided access to an individual's or entity's own money that was then *used by others* to recruit sex-trafficking

victims "do[es] not make [the bank itself] the recruiter" in violation of § 1591(a)(1).  *Doe 1*, 671 F. Supp. 3d at 410.  Because it contains no allegations that BNY itself was a direct perpetrator of sex trafficking, this claim must be dismissed.

### C.    The TVPA Does Not Provide For Aiding-And-Abetting Liability (Count III)

The Court may easily dispatch with Count III as well.  That count seeks to hold BNY liable as an aider and abettor of Epstein's alleged sex-trafficking violations.  As this Court has previously (correctly) held, "[t]he TVPA does not provide civil liability for aiding and abetting," because "neither the text nor the legislative history of the TVPA indicates that Congress intended to provide civil liability for aiding and abetting a violation."  *Doe 1*, 671 F. Supp. 3d at 411.  To the contrary, "aspects of the TVPA's legislative history suggests that Congress had the opposite intention: Congress specifically rejected defining 'participation in a venture'—which would entail civil liability—so as to include aiding and abetting."  *Id.*  Against this backdrop, "aiding and abetting liability should not be read into" the TVPA's silence.  *Id.*  Count III should be dismissed.

### D.    The Complaint Fails To Plead TVPA Obstruction (Count IV)

In Count IV, the complaint asserts that BNY "knowingly and intentionally obstructed … the enforcement of the" TVPA, in violation of 18 U.S.C. § 1591(d).  Compl. ¶ 165.  As a threshold matter, this claim is subject to dismissal because the TVPA does not provide a private right of action for obstruction.  The "[c]ivil remedy" provision states (in relevant part) that "a victim of a violation of this chapter may bring a civil action against *the perpetrator*" or "whoever *knowingly benefits … from participation* in a venture."  18 U.S.C. § 1595(a) (emphasis added).  The provision never mentions "obstruction," indicating that Congress did not intend to authorize civil liability for such conduct.  *See, e.g.*, *Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 439 (2023) ("We assume that Congress 'acts intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another section of the same Act.'").  Moreover, even if the

statute did mention obstruction, the cognizable "victim" of obstruction would be the "government—the entity 'enforcing' the criminal penalties." *Doe v. Fitzgerald*, 2022 WL 425016, at *4 (C.D. Cal. Jan 6, 2022) (TVPA does not provide private plaintiffs a right of action for obstruction).

In any event, to the extent a private cause of action for obstruction did exist, the claim here would fail on the merits. Obstruction requires plausible allegations of two elements: The defendant must (1) know of an effort to enforce the TVPA and (2) intentionally obstruct or attempt to obstruct that enforcement effort. *See United States v. Farah*, 766 F.3d 599, 612 (6th Cir. 2014); *Doe 1*, 671 F. Supp. 3d at 409. The complaint here does not allege either requirement.

First, the complaint never alleges that BNY "knew of investigations into Jeffrey Epstein's sex-trafficking operation." *Doe 1*, 671 F. Supp. 3d at 409. The complaint makes the conclusory statement that "BNY chose not to cooperate with law enforcement and other investigations into Epstein's sex trafficking at any time," Compl. ¶ 73, but nowhere does it allege that BNY actually *knew* about any ongoing investigation or was ever approached by law enforcement relating to Epstein in any way. The complaint references the investigation resulting in Epstein's 2006 arrest and 2008 non-prosecution agreement, but that investigation took place before an obstruction provision was even added to the TVPA. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 222(b)(5), 122 Stat. 5044, 5069. And the Second Circuit has already held that those 2008 TVPA amendments do not apply retroactivity to conduct preceding their enactment. *Velez v. Sanchez*, 693 F.3d 308, 324-325 (2d Cir. 2012). Regardless, the allegations about the 2006 investigation are wholly deficient. The complaint asserts that "[w]hen the U.S. Attorney's Office entered into th[e] non-prosecution agreement with Epstein, it had not received reports from BNY about Epstein, nor did BNY provide any other

assistance in the investigation." Compl. ¶ 31. But the complaint fails to allege that, prior to Epstein's 2006 arrest, BNY (1) had any connection whatsoever to Epstein, (2) knew or should have (or even could have) known about Epstein's misdeeds, or (3) knew about an active criminal investigation. BNY hardly could have provided assistance to an investigation that it did not know about, concerning a person with whom it had no association, about misdeeds of which it had no awareness. Likewise, although the complaint mentions the later criminal investigation that resulted in Epstein's 2019 federal indictment, *id.* ¶ 167, it does not allege that BNY was informed of that investigation before the indictment or any time thereafter. That is fatal to Plaintiff's obstruction claim.

