**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, <br><br>     Plaintiff, <br><br>       v. <br><br> BANK OF AMERICA, N.A., <br><br>     Defendant. | Case No. 25-cv-8520 (JSR) |
| JANE DOE, individually and on behalf of all others similarly situated, <br><br>     Plaintiff, <br><br>       v. <br><br> THE BANK OF NEW YORK MELLON CORP., <br><br>     Defendant. | Case No. 25-cv-8525 (JSR) |

**PLAINTIFF JANE DOE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT BANK OF NEW YORK MELLON CORP.'s MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................... 4

ARGUMENT ..................................................................................................................................... 8

   I. DOE HAS PROPERLY PLED CLAIMS UNDER THE TVPA ......................................... 8

      A. The Complaint States a Claim for TVPA Participation Liability (Count I). ............... 9

         1. BNY Participated in Epstein's Sex-Trafficking Venture ................................. 9

         2. BNY Knew or Should Have Known About Epstein's Sex-Trafficking Venture ..................................................................................................................... 12

         3. BNY Benefitted from its Participation in Epstein's Sex-Trafficking Venture ..................................................................................................................... 14

      B. The Complaint States a Claim for Obstruction of TVPA Enforcement. ................... 16

   II. DOE HAS PROPERLY PLED HER NEGLIGENCE CLAIMS ...................................... 18

      A. Doe's Negligence Claims Are Not Time-Barred ........................................................ 18

      B. The Complaint States Two Claims for Negligence (Counts V–VI). .......................... 21

         1. The Complaint Sufficiently Alleges BNY Owed Doe a Duty of Care. .......... 21

         2. The Complaint Sufficiently Alleges That BNY Proximately Caused Doe's Injuries. ................................................................................................................. 24

CONCLUSION ................................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ardolf v. Weber*,
  332 F.R.D. 467 (S.D.N.Y. 2019)................................................................. 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................. 8

*B.C. v. G6 Hosp. Prop. LLC*,
  2025 WL 1837620 (W.D. Wash. July 3, 2025)....................................... 12

*Bensky v. Indyke*,
  743 F. Supp. 3d 586 (S.D.N.Y. 2024)............................................... 8, 18

*Canosa v. Ziff*,
  2019 WL 498865 (S.D.N.Y. Jan. 28, 2019)............................................. 8

*Childers v. New York & Presbyterian Hosp.*,
  36 F. Supp. 3d 292 (S.D.N.Y. 2014)..................................................... 19

*City of Almaty v. Sater*,
  503 F. Supp. 3d 51 (S.D.N.Y. 2020)................................................ 19, 20

*Cogliati v. Ecco High Frequency Corp.*,
  92 N.J. 402, 456 A.2d 524 (1983).......................................................... 6

*Corradino v. Liquidnet Holdings Inc.*,
  2021 WL 2853362 (S.D.N.Y. July 8, 2021) .......................................... 15

*Doe (G.N.C.) v. Uniquest Hosp., LLC*,
  2024 WL 4149251 (S.D.N.Y. Sept. 11, 2024)....................................... 14

*Doe (K.E.C.) v. G6 Hosp., LLC*,
  750 F. Supp. 3d 719 (E.D. Tex. 2024) .................................................. 11

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024) ............................................................... 12

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
  671 F. Supp. 3d 387 (S.D.N.Y. 2023)............................................. passim

*Doe 1 v. Twitter, Inc.*,
  148 F.4th 635 (9th Cir. 2025)................................................................ 16

*Doe v. Indyke*,
  465 F. Supp. 3d 452 (S.D.N.Y. 2020).................................................... 10

*E.S. v. Best W. Int'l, Inc.,*
    510 F. Supp. 3d 420 (N.D. Tex. 2021) ................................................................ 12

*Elmaliach v. Bank of China Ltd.,*
    110 A.D.3d 192 (1st Dep't 2013) ........................................................................ 22

*Francis v. Kings Park Manor, Inc.,*
    992 F.3d 67 (2d Cir. 2021) .................................................................................. 10

*G.G. v. Salesforce.com, Inc.,*
    76 F.4th 544 (7th Cir. 2023) ............................................................................... 11

*Geiss v. Weinstein Co. Holdings LLC,*
    383 F. Supp. 3d 156 (S.D.N.Y. 2019) ................................................................ 15

*Gen. Stencils, Inc. v. Chiappa,*
    18 N.Y.2d 125 (1966) ......................................................................................... 19

*Goldberg v. UBS AG,*
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................................ 25

*Harris v. City of New York,*
    186 F.3d 243 (2d Cir. 1999) ................................................................................ 19

*In re Arqit Quantum Inc. Sec. Litig.,*
    774 F. Supp. 3d 505 (E.D.N.Y. 2025) .................................................................. 5

*In re Nine W. Shoes Antitrust Litig.,*
    80 F. Supp. 2d 181 (S.D.N.Y. 2000) .................................................................. 20

*In re S. Afr. Apartheid Litig.,*
    617 F. Supp. 2d 228 (S.D.N.Y. 2009) ................................................................ 18

*In re Terrorist Attacks on Sept. 11, 2001,*
    740 F. Supp. 2d 494 (S.D.N.Y. 2010) ................................................................ 23

*Kashef v. BNP Paribas S.A.,*
    925 F.3d 53 (2d Cir. 2019) .................................................................................... 8

*Langston v. MFM Contracting Corp.,*
    172 A.D.3d 583 (1st Dep't 2019) ........................................................................ 19

*Lelchook v. Commerzbank AG,*
    2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011) ..................................................... 25

*Levin v. Sarah Lawrence Coll.,*
    747 F. Supp. 3d 645 (S.D.N.Y. 2024) ................................................................ 16

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012) ................................................................................. 23

*Licci v. Am. Exp. Bank Ltd.*,
    704 F. Supp. 2d 403 (S.D.N.Y. 2010) ................................................................. 23

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ................................................................. 25

*Local No. 4, Intl. Assn. of Heat & Frost & Asbestos Workers v. Buffalo Wholesale Supply Co.,
    Inc.*,
    49 A.D.3d 1276 (4th Dep't 2008) ....................................................................... 18

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) ............................................................... 11

*Mueller v. Deutsche Bank Aktiengesellschaft*,
    777 F. Supp. 3d 329 (S.D.N.Y. 2025) ................................................................. 12

*Ortiz v. Cornetta*,
    867 F.2d 146 (2d Cir. 1989) ................................................................................. 19

*Rahman v. Schriro*,
    22 F. Supp. 3d 305 (S.D.N.Y. 2014) ..................................................................... 4

*Robinson v. Foster*,
    2019 WL 6608842 (W.D.N.Y. Dec. 5, 2019) ........................................................ 4

*Rothstein v. UBS AG*,
    647 F. Supp. 2d 292 (S.D.N.Y. 2009) ................................................................. 25

*S.E.C. v. Jones*,
    2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006) ..................................................... 20

*S.J. v. Choice Hotels Int'l, Inc.*,
    473 F. Supp. 3d 147 (E.D.N.Y. 2020) ................................................................. 14

*Schumacher v. Richards Shear Co.*,
    59 N.Y.2d 239 (1983) ............................................................................................. 6

*Simcuski v. Saeli*,
    44 N.Y.2d 442 (1978) ........................................................................................... 19

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ................................................................................... 4

*Taylor v. CPLG FL Props. LLC*,
    2024 WL 4825814 (M.D. Fla. Nov. 19, 2024) ................................................... 12

*Tesla Wall Sys., LLC v. Related Companies, L.P.*,
   2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017)........................................................ 21

*Villalobos v. Telemundo Network Grp. LLC*,
   2025 WL 2687948 (S.D.N.Y. Sept. 19, 2025) ...................................................... 14

*Wang v. Enlander*,
   2018 WL 1276854 (S.D.N.Y. Mar. 6, 2018) ........................................................ 18

*Wei Su v. Sotheby's, Inc.*,
   490 F. Supp. 3d 725 (S.D.N.Y. 2020)................................................................... 19

