## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, | **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| THE BANK OF NEW YORK MELLON CORPORATION, | Case No. 1:25-cv-08525-JSR |
| Defendant. | |

## <u>AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT</u>

Plaintiff Jane Doe files this individual and civil class action complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex trafficking statute, 18 U.S.C. § 1591, *et seq.*—the Trafficking Victim Protection Act ("TVPA")—and for common-law tort claims under New York law.  The suit arises from Defendant The Bank of New York Mellon Corporation ("BNY" or the "Bank") participating in and financially benefitting from Jeffrey Epstein's widespread and well-publicized sex-trafficking operation, as well as the direct financial benefits it received therefrom. Doe makes the following allegations based on personal knowledge as to her own acts and status, and upon information and belief as to all other matters. As detailed below, BNY has actively concealed details and evidence concerning its assisting and facilitating Epstein's sex trafficking. Doe believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### PRELIMINARY STATEMENT

1.      Jeffrey Epstein, the world's most infamous sexual predator, ran an international sex-trafficking operation and abused thousands of women and girls for decades. Epstein's sex

trafficking could not have happened at the scope, scale, and duration it did without the assistance and facilitation of powerful individuals and institutions, including BNY ███████████ ████████████.

2.      With knowledge that BNY would be clearing or serving as the correspondent bank on Epstein's Deutsche Bank accounts, in 2014, Epstein, through his company, Southern Financial, acquired millions of dollars of BNY shares.

3.      As a recent Congressional investigation reported, "more than $1 billion worth of transactions . . . flowed in and out of Epstein's accounts"[1] at large financial institutions. As a document in the Treasury Department's Epstein file reveals, between 2003-2019 there were more than 4,725 wire transfers exceeding $1 billion involving Jeffrey Epstein, his entities, and his agents, including Darren Indyke, Harry Beller, Richard Kahn and Erika Kellerhals. Epstein's sex trafficking depended on these transactions. More than $600 million of these transactions were transfers made by BNY by, to, or on behalf of Epstein, his entities, agents, and co-conspirators.

4.      Until recently, BNY's role in assisting and facilitating Epstein's sex trafficking was not known. One of the ways BNY concealed Epstein's sex trafficking and its assistance and facilitation of it, was by failing to file Suspicious Activity Reports ("SARs") concerning large cash transfers to, by, and on behalf of Epstein—reports that BNY was legally obligated to file, and reports which, if filed, would have alerted authorities to the sex trafficking and brought it to an end.

---

[1] *See, e.g.*, U.S. Senate Committee on Finance, *Letter to Attorney General Bondi from Senator Wyden* (July 21, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj_-follow_the_money_on_jeffrey_epstein_7-21-25pdf.pdf, ("July 2025 Wyden Letter") at 1; *see also* Alex Woodward, *Top Democrat demands Trump's IRS investigate Epstein bank records in sprawling probe: 'Follow the money'*, THE INDEPENDENT (July 31, 2025), https://www.the-independent.com/news/world/americas/us-politics/epstein-bank-records-ron-wyden-leon-black-b2799888.html.

5.      Despite widespread public knowledge of and attention to Epstein's sex trafficking, BNY continued to provide financial support, assistance, and facilitation to Epstein's sex trafficking until after Epstein's second arrest. For example, BNY ███████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████:



6.      ████████████████████████████████████████████████████████ ████████████████████████████████████████████ Throughout all this, BNY knowingly and intentionally failed to timely file the suspicious activity reports it was legally required to file until it was far too late to do any good.

7.      Accepted industry practice as well as banking rules and regulations required BNY

and banks performing BNY's functions to know the parties to, from, and on whose behalf they were transferring and processing the transfers of cash, to monitor such transfers for suspicious transactions, and to report suspicious transactions.

8.     Although Epstein had been publicly exposed as a sex trafficker and his co-conspirators and agents had been publicly identified for years before BNY processed transactions for Epstein, his entities, and agents, the Bank continued to make tens of millions of dollars in transfers into and out of Epstein's various accounts without any known or apparent lawful or business reason or justification.

9.     BNY knowingly and intentionally benefited from the assistance and support it provided to Epstein, including from fees, referrals, and the development and preservation of relationships with Epstein's high-net worth associates.

10.    Many details of BNY's knowing assistance and facilitation of Epstein's sex trafficking remain unknwon as a result of BNY's refusal to voluntarily produce data or documents without court orders, or to cooperate with Congressional investigations. For example, an October 8, 2025 letter from the U.S. House of Representatives to BNY's CEO Robin Vince requested information and documents concerning Epstein-related accounts, including accounts for or transactions to Epstein-related entities and Ghislaine Maxwell. BNY has not produced the requested information to Congress.[2] What is known from the limited data and documents that have

---

[2] U.S. House of Representatives Committee on the Judiciary, *Letter to BNY Mellon CEO Robin Vince from Representative Raskin* (Oct. 8, 2025), https://fm.cnbc.com/applications/cnbc/resources/editorialfiles/2025/10/08/2025-10-08Raskin_to_Vince_BNY_Mellon_re_Epstein_1.pdf, at 2. Letters were also sent to the CEOs of other financial institutions tied to Epstein's sex-trafficking venture, including JPMorgan Chase & Co, Deutsche Bank, and Bank of America. *See* U.S. House of Representatives Committee on the Judiciary, *Letter to JPMorgan CEO Jamie Dimon from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-dimon-jpmorgan-re-

come to light is:

(a) Epstein was a convicted and registered sex offender who presided over an intentional sex-trafficking venture for more than 30 years until he was arrested for a second time in July 2019.

(b) Key co-conspirators of Epstein and collaborators in Epstein's sex trafficking included Ghislaine Maxwell, Jean-Luc Brunel (his procurer), Darren Indyke (his in-house lawyer), and Richard Kahn (the accountant for the venture). Key Epstein entities included MC2 (a "modeling" agency that Epstein and Brunel used to procure victims), Southern Financial LLC, Southern Trust Company, J Epstein Virgin Islands Foundation, Inc., the Haze Trust, Jeepers, Inc., the Butterfly Trust, Enhanced Education, FT Real Estate, and Gratitude America.

(c) Epstein was a college dropout with no professional training or licenses, and no apparent means of support other than sex trafficking.

(d) In 2010, Maritza Vasquez, the Financial Controller for MC2, publicly testified that BNY not only knew of Epstein's relationship with MC2 but refused to extend MC2 a credit line if Epstein did not execute a guarantee to secure the credit line.[3]

---

epstein.pdf; U.S. House of Representatives Committee on the Judiciary, *Letter to Deutsche Bank CEO Christian Sewing from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-sewing-deutsche-bank-re-epstein.pdf; U.S. House of Representatives Committee on the Judiciary, *Letter to Bank of America CEO Brian Moynihan from Representative Raskin* (Oct. 8, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-10-08.raskin-to-moynihan-bofa-re-epstein.pdf.

[3] *Doe v. Epstein*, No. 08-cv-80893 (S.D. Fla. 2008), Sworn Statement of Maritza Vasquez (MC2 financial controller) (Jun. 15, 2010), available at https://s3.documentcloud.org/documents/25966082/maritza-vasquez-deposition-ocrmypdf.pdf.

(e) Epstein's sex trafficking, like sex trafficking in general, required access to banking services and to large amounts of cash.

(f) At critical times, including after other banks had terminated their business with Epstein, BNY continued to process hundreds of millions of dollars of transfers to, from, and on behalf of Epstein, which transfers were required to permit Epstein's sex-trafficking venture to continue.

(g) BNY was, and certainly should have been, aware of, from its own records, public knowledge, and BNY's required compliance with banking laws and regulations, Epstein's sex-trafficking and the essential assistance to, and facilitation of, that venture that BNY provided.

11. Despite its knowledge, BNY opened accounts for Epstein, known Epstein entities including ██████████████████████████████████████████████ ███████████████████████████████, and known Epstein agents and co-conspirators, including Brunel.

12. BNY also processed hundreds of suspicious wire transfers totaling hundreds of millions of dollars to, from, and on behalf of Epstein and his known entities and co-conspirators. The details of these suspicious wires are still unknown and concealed by BNY. However, from admissions BNY made in SARs belatedly filed after Epstein's second arrest in July 2019, we know that:

(a) ████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████



(b) ███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████ ;

(c) ███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████ .

13.    From limited documentation thus far produced, including in other lawsuits, we also know that:

(a) BNY processed and assisted in the suspicious transfers of at least $20 million (in whole $1 million dollar amounts multiple times a month) to Epstein's JP Morgan accounts.

(b) BNY, without any due diligence, extended a credit line to MC2, a modeling agency owned by Jean-Luc Brunel and financed by Epstein despite public reports indicating that Epstein and Brunel used MC2 to lure young girls—often from Eastern Europe—to the United States on Epstein's private jets for the sole purpose of abusing them.

(c) In 2007, BNY facilitated and processed a wire transfer in the amount of $7.4 million

from one of Epstein's Deutsche Bank accounts to his known co-conspirator Ghislaine Maxwell without any known or apparent lawful or business reason or justification.

14.     BNY profited from the banking services, assistance, and facilitation that it provided to Epstein, his agents and co-conspirators, including from the fees BNY earned and the relationships BNY was able to cultivate with Epstein's assistance. Epstein, who became a major shareholder of BNY, also provided guarantees for loans BNY made.

## JURISDICTION, VENUE, AND TIMELINESS

15.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Jane Doe—individually and on behalf of the other Class members—proceeds under the federal TVPA statute, 18 U.S.C. § 1589 through § 1595. The Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District. Epstein, his co-conspirators, and BNY all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and trafficked Jane Doe and members of the Class in this District.

17.     This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1) because it is filed within ten years after the cause of action arose.

18.     In addition, any statute of limitations applicable to Jane Doe's and the putative

Class's claims, if any, is tolled due to the Bank's affirmative concealment of the facts that make up Doe's and the Class's claims, including affirmative misrepresentations that created the false impression that the Bank had no meaningful role in, or knowledge of, Epstein's sex-trafficking enterprise, as well as the continuous and active deception, duress, threats of retaliation, and other forms of misconduct that Epstein and his co-conspirators used to silence his many victims, including Doe. These acts induced Doe, despite reasonable diligence, to refrain from bringing suit earlier.

19. BNY strategically and fraudulently covered up its conduct and it was not until recently when Congress began to release information concerning Epstein's financial institutions that the Bank's conduct was partially revealed. These acts went well beyond the underlying wrongdoing and were specifically designed to and did obscure the Bank's role in facilitating Epstein's sex-trafficking enterprise.

20. BNY knowingly and fraudulently concealed its involvement by, among other things, failing to make filings and disclosures that it was legally obligated to make; failing to provide responsive documents requested by Congressional investigations; making misleading assertions that it only provided routing banking services to Epstein, his entities, and agents, and that it was unaware that BNY accounts were used to assist and facilitate Epstein's sex trafficking, delaying or withholding the production of responsive documents; and resisting cooperation with law enforcement and Congressional investigations.

21. In addition, prior to the commencement of this action, BNY negotiated with known victims of Epstein's sex trafficking to settle claims against BNY and secure non-disclosure agreements limiting what the victims could say about the Bank's conduct. Those negotiations, and the Bank's insistence on confidentiality, were intended to prevent other victims, including Doe,

from learning facts necessary to assert claims against the Bank.

22.    This concealment occurred in the context of a broader scheme of coercion and silence orchestrated by Epstein and his co-conspirators, including threats of retaliation, threats to Doe's immigration status, economic pressure, confidentiality demands, and other forms of intimidation that deterred victims from coming forward. BNY knowingly benefited from and capitalized on this environment of enforced silence, which further impeded Plaintiff's ability to discover the Bank's involvement through reasonable diligence.

23.    In 2019, Darren Indyke and Richard Kahn instilled even more fear in Doe when they attempted to contact her through other associates of Epstein, including Lesley Groff and Bella Klein, as a consequence of Doe's attempt to sever ties with the Epstein organization.

24.    These actions were separate from and subsequent to the conduct giving rise to their liability and were intended to prevent Epstein's victims, including Doe, from learning of the Bank's role and from commencing suit.

25.    Including for these reasons, BNY is equitably estopped from asserting a statute-of-limitations defense.[4]

## PARTIES

26.    Plaintiff Jane Doe is a citizen of Florida and was at all relevant times a resident of and domiciled in the State of New York.

27.    Jane Doe is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

28.    Jane Doe is also at serious risk of retaliatory harm because the co-conspirators who

---

[4] Alternatively, BNY's wrongdoing is inherently self-concealing such that Doe need not plead any affirmative actions by the Bank.

participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm, including threats to her immigration status.

29.     Jane Doe's safety, right to privacy, and security outweigh the public interest in her identification and any prejudice to Defendant by allowing her to proceed anonymously.

30.     As discussed below, many other women are similarly situated to Jane Doe and also need to proceed anonymously for the same reasons. The identities of most of these other women are known to Defendant.

31.     Defendant The Bank of New York Mellon Corporation, formed by a merger in 2007 between The Bank of New York and Mellon Financial Corporation, is a global financial institution headquartered in New York, New York, and operating in this District. As used herein, "BNY" refers to The Bank of New York Mellon Corporation, as well as The Bank of New York and Mellon Financial Corporation before the merger.

32.     BNY is responsible, under United States law and otherwise, for the acts and knowledge of its officers, directors, employees, and agents, including the acts and knowledge described in this complaint. The acts and knowledge alleged were committed by BNY's officers, directors, employees, and agents within the scope of their employment and with the intention, at least in part, to benefit BNY.

## THE TRAFFICKING VICTIMS' PROTECTION ACT

33.     The Trafficking Victims Protection Act ("TVPA") outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States. It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

11

34.     The TVPA forbids the following sex-trafficking conduct:

(a) Whoever knowingly—

>    (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

>    (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

>    knowing, or, except where the act constituting the violation of paragraph is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in acommercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b). 18 U.S.C. § 1591(a).

35.     The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (e.g., violation of 18 U.S.C. §§ 1591-94) to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving anything of value from participation in an illegal sex-trafficking venture. 18 U.S.C. § 1595(a).

36.     Unlike the criminal penalties provisions in the TVPA, the civil remedies provision contains a "constructive knowledge" provision. This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking but also against a person or entity who participated in a venture that the person or entity should have known had engaged in illegal sex trafficking. 18 U.S.C. § 1595(a). This provision provides:

>    An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable

attorneys fees.

## FACTUAL ALLEGATIONS

**A.**    **The Epstein Sex-Trafficking Venture.**

37.    Beginning in the early 1990s and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture in violation of 18 U.S.C. §§ 1591–95. As part of the venture, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them. For example:

(a) Epstein and his co-conspirators threatened that physical and reputational harm would come to victims if they did not comply with his demands that they perform commercial sex acts;

(b) Epstein and his co-conspirators falsely and fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands, promises that Epstein did not or never intended to fulfill; and

(c) Epstein and his co-conspirators threatened to deprive victims of living accommodations, food, clothing, education, or other necessities, exploiting the vulnerabilities of his often poor and underprivileged victims.

38.    In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, recruiting victims, coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands.

