**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Jane Doe, individually and on behalf of
all others similarly situated,

      Plaintiff,

              v.

The Bank of New York Mellon Corporation,

      Defendant.

Case No. 1:25-cv-08525-JSR

**REDACTED VERSION**


**THE BANK OF NEW YORK MELLON CORPORATION'S**
**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

ARGUMENT ...................................................................................................................2

I.     The Amended Complaint Does Not State A Claim Under The TVPA ..............................2

     A.     The Amended Complaint Fails To Plead TVPA Participation (Count I) ...............2

               1.     The amended complaint does not allege facts suggesting that BNY participated in a sex-trafficking venture .......................................................2

               2.     The amended complaint does not allege facts suggesting BNY had knowledge of a sex-trafficking venture .......................................................9

               3.     The amended complaint does not allege facts suggesting that BNY received any benefit in relation to a sex-trafficking venture ....................12

     B.     The Amended Complaint Fails To Plead TVPA Obstruction (Count IV)............13

     C.     The Other TVPA Claims Remain Facially Deficient (Counts II and III).............14

II.    The Amended Complaint Does Not Plead Negligence......................................................14

     A.     The Amended Complaint Does Not Allege Facts Supporting Equitable Estoppel.................................................................................................................14

     B.     The Amended Complaint Does Not Allege Facts Suggesting That BNY Owed A Duty To Plaintiff, Or That BNY Proximately Caused Plaintiff's Injuries ...............................................................................................................15

CONCLUSION...............................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Defer LP v. Raymond James Financial, Inc.*,
  654 F. Supp. 2d 204 (S.D.N.Y. 2009) ................................................................. 10

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024) ........................................................................... 2, 4

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
  671 F. Supp. 3d 387 (S.D.N.Y. 2023) ................................. 4, 9, 11, 12, 13, 15

*Doheny v. IBM, Corporation*,
  714 F. Supp. 3d 342 (S.D.N.Y. 2024) ................................................................. 3

*Dole Food Company v. Patrickson*,
  538 U.S. 468 (2003) ............................................................................................. 3

*G.G. v. Salesforce.com, Inc.*,
  76 F.4th 544 (7th Cir. 2023) ........................................................................ 2, 3, 7

*Ganino v. Citizens Utilities Company*,
  228 F.3d 154 (2d Cir. 2000) .............................................................................. 12

*Harbinger Capital Partners II, LP v. Apollo Global Management, LLC*,
  230 N.Y.S.3d 68 (App. Div. 2025) .................................................................... 14

*In re Australia & New Zealand Banking Group Limited Securities Litigation*,
  712 F. Supp. 2d 255 (S.D.N.Y. 2010) ............................................................... 14

*In re Terrorist Attacks on September 11, 2001*,
  740 F. Supp. 2d 494 (S.D.N.Y. 2010) ............................................................... 15

*Levin v. Sarah Lawrence College*,
  747 F. Supp. 3d 645 (S.D.N.Y. 2024) ................................................................. 7

*Liberty Capital Group v. Oppenheimer Holdings Inc.*,
  2025 WL 2825402 (S.D.N.Y. Oct. 6, 2025) ....................................................... 3

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  672 F.3d 155 (2d Cir. 2012) (per curiam) ......................................................... 15

*Mueller v. Deutsche Bank Aktiengesellschaft*,
  777 F. Supp. 3d 329 (S.D.N.Y. 2025) ......................................................... 2, 5, 8

*Noble v. Weinstein*,
  335 F. Supp. 3d 504 (S.D.N.Y. 2018) ................................................................. 6

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019)...............................................................................10

*Thomson-CSF, S.A. v. American Arbitration Association*,
  64 F.3d 773 (2d Cir. 1995)..............................................................................................3

*United States v. Bestfoods*,
  524 U.S. 51 (1998)...........................................................................................................3

*Villalobos v. Telemundo Network Group LLC*,
  2025 WL 2687948 (S.D.N.Y. Sept. 19, 2025)............................................................9, 11