Second, the complaint fails to plausibly allege that BNY "intentionally obstruct[ed] or attempt[ed] to obstruct" a known law-enforcement effort. *Kitler*, 2025 WL 2209870, at *19 (citing *Doe 1*, 671 F. Supp. 3d at 409). The closest the complaint gets is its statement that BNY "purposefully and deliberately failed to timely file required Suspicious Activity Reports," Compl. ¶¶ 71, 170-171, but this naked assertion does not suffice. As previously noted (*supra* p.10), the complaint "does not offer a single non-conclusory example of" a SAR that was supposedly filed in an untimely fashion, *Arcadia Biosciences*, 356 F. Supp. 3d at 398, nor does it contain any concrete allegations supporting the inference that any such filing really *was* untimely, or that any delay in filing was purposeful or deliberate. Again, the complaint is bereft of any factual allegations about the timing of any SARs, or the timing or nature of the transactions at issue. Absent such factual allegations, there is no basis to infer that BNY engaged in obstruction, and Count IV must be dismissed.

## II.    The Complaint Fails To Plead Negligence (Counts V and VI)

Although they are labeled as distinct causes of action, Counts V and VI are both grounded in theories of negligence, and they both fail for the same reasons:  They are time-barred, and they fail on the merits.

### A.    Any Negligence Claim Is Time-Barred

To start, Counts V and VI are barred by the three-year statute of limitations applicable to negligence claims.  N.Y. C.P.L.R. § 214(5); *see, e.g.*, *C.L. v. County of Oneida*, 212 N.Y.S.3d 533, 540 (Sup. Ct. 2024) ("causes of action for negligence … are subject to three-year statutes of limitations").  Under New York law, a negligence claim "for personal injuries … accrues at the time of injury."  *Barrell v. Glen Oaks Vill. Owners, Inc.*, 814 N.Y.S.2d 276, 277 (App. Div. 2006).  By definition, "the time of injury" in this case was outside the three-year limitations period because even the last possible time of injury—Epstein's death—was over six years ago.  The complaint asserts in a footnote that "any statute of limitations is tolled," Compl. ¶ 7 n.5, but "the doctrine of equitable tolling is not available in state causes of action in New York," *Jang Ho Choi v. Beautri Realty Corp.*, 22 N.Y.S.3d 431, 452 (App. Div. 2016).  And even if tolling were available, the complaint's contention that "BNY strategically and fraudulently covered up its conduct" (Compl. ¶ 7 n.5) is entirely unsupported by any factual allegations.  Accordingly, the complaint has not "plead[ed] facts sufficient to warrant equitable tolling."  *Tesla Wall Sys., LLC v. Related Cos., L.P.*, 2017 WL 6507110, at *8 (S.D.N.Y. Dec. 18, 2017).  For that reason, Counts V and VI should be dismissed.

### B.    The Complaint Does Not Allege Facts Suggesting That BNY Owed A Duty To Plaintiff

Even if Counts V and VI were timely, they would still fail to state a negligence claim.  To successfully plead negligence under New York law, a plaintiff must plausibly allege "(1) a duty

owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Doe 1*, 671 F. Supp. 3d at 414 (quoting *Solomon ex rel. Solomon v. City of New York*, 489 N.E.2d 1294, 1294 (N.Y. 1985)). Here, the complaint does not plausible allege that BNY owed any duty that it could have breached or that any such breach proximately caused an injury to Plaintiff.

New York law "does not impose a duty to control the conduct of third persons to prevent them from causing injury to others." *Purdy v. Pub. Adm'r of Westchester*, 526 N.E.2d 4, 8 (N.Y. 1988). In particular, it is well established that "banks and other financial institutions do not owe non-customers a duty to protect them from the intentional torts of their customers." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 126 (2d Cir. 2013) (brackets omitted). Narrow exceptions to New York's default rule are occasionally recognized in "extraordinary circumstances," *Wang v. TD Ameritrade Holding Corp.*, 216 N.Y.S.3d 885, 2024 WL 4020044, at *2 (Sup. Ct. July 24, 2024), and this Court held in *Doe 1* that banks may owe a duty to non-customers when they "provide nonroutine services," 671 F. Supp. 3d at 414 (citing *Elmaliach v. Bank of China Ltd.*, 971 N.Y.S.2d 504, 517 (App. Div. 2013)). Here, however, there are no plausible allegations that BNY provided such non-routine services.

As explained (*supra* pp.7-9), the complaint identifies only two services that BNY allegedly provided: (1) a line of credit to MC2 (with which Epstein had no alleged ownership or management role); and (2) the "process[ing] of transactions." Each is a textbook example of a routine banking service. In cases involving similar alleged services, courts applying New York law have consistently held that no duty was owed to non-customers. The Second Circuit recognized, for example, that a correspondent bank did not owe a duty to non-customers when it was alleged to have "facilitat[ed] … wire transfers" concerning funds that were later used in terrorist attacks.

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 156-158 (2d Cir. 2012). Likewise, another court in this district held that a bank could not "be held liable for the wrongdoing of its patron based solely on the allegations that the patron utilized the banking and financial services offered to all bank customers." *In re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d 494, 518 (S.D.N.Y 2010), *aff'd*, 714 F.3d 118 (2d Cir. 2013). And the Second Department ruled that a bank owed no duty to non-customer plaintiffs when the bank was alleged solely to have "maintained accounts" for customers whose actions the banks allegedly "knew or should have known … were fraudulent." *Winkler v. Battery Trading, Inc.*, 934 N.Y.S.2d 199, 200-202 (App. Div. 2011). The reasoning in these decisions applies with equal force here.