## Statutes

18 U.S.C. § 1591 ..................................................................................................... 3

18 U.S.C. § 1595 ................................................................................................... 16

18 U.S.C. § 1956 ..................................................................................................... 6

18 U.S.C. §§ 1581–97 ........................................................................................... 16

## Rules

Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010) ................................ 21

## Other Authorities

60 MINUTES: *American Girls in Paris* (aired Dec. 23, 1988) ...................................... 7

Alex Woodward, *Top Democrat demands Trump's IRS investigate Epstein bank records in
   sprawling probe: 'Follow the money'*, The Independent (Jul. 31, 2025), https://www.the-
   independent.com/news/world/americas/us-politics/epstein-bank-records-ron-wyden-leon-
   black-b2799888.html.............................................................................................. 3

Conchita Sarnoff, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, THE DAILY BEAST
   (Jul. 22, 2010) (Updated Jul. 17, 2025)  https://www.thedailybeast.com/jeffrey-epstein-
   pedophile-billionaire-and-his-sex-den/ .................................................................... 7

*Doe v. Epstein*, No. 08-cv-80893 (S.D. Fla. 2008), Sworn Statement of Maritza Vasquez (MC2
   financial controller) (Jun. 15, 2010) (available at
   https://s3.documentcloud.org/documents/25966082/maritza-vasquez-deposition-ocrmypdf.pdf)
   ................................................................................................................................ 7

Federal Financial Institutions Examination Council, *Assessing Compliance With BSA Regulatory
   Requirements: Due Diligence Programs for Correspondent Accounts for Foreign Financial
   Institutions*, BSA/AML Manual (last accessed Nov. 25, 2025),
   https://bsaaml.ffiec.gov/manual/AssessingComplianceWithBSARegulatoryRequirements/10
   ("BSA/AML Manual")............................................................................................ 4

Federal Financial Institutions Examination Council, BSA/AML Examination Manual — Risks Associated with Money Laundering and Terrorist Financing (Apr. 2020), https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/01_ep .................................................................................................................................. 4

*FinCEN Assesses Record $1.3 Billion Penalty against TD Bank* (Oct. 10, 2024), https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-billion-penalty-against-td-bank.......................................................................................................................... 23

*Jeffrey Epstein Accuser Virginia Roberts Giuffre Testifies Against Modeling Agent*, NBC NEWS (June 16, 2021), https://www.nbcnews.com/news/world/jeffrey-epstein-accuser-virginia-roberts-giuffre-testifies-against-modeling-agent-n1270959 ...................................................... 8

Jon Swaine & Paul Lewis, *Modelling scout to take legal action over claims linking him to Jeffrey Epstein*, https://www.theguardian.com/us-news/2015/feb/06/modelling-scout-jean-luc-brunel-jeffrey-epstein (Feb. 6, 2015).......................................................................................... 7

Matthew Goldstein, *In Epstein Case, Follow the Money, Democratic Senator Says*, N.Y. TIMES (Jul. 17, 2025), https://www.nytimes.com/2025/07/17/business/epstein-banks-wyden-trump.html ................................................................................................................................ 20

Michele Dargan, *Lawsuit documents link Jeffrey Epstein to modeling agency owner Jean Luc Brunel*, PALM BEACH DAILY NEWS (Updated Apr. 1, 2012), https://www.palmbeachdailynews.com/story/news/2012/04/01/lawsuit-documents-link-jeffrey-epstein/9662207007/ .............................................................................................................. 7

NY State Department of Financial Services, *Deutsche Bank Consent Order* (Jul. 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf ........................................................................................................................ 23

U.S. House Committee on Oversight and Government Reform, *Letter from Rep. Robert Garcia to the U.S. Department of Justice Regarding Giuffre Information* (Oct. 22, 2025), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-10-22.garcia-to-doj-re-giuffre-info.pdf . 7

U.S. House of Representatives Committee on the Judiciary, *Letter to BNY Mellon CEO Robin Vince from Representative Raskin* (Oct. 8, 2025), https://fm.cnbc.com/applications/cnbc.com/resources/editorialfiles/2025/10/08/2025-10-08Raskin_to_Vince_BNY_Mellon_re_Epstein_1.pdf............................................................. 20

U.S. Senate Committee on Finance, *Letter to Attorney General Bondi from Senator Wyden* (Jul. 21, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj_-_follow_the_money_on_jeffrey_epstein_7-21-25pdf.pdf .......................................................... 2

U.S. Senate Committee on Finance, *Memorandum to Senator Wyden* (Nov. 19, 2025), https://www.finance.senate.gov/imo/media/doc/memorandum_to_senator_wyden_on_jpmc-epstein_redactedpdf.pdf ................................................................................................... 3

U.S. Treasury Financial Crimes Enforcement Network, *Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries*, FIN-2006-G009 (May 10, 2006), https://www.fincen.gov/resources/statutes-regulations/guidance/application-regulations-requiring-special-due-diligence-0 ....................... 4

*Understanding Lines of Credit: Usage, Risks, and Benefits*, Investopedia (Updated Nov. 4, 2025), https://www.investopedia.com/articles/personal-finance/072913/basics-lines-credit.asp6

Virginia Roberts Giuffre, Nobody's Girl: A Memoir of Surviving Abuse and Fighting for Justice (2025)................................................................................................................. 7

Plaintiff Jane Doe ("Plaintiff" or "Doe") submits this memorandum of law in opposition to Defendant Bank of New York Mellon Corporation ("BNY")'s Motion to Dismiss the Complaint.

## PRELIMINARY STATEMENT

BNY suggests that it never "provided *any* services *to* Epstein," and argues that it could not be held liable for "a person with whom it had no association, about misdeeds of which it had no awareness." ECF No. 30 ("Mot.") at 1, 20. Such factual assertions concerning BNY's conduct and knowledge, however, are improper on a motion to dismiss, where the Court must accept Doe's factual allegations as true. The statement that BNY provided no services to Epstein whatsoever, however, is frankly impossible given that it has already been widely reported (based on public statements from sitting U.S. Senators, Congressmen, and their staff) that BNY filed suspicious-activity reports ("SARs") *after* Jeffrey Epstein's arrest in 2019 describing $378 million in transactions relating to his sex-trafficking ring. If, as alleged, BNY had contemporaneous knowledge that it was executing hundreds of millions of dollars' worth in payments from Epstein and his affiliates to victims, then it is at least a question of fact whether BNY should have filed SARs describing those same exact transactions during the years in which they could have prevented further abuse, as opposed to only after Epstein's arrest.

The remainder of BNY's motion relies on the meritless arguments that Doe was required to detail in her Complaint facts that the bank continues to conceal even today, and that banks cannot be liable if they only service sex traffickers as "correspondent" or "clearing" banks. But the Complaint sufficiently alleges that BNY had a direct banking relationship with MC2 as far back as 2006 (Epstein's joint venture with Jean-Luc Brunel), that it "processed $378 million in payments to women trafficked by Jeffrey Epstein," and that it failed to timely report suspicious activity or otherwise prevent Epstein's continued abuse. Compl. ¶¶ 2, 3, 67. Even in its purported

1

role as a correspondent or clearing bank—services banks provide for profit—BNY had full visibility into who was sending the money and who was receiving the money for each transaction that it ultimately reported as connected to Epstein's crimes.

BNY's dealings with Jeffrey Epstein "went well beyond merely providing their usual services." *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 406 (S.D.N.Y. 2023) (Rakoff, J.) ("*Deutsche Bank/JP Morgan*") (denying banks' motions to dismiss). For years, BNY provided the funding, financial support, and complicity necessary to run Epstein's international sex-trafficking operation. BNY knowingly sustained Epstein's sex-trafficking operation by, among other things, providing financial support to Epstein and his co-conspirators, processing and clearing $378 million of payments to women trafficked by Epstein (including those located in Eastern European countries), maintaining banking relationships with entities used to facilitate sex-trafficking, failing to timely file required SARs with the federal government, failing to follow anti-money laundering and reporting laws, and providing special treatment to Epstein and his co-conspirators. Compl. ¶¶ 3, 18, 116–18. For its services to Epstein, BNY earned substantial profits.