39.    Among other things, Epstein sexually abused his many victims and caused his victims to engage in commercial sex acts, specifically sex acts for which his victims received

things of value, including money, promises of educational and career advancement, a place to live, and promises that Epstein would provide various forms of assistance.

40.     As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened that harm would come to victims if they did not comply with his demands that they perform commercial sex acts.

41.     As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators falsely and fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands. These promises, most of which were never, and were never intended to be, fulfilled, were a quid pro quo for the sex acts that occurred.

42.     As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would threaten to deprive his victims of their living accommodations and other necessities, further exploiting the vulnerabilities of his often poor and underprivileged victims. Epstein used this material support to maintain victims' dependence, including by threatening to withhold basic necessities like food for non-compliance with his demands.

43.     In 2006, Jeffrey Epstein was arrested in Florida after state and federal law enforcement discovered that he had sexually abused more than 30 children in his Palm Beach, Florida mansion.  During that investigation, the government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the TVPA and other federal laws, including 18 U.S.C §§ 2422(b), 2423(f), 2423(b), 2424 (e); 18 U.S.C § 371; 18 U.S.C §§ 1591(c)(1), 1591(a)(1), 1591(a)(2); as well as state crimes in violation of Florida Statute §§ 796.07 and 796.03, against dozens of young women.

44.     As a consequence of the Florida investigation, Epstein pled guilty to two felonies, was permanently labeled a "Registered Sex Offender," and was jailed in 2008. Epstein also entered

into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barring his prosecution (and prosecution of his co-conspirators) for violations of the TVPA and other sex offenses by that office. When the U.S. Attorney's Office entered into that non-prosecution agreement with Epstein, it had not received reports from BNY about Epstein, nor did BNY provide any other assistance in the investigation.

45.     Epstein's criminal case in Florida and the many related news reports left no doubt about Jeffrey Epstein and his extraordinary penchant for sex abuse and trafficking of young females. For instance, it was reported that up until the time of his Florida arrest, Epstein had been sexually abusing *three to four young females per day*.

46.     The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce between the United States and Europe, especially Eastern Europe.

47.     At all times relevant to this complaint, the Epstein sex-trafficking venture was a group of two or more individuals associated in fact, even if they were not a formal legal entity. Indeed, members of the Epstein sex-trafficking venture referred to it as an "organization." Epstein was continuously at the hub of this sex-trafficking organization, which operated throughout the times indicated in this complaint.

48.     The Epstein organization used its in-house attorney, Darren Indyke, for services related to Epstein's trafficking operation and other illegal activities, which sought to protect inter-organization communications by the claim of attorney-client privilege, and which was used to withhold relevant documents from discovery. Any time Epstein needed legitimate legal work performed, including defending his criminal investigations and defending all civil lawsuits, he

hired high-end legal teams and firms.

49. Likewise, while Epstein hired outside accounting firms to service his and his corporate taxes, he utilized a company providing exclusive accounting and in-house financial services for Epstein—HBRK—to keep the books on his sex-trafficking venture, pay victims, withdraw and hold large amounts of cash for hush money payments and illegal payments to sex-trafficking victims, create false companies and maintain accounts for the purpose of causing sex-trafficking victims to remain entrapped by the organization and to otherwise develop false schemes to protect the operation and control the victims. "HBRK" stands for "Harry Beller Richard Kahn," referring to its founding members and longtime Epstein associates and accountants, Harry Beller and Richard Kahn. Kahn serviced the taxes of numerous Epstein victims and devised schemes to entrap them, and often had to communicate with financial institutions on behalf of victims (including Jane Doe and other trafficking victims which should have raised other red flags).

50. In 2008, Darren Indyke appeared as one of Epstein's attorneys in the criminal case against Epstein. These court records were publicly available and were or should have been detected by BNY.

51. During that time, press reports, including from the Miami Herald, identified Epstein's legal team as including Indyke.

52. On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of Sex Trafficking Conspiracy and one count of Sex Trafficking for violations of 18 U.S.C. §1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street. *See United States v. Jeffrey Epstein*, Case No. 1:19-cr-490 (S.D.N.Y.).

53. On July 6, 2019, Jeffrey Epstein was arrested pursuant to the New York Indictment.

54.     On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where he was awaiting trial on the federal sex trafficking charges. He was later pronounced dead from apparent suicide.

55.     In July 2020, Epstein's co-conspirator in the sex-trafficking venture, Maxwell, was arrested on federal sex-trafficking charges filed in the Southern District of New York. The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex-trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims. *See United States v. Maxwell*, Case No. 1:20-cr-00330 (S.D.N.Y.). On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in painstaking detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

56.     On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in painstaking detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

57.     Maxwell had been publicly linked to Epstein for decades before her conviction.

58.     In March 2003, Vanity Fair reported that Maxwell "summon[ed]" young women to Epstein's town house, and threw parties filled "with young Russian models."[5] Epstein was quoted as describing Maxwell as his "best friend," and explained that while Maxwell was not on his payroll, she seemed to "organize much of his life." In another Vanity Fair article published in

---

[5]   Vicky Ward, *The Talented Mr. Epstein*, VANITY FAIR (Mar. 1, 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOoqnnrU1uBXxU99OWzhZNbZBcb1STXwnAnTsESpEKC8JsAh2iMee.

March 2011, Maxwell was described as a "'procurer' of young women" for Epstein who introduced him to young women he later had sexual relationships with.[6]

59.     In July 2010, Conchita Sarnoff of the Daily Beast wrote an article titled "Jeffrey Epstein, Pedophile Billionaire, and his Sex Den," reporting on Epstein's sex-trafficking ring.[7] Sarnoff detailed Maxwell's recruitment of young women and minors to engage in sexual activities with Epstein. "According to police reports and sworn statements in the civil suits, all four women, among their other duties, worked to ensure that an appointment book for twice- or thrice-daily 'massages' was stocked with fresh recruits. Ghislaine Maxwell, daughter of the late Czechoslovakian-born press baron Robert Maxwell, who was for many years Epstein's live-in partner, also recruited young girls."[8]

60.     In August 2010[9] and 2015,[10] the Daily Beast again connected Maxwell to Epstein, describing Epstein's crimes and Maxwell's continued allegiance.

61.     In March 2011, the Guardian described Maxwell and Epstein's romantic

---

[6] Vicky Ward, *Jeffrey and Ghislaine: Notes on New York's Oddest Alliance*, VANITY FAIR (Mar. 8, 2011), https://www.vanityfair.com/news/2011/03/notes-on-new-yorks-oddest-couple-jeffrey-epstein-and-ghislaine-maxwell?srsltid=AfmBOoqzvh7sO7NiaU0Sd0GCKiqz38N9bzaKn-p37Dzuf-tGRfldKQMC.

[7] Conchita Ward, Jeffrey Epstein, *Pedophile Billionaire, and Hi Sex Den*, THE DAILY BEAST (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

[8] *Id.*

[9] Conchita Sarnoff, *Jeffrey Epstein and the New Pedophile Defense*, THE DAILY BEAST (Aug. 18, 2010), https://www.thedailybeast.com/epstein-and-saintil-the-new-pedophile-defense/.

[10] Vicky Ward, *I Tried to Warn You About Sleazy Billionaire Jeffrey Epstein in 2003*, THE DAILY BEAST (Jan. 6, 2015), https://www.thedailybeast.com/i-tried-to-warn-you-about-sleazy-billionaire-jeffrey-epstein-in-2003/.

relationship despite Epstein's sex crimes.[11]

62.    In early January 2015, Maxwell was described as a "'madame' for Epstein, supplying a string of underage girls for the American billionaire and his friends"[12] and as "one of the main women whom Epstein used to procure under-aged girls for sexual activities."[13]

63.    On January 10, 2015, the Guardian reported that Maxwell was Epstein's girlfriend and recruiter of young women for Epstein to abuse.[14] In furtherance of Epstein's crimes, Maxwell allowed Epstein to abuse young women at her various properties.

64.    On September 21, 2015, Virginia Roberts Giuffre sued Ghislaine Maxwell for defamation in the Southern District of New York, which extensively detailed Maxwell's central role as one of the main women who Epstein used to procure under-aged girls for sexual activities and a primary co-conspirator and participant in his sexual abuse and sex-trafficking scheme. *See Giuffre v. Maxwell*, Case No. 15-cv-7433 (S.D.N.Y.). The case was intensely litigated and received widespread national and international media coverage.

65.    The information and materials, which made clear Maxwell's role in Epstein's sex-

---

[11] Owen Bowcott, *Ghislaine Maxwell: Press baron's daughter and Epstein's former lover*, THE GUARDIAN (Mar. 6, 2011), https://www.theguardian.com/uk/2011/mar/06/ghislaine-maxwell-sandringham-epstein.

[12] Caroline Davies, *Court papers put daughter of Robert Maxwell at centre of 'sex slave' claims*, THE GUARDIAN (Jan. 4, 2015) https://www.theguardian.com/us-news/2015/jan/04/court-papers-robert-maxwell-daughter-sex-slave-claims-prince-andrew.

[13] Paul Lewis & James Ball, *Prince Andrew named in US lawsuit over underage sex claims*, THE GUARDIAN  (Jan. 3, 2015), https://www.theguardian.com/uk-news/2015/jan/02/prince-andrew-named-us-lawsuit-underage-sex-allegations.

[14] Paul Lewis & Jon Swaine, *Jeffrey Epstein: inside the decade of scandal entangling Prince Andrew*, THE GUARDIAN (Jan. 10, 2015), https://www.theguardian.com/world/2015/jan/10/jeffrey-epstein-decade-scandal-prince-andrew.

trafficking venture were, and certainly should have been, known by BNY, including and as a result of the Bank's required customer due diligence.

66.    As of July 6, 2020, a Consent Order entered by the NY Department of Financial Services ("DFS") found that: "Epstein [] had a well-publicized reputation related to the trafficking and abuse of young women" as "[a]llegations against him began appearing in the press as early as March 2005 with the accusation that he paid a 14-year old girl for a 'massage.'" As DFS went on to report: "between 2005 and 2013, press reports outlined the allegations underlying the plea agreement and to varying degrees," including that "Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought 'young girls . . . often from Eastern Europe' to the U.S. on Mr. Epstein's private jets,'" referring to Jean-Luc Brunel and MC2.[15]

67.    The July 6 Consent Order also penalized Deutsche Bank $150 million and was entered in favor of the DFS finding violations against Deutsche Bank for violations of AML laws. The Order detailed criminal activity committed by Epstein's top loyalists, Darren Indyke and Richard Kahn, identified respectively in the consent order as "ATTORNEY-1" and "ACCOUNTANT-1," who were carrying out suspicious financial actions in furtherance of Epstein's sex-trafficking operation. Epstein, again including through Indyke and Kahn, was carrying out suspicious financial transactions in furtherance of Epstein's sex trafficking to BNY as well as Deutsche Bank.

68.    As noted by the Senate Committee on Finance, Indyke and Kahn were employed

---

[15] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

by Jeffrey Epstein for decades.[16] "In their capacities as Epstein's in-house attorney and accountant, Indyke and Kahn controlled the movement of funds through Epstein's bank accounts and oversaw virtually every aspect of the financial infrastructure that paid for Epstein's sex trafficking activities." December 2025 Wyden Letter, at 1. Moreover, Kahn has lied to U.S. immigration officials by supporting a sham marriage designed to help Epstien's victims remain in the United States. *Id.*

69.     The Senate Committee on Finance explained that "at Epstein's direction, Indyke and Kahn structured hundreds of Epstein's bank accounts, created and administered dozens of corporate entities, regularly made large cash withdrawals on Epstein's behalf and authorized thousands of suspicious wire transfers." *Id.* "According to bank records recently unsealed in federal court, Indyke and Kahn had signatory authority or power of attorney over Epstein's bank accounts and were the subject of numerous suspicious activity reports ("SARs") filed with the U.S. Treasury Department." *Id.*

70.     The Senate Committee on Finance also noted that SARs filed by JPMorgan Chase flagging more than $1 billion worth of suspicious wire transfers through Epstein's accounts noted that Indyke "controlled the movement of Epstein's funds as signer of several Epstein accounts." *Id.* at 2.

71.     As Congressional investigations found, and the Wall Street Journal reported, Kahn and Indyke participated in Epstein's sex-trafficking venture by, among other things, perpetuating

---

[16] U.S. Senate Committee on Finance, *December 17, 2025 Letter to Attorney General Bondi and FBI Director Patel from Senator Wyden* (Dec. 17, 2025) https://www.finance.senate.gov/imo/media/doc/letter_to_doj-fbi_from_us_senators_on_darren_indyke_and_richard_kahn_12-17-25pdf.pdf ("December 2025 Wyden Letter"), at 1.

sham marriages between Epstein's victims.[17] Kahn lied to U.S. Immigration officials by providing "glowing" endorsements of the forced marriages.[18] "Another part of the job was dealing directly with women later revealed to have been caught in Epstein's web. They facilitated marriages that turned out to be shams, sent payments to women who have since said they were abused and monitored the personal expenses Epstein was paying for."[19]

72.      In one documented instance, Kahn prepared a letter describing a "healthy marriage" between two women, and "their bond so deep they 'often complete each other's sentences.'"[20] "Kahn prepared the letter on behalf of his longtime boss and patron, Jeffrey Epstein" who "was trying to secure U.S. papers for an Eastern European woman he wanted to keep in the country. The plan required a spouse. Epstein had pressured an American woman he had abused into marrying the woman—and Kahn's letter gave it legitimacy."[21] Kahn's assertions were knowingly false.

73.      As the Wall Street Journal reported, "the American woman told attorney Darren Indyke that she wanted a divorce. Indyke, who had previously advised her on how to communicate with U.S. immigration officials, warned against it. He, too, worked for Epstein."[22]

---

[17] Khadeeja Safdar & Joe Palazzolo, *The CPA and the Lawyer Who Served Jeffrey Epstein—and Control His Fortune and Secrets*, THE WALL STREET JOURNAL (Nov. 22, 2025), https://www.wsj.com/us-news/epstein-accountant-lawyer-control-estate-0d31070b?gaa_at=eafs&gaa_n=AWEtsqcukK5gB2i3PhfPz9TdTmdeljSyeQNHQDBeKrUuOPA0CPoaKj-3Ql99MiBHBTY%3D&gaa_ts=6948a670&gaa_sig=jKOB_1Txjj849sg56QIqZ6dhxTEtoVm8RgMDCOKn3ladmEgUAfmZuv96TXCs09-z15wQuf-xStGXAITuD_qRnQ%3D%3D.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

74.    "[I]t was Kahn, the trusted accountant, and Indyke, the loyal lawyer, who kept the engine running for years with their financial and legal maneuvers."[23] Kahn managed the expenses, and Indyke structured withdrawals of cash in amounts that didn't trigger federal reporting."[24]

75.    As the Wall Street Journal further reported Kahn and Beller established HBRK to serve a single client: Jeffrey Epstein. HBRK's listed its business address as "301 E. 66th Street, [a] building used by Epstein. It was a one-bedroom apartment converted into an office. Indyke had a similar one, and their doors were across the hall from each other."[25]

**B.    BNY Knew, Should Have Known, and Recklessly Disregarded Epstein's Sex Crimes and Sex-Trafficking Venture.**

76.    Epstein's sex-trafficking venture was publicly and widely known. For decades, several high-profile investigations, lawsuits, and articles covered Epstein's crimes. Despite having access to and knowledge of these public sources, BNY knowingly and intentionally disregarded this damning information in the name of financial gain.