*Zumpano v. Quinn*,
  849 N.E.2d 926 (N.Y. 2006)........................................................................................14, 15

## STATUTES

18 U.S.C. § 1595...................................................................................................................12

## OTHER AUTHORITIES

Bank of Int'l Settlements, *Correspondent Banking* (July 2016),
  https://www.bis.org/cpmi/publ/d147.pdf..........................................................................8

BNY Mellon, *4Q14 Earnings Release* (Jan. 23, 2015), https://tinyurl.com/2kst54ar...................12

The amended complaint is longer than its predecessor but suffers from the same flaws. The new allegations consist almost entirely of: (1) additional press articles about Epstein, none of which even refer to BNY; and (2) ███████████████, which further underscore the meritless nature of this suit, and confirm that BNY had no direct customer relationship with Epstein but instead engaged in nothing more than the routine processing of transactions for other banks. There remain no allegations that BNY played any role in initiating any Epstein-related transactions or in formulating any aspect of Epstein's financial strategy. Nor are there allegations identifying even a single person at BNY who ever communicated with Epstein or his associates.

Indeed, in important ways, the amended complaint has had to walk back central allegations from the original complaint. The amended complaint now acknowledges that the line of credit to MC2 was offered by a former subsidiary of BNY rather than by BNY itself, and it provides no allegations that would plausibly justify piercing the corporate veil between parent and (former) subsidiary. Even more notably, the amended complaint no longer alleges that BNY processed hundreds of millions of dollars in payments to women trafficked by Epstein, likely because ██

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████

The amended complaint now also clarifies that BNY's services were performed as a correspondent bank, without providing any allegations suggesting that this circumscribed role would have provided BNY insight into the purpose of any Epstein-related transactions, let alone knowledge of Epstein's sex trafficking. To the contrary, the amended complaint itself cites industry guidance stating that correspondent banks generally are not expected to perform normal

"due diligence … on the customers of their respondent banks" because "it is very difficult" for them "to check the identities and purpose of the transactions."    Against this backdrop, the allegations of the amended complaint remain entirely inadequate to state a plausible claim.

## ARGUMENT

### I.    THE AMENDED COMPLAINT DOES NOT STATE A CLAIM UNDER THE TVPA

#### A.    The Amended Complaint Fails To Plead TVPA Participation (Count I)

##### 1.    The amended complaint does not allege facts suggesting that BNY participated in a sex-trafficking venture

As BNY has explained (MTD 6-7; Reply 1-2), the participation element requires more than "mere passive nonfeasance" or an "arm's length" relationship.  *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 563-564 (7th Cir. 2023); *accord Doe 1 v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024) ("something more than engaging in an ordinary buyer-seller transaction is required to establish 'participation'").  Yet that is (at most) all that is alleged here.  Like the original, the amended complaint alleges only two Epstein-related services to which BNY had any purported connection: (1) a $1 million line of credit to MC2, a modeling agency owned and operated by someone who is not Jeffrey Epstein; and (2) the processing of transactions for other banks.  These "routine financial services" are (still) insufficient to plead participation.  *Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329, 338 (S.D.N.Y. 2025).

*MC2 line of credit.*  To start, the allegation that BNY extended a line of credit to a company called MC2 does not plausibly suggest that BNY participated in Epstein's alleged sex-trafficking venture because it was not extended by BNY at all.  The amended complaint now acknowledges that the line of credit was provided by "Mellon United National Bank," a former "subsidiary of BNY" (Am. Compl. ¶ 117) that BNY sold in January 2010 (MTD 8 n.6).  The amended complaint attempts to impute Mellon United's alleged conduct to BNY, but it is a "deeply 'ingrained'" legal