The allegations in this case are materially different from the alleged conduct in *Doe 1*, where other banks were alleged to have (among other things) "enabled Epstein to access the large quantities of cash that fueled his operation" and advised him "about how to structure his withdrawals so as to evade notice." 671 F. Supp. 3d at 397, 399. The Court held that this alleged conduct—entirely absent from the complaint here—established a plausible inference that the banks were engaged in non-routine services and had a duty to non-customers. *See id.* at 406, 415. The allegations in this case are also distinguishable from *Bank of China*, the case on which *Doe 1* relied when recognizing that the provision of non-routine services may give rise to a duty to non-customers. In *Bank of China*, the defendant's alleged customers were designated terrorists that were subject to "worldwide economic sanctions intended to prevent [them] from conducting banking activities that would help finance their attacks," and the defendant was "allegedly one of a few banks worldwide that [did] not enforce the … sanctions." 971 N.Y.S.2d at 509. Government officials allegedly warned the defendant that these transfers "were being made … for the purpose of carrying out terrorist attacks" and "demanded [that the defendant] stop the wire transfers." *Id.*

Yet the defendant "continued to carry out these wire transfers" for at least another eighteen months. *Id.* Based on those allegations, the First Department rejected the argument that the bank was engaged in merely "'routine' banking services." *Id.* at 517. Suffice it to say, the complaint here does not include plausible allegations that BNY provided comparable support to Epstein, or that it ever received notice of such support from anyone.

Finally, the complaint's references to KYC practices, AML laws, and SARs do not establish that BNY had a duty to non-customers. Compl. ¶¶ 202-203, 205. To the extent SARs were filed, the existence of a potentially suspicious transaction alone does not suggest that the financial services provided in connection with the transaction were non-routine. Moreover, as already discussed (*supra* pp.10, 12), the complaint does not allege any facts suggesting that BNY failed to file SARs on a timely basis or that it failed to follow KYC or AML requirements. And even if there were such allegations, they would not give rise to a duty to non-customers on their own—absent plausible additional allegations of non-routine services. As *Bank of China* recognized, mere "noncompliance with banking laws and industry standards alone will not render a bank negligently liable" simply by virtue of "monies passing through the bank during the performance of routine banking services." 971 N.Y.S.2d at 517 (quoting *Licci v. Am. Express Bank Ltd.*, 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010)). Because that is, at most, what is plausibly alleged here, the complaint does not adequately plead a duty owed by BNY to non-customers like the Plaintiff. For that reason, Counts V and VI should be dismissed.

### C.    The Complaint Does Not Plausibly Allege That BNY Proximately Caused Plaintiff's Injuries

Even if the complaint alleged a plausible duty owed by BNY to Plaintiff, Counts V and VI would still fail for failure to plead proximate cause. "When an alleged injury is caused by an intervening criminal act, such as sexual abuse, the defendant's conduct is a proximate … cause

only when that intervening act is 'a *natural and foreseeable consequence* of a circumstance created by the defendant.'" *Doe 1*, 671 F. Supp. 3d at 414-415 (emphasis added) (quoting *Hain v. Jamison*, 68 N.E.3d 1233, 1236-1237 (N.Y. 2016)). The allegations here do not plausibly indicate that Plaintiff's injuries were a foreseeable consequence of the services that BNY allegedly provided. The factual allegations in the complaint do not plausibly suggest that BNY was "a primary or even relatively significant source" of financial services to Epstein, which in and of itself casts significant doubt on the "causal chain." *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 294 (S.D.N.Y. 2009). Nor are there allegations of non-routine or tailored services to Epstein, such that BNY knew or should have known they were being used to further criminal activity. *Supra* pp.6-10. And there are no allegations of other facts that would have raised red flags that BNY's services were being used to further crimes. *Supra* pp.5, 13-14. Thus, to the extent there is any causal connection whatsoever between BNY's conduct and Plaintiff's injuries, the connection was not foreseeable. The complaint accordingly does not plausibly allege proximate cause and, for that reason as well, Counts V and VI should be dismissed.

## CONCLUSION

The complaint should be dismissed with prejudice.

Dated:  November 13, 2025

Respectfully submitted,

*/s/ Felicia H. Ellsworth*
Felicia H. Ellsworth (*pro hac vice pending*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
felicia.ellsworth@wilmerhale.com

Boyd M. Johnson III
Christopher Bouchoux
Andres C. Salinas
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888
boyd.johnson@wilmerhale.com
christopher.bouchoux@wilmerhale.com
andres.salinas@wilmerhale.com

*Attorneys for The Bank of New York Mellon Corporation*

## **CERTIFICATE OF COMPLIANCE**

I, Felicia H. Ellsworth, hereby certify pursuant to Local Civil Rule 7.1(c) that the

foregoing memorandum of law was prepared using Microsoft Word and complies with Rule 2(e)

of this Court's Individual Rules and Local Civil Rule 7.1(c).


*/s/ Felicia H. Ellsworth*
Felicia H. Ellsworth