Recent U.S. government investigations into Epstein's sex-trafficking venture uncovered more than $1 billion in transactions "that flowed in and out of Epstein's accounts" at large financial institutions.[1] Treasury Department records show that between 2003 and 2019, "there were more than 4,725 wire transfers totaling $1.08 billion involving Jeffrey Epstein and his associates, including Darren Indyke, Harry Beller, Richard Kahn and Erika Kellerhals." Wyden Letter, at 1. These transactions included "wire transfers from wealthy figures over the sales of artwork, fees

---

[1] U.S. Senate Committee on Finance, *Letter to Attorney General Bondi from Senator Wyden* (Jul. 21, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj_-_follow_the_money_on_jeffrey_epstein_7-21-25pdf.pdf ("Wyden Letter"), at 2.

paid to Epstein, and payments to several women."[2] Newly unsealed documents confirm that Epstein wired $7.4 million from his BNY account to convicted sex trafficker Ghislaine Maxwell's account at JP Morgan Chase.[3] While BNY's failure to file required SARs—and refusal to produce any if they exist—has obscured the true scope of its role, this existing information shows that BNY cannot credibly deny its involvement.

On behalf of herself and a class of Epstein victims, Doe alleges that BNY knowingly benefitted from participating in Epstein's sex-trafficking venture, in violation of the Trafficking Victims' Protection Act, 18 U.S.C. § 1591, *et seq.* ("TVPA"), and that it negligently failed to exercise reasonable care as a banking institution providing non-routine banking services.

In response, BNY insists that it was not involved in Epstein's sex trafficking, asserting that "a central aspect" of its business is providing clearing, custody, correspondent, and fund transfer services for other financial institutions. Mot. at 4. Even assuming that is true, BNY fails to explain how merely being a clearing or correspondent bank absolves it of liability. According to the Bank Secrecy Act ("BSA")/Anti-Money Laundering ("AML") Manual, U.S. banks providing correspondent services are obligated to conduct due diligence, including "[a]ssessing the [money-laundering] risks presented by" the correspondent account based on "relevant factors"; applying "risk-based procedures and controls reasonably designed to detect and report known or suspected [money-laundering] activity"; and, under certain circumstances, establishing enhanced due diligence procedures "when a correspondent account is established, maintained, administered, or

---

[2] Alex Woodward, *Top Democrat demands Trump's IRS investigate Epstein bank records in sprawling probe: 'Follow the money'*, The Independent (Jul. 31, 2025), https://www.the-independent.com/news/world/americas/us-politics/epstein-bank-records-ron-wyden-leon-black-b2799888.html.
[3] U.S. Senate Committee on Finance, *Memorandum to Senator Wyden* (Nov. 19, 2025), https://www.finance.senate.gov/imo/media/doc/memorandum_to_senator_wyden_on_jpmc-epstein_redactedpdf.pdf ("Wyden Memo"), at 18.

managed in the United States for foreign banks."[4] These enhanced procedures include "tak[ing] reasonable steps to obtain information relevant to assess and mitigate [money laundering] risks associated with the foreign bank's correspondent accounts for other foreign banks." *See* BSA/AML Manual. Clearing banks must maintain a risk-based AML program to monitor businesses, including "policies, procedures, and controls to monitor and mitigate the money laundering risk of the business introduced to it and to detect and report suspicious activity attempted at or conducted through the clearing firm."[5] Given the sheer volume of the $378 million in payments for sex trafficking believed to have been sent through BNY, it cannot seriously suggest that its purported role as a correspondent or clearing absolves it of liability for the operation it helped fund. Correspondent bank or not, the TVPA does not provide a safe harbor for financial institutions that knowingly enable and conceal sex trafficking.

## FACTUAL BACKGROUND[6]

For years, BNY knowingly and intentionally participated in Jeffrey Epstein's sex-

---

[4] *See* Federal Financial Institutions Examination Council, BSA/AML Examination Manual — Risks Associated with Money Laundering and Terrorist Financing (Apr. 2020), https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/01_ep; Federal Financial Institutions Examination Council, *Assessing Compliance With BSA Regulatory Requirements: Due Diligence Programs for Correspondent Accounts for Foreign Financial Institutions*, BSA/AML Manual (last accessed Nov. 25, 2025), https://bsaaml.ffiec.gov/manual/AssessingComplianceWithBSARegulatoryRequirements/10 ("BSA/AML Manual").

[5] *See* U.S. Treasury Financial Crimes Enforcement Network, *Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries*, FIN-2006-G009 (May 10, 2006), https://www.fincen.gov/resources/statutes-regulations/guidance/application-regulations-requiring-special-due-diligence-0.

[6] The Court is permitted to consider news coverage, government publications, and other matters of public records. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (explaining that courts may take judicial notice of press coverage and prior actions in deciding issue of notice); *Rahman v. Schriro*, 22 F. Supp. 3d 305, 311 (S.D.N.Y. 2014) ("[T]he Court is permitted to take judicial notice of United States government publications."); *Robinson v. Foster*, 2019 WL 6608842, at *3 (W.D.N.Y. Dec. 5, 2019) ("Courts may take judicial notice of public documents or matters of public record."). The Court is also permitted to consider "statements or

trafficking venture by (among other things) providing the essential financial underpinnings for the venture. Compl. ¶ 64. From its inception until Epstein's subsequent arrest and death in 2019, Epstein's sex-trafficking venture operated primarily by means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause girls and young women (like Doe) to engage in commercial sex acts and commit sexual offenses against them. *Id.* ¶ 24. Epstein's sex-trafficking venture was not possible without the assistance and complicity of financial institutions—specifically, banks—to provide special treatment to Epstein, his co-conspirators, and the sex-trafficking venture, thereby ensuring its continued operation. *Id.* ¶ 18. Specifically, Epstein needed a reliable bank that would provide the necessary legitimate appearance for his operation, allow him to open accounts for illegitimate companies, ignore red flags and banking laws, permit him to transfer money without question, and otherwise knowingly facilitate his sex-trafficking venture. *Id.* ¶ 62. For Epstein, BNY was one of those banks, clearing hundreds of millions of dollars in suspicious transactions including to victims in the United States and abroad. *Id.* ¶ 3.

Rather than merely providing routine banking services to Epstein, BNY assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture. *Id.* ¶ 70. It also failed to follow routine banking practices of reviewing Epstein-related accounts against the backdrop of the public information outing him as a serial sex abuser and reporting Epstein for running what was obviously a sex-trafficking operation. *Id.* ¶ 71. For example, BNY purposely and deliberately failed to timely file required SARs for Epstein's suspicious activities. *Id.*

BNY also maintained a banking relationship with MC2, a "modeling agency" established

documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," including the Wyden Letter. *See In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 520 n.10 (E.D.N.Y. 2025) (treating news article as incorporated into complaint).

by Epstein and another known sexual abuser, Jean-Luc Brunel. *Id.* ¶¶ 66–67. The company name referred to the math equation "E=MC2," where "E" stood for Epstein. *Id.* ¶ 66. In reality, MC2 functioned as a front through which Epstein and Brunel recruited new victims with promises of modeling careers before sexually abusing and trafficking them. *Id.* BNY extended a line of credit to MC2, providing Epstein and Brunel the ready cash to bankroll their trafficking operation.[7] *Id.* ¶¶ 67, 91. Brunel and others affiliated with Epstein's sex-trafficking venture drew on this line of credit to carry out sex crimes, which Epstein's virtually unlimited wealth could easily replenish. Undoubtedly, the transactions between MC2, Brunel, and Epstein constitute textbook money laundering. *See* 18 U.S.C. § 1956.[8]

BNY knowingly extended MC2 a line of credit despite public reports indicating that Epstein and Brunel used MC2 to bring "young girls . . . often from Eastern Europe" to the United States on Epstein's private jets. Compl. ¶ 91. In the 1980s, *60 Minutes* exposed Brunel's sex crimes, reporting that Brunel used his position in the fashion industry to drug and sexually assault

---

[7] A line of credit is a revolving loan that allows businesses or individual borrowers to access funds as needed up to a certain limit. Stephen D. Simpson, *Understanding Lines of Credit: Usage, Risks, and Benefits*, Investopedia (Updated Nov. 4, 2025), https://www.investopedia.com/articles/personal-finance/072913/basics-lines-credit.asp. Borrowers can borrow up to that limit multiple times as the funds are repaid. *Id.*