77.    On October 28, 2002, Landon Thomas published, "Jeffrey Epstein: International Moneyman of Mystery" in New York Magazine.[26] This article would have been available to any financial institutions conducting diligence checks on Epstein when deciding whether to open or maintain accounts with him, and emphasized the need to scrutinize the source of Epstein's funds and whether these incoming and outgoing payments could reasonably have any valid business

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] Landon Thomas, Jr., *Jeffrey Epstein: International Moneyman of Mystery*, NEW YORK MAGAZINE (Oct. 28, 2002), https://nymag.com/nymetro/news/people/n_7912/.

purpose.

78.     On March 1, 2003, Vicky Ward published, "The Talented Mr. Epstein" in Vanity Fair, revealing Epstein's deep rooted ties to Ghislaine Maxwell, the fact that he dropped out of college and acted as a school teacher before being hired at Baer Sterns, and the fact that his deposition was taken by the SEC in 1981 for committing a Regulation D violation.[27] The article also documented Epstein's ties to convicted criminal Steven Hoffenberg and his unusual relationship with Leslie Wexner, the founder of Victoria's Secret. The article raised serious questions about Epstein's credibility, sources of wealth, business practices, and associations, and publicly exposed numerous red flags that were readily available to financial institutions conducting due diligence on Epstein.

79.     In 2005, the Palm Beach Police Department began investigating Jeffrey Epstein.

80.     On July 23, 2006, Jeffrey Epstein was arrested.[28]

81.     In 2006, Epstein was publicly exposed for sexually abusing dozens of young women and girls, several as young as 14 years old. There were hundreds of pages of police reports revealing that Epstein was a serial sexual abuser and trafficker, including detailed reports making it clear that his operation depended on his accessing nearly unlimited cash to use as payments to his victims who were then paid more cash to bring him more victims. The money trail into the Epstein-related accounts made plain that Epstein was engaging in crimes and the recipients of his money exposed the type of crimes. The police reports generated in that investigation were made

---

[27] Vicky Ward, *The Talented Mr. Epstein*, VANITY FAIR (Mar. 1, 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOoqec1Twtdt-Bq8Oo14_-nlf02nRGON9rgbBU2YMrGtzZiivv1m_.

[28] *Probable Cause Affidavit,* Palm Beach Police Dep't (July 25, 2006), available at https://abcnews.go.com/images/WNT/Palm_Beach_Records_Epstein.pdf.

public and spread rampantly across the internet, beginning with TheSmokingGun.com.[29]

82.    In 2006, local Palm Beach news outlets began covering the Epstein investigation which resulted in dozens of early articles about Epstein's arrest and the allegations of sexual abuse being published and circulated online.[30]

83.    By August 14, 2006, the Epstein saga had become more wide-spread and nationally known culminating in an article by the New York Post titled, "Mystery Moguel's Teen Sex Secret Bared in Probe."[31]

84.    On September 24, 2007, Jeffrey Epstein entered into a Non-Prosecution Agreement ("NPA") with the Southern District of Florida.

85.    On October 6, 2007, Page Six of the New York Post published an article linking Jean-Luc Brunel and MC2 Models to Jeffrey Epstein.[32] Additionally, as the 2020 Consent Order states, "press reports during this time noted allegations that Mr. Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought 'young girls . . . often from Eastern Europe' to the U.S. on Epstein's private jets."[33] The modeling agency was

---

[29] Staff Writer, *Billionaire in Palm Beach Sex Scandal*, THE SMOKING GUN (July 26, 2006), https://thesmokinggun.com/documents/sex/billionaire-palm-beach-sex-scandal.

[30] *See e.g.*, Staff Writer, *After long probe, billionaire faces solicitation charge*, THE PALM BEACH POST (July 27. 2006), https://www.palmbeachpost.com/story/news/2006/07/27/after-long-probe-billionaire-faces-solicitation-charge/2623078007/.

[31] Dan Mangan, *Mystery Mogul's Teen-Sex Secret Bared in Probe*, NEW YORK POST (Aug. 14, 2006), https://nypost.com/2006/08/14/mystery-moguls-teen-sex-secret-bared-in-probe/.
[32] PageSix.com Staff, *Model Shop Denies Epstein Tie*, Page Six (Oct. 6, 2007), https://pagesix.com/2007/10/06/model-shop-denies-epstein-tie/.

[33] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

MC2.

86.     An October 15, 2007 Page Six article also reported that "lawyers for Manhattan billionaire investor Jeffrey Epstein . . . are bracing for a slew of lawsuits from as many as 40 young women."[34]

87.     By 2007, because Epstein was so publicly exposed as a sex trafficker and abuser, Epstein's primary financial supporter, Les Wexner, abandoned him and terminated his support.

88.     On June 30, 2008, Jeffrey Epstein pled guilty to solicitation of prostitution and procuring a minor for prostitution in state court in Florida.  As a result of his guilty plea, Epstein was required to publicly register as a sex-offender which becomes publicly available to anyone anywhere.[35]

89.     On July 3, 2008, Jane Doe sued the US Attorney's Office in Southern District of Florida Case 08-80736 for violations of the Crime Victims' Rights Act under 18 USC 3771.

90.     Shortly thereafter, Epstein's NPA with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge with the litigation. Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges.[36]

91.     Epstein's legal team also garnered significant publicity between 2006 and 2008,

---

[34] PageSix.com Staff, *Sex Case 'Victims' Lining Up*, Page Six (Oct. 15, 2007), https://pagesix.com/2007/10/15/sex-case-victims-lining-up/.

[35] Landon Thomas Jr., *Financier Starts Sentence in Prostitution Case*, NY TIMES (July 1, 2008), https://www.nytimes.com/2008/07/01/business/01epstein.html.

[36] Staff Writer, *Epstein secret pact with Feds reveals "highly unusual" terms*, PALM BEACH POST (June 10, 2009) https://www.palmbeachpost.com/story/news/2009/06/10/epstein-secret-pact-with-feds-reveals-ldquohighly-unusualrdquo-terms/2616074007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z113728d00----v113728d--42--b--42--&gca-ft=245&gca-ds=sophi.

not only because of their well-known names, but also the unusual number of them. Epstein hired Alan Dershowitz, Roy Black, Ken Starr, Jay Lefkowitz, Guy Lewis, Michael Tien, Lily Ann Sanchez, Gerald Lefcourt, Guy Fronstein, and Jack Goldberger. All of these lawyers were now on Epstein's payroll and millions of dollars were being paid to these attorneys to pay for his legal defense. From public reports BNY was also aware that members of this defense team were engaged in a public media campaign aimed at discrediting Epstein's minor victims and minimizing his alleged crimes.[37]

92.    As this point in time in 2008, Jeffrey Epstein was a registered sex offender accused of maintaining inordinate amounts of cash to pay underage victims and hush money for witnesses. With indisputable publicly available knowledge that Epstein was a sexual offender who was using his wealth to run a sexual abuse and trafficking operation, any responsible bank providing only routine banking services would have cut ties with Epstein.[38]

93.    Court proceedings against the government involving the challenge to Epstein's NPA also continued beyond 2008 and attracted significant media attention. Indeed, for years between 2008 and 2015, hundreds of press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators, including Lesley Groff, Darren Indyke, Richard Kahn, and Ghislaine Maxwell.[39]

---

[37] Jane Musgrave, *Victims Seeking Sex Offender's Millions See Painful Pasts Used Against Them*, THE PALM BEACH POST (Jan. 24, 2010); Michele Dargan, *Claim: Epstein filed lawsuit to 'intimidate' victims' attorney*, PALM BEACH DAILY NEWS (Oct. 16, 2010).

[38] Conchita Sarnoff, Jeffrey Epstein, *Pedophile Billionaire, and his Sex Den*, THE DAILY BEAST (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

[39] Vicky Ward, *Jeffrey and Ghislaine: Notes on New York's Oddest Alliance*, VANITY FAIR (Mar. 8, 2011) https://www.vanityfair.com/news/2011/03/notes-on-new-yorks-oddest-couple-jeffrey-epstein-and-ghislaine-maxwell; *Authorities have questions about how financier Jeffrey Epstein*

94.    In addition to public reporting surrounding the Crime Victims' Rights Act Case, dozens of civil lawsuits were filed against Jeffrey Epstein detailing his sexual abuse and trafficking, which all received significant media attention.

95.    One such case was *Jane Doe 102 v. Jeffrey Epstein*, which was filed in May 2009. In her Complaint, Virginia Roberts Giuffre detailed that Epstein had trafficked her nationally and internationally, including by trafficking her to other men. Because the allegations extended beyond Epstein himself and involved broader sex-trafficking conduct, the lawsuit garnered significant media attention.[40]

96.    Epstein was deposed in a number of those civil lawsuits, which again was covered widely by the press because of Epstein's invocation of his Fifth Amendment rights.[41]

---

*donates       his       money*, BUSINESS       INSIDER       (Mar.       5,       2015) https://www.businessinsider.com/authorities-have-questions-about-how-financier-jeffrey-epstein-donates-his-money-2015-3.

[40] Michele Dargan, *Jeffrey Epstein address book 'Holy Grail' of famous names*, PALM BEACH DAILY NEWS (Mar. 11, 2011) https://www.palmbeachdailynews.com/story/news/2011/03/12/jeffrey-epstein-address-book-holy/6643962007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z114401d00----v114401d--44- -b--44--&gca-ft=142&gca-ds=sophi; Paul Lewis and Jon Swaine, *Jeffrey Epstein: Inside the decade of scandal entangling Prince Andrew*, THE GUARDIAN (Jan. 10, 2015), https://www.theguardian.com/world/2015/jan/10/jeffrey-epstein-decade-scandal-prince-andrew.

[41] Susan Spencer-Wendel, *Suit Accuses Jailed Tycoon of Sex Crime*, THE PALM BEACH POST (April 21, 2009); Michele Dargan, *Victim: Unseal Epstein Document*, PALM BEACH DAILY NEWS (July 16, 2009); Michele Dargan, *No Monitoring Device for Epstein*, PALM BEACH DAILY NEWS (July 23, 2009); Jane Musgrave, *Victims Seeking Sex Offender's Millions See Painful Pasts Used Against Them*, THE PALM BEACH POST (Jan. 24, 2010); Michele Dargan, *Lawyer: Epstein Made Admissions on Tape*, PALM BEACH DAILY NEWS (April 29, 2010); Michele Dargan, *Judge Receives Epstein Tape*, PALM BEACH DAILY NEWS (May 5, 2010); Jane Musgrave, *Sex Offender Agrees to Disclose Net Worth, but Wants it a Secret*, THE PALM BEACH POST (May 7, 2010); Jane Musgrave, *Epstein's Attorneys Affirm He's Billionaire*, THE PALM BEACH POST (May 14, 2010); Michele Dargan, *Judge Orders N.Y. Paper To Give Up Epstein Tape*, PALM BEACH DAILY NEWS (May 27, 2010); Michele Dargan, *Judge: Ex-Epstein worker has 10 Days to Produce Journal*, PALM BEACH DAILY NEWS (June 3, 2010); Michele Dargan, *Claim: Epstein filed lawsuit to 'intimidate' victims' attorney*, PALM BEACH DAILY NEWS (Oct. 16, 2010).

97.    In 2009, Epstein's sexually abusive behaviors again made headlines when during a deposition he was asked a question about the shape of his genitalia. Epstein abruptly ended the deposition and left the room, but the clip has been re-circulated all over the internet ever since.[42]

98.    In July 2010, Conchita Sarnoff from the Daily Beast wrote in an article titled "Jeffrey Epstein, Pedophile Billionaire, and his Sex Den," "[p]erhaps most disturbing, in terms of possible sex trafficking, was Epstein's relationship with Jean Luc Brunel, owner of the MC2 modeling agency."[43]

99.    A second article by Sarnoff covered the Department of Justice's investigation into Epstein for child trafficking. The article stated, "[f]ederal investigators continue to investigate Epstein's activities, to see whether there is evidence of child trafficking—a far more serious charge than the two in his non-prosecution agreement, the arrangement between Epstein and the Department of Justice enabling him to plead guilty to lower-level state crimes."[44] Further, "an alleged victim said that Epstein, Maxwell, Brunel, Rodriguez, and [victim] 'deliberately engaged in a pattern of racketeering that involved luring minor children through MC2, mostly girls under the age of 17, to engage in sexual play for money.' (Which would amount to trafficking.)."[45]

---

[42] *Jeffrey Epstein Egg Shaped Penis Deposition*, THE DAILY BEAST (May 4, 2010) https://www.thedailybeast.com/jeffrey-epstein-egg-shaped-penis-deposition/.

[43] Conchita Sarnoff, Jeffrey Epstein, *Pedophile Billionaire, and his Sex Den*, The Daily Beast (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

[44] Conchita Sarnoff, *Jeffrey Epstein Investigated for Child Trafficking*, THE DAILY BEAST (July 29, 2010), https://www.thedailybeast.com/jeffrey-epstein-investigated-for-child-trafficking/.

[45] Conchita Sarnoff, Jeffrey Epstein, *Pedophile Billionaire, and his Sex Den*, The Daily Beast (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

100.    In a third article, Sarnoff summarized the claims against Epstein and a history of sex crimes.[46] Sarnoff reported: "In March 2005, [the West Palm Beach Police Department], acting on a complaint from the Florida parents of a 14-year-old girl, launched an investigation that would eventually uncover a pattern of predatory behavior stretching back years and spanning several continents, knowingly enabled by Epstein's associates and employees."[47]

101.    Sarnoff further reported, "the Palm Beach Police Department identified 17 local girls who had contact with Epstein before the age of consent; the youngest was 14, and many were younger than 16. And that was just at one of Epstein's many homes around the world—he also owns property in New York, Santa Fe, Paris, London, and the Caribbean. Subsequent investigation by the FBI, reaching as far back as 2001, identified roughly 40 victims, not counting [Victim], whom Epstein referred to as his 'Yugoslavian sex slave' because he had imported her from the Balkans at age 14."[48]

102.    In October 2010, Michele Dargan from the Palm Beach Daily News wrote in article titled "Suit links Epstein to modeling agency," that publicly linked Epstein and Brunel's use of MC2 to bring in underage girls from all over the world and promise them modeling contracts.[49]

103.    In January 2011, Epstein's attorneys attempted to get his sex offender registry status changed and requested that he be afforded Level 1 sex-offender status in New York. The Court

---

[46] Conchita Sarnoff, *Jeffrey Epstein, Billionaire Pedophile, Goes Free*, THE DAILY BEAST (July 17, 2010), https://www.thedailybeast.com/jeffrey-epstein-billionaire-pedophile-goes-free/.

[47] *Id*.

[48] *Id*.