principle that "a parent corporation … is not liable for the acts of its subsidiaries," and "nothing in [the TVPA] purports to reject this bedrock principle." *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998).  Moreover, piercing the corporate veil between parent and subsidiary is appropriate in only "rare," "exceptional circumstances." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).  To do so, there must be specific allegations that the parent abused the corporate form to "perpetrate a fraud" or that the parent "dominate[d] and control[led]" the subsidiary.  *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995); *accord Doheny v. IBM, Corp.*, 714 F. Supp. 3d 342, 374 (S.D.N.Y. 2024).  The amended complaint here does not include a single allegation to attempt to plead either point.  There is nothing, for example, about "whether corporate formalities [were] observed," whether Mellon United's "capitalization [was] adequate," or whether Mellon United exercised its own "business discretion."  *Doheny*, 714 F. Supp. 3d at 373.  Without any such facts, Mellon United's alleged line of credit to MC2 cannot support a claim against BNY.  *See, e.g.*, *Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 2025 WL 2825402, at *4 (S.D.N.Y. Oct. 6, 2025) (dismissing claims against parent entities where complaint did "not contain any non-conclusory allegations" as to veil piercing).

Even if BNY could be answerable for Mellon United's alleged conduct (it cannot), the allegations relating to the MC2 line of credit still do not amount to participation.  A line of credit is a quintessential routine financial service (MTD 8; Reply 2), and the amended complaint does not add any factual allegations to suggest that the terms or the amount were in any way unique, or that Mellon United provided any "'active, ongoing support' that was 'tailored' to [MC2's] needs." *G.G.*, 76 F.4th at 562.  The only newly alleged fact is that Epstein "guarantee[d]" the credit line, Am. Compl. ¶ 125, but it is commonplace for a loan to be backstopped by a guarantor.  The alleged

3

line of credit continues to be the kind of "ordinary buyer-seller transaction" that does not give rise to participation liability.  *Apple*, 96 F.4th at 415.

**The processed transactions.**  The amended complaint remains bereft of allegations that BNY provided non-routine, specialized services in connection with any of the Epstein-related transactions alleged.  Rather, the amended complaint continues to allege that BNY merely "*processed*" transactions (*e.g.*, Am. Compl. ¶¶ 5, 12, 168, 192)—and it clarifies that BNY did so pursuant to clearing or correspondent agreements with other banks (*e.g.*, *id.* ¶ 146).  Thus, the amended complaint now makes clear that BNY never had a direct customer relationship with Epstein or any Epstein-related entity; instead, BNY provided services *for its institutional customers*, and those institutional customers sometimes transacted in Epstein-related funds.  *See* MTD 9.  There are still no allegations that BNY played any role in structuring or initiating the Epstein-related transactions, or in formulating any aspect of Epstein's financial strategy—let alone transactions or strategy relating to sex trafficking.  The amended complaint does not even allege a single instance where BNY personnel communicated with Epstein or his associates.[1]

The amended complaint's allegations therefore remain fundamentally different than those found sufficient to survive dismissal in *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387 (S.D.N.Y. 2023).  There are still no allegations, for example, that Epstein or anyone affiliated with him "solicited [BNY's] advice about how to structure" the processed transactions (or about anything else, for that matter).  *Id.* at 399.  Nor is BNY alleged to have provided Epstein "unusual," "extravagant sums" of cash.  *Id.* at 406.  Indeed, despite alleging that Epstein's

---

[1] The stray assertion that "Indyke and Kahn … communicated with BNY directly in highly suspicious manners" (Am. Compl. ¶ 232) is a carry-over from the original complaint that was copied verbatim from a complaint against a different bank.  The Court has instructed that this kind of conclusory statement is insufficient at the motion-to-dismiss stage.  *See* 12/15 Hr'g Tr. 24:9-10.

operation depended on "withdraw[ing] and hold[ing] large amounts of cash for hush money payments and illegal payments to sex-trafficking victims," Am. Compl. ¶ 49, the amended complaint does not assert that BNY ever provided cash to Epstein or his affiliates (nor would such an allegation be plausible given BNY's limited role as a clearing or correspondent bank). At bottom, BNY is not alleged to have "interacted with" Epstein-related entities or funds "any more or differently than [it] would with" the "many other" accountholders of BNY's institutional customers. *Mueller*, 777 F. Supp. 3d at 338.