[8] Improperly relying on evidence and facts outside the pleadings, BNY asserts that it sold the entity that provided the MC2 line of credit. Mot. at n.3. Even assuming the Court could consider this argument, it is irrelevant. The general rule is that a seller corporation cannot avoid liability for its tortious misconduct by hiding behind the sale of its assets. *Cogliati v. Ecco High Frequency Corp.*, 92 N.J. 402, 456 A.2d 524 (1983) (recognizing that predecessor remains liable for dangerous sidewalk condition it created or maintained after transfer of property); *see also Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 244 (1983) (recognizing that general rule is that liability is not transferred to successors absent certain exceptions). Second, even if BNY later sold the entity responsible for the MC2 line of credit, that sale does not absolve BNY of its own obligations under the BSA and related regulations or of its knowledge of the red flags associated with Epstein and his related entities.

young women with modeling aspirations,[9] and by 2010, public court documents[10] and reports detailed how Epstein and Brunel used MC2 to lure young women and girls into Epstein's sex-trafficking ring.[11] Yet BNY continued servicing MC2, placing profit over its regulatory duties to monitor and report the sex-trafficking activity it was enabling.

In 2019, Brunel was arrested in France for sex trafficking related to his relationship with Epstein and, like Epstein, was found hanging in his cell from an apparent suicide. *Id.* ¶ 68. As Virginia Giuffre recounted in her posthumous memoir, Epstein boasted that Brunel had sent him "more than a thousand girls," including "three French twelve-year-olds," and that Brunel dispatched "'talent' scouts to Brazil to recruit young girls from soccer fields for Epstein."[12] In June 2021, Giuffre bravely provided testimony in Paris, France during Brunel's criminal trial about his

---

[9] *See* 60 MINUTES: *American Girls in Paris* (aired Dec. 23, 1988).

[10] *Doe v. Epstein*, No. 08-cv-80893 (S.D. Fla. 2008), Sworn Statement of Maritza Vasquez (MC2 financial controller) (Jun. 15, 2010) (available at https://s3.documentcloud.org/documents/25966082/maritza-vasquez-deposition-ocrmypdf.pdf).

[11] Conchita Sarnoff, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, THE DAILY BEAST (Jul. 22, 2010) (Updated Jul. 17, 2025) https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/ ("Perhaps most disturbing, in terms of possible sex trafficking, was Epstein's relationship with Jean Luc Brunel, owner of the MC2 modeling agency. According to a complaint filed in the U.S. District Court for the Southern District of Florida, an alleged victim said that Epstein, Maxwell, Brunel [and others] 'deliberately engaged in a pattern of racketeering that involved luring minor children through MC2, mostly girls under the age of 17, to engage in sexual play for money.'"); *see also* Michele Dargan, *Lawsuit documents link Jeffrey Epstein to modeling agency owner Jean Luc Brunel*, PALM BEACH DAILY NEWS (Updated Apr. 1, 2012), https://www.palmbeachdailynews.com/story/news/2012/04/01/lawsuit-documents-link-jeffrey-epstein/9662207007/ (reporting that Epstein provided financial support to MC2 and that Epstein and Brunel would bring underage girls from "all over the world" and would house the girls in Epstein's New York condos); Jon Swaine & Paul Lewis, *Modelling scout to take legal action over claims linking him to Jeffrey Epstein*, https://www.theguardian.com/us-news/2015/feb/06/modelling-scout-jean-luc-brunel-jeffrey-epstein (Feb. 6, 2015) (summarizing claims that Brunel supplied "his friend Jeffrey Epstein with underage girls").

[12] U.S. House Committee on Oversight and Government Reform, *Letter from Rep. Robert Garcia to the U.S. Department of Justice Regarding Giuffre Information* (Oct. 22, 2025), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-10-22.garcia-to-doj-re-giuffre-info.pdf (citing VIRGINIA ROBERTS GIUFFRE, NOBODY'S GIRL: A MEMOIR OF SURVIVING ABUSE AND FIGHTING FOR JUSTICE (2025)).

participation in Epstein's sex-trafficking operation in June 2021.[13] Over years of servicing MC2 and other Epstein-related entities or accounts, BNY processed $378 million in payments to women trafficked by Epstein. *Id.* ¶ 3.

## ARGUMENT

The Court should deny BNY's motion to dismiss Doe's claims. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face . . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). The Court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019). Drawing all reasonable inferences in Doe's favor, as the Court must at this juncture, BNY has failed to demonstrate that Doe has failed to state a claim.

## I.      DOE HAS PROPERLY PLED CLAIMS UNDER THE TVPA

The TVPA provides a civil cause of action for sex-trafficking victims against those who, like BNY, participate in a sex-trafficking venture. Section 1595 of the TVPA, as a remedial provision, should be liberally construed. *See, e.g.*, *Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019); *Canosa v. Ziff*, 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019). Moreover, because this remedial provision "doesn't distinguish between different violations," "if the complaint plausibly alleges one violation, the § 1595 claim survives." *Bensky v. Indyke*, 743 F. Supp. 3d 586, 599 (S.D.N.Y. 2024).

---

[13] Jessica Murray, *Jeffrey Epstein Accuser Virginia Roberts Giuffre Testifies Against Modeling Agent*, NBC NEWS (June 16, 2021), https://www.nbcnews.com/news/world/jeffrey-epstein-accuser-virginia-roberts-giuffre-testifies-against-modeling-agent-n1270959.

### A.  The Complaint States a Claim for TVPA Participation Liability (Count I).

The elements of a participation liability claim under § 1591(a)(2) are: (1) "the defendant must have participated in a commercial sex-trafficking venture;" (2) "the defendant must have known (or recklessly disregarded) that force, fraud, or coercion would be used in the sex-trafficking venture;" and (3) "the defendant must have benefited from its participation in the venture." *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 405. Doe has alleged these elements.

#### 1.  BNY Participated in Epstein's Sex-Trafficking Venture.

BNY incorrectly asserts that Count I should be dismissed because the Complaint alleges only passive facilitation through routine banking services. Mot. at 6. The Complaint, however, alleges far more than "passive facilitation."

The Complaint contains specific factual allegations that BNY participated in Epstein's sex-trafficking venture. Among other detailed factual allegations, the Complaint alleges that BNY: (1) processed $378 million in payments to women trafficked by Epstein, Compl. ¶ 3; (2) provided banking services to MC2, a company financed by Epstein and Brunel to facilitate Epstein's sex-trafficking scheme, *id.* ¶¶ 66–68; (3) failed to carry out the required due diligence, including failing to timely file necessary SARs, *id.* ¶¶ 71–72; and (4) chose not to cooperate with law enforcement and other investigations into Epstein's sex-trafficking venture, *id.* ¶ 73. BNY's actions and intentional omissions directly enabled and concealed Epstein's sex-trafficking venture.

This Court recently found similar allegations by another Epstein victim against Deutsche Bank sufficient to survive a motion to dismiss. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 396. There, the Court held that the plaintiff sufficiently stated that Deutsche Bank had participated in Epstein's sex-trafficking venture where she alleged that Deutsche Bank facilitated and concealed cash withdrawals by Epstein and his affiliates, failed to implement oversight, allowed dozens of transfers to Epstein's known co-conspirators. *Id.* at 406.

9

Contrary to BNY's argument (Mot. at 10–11), this case is analogous to *Deutsche Bank/JP Morgan*. Here, Doe alleges that BNY continuously and knowingly carried out transfers in the amount of $378 million paid to Epstein's trafficking victims and provided financial services to Epstein affiliates, including Brunel and MC2. Compl. ¶¶ 3, 66–67. Further, to avoid notifying regulators, BNY ignored various red flags and failed to file the necessary SARs, concealing the sex-trafficking venture. *Id*. ¶¶ 71–73.