[49] Michele Dargan, *Suit links Epstein to modeling agency*, PALM BEACH DAILY NEWS (Oct. 16, 2010).

rejected his request, labeling him a Level 3 sex-offender, the highest possible risk level. This public

fact was widely publicized, and culminated in Epstein's public registration as a high-risk sex

offender in the state of New York in November 2011. As the New York Post reported in February

2011, this meant "according to the state, Epstein is at 'high risk' to repeat his offense and poses 'a

threat to public safety.'"[50]

104.    In March 2011, Sharon Churcher published a series of articles in the Daily Mail

that brought international attention to Epstein's sex-trafficking of Virginia Roberts Giuffre,

including that she had been trafficked by Epstein and Ghislaine Maxwell to Prince Andrew.[51]

These stories sparked international media attention on Jeffrey Epstein and his sexual crimes.

105.    In May 2011, Baltic News Services brought even further international attention to

Epstein and Brunel's relationship, including that Brunel "known for his pedophile tendencies"

judged a modeling contest in Latvia. The article further went on to detail Brunel's connections to

Epstein who had already served a jail term in the United States for child sex offenses, and indicated

that "the FBI is currently probing Brunel for supplying Epstein with underage girls."[52]

---

[50] *See* Amber Sutherland, *Billionaire Jeffrey Epstein: I'm a sex offender, not a predator*, New York Post (Feb. 25, 2011), https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/ (reporting that "a New York judge ruled at a hearing last month that the moneyman is the most dangerous kind of sex offender: a Level 3").

[51] Sharon Churcher, *Prince Andrew and the 17-year-old girl his sex offender friend flew to Britain to meet him*, THE DAILY MAIL (Mar. 2, 2011), https://www.dailymail.co.uk/news/article-1361039/Prince-Andrew-girl-17-sex-offender-friend-flew-Britain-meet-him.html; Sharon Churcher, *Epstein's Girl Friday 'fixer': Dead tycoon's daughter Ghislaine Maxwell and the girls she hired for paedophile's stable*, THE DAILY MAIL (Mar. 7, 2011), https://www.dailymail.co.uk/news/article-1363444/Jeffrey-Epstein-Robert-Maxwells-daughter-Ghislaine-hired-girls-paedophile.html; *see also* Sharon Churcher and Chelsea White, *The Prince, a paedophile and the sex slave teen*, The Daily Telegraph, https://www.dailytelegraph.com.au/the-prince-a-paedophile-and-the-sex-slave-teen/news-story/8cdeee961a486febf459eafe00a7f710

[52] *Alleged Pedophile from US judges modeling contest in Latvia*, BALTIC NEWS SERVICE (May 2, 2011).

106.    On September 21, 2015, Virginia Roberts Giuffre sued Ghislaine Maxwell for defamation in the Southern District of New York, again publicly laying out the mechanics of Jeffrey Epstein's sex-trafficking operation. The lawsuit received extensive media coverage.[53]

107.    On April 18, 2016, author Conchita Sarnoff published the book *TrafficKing*, who "despite bribes to stay silent, risked her life to expose the brutal reality of human trafficking and the Jeffrey E. Epstein case."

108.    On October 10, 2016, bestselling author James Patterson released *Filthy Rich: The Jeffrey Epstein Story*, a New York Times bestseller self-described as "A Powerful Billionaire, the Sex Scandal that Undid Him, and all the Justice that Money can Buy: The Shocking True Story of Jeffrey Epstein." Among other things, the book detailed Epstein's relationship with Jean-Luc Brunel, including that Epstein provided financial support to MC2; that Epstein and Brunel "used the agency to bring underage girls from foreign countries into the United States by promising them modeling contracts"; and that "[t]hese girls were then housed in condominiums belonging to Epstein" and then charged rent, "presumably to live as underage prostitutes in the condos."

109.    On January 26, 2017, Jane Doe 43 sued Jeffrey Epstein for sex-trafficking in the Southern District of New York, publicly detailing the inner workings of Epstein's sex-trafficking operation. *See Jane Doe 43 v. Epstein et al.*, Case No. 17-cv-00616-JGK (S.D.N.Y.). There was

---

[53] Caroline Davies, *Court papers put daughter of Robert Maxwell at centre of 'sex slave' claims*, THE GUARDIAN (Jan. 4, 2015) https://www.theguardian.com/us-news/2015/jan/04/court-papers-robert-maxwell-daughter-sex-slave-claims-prince-andrew; Lia Eusachewich, *Alleged Epstein madam forced to hand over 17 years of documents*, PAGE SIX (Mar. 17, 2016) https://pagesix.com/2016/03/17/alleged-epstein-madam-forced-to-hand-over-17-years-of-documents/; Josh Gerstein, *Suit over billionaire's underage sex abuse settles*, POLITICO (May 24, 2017) https://www.politico.com/blogs/under-the-radar/2017/05/24/jeffrey-epstein-sex-abuse-lawsuit-238793.

again extensive media coverage of this lawsuit.[54]

110.    In November 28, 2018, the *Miami Herald* published a series titled, "Perversion of Justice," which revisited the heinous details of the sexual abuses that Epstein serially committed against high school children in Palm Beach in the early 2000s and prompted international outrage.[55]

111.    On July 6, 2019, Jeffrey Epstein was again arrested in New York on federal sex-trafficking charges. On July 25, 2019, Jeffrey Epstein committed suicide in his Manhattan jail cell.

112.    In December 2021, Ghislaine Maxwell, was convicted of federal sex-trafficking charges.

113.    Throughout all of this, BNY continued to provide banking services, including large cash transfers to Epstein and his entities and agents without seeking explanations and without any known or apparent lawful or business purpose and without filing the required SARs.

## C.    BNY Knew, Should Have Known, and Recklessly Disregarded Epstein's Criminal Connections to Jean-Luc Brunel and MC2.

114.    BNY knew, should have known, and recklessly disregarded Epstein's criminal connections to MC2 and Brunel.

115.    Epstein cultivated a relationship with known sexual abuser, Jean-Luc Brunel, a French model scout who had suffered public disgrace for serial sexual abuse of young females. Epstein enlisted Brunel to recruit new victims from all over the world, enticing them with promises

---

[54] Martin Gould, *Pedophile Jeffrey Epstein is accused of luring an underage girl into his elaborate sex trafficking enterprise under the guide of using his wealth and connections to get her into a prestige NYC college*, DAILY MAIL (Jan. 27, 2017) https://www.dailymail.co.uk/news/article-4164082/Pedophile-Jeffrey-Epstein-accused-new-sex-traffick-case.html.

[55] Julie K. Brown, *How a future Trump Cabinet member gave a serial abuser the deal of a lifetime*, MIAMI HERALD (Nov. 28, 2018), https://www.miamiherald.com/news/local/article220097825.html/

of modeling careers before sexually abusing and trafficking them through a modeling agency Epstein and Brunel established called MC2. The name referred to the math equation "E=MC2," where "E" stood for Epstein. MC2 was financed entirely by Jeffrey Epstein.

116.    BNY had actual and constructive knowledge of Epstein's connections to Brunel and MC2, and of the sex crimes and sex-trafficking activities carried out through their venture.

117.    In or about 2009, Mellon United National Bank, then a wholly-owned subsidiary of BNY, dealt directly with Epstein and his agents to secure financing for MC2, including to secure a letter of credit from Epstein to "backstop" a loan from Mellon to MC2.

118.    BNY required the letter of credit from Epstein in order to continue funding MC2 and obviously had actual knowledge that it was the beneficiary of a letter of credit from Epstein's JP Morgan account.

119.    In 1988, *60 Minutes* exposed Brunel's sex crimes, reporting that Brunel used his position in the fashion industry, including his fashion agency Karin Models, to drug and sexually assault young women with modeling aspirations.[56] Notably, according to public corporate filings, Karin Models changed its corporate name to MC2 in 2005.[57]

120.    In 1995, author Michael Gross published a book titled *Model: The Ugly Business of Beautiful Women*, which detailed the *60 Minutes* allegations against Brunel and quoted prominent industry players who described Brunel as someone who used drugs and committed "silent rape," spiking women's drinks to exploit them sexually. By that time, Brunel's criminal

---

[56] 60 MINUTES: *American Girls in Paris* (aired Dec. 23, 1988).

[57] Division of Corporations, Florida Department of State, *Karin Models of America, LLC Limited Liability Amendment* (Sept. 2, 2005), https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2005%5C0913%5CH0210889.Tif&documentNumber=L03000036942.

conduct was well known both in the industry and throughout the world as a result of the consistent major reporting on him.

121.    In 2003, author Ian Halperin published a book titled *Bad and Beautiful: Inside the Dazzling and Deadly World of Supermodels*, describing Brunel as the dark side of the modeling world where glamorous facades hide serious abuses. The book details allegations from former models who directly accused Brunel and his associates of rape including on one occasion when he invited more than a dozen models to a private party and forced a number of them to have sex.

122.    During the 2005 Palm Beach Police Department investigation into Epstein, investigators recovered message pads in Epstein's garbage that included messages from Brunel about MC2. These messages were also made public, highlighting the connection between Epstein and Brunel. Among them was a message that Brunel left for Epstein that said: "He has a teacher for you to teach you how to speak Russian. She is 2x8 years old not blonde. Lessons are free and you can have 1st today if you call." Brunel was communicating to Epstein that he had a 16-year-old Russian female that he was sending to Epstein for sex trafficking.

123.    Press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped develop with his friend and sexual abuser, Jean-Luc Brunel, brought young girls from Eastern Europe to the United States on Epstein's private jets.

124.    On October 6, 2007, *Page Six* published an article titled, "Model Shop denies Epstein Tie," which described Epstein's sexual exploitation of young women. The article reported that "the owners of MC2 models are denying industry speculation that massage maven Jeffrey Epstein is a secret financial backer of the agency being run by scandal-scarred Jean-Luc Brunel,

who was once accused of taking advantage of underage models." [58] The article further reported that "Epstein, who this week agreed to plead guilty to soliciting underage prostitutes at his Florida mansion in a deal that will send him to prison for about 18 months, reportedly gave 'millions' to start MC2, which opened in October 2005 with offices in New York, Miami and Tel Aviv. One of the girls Epstein, 54, was accused of soliciting massages from was described in court documents as being just 14."[59]

125.    While Epstein was still banking with JP Morgan, Epstein obtained a letter of credit to backstop a line of credit from BNY to MC2. Epstein obtained this letter of credit for the purpose of guaranteeing BNY's line of credit to MC2. BNY knew and should have known who was guaranteeing the credit line the Bank was extending to MC2.

126.    BNY was required to conduct due diligence before opening a line of credit with MC2. Even limited due diligence with respect to MC2 and its beneficial owner Brunel reveals MC2 and Brunel's relationship to Epstein and participation in Epstein's sex trafficking.

127.    In 2010, Maritza Vasquez, the Financial Controller for MC2, publicly testified that BNY not only knew of Epstein's relationship with MC2 but refused to extend MC2 a credit line if Epstein did not execute a guarantee to secure the credit line.[60]

128.    In July 2010, an article detailing Epstein's sex crimes and sex-trafficking venture, "Jeffrey Epstein, Pedophile Billionaire, and His Sex Den," reported that Epstein gave $1 million

---

[58] PageSix.com Staff, *Model Shop Denies Epstein Tie*, Page Six (Oct. 6, 2007), https://pagesix.com/2007/10/06/model-shop-denies-epstein-tie/.

[59] *Id.*

[60] *Doe v. Epstein*, No. 08-cv-80893 (S.D. Fla. 2008), Sworn Statement of Maritza Vasquez (MC2 financial controller) (Jun. 15, 2010), available at https://s3.documentcloud.org/documents/25966082/maritza-vasquez-deposition-ocrmypdf.pdf.

to "his friend Jean Luc Brunel when he was starting the modeling agency MC2" and that many of the young women recruited by MC2 flew on Epstein's private jets.[61] "Perhaps most disturbing, in terms of possible sex trafficking, was Epstein's relationship with Jean Luc Brunel, owner of the MC2 modeling agency and their deliberate pattern of racketeering that involved luring minor children through MC2, mostly girls under the age of 17, to engage in sexual play for money."[62]

129.    In August 2010, an article covered Epstein's sex crimes, including having a 14-year-old sex slave, and his connection to Brunel and MC2, reporting that "Brunel, along with numerous young models, was a frequent passenger on Epstein's private jet, according to flight manifests. The agency owner also allegedly received $1 million from Epstein in 2005, when he founded MC2[…]."[63] The article further reported that whether "the money was a secret investment in MC2, or a payment for Brunel's services as a procurer, is unknown. Brunel also visited Epstein in jail."[64]

130.    In 2012, local news outlets reported that Epstein provided MC2 with financial support and that Epstein and Brunel used MC2 to bring underage girls from all over the world and would house the girls in Epstein's New York condos.[65]

---

[61] Conchita Sarnoff, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, The Daily Mail (July 22, 2010), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/

[62] *Id.*; *see also* Conchita Sarnoff, *Jeffrey Epstein, Billionaire Pedophile, Goes Free*, The Daily Beast (July 20, 2010), https://www.thedailybeast.com/jeffrey-epstein-billionaire-pedophile-goes-free/.

[63] Jenna Sauers, *The Sex Trafficking Model Scout, Jezebel with Splinter*, JEZEBEL (Aug. 4, 2010), https://www.jezebel.com/the-sex-trafficking-model-scout-5603638.

[64] *Id.*

[65] Michele Dargan, *Lawsuit documents link Jeffrey Epstein to modeling agency owner Jean Luc Brunel*, PALM BEACH DAILY NEWS (Apr. 1, 2012), https://www.palmbeachdailynews.com/story/news/2012/04/01/lawsuit-documents-link-jeffrey-

131.    In February 2015, another article reported on allegations that "Brunel procured young models by offering them visas. Once in the country, some of the models were allegedly funneled into Epstein's various mansions and then victimized."[66] Further, "[t]wo sources familiar with Epstein's finances [told] The Daily Beast they believe Epstein dropped as much as $2 million into MC2 to get it started."[67]

132.    In 2019, Brunel was arrested in France for sex trafficking related to his relationship with Epstein and, like Epstein, was found hanging in his cell from an apparent suicide.

133.    As Virginia Roberts Giuffre recounted in her posthumous memoir, Epstein boasted that Brunel had sent him "more than a thousand girls," including "three French twelve-year-olds," and that Brunel dispatched "'talent' scouts to Brazil to recruit young girls from soccer fields for Epstein.'"[68]

134.    In June 2021, Guiffre bravely provided testimony in Paris, France during Brunel's criminal trial about his participation in Epstein's sex-trafficking operation in June 2021.[69]

---

epstein/9662207007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z115001d00----v115001d--50--b--50--&gca-ft=199&gca-ds=sophi.

[66] M.L. Nestel, *The Dead Model and the Dirty Billionaire*, THE DAILY BEAST (Feb. 13, 2015), https://www.thedailybeast.com/the-dead-model-and-the-dirty-billionaire/.

[67] *Id*.