The amended complaint's new allegations ████████████████████████████ ███████████████████ do not change the analysis. Notably, the amended complaint walks back the original complaint's baseless and irresponsible assertion that BNY processed hundreds of millions of dollars of payments to Epstein's victims. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ There is nothing inherently improper about these transactions (particularly given that Epstein was wealthy and, by all accounts, engaged in *some* legitimate investment activities), and the amended complaint does not draw any factual nexus between these transactions and Epstein's sex trafficking. The most the amended complaint can muster is that these transactions could reflect "a common money laundering practice … for the purpose of concealing criminal activity," Am. Compl. ¶ 185, but even if that were true with respect to some of the transactions, Epstein has been accused of crimes unrelated to sex trafficking, including misappropriation of client funds, *see, e.g.*, *id.* ¶ 78 (noting accusations about Epstein's "business practices" and "sources of wealth"). The amended complaint never explains how these transfers between Epstein-related accounts "specific[ally]"

"furthered" Epstein's sex trafficking—"association" with Epstein "alone" is not sufficient. *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018).[2]

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ the $378 million alleged in the original complaint. *See* Am. Compl. ¶¶ 186, 193.[3]   And some of those transactions clearly have nothing to do with alleged sex trafficking: For example, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████, those transactions must be viewed in light of the circumscribed role BNY is alleged to have played.  The amended complaint alleges only that BNY "allow[ed]" these isolated, small-dollar-amount transactions "to

---

[2] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████

[3] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

continue"—amidst millions of dollars in other transactions that bore no apparent connection to sex trafficking. Am. Compl. ¶ 163. That alleged conduct is (at most) passive facilitation, which does not amount to participation in the sex-trafficking venture. *See* MTD 8.

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ As the amended complaint makes clear, the alleged sex-trafficking venture had concluded by that time (*id.* ¶ 37), so this transaction by definition could not have furthered the venture. *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 679 (S.D.N.Y. 2024) (existence of a venture a necessary element of participation claim).

Finally, the amended complaint's assertions that BNY "failed to conduct required due diligence and KYC processes," "fail[ed] to follow AML requirements," and "fail[ed] to file required SARs" continue to be insufficient to plead participation. Am. Compl. ¶¶ 236, 287, 292; *see also id.* ¶¶ 220-249. These allegations by definition concern omissions rather than affirmative conduct, so, even if true, they would establish nothing more than "passive nonfeasance." *G.G.*, 76 F.4th at 563; *see* MTD 10; Reply 4. But in any event, the amended complaint does not provide factual allegations plausibly suggesting that BNY failed to comply with any of these obligations.

With respect to KYC, there remain no allegations of a direct customer relationship that would give rise to those obligations vis-à-vis Epstein (MTD 12); in fact, Plaintiff now acknowledges that no such relationship existed (*supra* p.4). The amended complaint references "know your customer's customer" ("KYCC") guidance issued by the Bank for International Settlements (Am. Compl. ¶ 150), which actually undermines Plaintiff's allegations. That guidance recognizes that regulatory obligations and industry norms "***do not require***" correspondent banks

like BNY to "perform, as a matter of course, customer due diligence on the customers of their respondent banks when establishing and maintaining correspondent banking relationships." Bank of Int'l Settlements, *Correspondent Banking* 27-28 (July 2016) ("BIS Guidance") (emphasis added), https://www.bis.org/cpmi/publ/d147.pdf. The guidance adds, "[e]ven if correspondent banks have access to additional information on specific transactions, it is very difficult in many cases for an upstream bank to check the identities and purpose of the transactions, as they have no direct contact with the customers." *Id.* at 28. This is precisely such a case because Epstein often transacted through corporate entities rather than personal accounts. *See* Am. Compl. ¶ 185. Thus, while the amended complaint alleges that BNY was required to stop all transactions "without any legitimate business purpose" in real-time (*id.* ¶ 189), the very guidance the amended complaint relies upon emphasizes just the opposite—that "this type of due diligence process [is] difficult to fulfill" for correspondent banks and is not the legal expectation. BIS Guidance at 28.