BNY incorrectly asserts that Doe's claim must be dismissed because she does not identify the specific BNY employees that communicated with Epstein's associates or assisted in opening BNY accounts for Epstein and his affiliates. Mot. at 7. This argument also fails. The Complaint alleges far more than account openings, including that BNY carried out millions of dollars in transfers, provided financial services that allowed Epstein to fund his sex-trafficking venture through MC2, and failed to file the requisite SARs. *See* Compl. ¶¶ 3, 66–67. Doe need not plead the level of specificity BNY demands at this stage. *See Doe v. Indyke*, 465 F. Supp. 3d 452, 465 (S.D.N.Y. 2020) ("While, the Amended Complaint does not identify which specific employees took the action . . . Defendants point to no authority suggesting that such specificity is required under Fed. R. Civ. P. 8(a)."). BNY does not identify any authority imposing such a heightened pleading standard. Instead, BNY relies on *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021), a civil rights discrimination case.

Next, BNY cherry picks allegations in the Complaint to argue that Doe has only alleged that BNY provided "routine financial services," including opening a line of credit and processing transactions. Mot. at 7–10. BNY's argument ignores critical context alleged in the Complaint. Chiefly, that BNY maintained a banking relationship with MC2, a "modeling agency" established by Epstein and Brunel—both of whom had been accused and convicted of sex crimes before and

during their relationship with BNY. Compl. ¶¶ 66–67. Epstein and Brunel used MC2 to recruit new victims with promises of modeling careers before sexually abusing and trafficking them. *Id.* ¶ 66. The Complaint further alleges that BNY maintained its banking relationship with MC2 despite public reports indicating that Epstein and Brunel used MC2 to traffic young girls. *Id.* ¶ 91. These allegations exceed the realm of "routine financial services." *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 396; *see also M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970–71 (S.D. Ohio 2019) (denying motion to dismiss participation claim because complaint alleged "a pattern of conduct or [that defendant] could be said to have a tacit agreement" to participate in sex-trafficking venture); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 558–64 (7th Cir. 2023) (finding participation in trafficking venture where defendant provided support and software to a website that hosted prostitution ads).

BNY incorrectly argues that Doe fails to allege that BNY provided "services or support that was tailored to MC2" and offers only "conclusory" allegations of oversight and reporting failures. Mot. at 8–10. But BNY ignores that extending MC2 a line of credit, coupled with its failures to implement the requisite oversight, its disregard of serious red flags, and its failure to file required SARs, constitutes the provision of tailored services to MC2. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 405–06 (concluding plaintiffs' allegations that banks engaged in financial relationships with Epstein and affiliates despite knowledge of his crimes, ignored red flags, and failed to implement oversight or file SARs sufficient to constitute TVPA participation).

BNY's own case, *Doe (K.E.C.) v. G6 Hosp., LLC*, 750 F. Supp. 3d 719, 735 (E.D. Tex. 2024), belies BNY's position and bolsters Doe's TVPA participation claim. There, the court declined to dismiss the plaintiff's TVPA participation claim because the plaintiff alleged that the hotel franchisee participated in the sex-trafficking venture. *Id.* at 735–36.

BNY's remaining cases are readily distinguishable in that the plaintiffs failed to allege sufficient facts to state participation under Sections 1591 and 1595. For example, in *B.C. v. G6 Hosp. Prop. LLC*, 2025 WL 1837620, at *6 (W.D. Wash. July 3, 2025), the court dismissed a participation claim because the plaintiff failed to allege facts supporting a sex-trafficking venture as opposed to commercial sex work.[14] *See also Doe 1 v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024) (dismissing TVPA participation claim because complaint alleged only that the defendants engaged in arms-length transactions); *Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329, 338–39 (S.D.N.Y. 2025) (concluding bank did not participate in venture due to lack of allegations that bank tailored services); *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 427–28 (N.D. Tex. 2021); *Taylor v. CPLG FL Props. LLC*, 2024 WL 4825814, at *5 (M.D. Fla. Nov. 19, 2024) (finding hotel did not participate in venture where it was not legally obligated to implement anti-trafficking policies, and it provided rooms and Wi-Fi). Here, BNY does not—and cannot— dispute that Doe has alleged the existence of Epstein's sex-trafficking venture.

> 2.  BNY Knew or Should Have Known About Epstein's Sex-Trafficking Venture.

BNY's argument that Doe has failed to allege that it knew or recklessly disregarded that Epstein and his co-conspirators were operating a sex-trafficking operation is without merit. The Complaint sufficiently alleges BNY's knowledge and reckless disregard of Epstein's trafficking venture. The Complaint alleges BNY maintained a relationship with Brunel and MC2, a purported modeling agency financed by Brunel and Epstein, since as early as 2006. Compl. ¶ 67. By this

---

[14] Even if *B.C.* was factually analogous to this case, there, the court relied on reasoning this Court has expressly rejected. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 408 ("the Court is not convinced that the benefit element should be read" as requiring a showing that "received revenue from Jeffrey Epstein and his affiliated entities *in exchange for* their furtherance of Epstein's sex-trafficking venture.").

time, both Epstein and Brunel had been exposed for their sex crimes. *Id.* ¶¶ 30–31, 64–68, 82–90; *see* n.10–11 *supra*. Indeed, the Complaint alleges that in 2006, Epstein was arrested after law enforcement discovered that he had sexually abused more than 30 children. *Id.* at ¶ 30. The government concluded that Epstein and his co-conspirators had committed federal crimes constituting violations of the TVPA. *Id.* at ¶ 31. Likewise, in 1988, Brunel was exposed for using his position in the fashion industry to drug and sexually abuse young women. *See* p. 7 & n.9 *supra*. Epstein's association with MC2 was highly publicized since as early as 2010 when it was reported that "[p]erhaps most disturbing, in terms of possible sex trafficking, was Epstein's relationship with Jean Luc Brunel, owner of the MC2 modeling agency . . . an alleged victim said that Epstein, [assistant and girlfriend Ghislaine] Maxwell, Brunel . . . lur[ed] minor children through MC2 . . . to engage in sexual play for money." *See* n.11 *supra*. In the aggregate, these allegations show that BNY knew or recklessly disregarded that Epstein was operating a sex-trafficking venture and using BNY to do so. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 407.

Citing to *Deutsche Bank/JP Morgan*, BNY incorrectly argues that Doe fails to allege it had knowledge of Epstein's sex-trafficking venture because she does not allege that "any 'risk management division' within BNY 'discussed . . . allegations against Epstein.'" Mot. at 12. But this Court did not require such allegations, noting that allegations that JP Morgan "was aware of Epstein's convictions for sex crimes and ignored numerous red flags associated with Epstein's accounts" "***alone are sufficient***" to show knowledge. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 407 (emphasis added). Here too, Doe has alleged BNY's knowledge of Epstein's convictions, Brunel's sex crimes, and their use of MC2 as a front to carry out their crimes.

BNY incorrectly asserts that Doe fails to allege that it had knowledge of MC2's connection to Epstein. Mot. at 13. The Complaint clearly alleges that press reports during the time BNY

extended a line of credit to MC2 connected it to Epstein and Brunel. Compl. ¶ 91. Further, public court documents, which the court may consider at this posture, reveal that one witness testified that BNY had knowledge of Epstein's connection to MC2 and would not extend the line of credit unless Epstein executed documents connected to MC2's BNY account. *See supra* n.10.

BNY's cases therefore are easily distinguishable, as they involve no similar allegations of knowledge. *See Doe (G.N.C.) v. Uniquest Hosp., LLC*, 2024 WL 4149251, at *4 (S.D.N.Y. Sept. 11, 2024) (concluding that hotel lacked knowledge of sex-trafficking venture because merely providing management services at "low priced hotels" is insufficient); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) (holding hotels lacked knowledge of trafficking because plaintiff alleged only general awareness of occasional trafficking); *Villalobos v. Telemundo Network Grp. LLC*, 2025 WL 2687948, at *3–4 (S.D.N.Y. Sept. 19, 2025) (explaining that general allegations of a pattern of sexist conduct, including ignoring accusations, was insufficient to suggest knowledge of sex trafficking).

3.  <u>BNY Benefitted from its Participation in Epstein's Sex-Trafficking Venture.</u>

BNY also wrongly asserts that the Complaint fails to allege that it knowingly benefitted from its participation in Epstein's sex-trafficking venture. Mot. at 14–17. BNY contends that any alleged benefit it received is disconnected from BNY's alleged conduct. Not so.