[68] U.S. House Committee on Oversight and Government Reform, *Letter from Rep. Robert Garcia to Attorney General Bondi Regarding Giuffre* (Oct. 22, 2025), https://oversightdemocrats.house.gov/imo/media/doc/2025-10-22.garcia-to-doj-re-giuffre-info.pdf, at 2 (citing VIRGINIA ROBERTS GIUFFRE, NOBODY'S GIRL: A MEMOIR OF SURVIVING ABUSE AND FIGHTING FOR JUSTICE (2025)).

[69] Sarah Fitzpatrick, Nancy Ing, & Saphora Smith, *Jeffrey Epstein Accuser Virginia Roberts Giuffre testifies against modeling agent*, NBC NEWS (June 16, 2021), https://www.nbcnews.com/news/world/jeffrey-epstein-accuser-virginia-roberts-giuffre-testifies-against-modeling-agent-n1270959.

135.    BNY had not denied, and could not plausibly deny, its knowledge of Epstein's sex trafficking or his connection to Brunel and MC2.

136.    BNY knowingly derived a financial benefit from its relationship by extending a line of credit to MC2 secured by Epstein's personal guarantee.

137.    As evidenced in belatedly filed SARs, BNY considered several internet sources and articles in support of their alert of suspicious activities.

**D.    BNY's Required Compliance with Banking Laws and Regulations Provided BNY with Actual, and Certainly Constructive, Knowledge of Epstein's Sex Trafficking Venture and the Bank's Assistance And Facilitation of That Venture.**

138.    BNY's required compliance with banking laws and regulations provided it with actual, and certainly constructive knowledge, of Epstein's sex-trafficking venture and the Bank's assistance and facilitation of that venture.

139.    The Federal Bank Secrecy Act ("BSA") requires financial institutions to have adequate anti-money laundering ("AML") policies and systems in place. New York state law also requires financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law.

140.    Indeed, Section 326.8 of the BSA establishes requirements for all covered institutions, including BNY, to implement an effective and reasonably designed AML program as a system of internal control to assure ongoing risk management and compliance.[70] These safeguards include policies, procedures, and processes aimed at mitigating the risks associated with offering financial services to customers.

141.    All regulated institutions are expected to configure systems based on their unique

---

[70] 12 C.F.R. § 326.8.

risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively. In addition to having effective AML controls in place, the BSA requires banks to have "[a]ppropriate risk-based procedures for conducting ongoing customer due diligence."[71]

142.    According to FinCEN, the customer due diligence rules requires that financial institutions, like BNY, establish and maintain written policies and procedures that are reasonably designed to: (1) identify and verify the identity of customers; (2) understand the nature and purpose of customer relationships to develop customer risk profiles; and (3) conduct ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information.[72] This due diligence is necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions' facilities.

143.    As part of preventing criminal activity through customer due diligence, Know Your Customer ("KYC") procedures are critically important, and financial institutions must collect customer information at the time of establishing new relationships with clients, to assess the risks associated with the client. KYC obligations require banks to obtain customer information including name, address, date of birth identification number, and verify the identity of the customer.

144.    In addition, banks must adopt and implement Customer Due Diligence ("CDD") for all customers, particularly those that present a higher risk of money laundering. The objective of CDD is to enable the bank to understand the nature and purpose of a customer relationships,

---

[71] 31 C.F.R. § 1020.210.

[72] *Id*.

which may include understanding the types of transactions in which a customer is likely to engage. CDD information typically collected by financial institutions includes the intended use of the account, expected transaction types/volumes/amounts/geography, business or entity type details including ownership structure, source of wealth, information about a business customer's customers, and other information.

145.    To uncover potential risks, financial institutions, like BNY, must assess information about the customers, sanctions lists published by governments, as well as public and private data sources, on an ongoing basis.

146.    In addition, BNY provided correspondent banking services to a foreign financial institution, Deutsche Bank. Under 31 C.F.R. § 1010.610, U.S. financial institutions that offer correspondent banking for foreign financial institutions are required to "establish a due diligence program that includes appropriate, specific, risk-based, and where necessary, enhanced policies, procedures, and controls that are reasonably designed to enable the covered financial institution to detect and report, on an ongoing basis, any known or suspected money laundering activity conducted through or involving any correspondent account established, maintained, administered, or managed by such covered financial institution in the United States for a foreign financial institution."[73]

147.    31 C.F.R. § 1010.610 also requires U.S. banks, like BNY, to perform enhanced due diligence, including by "[o]btaining information from the foreign bank about the identity of any person with authority to direct transactions through any correspondent account that is a payable-through account, and the sources and beneficial owner of funds or other assets in the payable-

---

[73] 31 C.F.R. § 1010.610.

through account."[74]

148. Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

149. Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

150. Additionally, in 2016, the Bank for International Settlements ("BIS") issued guidance related to correspondent banking relationships, where banks understand that they have to conduct due diligence where they "know your customer's customer" ("KYCC") to ensure that the financial institution providing banking services is compliant with its AML and sanctions compliance requirements.

151. Another critical aspect of the AML regime are suspicious activity reports ("SARs"). Financial institutions are required to report known or suspected criminal offenses or transactions that they suspect involve money laundering or other crimes, like sex trafficking.

152. Typical suspicious activity monitoring systems are comprised of several components, including: (1) the identification or alert of unusual activity (such as employee identification, law enforcement inquiries, other referrals, and transaction surveillance monitoring system output); (2) managing alerts; (3) suspicious activity report decision making; (4) suspicious

---

[74] *Id.*

activity report completion and filing; and (5) monitoring and suspicious activity reporting on continuing activity.

153.    Generally, a transaction is suspicious and merits the filing of a SARs if a bank "knows, suspects, or has reason to suspect" the transaction: (1) involves funds derived from illegal activities, or is conducted to conceal monies derived from illegal activities; (2) is designed to evade the reporting requirements of the BSA or related regulations; or (3) has no business or apparent lawful purpose or is not the sort in which the customer normally would be expected to engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including background and possible purpose of the transaction.

154.    Suspicious activities include but are not limited to: (1) wire transfers that are unexplained, repetitive, unusually large, show unusual patterns or have no apparent business purpose; (2) wire transfers made in small amounts in an apparent effort to avoid triggering identification or reporting requirements; and (3) payments made by third party check or money transfer from a source that has no apparent connection to the customer.[75]

155.    Suspicious activity monitoring and reporting does not exist in a vacuum. Financial institutions incorporate KYC and CDD information when monitoring a customer's activity. For example, if a customer was identified as a Politically Exposed Person ("PEP") then the institution would tailor the monitoring to the unique risks posed by PEPs, for instance corruption.[76] Similarly,

---

[75] *FINRA Provides Guidance to Firms Regarding Suspicious Activity Monitoring and Reporting Obligations, Regulatory Notice 19-18,* FINRA, (May 6, 2019) https://www.finra.org/rules-guidance/notices/19-18.

[76] Federal Financial Institutions Examiners Council (FFIEC), *BSA/AML Manual: Risks Associated With Money Laundering and Terrorist Financing – Politically Exposed Persons Examination and Testing    Procedures    (last    visited    Dec.    29,    2025),* https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/20_ep; *see also* FFIEC, *BSA/AML Manual: Risks Associated With Money Laundering and Terrorist*

if a bank customer was previously convicted of soliciting a minor for prostitution,[77] the bank would tailor their monitoring to the risks posed by that specific customer for human trafficking. Finally, financial institutions incorporate customer risk ratings into the frequency and level of scrutiny of customer transactions. For example, private banking[78] is typically considered a high-risk[79] customer relationship by banks.

156.    Regulators, non-governmental organizations, government agencies, international bodies, and private sector groups published notices and advisories to help financial institutions recognize transactional and behavioral red flags of money laundering, and for specific crimes including human trafficking, to incorporated into their monitoring programs.

157.    Human trafficking red flags have been extensively documented. Examples include: FATF's 2011 report "Money Laundering Risks Arising from Trafficking in Human Beings and Smuggling of Migrants," 2014 FinCEN's Advisory "Guidance on Recognizing Activity that May be Associated with Human Smuggling," 2018 FATF's Report "The Financial Flows of Human Trafficking," and FinCEN's 2020 "Supplemental Advisory on Identifying and Reporting Human

---

*Financing – Politically Exposed Persons* (last visited Dec. 29, 2025), https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/20/.

[77] U.S. Department of State, *Tracking Suspicious Financial Activity to Address Human Trafficking* (June 2018), https://www.state.gov/wp-content/uploads/2019/02/283793.pdf.

[78] FATF, *International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation*, Interpretive Note to Recommendation 10 (Customer Due Diligence) (updated October 2025), at 71, available at https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.coredownload.inline.pdf.

[79] FFIEC, *BSA/AML Manual: Assessing Compliance with BSA Regulatory Requirements – Customer Due Diligence – Overview* (last visited Dec. 29, 2025), https://bsaaml.ffiec.gov/manual/AssessingComplianceWithBSARegulatoryRequirements/02.

Trafficking and Related Activity." In addition, private sector initiatives such as the United States Banks Alliance which developed a 'Toolkit' on human trafficking including red flag indicators for financial institutions. The toolkit is published and would have been available to BNY to review.

158.    Red flag indicators of human trafficking from both the victim and perpetrator perspective visible to financial institutions include: (1) a common mobile number, address and employment references are used to open multiple accounts in different names; (2) frequent money transfers to "risk" countries; (3) concentration of "risk" nationalities among the opening of accounts; (4) money rapidly withdrawn from accounts, from one ATM, or several ATMs in close proximity; (5) frequent deposits or withdrawals with no apparent business source; (6) transactions undertaken that appear inconsistent with customer profile; (7) unusual withdrawals, deposits or wire activity inconsistent with normal business practices, or dramatic and unexplained changes in the account activity; (8) transactional activity inconsistent with a customer's alleged employment, business, or expected activity, or where transactions lack a business or apparent lawful purpose; and (9) frequent outbound wire transfers, with no business or apparent lawful purpose, directed to countries at a higher risk for human trafficking or to countries that are inconsistent with the customer's expected activity. All of these red flags were present with respect to BNY's banking services to, for, or on behalf of, Epstein, his entities, agents, and co-conspirators.

159.    The United Nations, the U.S. State Department, and the Financial Action Task Force (FATF) have all identified Russia and former Soviet republics as "High Risk" origin countries for human trafficking victims. For example, in 2017, the U.S. State Department stated: "[a]s reported over the past five years, Russia is a source, transit, and destination country for men, women, and children subjected to forced labor and sex trafficking."[80] The Department of State

---

[80] U.S. Department of State, *2017 Trafficking in Persons Report: Russia*, available at:

kept the Russian Federation as a Tier 2 Watch List for trafficking for almost a decade and, in most recent years, downgraded it to a Tier 3 because the country has and continues to be a destination and source country for traffickers and trafficking victims.

160.    Financial institutions consider the human trafficking indicators alongside the customer's profile (e.g., a registered sex offender or a young woman recently arriving from Russia) when evaluating whether observed behaviors or transactions are potentially suspicious.

161.    BSA laws require financial institutions to monitor for and report potentially suspicious activity related to human trafficking. In 2014, FinCEN added the keyword "Advisory Human Trafficking" in applicable SARs. In 2018, FinCEN updated the SAR form to include a standard checkbox indicating suspected human trafficking.

162.    BSA laws required BNY to conduct Customer Due Diligence on customers. As part of the CDD process, banks typically employ Negative News (alternatively called "Adverse Media") screenings against customer names and beneficial owners of accounts, especially those customers deemed a higher risk.[81]

163.    A financial institution reviews media reports, news articles and/or other references to assist in its performance of customer due diligence, as well as its evaluation of any transactions or activity it considers unusual or potentially suspicious. For example, negative news may cause a financial institution to review customer activity as well as other related information, such as that of third parties with transactions involving the customer's account. Following an evaluation and investigation of the negative news in conjunction with its review of transactions, the financial

---

https://www.state.gov/reports/2017-trafficking-in-persons-report/russia.

[81] *Publication of the Negative News Screening FAQs*, The Wolfsberg Group (May 11, 2022), https://wolfsberg-group.org/news/3.

institution will determine if a SAR filing is required. When multiple negative news alerts arise based on the same underlying event, financial institutions process alerts to determine whether the alert contains new or different information that warrants investigation or assists or informs its evaluation of activity. The financial institution assesses whether to update the customer risk profile, investigate transactions that may result in the filing of a SAR, or escalate or terminate a customer relationship. As demonstrated by the multi-year lag between the Epstein-related suspicious transactions, negative news about Epstein, and BNY's SAR filings, BNY provided non-routine services to Epstein by allowing his transactions to continue unreported.

164.    Banks routinely and necessarily rely on public reports as part of their due diligence.

██████████████████████████████████████████████████████████████

████████████

165.    BNY, and its other alias, were sophisticated financial institutions, which understood KYC laws and other banking obligations, and BNY's strict obligation to comply with those laws and obligations. Through its KYC, CDD, and other required processes, BNY learned, and certainly knew or should have known, of Epstein's sex trafficking venture; the important roles played by Maxwell, Brunel, MC2, Indyke, and Kahn in that venture; and the assistance and facilitation of that venture by BNY itself.

166.    BNY has not denied, and could not plausibly deny, that it knew and should have known of Maxwell, Indyke, Kahn, and Brunel's relationship with Epstein and their participation in Epstein's sex-trafficking venture.

167.    BNY's obligation to monitor did not end at the opening of Epstein or MC2's accounts were opened, but continued throughout the banking relationship, particularly, in light of the highly publicized reports of Epstein and his co-conspirators' wrongdoing.

**E.    BNY Knowingly and Intentionally Participated in Epstein's Sex-Trafficking Venture by Clearing Hundreds of Millions of Dollars in Suspicious Transactions that Enabled Epstein's Sex-Trafficking Venture.**

168.    BNY knowingly and intentionally participated in the Epstein sex-trafficking venture by providing the underpinnings for Epstein to have ready and reliable access to financial resources to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations.  BNY did so by processing hundreds of millions of dollars in suspicious transactions that enabled Epstein's sex-trafficking venture.

169.    Epstein and Deutsche Bank selected BNY out of all competing clearing banks because BNY, like Deutsche Bank, would conceal and further Epstein's sex-trafficking venture.

170.    Rather than merely providing routine banking services to Epstein, BNY went far beyond what a non-complicit bank would have done and instead assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture.

171.    As evidenced by recently revealed internal JP Morgan records, BNY's participation in, and assistance to, Epstein's sex-trafficking venture began as early as 2007 when BNY processed the transfer to Epstein of at least $20 million dollars in whole round numbers each time, including multiple times a month, related to Epstein and Financial Trust Company.[82]  These transfers included but are not limited to the following amounts:

| Date | Amount |
|------|--------|
| January 11, 2007 | $1,000,000 |
| January 22, 2007 | $1,000,000 |
| January 29, 2007 | $1,000,000 |
| February 22, 2007 | $1,000,000 |
| February 27, 2007 | $1,000,000 |
| May 9, 2007 | $1,000,000 |
| May 21, 2007 | $1,000,000 |

---

[82] A summary of Epstein's transactions for 2007, attached to JP Morgan internal emails, discusses transfers made via BNY related to Epstein and Financial Trust Company. *See U.S. Virgin Islands v. JPMorgan Chase Bank, N.A.*, Case No. 22-cv-10904-JSR (S.D.N.Y.), ECF No. 238-38.

| | |
|---|---|
| June 1, 2007 | $1,000,000 |
| June 6, 2007 | $1,000,000 |
| June 13, 2007 | $1,000,000 |
| June 27, 2007 | $1,000,000 |
| August 3, 2007 | $1,000,000 |
| August 14, 2007 | $1,000,000 |
| August 21, 2007 | $1,000,000 |
| August 21, 2007 | $1,000,000 |
| August 23, 2007 | $1,000,000 |
| August 23, 2007 | $1,000,000 |
| September 11, 2007 | $1,000,000 |
| September 19, 2007 | $1,000,000 |
| September 26, 2007 | $1,000,000 |

172.    These repeated and baseless self-dealing types of transfers are inherently suspicious pursuant to federal regulations and guidance because they do not have an apparent legal or business purpose.