Plaintiff's allegations that BNY violated AML requirements fail for the same reasons. Indeed, the only non-conclusory allegations of AML violations continue to concern the New York State consent order entered against Deutsche Bank, an order that does not include a single mention of BNY. Am. Compl. ¶¶ 242-246. And while the amended complaint alleges that "DFS held that Deutsche Bank was civilly liable for its 'clearing/correspondent banking relationships'" (*id.* ¶ 246), it fails to mention that the consent order identified the two specific correspondent relationships at issue, which involved other institutions—not BNY. Consent Order at 3-4, *In re Deutsche Bank AG* (July 6, 2020), https://tinyurl.com/msdrsnrs. As for SARs, Judge Cote correctly recognized in *Mueller* that the mere fact a SAR was filed does not mean that a financial institution provided non-routine or tailored services to the accountholders at issue. *See* 777 F. Supp. 3d at 339. ████████████████████████



*Infra* p.13.  Given that (and in light of the practicalities and expectations appliable to correspondent banks), any allegation that BNY "deliberate[ly]" sought to "conceal[]" Epstein's sex trafficking is not plausible.  *Contra* Am. Compl. ¶ 287.

### 2.    The amended complaint does not allege facts suggesting BNY had knowledge of a sex-trafficking venture

Count I should also be dismissed for failure to allege that BNY knew or should have known that "force, fraud, or coercion was used in the *particular* sex-trafficking venture that it is alleged to have participated in." *Doe 1*, 671 F. Supp. 3d at 406.  For this element, the amended complaint remains bereft of allegations specific to BNY.  Unlike in *Doe 1*, there are no allegations that any BNY personnel had "personal knowledge of Epstein's sex-trafficking venture" that can be imputed to BNY under respondeat superior principles.  *See id.* at 407-408.  Nor are there allegations that BNY was presented with "warning signs of sex trafficking in particular," *Villalobos v. Telemundo Network Grp. LLC*, 2025 WL 2687948, at *4 (S.D.N.Y. Sept. 19, 2025), in internal "risk management" memoranda about Epstein, *Doe 1*, 671 F. Supp. 3d at 398-399.

The amended complaint continues to assert that BNY would or should have known about Epstein's sex trafficking as a result of the MC2 line of credit, but the public reports connecting MC2 to Epstein's illicit activities were all published after the line of credit had already been issued. *See* Am. Compl. ¶¶ 114-137.  And more importantly, BNY did not extend that line of credit. *Supra*

pp.2-3.  Even if the amended complaint plausibly alleged that the credit line provided *Mellon United* with actual or constructive knowledge (it does not, *see* Reply 5-6), that would not mean that *BNY* had such knowledge.  "The mere existence of a parent-subsidiary relationship … is not on its own sufficient to impute the scienter of the subsidiary to the parent." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 301 (S.D.N.Y. 2019) (brackets omitted); *see also Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) ("there is no … rule requiring the imputation of a subsidiary's knowledge to its parent," as those relationships "do not yield to a simple rule of agency").  Instead, to impute a subsidiary's knowledge to its parent, "the plaintiff must allege" that the relevant officer of the subsidiary was "sufficiently senior in the parent's management that he serve[d] as a 'proxy' for the parent, or that the parent otherwise 'possessed some degree of control over, or awareness about'" the conduct.  *Schiro*, 396 F. Supp. 3d at 302 (brackets and citation omitted).  The amended complaint does not include a single allegation on these issues; it provides no facts about Mellon United suggesting that BNY would have been aware of the MC2 line of credit at all, much less any associated warning signs related to sex trafficking.  Indeed, such allegations would have been entirely implausible if they had been included:  Mellon United represented a small portion of BNY's overall business, and the $1 million line of credit bore the indicia of a routine small-business loan.  *See supra* p.3.  It strains credulity to assert that BNY's management would be aware of the relevant details every time Mellon United engaged in such a transaction.  *See Schiro*, 396 F. Supp. 3d at 302 (subsidiary did "not comprise a sufficiently large portion of [parent's] overall business" to plausibly impute knowledge).