The Complaint alleges that BNY benefitted from its participation in Epstein's trafficking venture by: (1) fostering connections with Epstein, his co-conspirators, and wealthy friends and associates; (2) obtaining additional deposits from Epstein and affiliates; and (3) the opportunity to earn financial benefits from the funds that had been deposited with it. Compl. ¶ 101. These benefits are connected to BNY's alleged misconduct. Indeed, by processing millions of dollars used to fund Epstein's sex-trafficking venture, *id.* ¶ 3, ignoring Epstein's activities through MC2, *id.* ¶¶ 66–69, and failing to file the required SARs, *id.* ¶ 72, BNY directly contributed and concealed Epstein's

sex-trafficking venture, *id.* ¶ 74 ("With BNY's complicity, Epstein was free to sexually abuse hundreds of women without the fear of detection by law enforcement."). The Complaint further alleges that BNY placed the benefits it reaped from its participation in Epstein's venture over compliance with banking laws (and Epstein's victims' safety). *Id.* ¶ 75.

BNY incorrectly argues that Doe's claim fails because she does not allege "a causal relationship between affirmative conduct furthering the sex-trafficking venture and [the defendant's] receipt of a benefit." Mot. at 15. But this Court has already rejected this exact argument. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 408 (casting doubt as to whether a causal relationship is required to plead the benefit element of a TVPA participation claim). Even if that was the standard, the Complaint satisfies it. Indeed, Doe alleges that BNY ignored red flags about Epstein, Brunel, and MC2 because it knew that retaining them as clients was more financially valuable than exposing them for their crimes. Compl. ¶¶ 70–76; *see Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 408 ("Doe expressly alleges that JP Morgan chose to ignore warnings that Epstein was involved in sex-trafficking because JP Morgan understood that it would lose a lot of money if it fired Epstein as client," and "Deutsche Bank overlooked warnings that Epstein was involved in sex-trafficking because of the 'number of sizable deals' that DB obtained through its relationship with . . . Epstein.").

BNY's cited cases are inapposite in that a benefit was not sufficiently alleged. *See, e.g.*, *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) ("[P]articipation giving rise to the benefit must be participation *in a sex-trafficking venture*, not participation in other activities that do not further the sex-trafficking a venture."); *Corradino v. Liquidnet Holdings Inc.*, 2021 WL 2853362, at *3 (S.D.N.Y. July 8, 2021) (dismissing TVPA participation claim because even if "the sexual harassment Plaintiff experienced amounts to a 'sex act,' there is no

indication that such acts were commercial, meaning in exchange *for something of value*"); *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 679 (S.D.N.Y. 2024) (dismissing TVPA complaint because it did not "allege that the tuition payments and housing fees SLC charged bore any relationship to the alleged sex and labor trafficking venture."); *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 642–44 (9th Cir. 2025) (concluding Twitter did not benefit from TVPA venture by receiving general "financial gain" from misconduct). By contrast, Doe has alleged that BNY's benefits are directly tied to its misconduct, namely, the preservation of lucrative financial relationships with wealthy individuals, including Epstein, Brunel, and MC2.

### B. The Complaint States a Claim for Obstruction of TVPA Enforcement.

BNY's arguments for dismissal of Count IV, obstruction of TVPA enforcement, likewise fail. BNY asserts that obstruction is not actionable under the TVPA's "civil remedy" provision, 18 U.S.C. § 1595(a), and that even if it were, the only "victim" of such obstruction is the government. Mot. at 18–20. But Congress has explicitly provided a statutory cause of action for "a violation of this chapter," *i.e.*, Chapter 77, 18 U.S.C. §§ 1581–97, expanding the civil remedy from a prior version, which applied only to "a violation of section 1589, 1590, or 1591 of this chapter." *Compare* 18 U.S.C. § 1595(a) *with* 18 U.S.C. § 1595(a) (Dec. 19, 2003 to Dec. 22, 2008). Consistent with that reading, this Court recognized a civil claim for obstruction of TVPA enforcement in *Deutsche Bank/JP Morgan*, holding "the 'victims' of one who obstructs the enforcement of the TVPA include not just the government, but . . . those who suffered harm because the government's enforcement efforts were hindered." 671 F. Supp. 3d at 409 (allowing TVPA obstruction claim to proceed). This includes sex-trafficking victims who were directly and proximately harmed, which is exactly what Doe alleges here. Compl. ¶ 178.

BNY also incorrectly contends that the Complaint fails to allege that BNY knew about a government investigation, or that it intentionally obstructed or attempted to obstruct such

16

investigation. Mot. at 19–20. But the Complaint specifically alleges BNY knew of several criminal investigations being pursued in both the Southern District of Florida and this District against Epstein, and that it intentionally chose not to report suspicious activities or cooperate with such investigations because it knew it would be exposed as assisting Epstein's scheme. *Id.* ¶¶ 30–32, 37–38, 71–73, 82–95, 167, 176. These allegations are more than sufficient to establish BNY's knowledge and intent and parallel the allegations this Court already found adequate to sustain a TVPA obstruction claim. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 409 (denying motion to dismiss TVPA obstruction claims where plaintiffs alleged banks knew of investigations into Epstein's sex-trafficking operation and failed to file SARs to frustrate such investigations").

As another example of BNY's obstruction, the Complaint alleges BNY knowingly failed to follow AML and anti-structuring reporting requirements under the BSA and other laws. Compl. ¶ 170. These obligations required BNY to review transactions in Epstein's (and his associates') BNY accounts for suspicious activities. *Id.* ¶¶ 55–60, 170. BNY knowingly did not follow these requirements because it knew that doing so would have prevented secret cash transactions critical to Epstein's sex-trafficking operation from escaping the notice of federal investigative and prosecuting agencies. *Id.* ¶ 170.

BNY's reliance on allegations regarding Epstein's 2006 arrest and 2008 non-prosecution agreement to manufacture a retroactivity concern is a strawman. Mot. at 19. Doe specifically alleges conduct occurring after the 2008 TVPA amendments, including BNY's financing of Epstein's sex-trafficking organization and knowing failures to file SARs and comply with AML and structuring obligations—failures that delayed federal investigators who ultimately brought Epstein's July 8, 2019 indictment. Compl. ¶¶ 167–73. While BNY argues that the Complaint does not allege that BNY was informed of the investigation before the indictment, it is enough for Doe

17

to "simply allege facts that . . . give rise to an inference of knowledge." *Bensky*, 743 F. Supp. 3d at 597. Taken together, Doe's allegations plausibly give rise to an inference that BNY was aware of ongoing government investigations.[15]

## II.    DOE HAS PROPERLY PLED HER NEGLIGENCE CLAIMS

### A.  Doe's Negligence Claims Are Not Time-Barred.

BNY's argument that Doe's negligence claims are untimely is premature at the motion to dismiss stage. Assessing timeliness here would require resolving factual issues that are improper prior to discovery. *See, e.g.*, *Local No. 4, Intl. Assn. of Heat & Frost & Asbestos Workers v. Buffalo Wholesale Supply Co., Inc.,* 49 A.D.3d 1276, 1278 (4th Dep't 2008) ("[T]he question of whether a defendant should be equitably estopped is generally a question of fact."); *see also Bensky*, 743 F. Supp. 3d at 602. As courts in this Circuit have repeatedly held, "when plaintiffs raise an equitable tolling argument, a court must deny a motion to dismiss based on the statute of limitations 'unless all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that this statute was tolled.'" *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 287 (S.D.N.Y. 2009); *Wang v. Enlander*, 2018 WL 1276854, at *4 (S.D.N.Y. Mar. 6, 2018) ("[A] claim may be dismissed based on the statute of limitations only if it is clear on the face of the complaint that the claim is untimely as a matter of law.") (citation omitted).