173.    Further, by the time these transfers were made, BNY had actual and constructive notice that the Financial Trust Company, later known as the Southern Trust Company,[83] was linked to Jeffrey Epstein.

174.    For example, the Financial Trust Company had been publicly linked to Jeffrey Epstein since at least 2002, when the company and Epstein brought suit against Citibank in the U.S. Virgin Islands. *See Financial Trust Co., Inc. v. Citibank, N.A.*, 268 F. Supp. 2d 561 (D.V.I. 2003). The same year, Citibank sued Financial Trust Company and Epstein. S*ee Citibank, N.A. v. Epstein, et al.*, Case No. 02-cv-05332-SHS (S.D.N.Y.). Litigation of this nature, particularly where a bank sues a customer, is among the indicators of financial and reputational risk that banks are

---

[83] Matthew Goldstein, *Jeffrey Epstein Raked In $200 Million After Legal and Financial Crises*, THE NEW YORK TIMES (Oct. 3, 2019), https://www.nytimes.com/2019/10/03/business/jeffrey-epstein-southern-trust.html (explaining that Epstein established Southern Trust in 2012, and in 2013, it replaced Financial Trust as Epstein's primary money managing arm).

required to know through ordinary due diligence.

175.    In July 2007, Bloomberg reported on Epstein as a "money man of mystery," indicating that that Epstein owned a "Virgin Islands-based money-management firm, Financial Trust Company."[84]

176.    Also in July 2007, the New York Times reported that the Epstein's "Virgin Islands-based money-management firm, Financial Trust Company, is listed in a filing with the Securities and Exchange Commission as a stakeholder in Bear Stearns's High-Grade Structured Credit Strategies Enhanced Leverage Fund, which became much easier to refer to in recent weeks as 'Bear Stearns' collapsing hedge fund.'"[85]

177.    Also by 2007, Epstein had been publicly exposed for his sex crimes and accused of sex trafficking. BNY had actual and constructive knowledge of Epstein's crimes. BNY had a duty to monitor and inquire about the purpose of repeated and baseless large transfers of funds between the accounts of a known sex trafficker.

178.    BNY knew it had such due diligence obligations, as evidenced by ███████ ████████████████████████████████████████████████████████ ████████████████████████.

179.    On June 15, 2007, Epstein transferred $7.4 million from Epstein's BNY account to the account at JP Morgan of his known co-conspirator and procurer, Ghislaine Maxwell.[86]

---

[84]    Matthew Goldstein, *Bear Stearns' Collateral Damage*, BLOOMBERG (July 11, 2007), https://www.bloomberg.com/news/articles/2007-07-11/bear-stearns-collateral-damagebusinessweek-business-news-stock-market-and-financial-advice.

[85]    Dealbook, *More Bad News for Jeff Epstein?*, THE NEW YORK TIMES (July 11, 2007), https://archive.is/kTd1n#selection-1019.41-1027.161.

[86]    U.S. Senate Committee on Finance, *Memorandum to Senator Wyden* (Nov. 19, 2025), https://www.finance.senate.gov/imo/media/doc/memorandum_to_senator_wyden_on_jpmc-

180.    ███████████████████████████████████████████████

████████████████████████████████████████████ cleared hundreds of millions

of dollars of suspicious transactions that enabled Epstein's sex-trafficking venture to operate and

did so in direct participation in Epstein's sex-trafficking venture.

181.    Shortly after opening accounts at BNY, in 2014 Epstein, through his company

Southern Financial, acquired millions of dollars of BNY shares.

182.    Considering BNY's enabling of hundreds of suspicious wire transfers to and out of

Epstein's accounts without the required due diligence or reporting, it is apparent that Epstein chose

BNY as its clearing house and invested in the company in exchange for BNY's concealment and

facilitation of Epstein's sex-trafficking venture.

183.    ███████████████████████████████████████████████

███████████████████████████████████████████

184.    ███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

185.    Epstein engaged in a common money laundering practice called "layering," which

included the use of shell companies to obscure the source of funds for the purpose of concealing

criminal activity. This is the type of suspicious activity that BNY was required to detect. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

epstein_redactedpdf.pdf ("Wyden Memo"), at 18.

███████████████████████████████████

████████████████████████████████████ BNY's evaluation of Epstein related transactions should have been informed by the CDD on Epstein, which alerted the banks that Epstein was a registered sex offender who was accused of sex trafficking.

186.    ████████████████████████████████

███████████████████████████████████

████████

(a)    ████████████████████████████████

████████████████████████████████

████████████████████ ;

(b)    ███████████████████████████████

████████████████████████████████

██████████████████████████████ ;

(c)    ████████████████████████████████

████████████████████████████████

██████████████ and

(d)    ███████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████[87]

─────────────────

[87] ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

187. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

188. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

189. ██████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ BNY was

required to flag baseless transactions without any legitimate business purpose as suspicious and at

a minimum review the transaction.[88]

190. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.

191. ████████████████████████████████████ it was

publicly known that Jeffrey Epstein was procuring women from Europe with the assistance of

Jean-Luc Brunel through the MC2 modeling agency.

192.   With that knowledge, ████████████████████████████

████████████████████████████████████████████████

──────────────────────────

████████████
[88] *FINRA Provides Guidance to Firms Regarding Suspicious Activity Monitoring and Reporting Obligations, Regulatory Notice 19-18,* FINRA (May 6, 2019), https://www.finra.org/rules-guidance/notices/19-18.



193.

194.

195.

_____

[89] The Butterfly Trust has no valid business purpose, was used to pay Epstein's co-conspirators and victims, and has been reported to be a mechanism for Epstein and his co-conspirators to hide funds. *See* Matthew Goldstein, *Executors of Jeffrey Epstein's estate are accused of moving $13 million*, N.Y. TIMES (July 22, 2022) https://www.nytimes.com/2022/07/22/business/jeffrey-epstein-estate-assets.html; New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

196.  █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

197.  █████████████████████████████████████

█████████████████████████████████████████████

198.     This account activity is inherently suspicious. The United Nations, the U.S. State Department, and the Financial Action Task Force ("FATF") have all identified Russia and former Soviet republics as "High Risk" origin countries for human trafficking victims. For example, in 2017, the U.S. State Department stated, "As reported over the past five years, Russia is a source, transit, and destination country for men, women, and children subjected to forced labor and sex trafficking." █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

199.  █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



(a)

(b)

(c)

(d)

200.     The use of shell companies is well-recognized as presenting a high risk for money laundering and other illicit criminal activity, like sex trafficking.

201.

202.

203.

████████████████████████████████████

████████████████████████████████████

███████████████████████

204.    Deutsche Bank and Epstein only offered his business to BNY because it was knowingly aiding Epstein's sex trafficking operation and the concealment thereof. BNY knew that if it stopped aiding the operation, it would lose the Epstein-related accounts and the financial benefits attached to handling those accounts.

### F.    BNY Knowingly and Intentionally Participated in Epstein's Trafficking of Jane Doe.

205.    BNY knowingly and intentionally participated in Epstein's trafficking of Jane Doe.

206.    Jane Doe was living in Russia when she met Jeffrey Epstein in 2011.

207.    Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe.  Epstein and his co-conspirators constantly reminded Jane Doe how powerful and important Epstein was, and that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and other life necessities would be denied victims if they failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe's and other victims' life necessities such as shelter or housing if she or they failed to perform those acts.

208.    Jane Doe was exceptionally vulnerable to being victimized by Epstein.  His sex-trafficking venture targeted vulnerable young women and Jane Doe was soon overwhelmed and unable to extricate herself.  Jane Doe was sexually abused and trafficked by Epstein for several

years.  Knowing that everyone surrounding Epstein, including accountants, lawyers, and other important people, were aware of the sex abuse and accepted it, Jane Doe was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

209.    Over the ensuing years, from 2011 through 2019, Epstein sexually abused Jane Doe on at least 100 occasions, including but not limited to, forcibly touching her, forcibly raping her, and forcing her to engage in sexual acts with other women for his own depraved sexual gratification.

210.    Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause Jane Doe to engage in commercial sex acts.

211.    Epstein recruited Jane Doe to cause her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cellular telephones and means of interstate transportation (such as aircraft that he owned or controlled).

212.    Epstein transported Jane Doe from New York to other states to cause her to engage in commercial sex acts.

213.    Jane Doe wanted to escape from the Epstein sex-trafficking venture, yet Epstein and his supporting team of co-conspirators increased the tactics of fraud, force, or coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

214.    Jeffrey Epstein controlled Jane Doe financially, emotionally, and psychologically. He used his knowledge of Jane Doe's aspirations, fears and problems to manipulate her until she was completely controlled by and dependent upon him.

215.    From 2011 through 2019, Jane Doe was paid repeatedly by Jeffrey Epstein in furtherance of his sex trafficking operation.

216.    ███████████████████████████████████████████

217. ████████████████████████████████████████████████

218. ████████████████████████████████████████████████

219. ████████████████████████████████████████████████

G.     **BNY Failed to Conduct Required Due Diligence and KYC Processes with Respect to Deutsche Bank.**

220.    BNY failed to conduct required due diligence and KYC processes with respect to Deutsche Bank.

221.    At all times material hereto, Deutsche Bank utilized the services of the largest processing bank in the world, BNY.

222.    ████████████████████████████████████████████████

███████

223.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

224.    With respect to BNY's correspondent and clearing banking relationship with Deutsche Bank, BNY failed to adequately monitor and manage the relationship.

225.    BNY was aware of potential issues with Deutsche Bank based on international sanctions, US-based sanctions, SEC penalties levied against the bank, compliance shortcomings tied to sanctions screening and processing of prohibited transactions, its Risk Assessment Customer score, its deficient internal risk management control system, its systematically inadequate maintenance of policies that provided practical guidance on major regulator issues, and its inadequate compliance regime.

226.    For example, on April 23, 2015, the US Commodity Futures Trading Commission ordered Deutsche Bank to pay an $800 million penalty to settle charges of false reporting, attempted manipulation, and at times, actual manipulation of the LIBOR and Euribor benchmarks.

227.    On November 4, 2015, the Federal Reserve Board issued a consent cease-and-desist order against Deutsche Bank and imposed a $58 million civil penalty for unsafe and unsound practices and violations of U.S. sanctions laws related to countries like Iran, Libya, Sudan, Syria, and Burma. At the same time, New York DFS announced that the Bank would pay $258 million and install an independent monitor related to the same malfeasance.

228.    On January 31, 2017, the Financial Conduct Authority ("FCA") fined Deutsche Bank £163,076,224 for failing to maintain an adequate anti-money laundering (AML) control framework from 2012 through 2015.

229.    Also in 2015, German financial watchdog, Bafin, imposed a fine of €40 million on Deutsche Bank for flaws in its systems designed to prevent money-laundering.

230.    In 2017, the Federal Reserve Board issued a $41 million penalty and consent order against Deutsche Bank's US operations for deficiencies in anti-money-laundering (AML) programs and Bank Secrecy Act compliance.

231.    The high-risk nature of the Deutsche Bank relationship further evidences that BNY knew and should have known that its processing of Epstein's wire transfers was improper.

232.    On July 6, 2020, a Consent Order penalizing Deutsche Bank $150 million was entered in favor of the NY Department of Financial Services finding violations against Deutsche Bank for violations of KYC laws.[90] The Order detailed criminal activity committed by Epstein's top loyalists, Darren Indyke and Richard Kahn, identified respectively in the consent order as "ATTORNEY-1" and "ACCOUNTANT-1," who were carrying out suspicious financial actions in furtherance of Epstein's sex-trafficking operation. Epstein, through these individuals, was carrying out similar suspicious activity through BNY as well.  Indyke and Kahn, the two main Epstein organization employees responsible for carrying out the financial, immigration, and logistics work for the sex-trafficking operation, communicated with BNY directly in highly suspicious manners.  Given their suspicious roles and actions related to Epstein-related accounts Indyke and Kahn are likely personally identified in the Bank's internal monitoring and untimely reporting.

233.    For years, BNY knowingly and intentionally participated in the Epstein sex-

---

[90] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

trafficking venture by (among other things) providing the essential financial underpinnings for the venture. It also financially benefitted from that participation and was financially incentivized to retain Epstein as a client due to his connections and referrals of other high-net-worth clients to the Bank.

234.    Accepted industry practice as well as banking rules and regulations required BNY and banks performing BNY's functions to know the parties to, from, and on whose behalf they were transferring and processing the transfers of cash, to monitor such transfers for suspicious transactions, and to report suspicious transactions.

235.    Epstein could not expand his operation to the level it ultimately reached without complicit financial banking institutions that would ignore red flags and assist him in his sex-trafficking scheme.

## H.    BNY Failed to Conduct Required Due Diligence and KYC Processes with Respect to Epstein and His Related Entities.

236.    BNY failed to conduct required due diligence and KYC processes with respect to Epstein and his related entities.

237.    Epstein, through Deutsche Bank, used BNY to clear hundreds of millions of dollars in highly suspicious transactions made by Epstein's various accounts at Deutsche Bank.

238.    Before banking with Deutsche Bank, Epstein was a client of JPMorgan Chase Bank, N.A. from around 1990 to early 2013.

239.    During that time, JP Morgan repeatedly flagged Epstein as a high-risk client by internal compliance teams due to his unusual transactions, frequent wire transfers to women, including those with Eastern European surnames in high-risk jurisdictions, and cash withdrawal activity. These red flags were further exacerbated after Epstein's arrest in July 2006, and negative media surrounding Epstein—almost always referenced in reputational risk meetings—that

explicitly detailed just how his sex-trafficking operation, and more specifically, the role in which financial institutions played in order to facilitate the same.[91]

240.    BNY knew and had an obligation to know all of the information that Deutsche Bank, especially as a foreign financial institution that posed a greater risk to BNY, knew about Jeffrey Epstein, his related accounts, and the risks associated therewith, and either knew or should have known that JP Morgan had terminated Epstein for evidence of sex-trafficking within his banking activities. Authorities expect correspondent banks to conduct sufficient due diligence to understand and mitigate risk which entails understanding of whom its customer does business with on an ongoing basis. Correspondent banks also need strong activity monitoring systems to detect suspicious transactions and the ability to timely report the potential suspicious activity.