Absent any knowledge allegations specific to BNY, the amended complaint repeats its predecessor's assertion that "Epstein's sex-trafficking venture was publicly and widely known"— this time, citing even more press reports and civil allegations following Epstein's 2006 arrest on

prostitution charges. *See* Am. Compl. ¶¶ 76-110. This hindsight-based contention fails to establish plausible knowledge for several independent reasons.

*First*, as BNY has explained (MTD 12-13; Reply 5), Epstein's solicitation of prostitution arrest and conviction would at most give rise to "general awareness of sexual misconduct" in the past, which is "insufficient to establish the more specific awareness" of "sex trafficking that is required for a TVPA violation." *Villalobos*, 2025 WL 2687948, at *4; *see* 12/15 Hr'g Tr. 8:17-23 (The Court: "[B]efore … the much more detailed and gross allegations" in "the New York prosecution, … it had been settled, so far as [the banks] knew, through a relatively modest plea and even more modest punishment."). *Second*, the civil lawsuits and press reports cited by Plaintiff were then-unproven allegations that would not have provided any reasonable banker actual or constructive knowledge. *See* 12/15 Hr'g Tr. 9:7-11. *Third*, on their face, the accusations in the cited sources did not reflect ongoing "force, fraud, or coercion" to perpetrate sex trafficking. *Doe 1*, 671 F. Supp. 3d at 406. Many of the accusations involved what was then already years-old conduct (*e.g.*, Am. Compl. ¶¶ 60 n.10, 62 n.12, 106 n.53, 108), and others plainly did not rise to the level of sex trafficking (*e.g.*, *id.* ¶¶ 58 n.5, 77 n.26, 78 n.27, 174). To take just one example, the amended complaint claims a 2016 Daily Mail article "accused [Epstein] of sex trafficking" (*id.* ¶ 186), but in reality, the article simply describes a group of "Manhattan 'it' girls" in their twenties coming "in and out of Epstein's house," which "[t]he Daily Mail identified … as a group of friends who mostly work as models and … social scene regulars" (*see id.* ¶ 186 n.87). *Fourth*, the amended complaint does not allege that BNY had reason to be engaged in real-time monitoring of press articles and civil lawsuits given that Epstein was not a BNY customer. As discussed above (pp.7-8), it is very difficult for correspondent banks to perform the same kind of customer due diligence as their respondent banks, and correspondent banks generally are not expected to do so.

### 3. The amended complaint does not allege facts suggesting that BNY received any benefit in relation to a sex-trafficking venture

Count I should be dismissed for failure to allege that BNY received a "benefit … from participation in a venture." 18 U.S.C. § 1595(a). For this element, Plaintiff continues to rely primarily on the same conclusory allegations that were insufficient in the original complaint. *See* MTD 14-15. Indeed, the amended complaint continues to conclusorily invoke Epstein's "connections and referrals of other high-net-worth clients" (Am. Compl. ¶ 233; *see also id.* ¶¶ 9, 14, 270), but still never identifies a single such "connection." MTD 15. And the amended complaint continues to allege that "BNY earned interest, commissions, [and] service fees," from processing transactions (Am. Compl. ¶ 269), yet that is the kind of standard revenue that courts have consistently held is insufficient to satisfy the benefit requirement. MTD 16 (collecting cases).