Because timeliness is an affirmative defense, BNY bears the burden of proving that Doe's claims are untimely, and Doe need not anticipate or plead around it. *See Childers v. New York &*

---

[15] Doe is mindful that this Court previously dismissed TVPA perpetrator liability and aiding-and-abetting a violation of the TVPA claims with similar allegations to those alleged here. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 410–12. However, because the TVPA's remedial provision "doesn't distinguish between different violations," Doe respectfully submits that Counts II and III should survive because the Complaint plausibly alleges at least one form of liability under the TVPA. *See Bensky*, 743 F. Supp. 3d at 599 (declining to dismiss individual TVPA claims where plaintiff alleged at least one violation).

*Presbyterian Hosp.*, 36 F. Supp. 3d 292, 301 (S.D.N.Y. 2014). A motion to dismiss based on timeliness "should not be granted unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (emphasis in original); *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999) ("dismissal is appropriate only if a complaint clearly shows the claim is out of time").

Doe has adequately pleaded that BNY should be estopped from asserting any statute of limitations defense to her negligence claims. Equitable estoppel prevents a defendant from invoking a statute of limitations defense where the plaintiff was "induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli*, 44 N.Y.2d 442, 449 (1978). Equitable estoppel applies where the defendant affirmatively conceals the cause of action, including the defendant's "involvement or identity in particular wrongdoing." *Wei Su v. Sotheby's, Inc.*, 490 F. Supp. 3d 725, 730 (S.D.N.Y. 2020); *Gen. Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 128 (1966) (equitable estoppel applies where the defendant's affirmative wrongdoing is "carefully concealed"); *see also Langston v. MFM Contracting Corp.*, 172 A.D.3d 583 (1st Dep't 2019) (finding "evasiveness in response to plaintiffs' requests for information" to be "an affirmative act of concealment that could give rise to equitable estoppel").

*City of Almaty v. Sater* is illustrative. In that case, the district court declined to dismiss various state law claims as untimely. 503 F. Supp. 3d 51, 67–68 (S.D.N.Y. 2020). The plaintiffs there alleged that although the defendants received stolen funds in 2012 and 2013, the plaintiffs were unable to uncover the wrongdoing until 2017 because of the defendants' "overarching strategy to obscure the source of the funds," specific "misrepresentations designed to evade detection," and other efforts to hide defendant's "role in the transaction" and receipt of the funds "from public view." *Id.* at 63, 67. The court found that these allegations were "enough at the

pleading stage to plausibly support the application of equitable estoppel." *Id.* at 67.

The same reasoning applies here. As the Complaint details, BNY affirmatively concealed its role in Epstein's sex-trafficking operation by failing to timely file required SARs, violating numerous banking laws and regulations, failing to implement enhanced monitoring of Epstein to conceal its involvement in Epstein's venture, providing services to avoid leaving a visible "paper trail," and failing to report or investigate the financial activity flowing through accounts related to Epstein, his entities, or his associates. Compl. ¶¶ 3, 71–72, 79, 121–23. These affirmative acts of concealment, much like the conduct in *Almaty*, prevented the public, law enforcement, regulators, and victims (including Doe) from uncovering BNY's involvement until only recently.[16]

Indeed, Doe was not privy to the facts that have only recently been revealed. *Id.* ¶ 7 n.5.[17] That BNY failed to file timely SARs for hundreds of millions of dollars in Epstein-related transactions was first reported on July 17, 2025.[18] These facts were unknown to anyone other than the handful of people at BNY who were involved in covering up the elaborate financial infrastructure that kept Epstein's sex-trafficking operation continuing for decades.

---

[16] Alternatively, because BNY's failures to investigate and file suspicious activity reports for Epstein-related transactions were inherently self-concealing, Doe "need not plead any affirmative actions by" the Bank. *S.E.C. v. Jones*, 2006 WL 1084276, at *6 (S.D.N.Y. Apr. 25, 2006); *see also In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (alleged price-fixing scheme was inherently self-concealing such that "plaintiff is not required to show defendants took independent affirmative steps to conceal their conduct"). Indeed, the fact that it took Congressional investigations to bring BNY's conduct to light underscores the self-concealing nature of the Bank's scheme.

[17] The government's investigation remains ongoing. On October 8, 2025, U.S. Representative Jamie Raskin sent a letter to BNY CEO Robin Vince requesting records relating to "$378 million in payments to and from Mr. Epstein's accounts," based on SARs purportedly "filed years after Mr. Epstein's death." U.S. House of Representatives Committee on the Judiciary, *Letter to BNY Mellon CEO Robin Vince from Representative Raskin* (Oct. 8, 2025), https://fm.cnbc.com/applications/cnbc.com/resources/editorialfiles/2025/10/08/2025-10-08Raskin_to_Vince_BNY_Mellon_re_Epstein_1.pdf, at 2.

[18] Matthew Goldstein, *In Epstein Case, Follow the Money, Democratic Senator Says*, N.Y. Times (Jul. 17, 2025), https://www.nytimes.com/2025/07/17/business/epstein-banks-wyden-trump.html.

BNY cites *Tesla Wall Sys., LLC v. Related Companies, L.P.*, 2017 WL 6507110, at *8 (S.D.N.Y. Dec. 18, 2017), but that case is distinguishable. There, the plaintiff knew "the essential facts" of its claim for three years. *Id.* Here, by contrast, Doe learned the essential facts underlying her claims only recently and has pleaded specific, affirmative acts of concealment by BNY that prevented her from uncovering its involvement until recent government investigations.

### B. The Complaint States Two Claims for Negligence (Counts V–VI).

Doe has properly stated claims for both her negligence counts. To state a claim for negligence under New York law, Doe must plead "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Deutsche Bank/JP Morgan*, 671 F. Supp. at 414 (internal citation omitted). BNY argues that it owed no duty to Doe and that the Complaint fails to allege proximate cause. The Court should reject both arguments.

#### 1. The Complaint Sufficiently Alleges BNY Owed Doe a Duty of Care.

BNY contends that it owed no duty to Doe to prevent harm from Epstein. But BNY, "like everyone else," owed a "duty of reasonable care" to avoid injury to others by "forces [it] set in motion," including actions undertaken by third parties. *Id.*; *see also* Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").

That is precisely what Doe alleges here: BNY "set [the] forces in motion" that injured Doe, as its financial support and concealment efforts were critical to Epstein's sex-trafficking venture. Compl. ¶ 186. The Complaint makes clear that his venture "*was not possible*" without BNY, which provided special treatment to Epstein and his co-conspirators to ensure the venture's continued operation and sex-trafficking of young women and girls. *Id.* ¶ 18 (emphasis added). BNY knowingly provided financial services which enabled Epstein to make at least $378 million in payments to victims, *id.* ¶¶ 3, 66–67, 77; failed to follow numerous banking requirements in

connection with financial dealings with Epstein, including AML rules, KYC rules, and anti-structuring rules, *id.* ¶¶ 55–60, 200, 202–03; purposely and deliberately failed to timely file SARs for suspicious activities in Epstein-related accounts, *id.* ¶ 71; ignored repeated red flags and suspicious activity indicative of sex-trafficking, including in its banking relationship with MC2, *id.* ¶¶ 67, 72, 91; and chose not to cooperate with law enforcement and other investigations into Epstein's scheme, *id.* ¶ 73. Because Doe alleges BNY "helped 'set in motion' Jeffrey Epstein's sex-trafficking venture" that caused Doe's injury, she plausibly alleges that BNY owed her a duty. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 414.

BNY concedes that banks owe a duty to non-customers when they provide non-routine services. Mot. at 22 (*Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 414). Nevertheless, it incorrectly asserts that there are no plausible allegations that BNY provided non-routine services here. To the contrary, the Complaint contains allegations demonstrating that BNY's conduct went well beyond ordinary banking activity. As detailed above, BNY did not merely process standard transactions; it, for years, processed $378 million in payments to women trafficked by Epstein, helped cover up sex-trafficking by failing to file required suspicious activity reports, overlooked glaring red flags of criminal activity, and maintained banking relationships with Epstein-related entities, including MC2, despite clear indicators that those entities were operating as a vehicle for sex-trafficking. *See, e.g.*, Compl. ¶¶ 3, 55–60, 67, 71–72, 75, 91. These types of allegations (coupled with those that BNY deliberately ignored banking laws and regulations, *see id.* ¶¶ 200, 202–03, 205) are the type of allegations that this Court has recognized as sufficient. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 414; *see also Elmaliach v. Bank of China Ltd.*, 110 A.D.3d 192, 207 (1st Dep't 2013) ("Although New York does not generally recognize a duty on the part of banks to non-customers, that does not mean that New York policy would prohibit recovery

under the alleged facts, if proven."). BNY's narrow focus on two specific allegations from *Deutsche Bank/JPMorgan*—access to cash and structuring withdrawals—fails to move the needle. To the extent the allegations here differ slightly from those in *Deutsche Bank/JPMorgan*, those differences reflect merely a matter of proof, not a lack of liability.