241.    BNY had access to all the same information Deutsche Bank had about Jeffrey Epstein, as recounted in the section above. BNY had access to KYC information on its customer's customer as demonstrated by ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Depending on the clearing agreement, the introducing broker may collect and then share the information with the clearing broker, or the firms may use a technology system that allows the clearing firm to directly view the information.

---

[91] The Wyden Memo summarizes several of JP Morgan's failures and participation in Epstein's sex-trafficking venture.  The memo notes that JP Morgan's "internal data shows that between 2002 and 2016, JPMC reported only $4.3 million in transactions from Epstein's accounts in a handful of SARs. **In September 2019, only after Epstein was arrested, JPMC filed far more comprehensive SARS to report an additional 5,000 wire transfers moving $1.3 billion in and out of Epstein's accounts.**" Wyden Memo, at 1 (emphasis added in original).

242.    In the 2020 Consent Order, DFS found that, "Epstein [] had a well-publicized reputation related to the trafficking and abuse of young women" as "[a]llegations against him began appearing in the press as early as March 2005 with the accusation that he paid a 14-year old girl for a 'massage.'"[92] DFS goes on to state that, "between 2005 and 2013, press reports outlined the allegations underlying the plea agreement and to varying degrees," including that "Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought 'young girls . . . often from Eastern Europe' to the U.S. on Mr. Epstein's private jets'" referring to Brunel and MC2.[93]

243.    Among various other violations, DFS found that while "Epstein held accounts at Deutsche Bank, he used the Butterfly Trust account and various other accounts to send over 120 wires totaling $2.65 million to beneficiaries of the Butterfly Trust, including some transfers to alleged co-conspirators or women with Eastern European surnames, for the stated purpose of covering hotel expenses, tuition, and rent."[94]

244.    DFS found: "If a financial institution decides to do business with a high-rick client, that institution is required to conduct due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is. In this case, Deutsche Bank failed to do so."[95] So did BNY because a correspondent/clearing bank at

---

[92] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

[93] *Id.*

[94] *Id.*

[95] *Id.*

Deutsche Bank to process Epstein's transfers.

245.    DFS also found that despite Epstein being classified by as "high risk" and therefore subject to enhanced due diligence as well as enhanced transaction monitoring of activity within his accounts, Deutsche Bank accepted the responsibility for the accounts because of "how lucrative the relationship could be" and the fact that Epstein "could generate millions of dollars of revenue as well as other lucrative clients…"[96] BNY took those same Epstein accounts with the same incentive.

246.    In the same Consent Order, DFS held that Deutsche Bank was civilly liable for its "clearing/correspondent banking relationships with foreign banks."[97]

247.    At the time Deutsche Bank onboarded Jeffrey Epstein's accounts from JP Morgan in 2013, ███████████████████████████████████████████████████████

███████████████

248.    Pursuant to FINRA, an introducing or clearing firm cannot be relieved of AML obligations to the extent that the other is monitoring for suspicious activities. While a clearing firm can provide tools to help the introducing firm monitor its accounts for potential suspicious activity, all broker-dealers have an independent responsibility to comply with the suspicious activity reporting requirements. Introducing and clearing firms are both responsible for filing SARs for suspicious transactions "conducted or attempted by, at, or through" the firm.

249.    BNY had access to all KYC information obtained by Deutsche Bank in reference to Epstein and Epstein-related entity accounts, had the right to request any additional information on Epstein or his related accounts or account activity, and had the ability to utilize the Patriot Act's

---

[96] *Id.*

[97] *Id.*

314(b), and request of Epstein's other banking institutions, including JP Morgan, the bank who after decades of servicing Epstein, terminated all of his accounts due to the years of suspicious banking activity inconsistent with legitimate business purpose and consistent with his operation of his sex-trafficking venture.

## I.     BNY Participated in Epstein's Sex-Trafficking Venture Through its Relationship with MC2 and Jean-Luc Brunel.

250.    BNY participated in Epstein's sex-trafficking venture through its relationship with MC2 and Jean-Luc Brunel.

251.    As early as 2006 (if not earlier), MC2 had a banking relationship with BNY, including but not limited to an account holding a line of credit on which Jeffrey Epstein was the primary signatory. The funds from that banking relationship were used to fund Epstein's sex-trafficking operation along with Brunel under the veneer of legitimacy with an institution like BNY. Epstein secured the credit line to MC2 and was responsible for withdrawing funds from and replenishing the credit line as a means for concealing his sex-trafficking venture.

252.    The funds were used to entice and silence young victims by keeping the pretense of a modeling agency alive. Young women would be promised modeling careers and connections in the fashion industry only to be abused by Epstein and Brunel.

253.    From its inception in 2005 and continuing until Epstein's death, countless women were filtered through the pipeline from MC2 to Jeffrey Epstein to be abused. Not surprisingly, ██

██████████████████████████████████████████

254.    As noted above, BNY had actual and constructive knowledge of Epstein's relationship with Brunel and MC2 and their respective sex crimes. Notwithstanding, MC2 remained a client of BNY and remained in business as a consequence of Epstein's financing.

255.    Mellon Bank, the predecessor entity to BNY, communicated directly with Epstein

and his agents about securing financing for MC2 at the exact time that he was under state and federal investigation for sex-trafficking crimes related to minor children.

256.    At the inception of the line of credit, BNY requested the letter of credit from Epstein and would not fund MC2's credit line without Epstein's guarantee. BNY's requirement of a personal guarantee from Jeffrey Epstein—a known sex offender—demonstrates that BNY was aware that it was underwriting a criminal enterprise.

257.    Then in 2011, as evidenced by an internal JP Morgan email, Paul Morris, Epstein's banker at JP Morgan, sought approval from the due diligence team to extend the existing letter of credit in support of Epstein's "backstop[ping]" a loan from [BNY] Mellon to MC2.

258.    Without BNY's credit line, MC2, the modeling agency front for Epstein's trafficking venture, would have collapsed due to lack of liquidity along with one branch of Epstein's sex-trafficking venture.

259.    BNY also failed to satisfy its due diligence obligations by extending MC2 a line of credit to MC2 without any due diligence, and worse, with actual knowledge of Epstein and Brunel's use of MC2 to abuse young women.

260.    BNY had several banking obligations to conduct customer due diligence and to know its customer, Jean-Luc Brunel, who had been publicly shamed as a sexual abuser of young women since as early as 1988.

261.    BNY knew or should have known from publicly available information that in 1978, Brunell was the head of Karin Models.

262.    Everything about this financial arrangement should have raised red flags for BNY as the financial institution with knowledge of its existence.

263.    Epstein's sex-trafficking venture would not have been possible without BNY's

credit line to MC2, which partially funded Epstein and Brunel's sex crimes and trafficking of young women.

**J.    Epstein Uses BNY Accounts for the Sex-trafficking Venture, and BNY Directly Benefits from the Venture.**

264.    Over the course of the relationship, Epstein and his associates used BNY accounts, including those affiliated with Jean-Luc Brunel, MC2, and Ghislaine Maxwell, as well as the bank's clearing services in furtherance of the sex-trafficking scheme.

265.    Because of the extraordinary financial benefit to ████████████████████████ ████████████████████████, BNY cleared nearly $700 million in suspicious transactions in furtherance of Epstein's sex-trafficking venture; all transactions which BNY knew or should have known to be suspicious at the time that they were made.

266.    Given BNY's knowledge about Epstein's past sex trafficking, its continuation of its financial relationship with Epstein was, at a minimum, in reckless disregard of the fact that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause Epstein's victims to engage in commercial sex acts.

267.    If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is. BNY knowingly, intentionally, deliberately, and maliciously failed to do so with regard to its relationship with Epstein.

268.    BNY knowingly and intentionally benefitted financially and in other ways from its participation in Epstein's sex-trafficking venture with actual and constructive knowledge to the fact, that Epstein used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young women and girls into engaging in commercial sex acts.

68

269.    By facilitating and financing Epstein's commercial sex acts in interstate and foreign commerce, BNY earned interest, commissions, service fees, and other financial benefits directly from its connection with Epstein, Epstein-related entities, and others acting in concert with Epstein. Epstein provided those financial benefits to BNY precisely because it was facilitating his sex-trafficking venture—and BNY knew that was the reason that Epstein was providing them with those financial benefits.

270.    BNY benefitted by receiving things of value from its participation in the Epstein sex-trafficking venture, including (1) connections with Jeffrey Epstein, his co-conspirators, and his wealthy friends and associates; (2) additional deposits from Epstein, his co-conspirators, and his wealthy friends and associates; (3) the opportunity to earn financial benefits from the funds that had been deposited with it. BNY knowingly and intentionally received these things of value as a direct result of its participation in the Epstein sex-trafficking venture.

## CLASS ACTION ALLEGATIONS

271.    Jane Doe brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

All women who were sexually abused or trafficked by Jeffrey Epstein or Epstein's co-conspirators during the time when BNY maintained bank accounts for Epstein, Epstein's co-conspirators, Epstein related-entities, and/or Epstein-related accounts (the "Class Period").

272.    Jane Doe reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

273.    **Numerosity:** The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by the

Epstein Estate and Defendant, including but not limited to records for Epstein-related accounts (e.g., account ledgers reflecting payments from Epstein to Class members).

274.    **Typicality:** Jane Doe's claims are typical of the claims of the other Class members she seeks to represent. The claims of Jane Doe and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendant's participation in and funding of the Epstein's sexual abuse and Epstein's sex-trafficking venture.

275.    **Commonality:** There are many questions of law and fact common to the claims of Jane Doe and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

276.    **Common Questions of Fact and Law affecting Class Members** include, but are not limited to, the following:

     a.  Whether Epstein ran a sex-trafficking venture;

     b.  Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

     c.  Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

     d.  Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex

acts;

e. Whether BNY knew or should have known disregarded the existence of the Epstein sex-trafficking venture;

f. Whether BNY participated in the Epstein sex-trafficking venture;

g. Whether BNY knowingly and intentionally assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

h. Whether BNY benefitted financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

i. Whether BNY knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a);

j. Whether BNY obstructed the enforcement of the TVPA with respect to Jeffrey Epstein's sex-trafficking venture;

k. Whether BNY owed a duty to Epstein's victims; and

l. Whether BNY breached its duty to Epstein's victims by providing banking services to Epstein and his associates.

277.    Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

278.    **Adequacy:** Jane Doe will fairly and adequately represent and protect the interests

of the other Class members she seeks to represent. Jane Doe has retained counsel with substantial experience in prosecuting complex litigation and class actions. Jane Doe and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Jane Doe nor her counsel have any interests adverse to those of the other Class members.

279.    This action has been brought and may properly be maintained as a class action against BNY pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from BNY's records.

280.    **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

   a.  Joinder of all Class Members is impracticable;

   b.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for BNY and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

   c.  Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

   d.  Absent a class action, Class Members will continue to suffer losses and be aggrieved and BNY will continue to violate New York and federal law without remedy;

e.  Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f.  Jane Doe and her counsel are unaware of any class action brought against any Defendant for the violations alleged in this action;

g.  The forum is desirable because Jane Doe conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h.  This action presents no difficulty that would impede its management by the Court as a class action.

## CAUSES OF ACTION

### <u>COUNT I</u>

**KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595**

281.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 280, as if fully set forth in this Count.

282.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

283.    BNY knowingly and intentionally participated in, assisted, supported, and facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

284.    BNY took many concrete steps to aid Epstein's sex-trafficking venture, as outlined above. Among the concrete steps that BNY took to aid Epstein was providing financial services

that made the sex-trafficking venture possible.  BNY's willingness to provide these services was the quid pro quo for it receiving financial benefits from Epstein.

285.    Among the concrete steps that BNY took to aid and participate in the Epstein sex-trafficking venture were opening up accounts at BNY for Epstein, his related entities, and associates. By opening these accounts, BNY received many benefits from participating in Epstein's venture.  The opening of these accounts was affirmative conduct that caused BNY to receive those benefits.

286.    Among the concrete steps that BNY took to aid the Epstein sex-trafficking venture, BNY willfully failed to timely file required SARs with the federal government, because doing so would imperil its ability to profit from the sex-trafficking venture. BNY's concealment of the cash transactions caused it to receive financial benefits through continuation of the Epstein sex-trafficking venture.

287.    Among the concrete steps that BNY took to aid the Epstein sex-trafficking venture were its failure to follow AML requirements. This failure was not just passive facilitation, but a deliberate omission by BNY.  This omission was a specific act of concealment, which allowed Epstein to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented.

288.    By taking the concrete steps outlined above (along with the others alleged in this complaint), BNY knowingly participated in sex trafficking and furthered the Epstein sex-trafficking venture. The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success.  The concrete steps above constituted active engagement by BNY in Epstein's sex-trafficking venture.

289.    BNY knowingly and intentionally benefited financially from, and received value

for, its participation in the sex-trafficking venture, in which Epstein, with BNY's actual and constructive knowledge of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

290.    BNY helped to conceal the names of Epstein's victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture. Among the ways in which BNY helped to conceal the venture's existence was by providing services to avoid leaving a visible "paper trail."

291.    BNY's concealment included failing to follow through on enhanced monitoring that was required for someone like Epstein.  BNY failed to implement that enhanced monitoring specifically to help conceal Epstein's ongoing sex-trafficking.

292.    BNY's concealment included failing to file required SARs for Epstein's suspicious transactions.

293.    In addition to having actual knowledge that it was participating in Epstein's sex trafficking venture, BNY had constructive knowledge that it was participating in Epstein's sex trafficking venture. BNY also had constructive knowledge that Jane Doe, as well as other Members of the Class, were being coercively sex trafficked by Epstein. Its constructive knowledge extended to the names of Epstein's victims, because Epstein and his associates knew the names of the victims.

294.    BNY had constructive knowledge of Epstein's sex-trafficking venture because of specific acts by Epstein that put it on notice of a particular and ongoing sex trafficking venture.

295.    BNY benefited from Epstein's sex trafficking venture. Among the financial benefits it received were the deposit of funds that Epstein and Epstein-controlled entities made to

BNY.

296.    BNY knowingly received financial benefits in return for its assistance, support, and facilitation of Epstein's sex-trafficking venture.

297.    BNY knew and certainly should have known that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

298.    BNY and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

299.    Despite such knowledge, BNY intentionally paid for, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which BNY knew and certainly should have known that, Epstein would coerce, defraud, and force Jane Doe, as well as other Members of the Class, to engage in commercial sex acts.

300.    In addition to actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, BNY also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

301.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, BNY is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

302.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2),

1595, BNY is liable to Jane Doe and other members of the Class for punitive damages.

## COUNT II

### PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(1), 1595

303.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 280, as if fully set forth in this Count.

304.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

305.    BNY knowingly and intentionally participated in, perpetrated, assisted, supported, facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

306.    Among other things, BNY  knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Jane Doe, as well as other Class Members, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

307.    BNY and its officers and employees had actual knowledge that they were perpetrating and facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

308.    Despite such knowledge, BNY intentionally paid for, facilitated, perpetrated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which BNY knew and certainly should have known that Epstein would coerce, defraud, and force Jane Doe, as well as other Members of the Class, to engage in commercial sex acts.