The only new allegation bearing (tenuously) on benefit is that "in 2014 Epstein, through his company, Southern Financial, acquired millions of dollars of BNY shares." Am. Compl. ¶ 181. The amended complaint fails, however, to provide any factual content to suggest how BNY (a large, publicly traded company) would have even known of this alleged fact, let alone actually benefitted from a stock purchase on the secondary market. Tellingly, the amended complaint does not allege that the purchase affected BNY's stock price, or that Southern Financial purchased the shares from BNY directly. Absent such allegations, it is implausible that the purchase of these shares would have caused any discernible benefit to BNY, particularly given that BNY's market cap in 2014 exceeded $40 billion.[4] The allegations here are worlds away from the allegations in *Doe 1* that a bank directly obtained a "'number of sizable deals' … through its relationship with … Epstein." 671 F. Supp. 3d at 408. No comparable allegation is or could be made against BNY.

---

[4] *See* BNY Mellon, *4Q14 Earnings Release* 4 (Jan. 23, 2015), https://tinyurl.com/2kst54ar; *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) (judicial notice of stock prices).

**B.      The Amended Complaint Fails To Plead TVPA Obstruction (Count IV)**

As BNY has explained (MTD 18-19; Reply 7), the TVPA does not provide a private right of action for obstruction.  But even if it did, the amended complaint still does not provide factual allegations plausibly suggesting that BNY (1) knew of an effort to enforce the TVPA, *and* (2) intentionally attempted to obstruct that enforcement effort.  *See Doe 1*, 671 F. Supp. 3d at 409.

The only new allegations relating to the first element are two press articles from 2010 and 2011 reporting vaguely that "[f]ederal investigators continue to investigate Epstein's activities." Am. Compl. ¶ 99; *see id.* ¶ 105.  But the amended complaint nowhere alleges that BNY was aware of these articles (one of which was from "Baltic News Service"), and as explained above (pp.7-8), BNY had no reason to be monitoring news reports about Epstein given that he was not a bank customer.  That is especially true with respect to these particular articles, which were ███████ ████████████████████████████████████████████████████████████████████  *See* Am. Compl. ¶ 5.  Reference to these two vague articles does not plausibly allege that BNY actually knew about an ongoing enforcement effort.  *See* MTD 19.

The obstruction claim also fails because the amended complaint does not include any allegations suggesting that BNY failed "to timely file SARs" (Am. Compl. ¶ 341) in a *deliberate* effort to hinder an enforcement effort.  *See* MTD 20.  If anything, that assertion is even *less* plausible now in light of the new allegations, which make clear that ████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████  That is the opposite of obstruction.

### C. The Other TVPA Claims Remain Facially Deficient (Counts II and III)

The amended complaint reasserts perpetrator and aiding-and-abetting claims even though Plaintiff previously did not even attempt to defend them (Opp. 18 n.15).  Both of these claims fail again because there are no non-conclusory allegations that BNY itself engaged in sex trafficking, and the TVPA does not provide for aiding-and-abetting liability.  MTD 17-18.

## II.    THE AMENDED COMPLAINT DOES NOT PLEAD NEGLIGENCE

### A. The Amended Complaint Does Not Allege Facts Supporting Equitable Estoppel

Plaintiff's negligence claims remain untimely, and the amended complaint's attempts to bolster an equitable-estoppel argument fall short as a matter of law.  *See* MTD 21; Reply 8-9.  The amended complaint first asserts that BNY made "affirmative misrepresentations" that it had "no meaningful role in, or knowledge of, Epstein's sex-trafficking enterprise," Am. Compl. ¶ 18, but any such statements would have been very recent (long after these claims accrued), and in any event, a "mere denial of wrongdoing … is not sufficient to create an estoppel," *e.g.*, *Harbinger Cap. Partners II, LP v. Apollo Glob. Mgmt., LLC*, 230 N.Y.S.3d 68, 71 (App. Div. 2025).  Likewise, the conclusory allegation that BNY "fail[ed] to make filings and disclosures" and to "provide responsive documents requested by Congressional investigations," Am. Compl. ¶ 20, is insufficient because "[i]t is not enough" for estoppel to allege that a defendant "remained silent" or declined to "report [wrongdoing] to law enforcement officials," *Zumpano v. Quinn*, 849 N.E.2d 926, 929-930 (N.Y. 2006).  And most egregiously, the amended complaint baselessly asserts—without a single supporting factual allegation—that "BNY negotiated with known victims of Epstein's sex trafficking to settle claims against BNY and secure non-disclosure agreements." Am. Compl. ¶ 21.  As BNY has informed Plaintiff's counsel, this blatant falsehood violates counsel's obligation to ensure that pleadings are "well grounded in fact."  *In re Aus. & N.Z.*

*Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 263-264 (S.D.N.Y. 2010).  What matters for present purposes, though, is that even if the assertion were true (it is not), it would not warrant equitable estoppel.  As the New York Court of Appeals has held, an allegation that a defendant "made private payments … so that charges would not be publicized" "is not fraudulent concealment as a matter of law."  *Zumpano*, 849 N.E.2d at 930.

###### B.    The Amended Complaint Does Not Allege Facts Suggesting That BNY Owed A Duty To Plaintiff, Or That BNY Proximately Caused Plaintiff's Injuries

The amended complaint also fails to state a negligence claim on the merits.  For one thing, it still does not plausibly allege that BNY owed a duty to Plaintiff because there are no allegations of non-routine banking services.  MTD 22-24; Reply 9-10.  Rather, as discussed (*supra* p.4), the amended complaint acknowledges that BNY processed wire transactions as a clearing or correspondent bank, services that do not give rise to a legal duty to non-customers under New York law.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 156-158 (2d Cir. 2012) (per curiam); *In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 518 (S.D.N.Y. 2010).  In addition, the amended complaint does not plead proximate cause because the allegations do not plausibly suggest that the alleged sex trafficking of Plaintiff was "a natural and foreseeable consequence of a circumstance created by" BNY.  *Doe 1*, 671 F. Supp. 3d at 415; MTD 24-25; Reply 10.  Again, the newly cited press articles do not indicate that BNY knew or should have known that its services were being used to further sex trafficking.  *Supra* p.11. ███

████████████████████████████████████████████████████████████████████████████

*Supra* p.6.  Accordingly, to the extent there is any causal connection between BNY's conduct and Plaintiff's alleged injuries, it was not foreseeable.

### CONCLUSION

The amended complaint should be dismissed with prejudice.

Dated: January 12, 2026                    Respectfully submitted,


                                           /s/ Felicia H. Ellsworth
                                           Felicia H. Ellsworth (*pro hac vice*)
                                           WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                           60 State Street
                                           Boston, MA 02109
                                           Telephone: (617) 526-6000
                                           Facsimile: (617) 526-5000
                                           felicia.ellsworth@wilmerhale.com

                                           Boyd M. Johnson III
                                           Christopher Bouchoux
                                           Andres C. Salinas
                                           WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                           7 World Trade Center
                                           250 Greenwich Street
                                           New York, NY 10007
                                           Telephone: (212) 230-8800
                                           Facsimile: (212) 230-8888
                                           boyd.johnson@wilmerhale.com
                                           christopher.bouchoux@wilmerhale.com
                                           andres.salinas@wilmerhale.com

                                           Brittany R. Warren (*pro hac vice*)
                                           WILMER CUTLER PICKERING
                                              HALE AND DORR LLP
                                           2100 Pennsylvania Avenue NW
                                           Washington, DC  20037
                                           Telephone: (202) 663-6000
                                           Facsimile: (617) 663-6363
                                           brittany.warren@wilmerhale.com


                                           *Attorneys for The Bank of New York Mellon*
                                           *Corporation*

16

**CERTIFICATE OF COMPLIANCE**

I, Felicia H. Ellsworth, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing

memorandum of law was prepared using Microsoft Word and complies with Rule 2(e) of this

Court's Individual Rules, Local Civil Rule 7.1(c), and this Court's December 15, 2025 order.


*/s/ Felicia H. Ellsworth*
Felicia H. Ellsworth