BNY's cases are readily distinguishable, as they involved either conclusory allegations or conduct limited to ordinary banking services. *See In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 518 (S.D.N.Y. 2010) (defendant bank merely provided banking and financial services "offered to all bank customers"); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 156 (2d Cir. 2012) (defendant bank merely processed wire transfers). Notably, the district court in *Licci* suggested that a bank could be liable for negligence based on facts similar to those alleged here. *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010) (suggesting that bank could be liable for negligence relating to terrorist attacks if plaintiff alleged bank "had any ties to Hizbollah, or that they knew or had reason to believe that the monies at issue would be used to carry out terrorist attacks on civilian targets").[19]

---

[19] Again, BNY's reliance on its apparent status as a correspondent bank is unavailing. Regulators have brought numerous enforcement actions against major financial institutions for failures in correspondent banking services or processing transactions, including at least one enforcement action involving Epstein-related transactions. *See, e.g.*, NY State Department of Financial Services, *Deutsche Bank Consent Order* (Jul. 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf, at ¶ 77 (faulting Deutsche Bank for failing to scrutinize its Bank customer's customer); Financial Crimes Enforcement Network, *FinCEN Assesses Record $1.3 Billion Penalty against TD Bank* (Oct. 10, 2024), https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-billion-penalty-against-td-bank ("Among other failures, TD Bank's **processing** of peer-to-peer transactions (e.g., Venmo and Zelle), including transactions indicative of human trafficking, was insufficient, and as a result, TD Bank failed to identify and timely report these transactions to FinCEN.") (emphasis added). Correspondent bank or not, BNY owed a duty of reasonable care to avoid injury to others by forces it set in motion, including victims of a sex-trafficking venture it funded and concealed. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 414.

2.  The Complaint Sufficiently Alleges That BNY Proximately Caused Doe's Injuries.

Doe has adequately alleged that BNY was the direct and proximate cause of her injuries. As explained above, Epstein's venture was not possible without BNY to provide special and non-routine treatment to Epstein and his co-conspirators and to ensure the sex-trafficking's continued operation. Compl. ¶ 18. It provided the necessary financial resources, structuring, and operational support that enabled Epstein to recruit, transport, and pay victims, to conceal his activities from law enforcement, and to continue abusing young women and girls for decades. *See, e.g.*, *id.* ¶¶ 64–74. Not only are these but-for causes of Doe's injuries, but also it was highly foreseeable that BNY's participation in a sex-trafficking venture would result in injuries to victims.

Nevertheless, BNY insists that Doe's injuries were not a foreseeable consequence of the services BNY provided. Mot. at 25. But "constructive knowledge plausibly makes harm to plaintiffs and other victims of Epstein's sex-trafficking a 'natural and foreseeable' consequence" of the actions of BNY. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 415. Because Doe alleges that BNY should have known—and actually knew and recklessly disregarded—that its banking services sustained a sex-trafficking venture, proximate cause is satisfied. *See, e.g.*, Compl. ¶¶ 71, 81–95, 99, 189, 207.

BNY incorrectly asserts that Doe does not allege that the Bank provided anything other than routine services to Epstein. Mot. at 25. The Complaint repeatedly states that BNY's services were far from routine. *See, e.g.*, Compl. ¶¶ 70–73, 198–201, 206. For example, maintaining a banking relationship with MC2, an entity established by known sex traffickers Epstein and Brunel to engage in sex trafficking, was anything but "routine." *Id.* ¶¶ 66–67. BNY provided financial services to MC2—including the funds used to support Epstein's sex-trafficking operation—despite numerous press reports indicating that the entity was functioning as a vehicle for trafficking under

24

the guise of a modeling agency. *Id.* ¶¶ 67, 91. These reports included accounts that Epstein and Brunel used MC2 to bring young girls into the United States on Epstein's private jets. *Id.* ¶ 91.

BNY's reliance on *Rothstein v. UBS AG* is misplaced. In *Rothstein*, the plaintiffs asserted no direct involvement by the bank and alleged only that the bank transferred U.S. cash dollars to the Iranian government, which in turn supplied funds to terrorist organizations. 647 F. Supp. 2d 292, 294 (S.D.N.Y. 2009). This Court rejected that argument, noting that "cash dollars have multiple legitimate uses" and are not necessarily devoted to supporting terrorism merely because they are transferred to a government that is linked to terrorism. *Id.* Unlike *Rothstein*, the Complaint here alleges that BNY maintained a direct banking relationship with MC2, a sex-trafficking front for which there was no legitimate function. Compl. ¶ 66–67. These allegations are more than sufficient to establish proximate cause. *See Lelchook v. Commerzbank AG*, 2011 WL 4087448, at *1 (S.D.N.Y. Aug. 2, 2011) (declining to apply *Rothstein* because maintaining a bank account for a "Hezbollah front" with no legitimate function was sufficient to establish a causal connection); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 417–19 (E.D.N.Y. 2009) (similar); *see also Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005) (banking services not routine "given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities").

## <u>CONCLUSION</u>

The Court should deny BNY's Motion to Dismiss Doe's Complaint in its entirety.[20]

---

[20] Alternatively, if the Court grants any portion of the Bank's motion to dismiss, such dismissal should be without prejudice and with leave to amend. *See Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 2025 WL 2825402, at *12 (S.D.N.Y. Oct. 6, 2025) (Rakoff, J.) ("Where claims are dismissed under Rule 12(b)(6), 'leave to amend the complaint should be refused only if there is no basis for concluding that plaintiff can state a claim.'"). Any deficiencies could be cured in an amended complaint, particularly given newly revealed evidence that BNY serviced at least one of Epstein's accounts and facilitated the transfer of millions of dollars to Ghislaine Maxwell. *See* Wyden Memo at 18; *E.E.O.C. v. Michael Cetta, Inc.*, 2011 WL 5117020, at *1 (S.D.N.Y. Oct. 27, 2011) (granting motion for leave to amend in light of information learned during discovery).

Dated: December 1, 2025                    Respectfully submitted,


                                           */s/ Sigrid McCawley*_____

                                           Sigrid McCawley
                                           Daniel Crispino
                                           Megan Nyman
                                           Boies Schiller Flexner LLP
                                           401 E. Las Olas Blvd., Suite 1200
                                           Fort Lauderdale, FL 33316
                                           Telephone: (954) 356-0011
                                           Fax: (954) 356-0022
                                           Email: smccawley@bsfllp.com
                                           Email: dcrispino@bsfllp.com
                                           Email: mnyman@bsfllp.com


                                           David Boies
                                           Andrew Villacastin
                                           Boies Schiller Flexner LLP
                                           55 Hudson Yards
                                           New York, NY
                                           Telephone: (212) 446-2300
                                           Fax: (212) 446-2350
                                           Email: dboies@bsfllp.com
                                           Email: avillacastin@bsfllp.com


                                           Bradley J. Edwards
                                           Brittany N. Henderson
                                           Dean Kaire
                                           Edwards Henderson
                                           425 N. Andrews Ave., Suite 2
                                           Fort Lauderdale, FL 33301
                                           Telephone: (954) 524-2820
                                           Fax: (954) 524-2822
                                           Email: brad@cvlf.com
                                           Email: brittany@cvlf.com
                                           Email: dean@cvlf.com


                                           *Counsel for Plaintiff Jane Doe*

                                           26

## **CERTIFICATE OF COMPLIANCE**

I, Sigrid McCawley, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing Memorandum of Law was prepared using Microsoft Word and complies with Rule 2(e) of this Court's Individual Rules and Local Rule 7.1(c).

*/s/ Sigrid McCawley*