309.    As part of perpetrating TVPA violations, BNY willfully failed to file required Suspicious Activity Reports (SARs) with the federal government.

310.    BNY's affirmative conduct was committed knowing, and in reckless disregard of the facts, that Epstein would use cash and the financial support provided by BNY as a means of defrauding, forcing, and coercing sex acts from Jane Doe as well as other Members of the Class. BNY's conduct was outrageous and intentional.

311.    BNY's knowing and intentional conduct has caused Jane Doe and the other Members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

312.    BNY's knowing and intentional conduct has caused Jane Doe and the other Members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

313.    This case does not involve mere fraud. Instead, BNY's conduct in perpetrating TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. BNY's conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. BNY's conduct was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking

organization.

314.    By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, BNY is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

315.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, BNY is liable to Jane Doe and other members of the Class for punitive damages.

<u>**COUNT III**</u>

**AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595**

316.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 280, as if fully set forth in this Count.

317.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

318.    Acting through its officers and employees, BNY aided, abetted, and induced Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

319.    Under 18 U.S.C. § 2, BNY is punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, and induced Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members.

320.    Under 18 U.S.C. § 2, BNY committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, and inducing Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members.  As a consequence, Jane Doe, as

well as other members of the Class, are victims of BNY's criminally aiding, abetting, and inducing Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2).

321.    Acting through its officers and employees, BNY itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing a sex-trafficking venture and the sex trafficking of Jane Doe, as well as other Class Members. BNY itself directly violated Chapter 77 by committing and perpetrating these violations.

322.    Among other things, BNY aided, abetted, and induced Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

323.    By aiding, abetting, and inducing Epstein's sex-trafficking venture and sex trafficking of Jane Doe, as well as other Class Members, BNY knowingly benefitted, both financially and by receiving things of value, from participating in Epstein's sex-trafficking venture.

324.    BNY and its officers and employees had actual knowledge that they were aiding, abetting, and inducing Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion. BNY knew, and should have known, that Epstein had engaged in acts in violation of the TVPA.

325.    Despite such knowledge, BNY intentionally paid for and aided, abetted, and

induced Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2.  BNY knew and should have known that Epstein would coerce, defraud, and force Jane Doe, as well as other Class Members, to engage in commercial sex acts.

326.    BNY's affirmative conduct of aiding, abetting, and inducing Epstein's violations was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash and financial support provided by BNY as a means of defrauding, forcing, and coercing sex acts from Jane Doe as well as other Class Members. BNY's conduct was outrageous and intentional.

327.    BNY's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

328.    BNY's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe and the other Class Members harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

329.    This case does not involve mere fraud. Instead, BNY's conduct in aiding, abetting, and inducing Epstein's TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. BNY's conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. BNY's conduct was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

330.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, BNY is liable to Jane Doe and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

331.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, BNY is liable to Jane Doe and other members of the Class for punitive damages.

<u>COUNT IV</u>

**OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)**

332.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1–280, as if fully set forth in this Count.

333.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

334.    BNY and its officers and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

335.    BNY's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and BNY thereby violated Chapter 77, Title 18.  BNY's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Jane Doe, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

336.    As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating

(among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019. On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

337.    By providing financing for Epstein's sex trafficking organization, BNY obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein. To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by BNY 's actions. Because of that delay, Jane Doe as well as other members of the Class, were coercively caused to engage in commercial sex acts.

338.    BNY provided its services to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

339.    As another example of how BNY obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, BNY did not follow AML and anti-structuring reporting requirements found in the Banking Secrecy Act and other laws. These requirements included an obligation that BNY would review transactions in Epstein's (and his associates') BNY accounts for a determination of whether they involved suspicious transactions. If BNY had observed these requirements imposed by law, then it would have prevented many of the subsequent transactions committed by the Epstein sex-trafficking venture. BNY knowingly did not follow these requirements because it knew that doing so would have prevented Epstein's secret cash transactions that were necessary to his sex-trafficking operation escaping knowledge of

federal investigative and prosecuting agencies.

340.    BNY obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, by failing to timely file with the federal government the required SARs that financial institutions must file with the FinCEN whenever there is a suspected case of money laundering or fraud. Timely filing of these reports is required by the Bank Secrecy Act and related laws and regulations.  By failing to timely file the required SARs regarding Epstein's cash and other suspicious transactions, BNY obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA by concealing from the federal government's attention Epstein's cash transaction in aid of sex trafficking.

341.    BNY's failure to timely file SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

342.    If BNY had filed timely SARs, as required, about Epstein's sex-trafficking venture with the federal government, the appropriate federal agencies would have been well positioned to investigate Epstein's sex-trafficking venture's TVPA violations.  BNY's failure to timely file the required SARs obstructed the federal government's ability to investigate those TVPA violations, including violations harming Jane Doe and other Class Members. If BNY had timely filed the required SARs, it would have prevented the continuation of Epstein's sex trafficking venture, which required the ability to secretly use cash to payoff victims.

343.    By providing Epstein and his associates, with banking services, BNY intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.

344.    BNY's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly.  For example, BNY knew

that Epstein was high risk—specifically, high risk to violate the TVPA through continuing criminal sex trafficking activities.

345.    BNY was well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA.  BNY was also well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators. BNY's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

346.    BNY's obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, BNY intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Jane Doe and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture.

347.    BNY knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe and other Class Members. BNY's obstruction has caused Jane Doe and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

348.    BNY's obstruction has caused Jane Doe harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

349.    This case does not involve mere fraud.  Instead, BNY's conduct in obstructing enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  BNY's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. BNY's obstruction was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sex trafficking organization.

350.    By virtue of these violations of 18 U.S.C. § 1591(d), BNY is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. BNY perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

351.    By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), BNY is liable to Jane Doe and other members of the Class for punitive damages by operation of 18 U.S.C. § 1595.

## COUNT V

## NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM

352.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 280, as if fully set forth in this Count.

353.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

354.    In addition to any duties that might arise as a financial institution (as alleged in the next Count, below), BNY owed a duty to Jane Doe and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them. BNY's duties included a duty to exercise reasonable care to avoid conduct that would combine with Epstein's (and others')

crimes, and permit Epstein's crimes, in violation of Chapter 130.

355.    BNY's own conduct in providing financial and other support for Epstein's sex trafficking venture set forces in motion that directly and proximately injured and caused physical harm to Jane Doe and the Class Members.  These forces that BNY set in motion caused Epstein's intentional tortious conduct and Chapter 130 Crimes against Jane Doe and the Class Members, causing physical harm and in themselves constituted physical harm to Jane Doe and the Class Members. BNY owed Jane Doe and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

356.    BNY reasonably could foresee, and did in fact foresee, that its negligent failure to prevent physical harm would result in physical harm to Jane Doe and the Class Members. BNY owed a duty to prevent that physical harm.

357.    BNY failed to act objectively reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against Jane Doe and the Class Members. If BNY had acted reasonably to prevent physical harm, it would not have supported and allowed Epstein's sex-trafficking and sex crimes to occur. BNY owed Jane Doe and the Class members a duty to act objectively reasonably.

358.    At the time of BNY's own negligent conduct, BNY both realized and should have realized the likelihood that it was creating an opportunity for Epstein to commit intentional tortious conduct and Chapter 130 Crimes against Jane Doe and the Class Members. Indeed, BNY knew that its own conduct was necessary to create Epstein's and others' opportunities to engage in that conduct and commit those crimes. BNY owed Jane Doe and the Class Members a duty not to create those opportunities for Epstein and others.

359.    In aiding, abetting, and facilitating Epstein's tortious conduct and crimes, BNY committed intentional torts directed against Jane Doe and the Class Members. BNY's aiding, abetting, and facilitating Epstein's tortious conduct and crimes were its own wrongful acts and omissions. BNY had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against Jane Doe and the Class Members.

360.    BNY's breaches of its legal duties were the direct—*i.e.*, the but-for—cause of physical and psychological injuries to Jane Doe and the Class Members. Without BNY's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to BNY and proximately caused by BNY's breaches.

361.    Jane Doe and the Class Members were easily within the zone of foreseeable harm from BNY's negligent acts and omissions. BNY's negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe and the Class Members fell within that zone.

362.    Because of BNY's negligent failure to prevent physical harm to Jane Doe and the Class Members, it is liable to Jane Doe and the Class Members for damages suffered as a direct and proximate result.

363.    As a direct and proximate result of BNY's negligent failure to prevent physical harm, Jane Doe and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. BNY's aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of

Chapter 130 directly and proximately caused Epstein's sex crimes.

364.    By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendant is liable to Jane Doe and other Members of the Class for punitive damages.

<u>**COUNT VI**</u>

**NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE AS A BANKING INSTITUTION PROVIDING NON-ROUTINE BANKING**

365.    Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 280, as if fully set forth in this Count.

366.    Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

367.    BNY owed a duty to Jane Doe and the Class Members not to knowingly provide non-routine banking assistance to Epstein that it knew, and had reason to know, would lead to and support intentional tortious conduct and Chapter 130 Crimes by Epstein (and others) against Jane Doe and the Class Members.

368.    BNY participated in, aided and abetted, and facilitating his sex-trafficking venture and his commission of intentional tortious conduct and Chapter 130 crimes.  BNY also knew, and was willfully blind to the fact, that it was going beyond providing routine banking by facilitating Epstein's sex-trafficking venture and his commission of Chapter 130 crimes.

369.    BNY deliberately failed to follow numerous banking requirements in connection with financial dealings with Epstein, including AML rules, KYC rules, and anti-structuring rules. In deliberately ignoring and failing to follow those rules, BNY acted in a non-routine way to facilitate and support Epstein's and his co-conspirators' intentional torts, sex-trafficking and

commission of Chapter 130 Crimes.

370.    BNY failed to act objectively reasonably by failing to comply with relevant banking laws and regulations with regard to its interactions with Epstein and his co-conspirators. BNY owed a duty to Jane Doe and the Class Members to act objectively reasonably in its interactions with Epstein and his co-conspirators and to exercise reasonable care to prevent them from engaging in foreseeable intentional torts and criminal activity by using BNY's exceptional and non-routine banking assistance.

371.    BNY owed a legal duty to Jane Doe and the Class Members to act objectively reasonably and to not deliberately ignore banking obligations, including KYC and AML laws and regulations described above, so as to provide Epstein and others with an opportunity to engage in coercive sex-trafficking and Chapter 130 Crimes.

372.    Under KYC, AML, and related laws and regulations, BNY had special duties not ignore crimes being committed by its customers—duties above and beyond any duties that the general public may have. The inquiries that banks must make include duties to inquire about specific individuals who banks know are being harmed. The regulations establish a duty of care that must be followed by banks, including BNY. These duties exist at least in situations where a bank is knowingly going beyond offering routine banking to its customers and offering bank accounts, currency, and other assistance specially adapted to facilitate crimes.

373.    BNY also owed Jane Doe and the Class Members a duty of care because it knew, and had reason to know, that Epstein and his co-conspirators were using BNY to facilitate a sex-trafficking venture, raising a duty to make a reasonable inquiry about suspicious activity.

374.    BNY owed Jane Doe and the Class Member a duty not to deliberately and purposely fail to file SARs, which would have alerted federal authorities to Epstein's and his co-conspirators'

illegal activities, including committing Chapter 130 Crimes.

375.    BNY also owed Jane Doe and the Class Members a duty to prevent physical harm to them when confronted with explicit information that Epstein and his co-conspirators were using BNY's non-routine assistance to further a sex-trafficking venture harming Jane Doe and the Class Members.  Once BNY had information about Epstein's use of BNY for a sex-trafficking venture that was physically harming Jane Doe and the Class Members, it owed them a duty of care to investigate and prevent Epstein's and his co-conspirators' suspicious and criminal activities.

376.    In the exercise of reasonable care, BNY and its employees knew, and should have known, of the dangerous propensities of Jeffrey Epstein to commit violations of article 130 of New York Penal Law against women and girls with whom he was in close proximity, including Jane Doe and the Class Members.

377.    BNY breached its legal duties to Jane Doe and the Class Members as described above. BNY's breach of its duties led to it failing to prevent Epstein from committing Chapter 130 Crimes against Jane Doe and the Class Members. BNY realized that Epstein were committing Chapter 130 Crimes against Jane Doe and the Class Members. The criminal activity that harmed Jane Doe and the Class Members included foreseeable TVPA and Chapter 130 Crimes committed by Epstein.

378.    As a direct and proximate result of the breach of legal duties by BNY, Jane Doe and the Class Members repeatedly suffered direct and foreseeable injuries from Epstein and his co-conspirators, including federal and state sexual offenses (including sexual assaults) and resulting emotional distress, mental pain and suffering, and other physical, psychological, and other injuries.

379.    The breaches of legal duties were the direct—*i.e.*, the but-for—cause of these

physical and psychological injuries to Jane Doe and the Class Members. Without BNY's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to BNY.

380. The injuries that Plaintiff Jane Doe and the Class Members suffered included injuries directly and proximately suffered while they were adults who were present in this District. These injuries are permanent in nature and Jane Doe and the other Class Members will continue to suffer these losses in the future.

381. BNY could reasonably foresee that their actions and omissions in facilitating Epstein's sex trafficking venture would lead to intentional torts and sex offenses against Jane Doe and the Class Members. Indeed, BNY was aware, and should have been aware, that Epstein was a high risk to commit sex offenses against young women and girls.

382. Jane Doe and the Class Members were easily within the zone of foreseeable harm from BNY's negligent acts and omissions. BNY's acts and omissions foreseeably created substantial risk of Jeffrey Epstein committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe and the Class Members fell within that zone.

383. While the foregoing allegations easily make out a clear case of negligence, this case does not involve mere negligence. Instead, Defendant's tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendant's tortious conduct was directed specifically at Jane Doe and other Members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

384. As a result of BNY's negligent actions and omissions described in this Count, Jane Doe and the Class Members have sustained both general and special damages from physical and psychological injury in substantial amounts.

385. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, BNY is liable to Jane Doe and other Members of the Class for punitive damages.

**REQUEST FOR RELIEF**

Jane Doe respectfully requests that the Court enter judgment in her favor, and against BNY, as follows:

a. That the Court certify the Class, name Jane Doe as Class Representative, and appoint her lawyers as Class Counsel;

b. That the Court award Plaintiff and the other members of the Class compensatory, consequential, general, nominal, and punitive damages against Defendant in an amount to be determined at trial;

c. That the Court award punitive and exemplary damages against Defendant in an amount to be determined at trial;

d. That the Court award to Plaintiff the costs and disbursements of the action, alongwith reasonable attorneys' fees, costs, and expenses;

e. That the Court award pre- and post-judgment interest at the maximum legal rate; and

f. That the Court grant all such other and further relief as it deems just and proper.

**JURY DEMAND**

Plaintiff and the Class demand a trial by jury on all claims so triable.

Dated: December 29, 2025

Respectfully submitted,

By: _/s/ David Boies_____

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 446-2300
dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
(954) 356-0011
smccawley@bsfllp.com

Bradley J. Edwards
Brittany N. Henderson
Edwards Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954) 524-2820
brad@cvlf.com
brittany@cvlf.com