# EXHIBIT H

# Committee on Payments and Market Infrastructures



# Correspondent banking

July 2016



BANK FOR INTERNATIONAL SETTLEMENTS

This publication is available on the BIS website (www.bis.org).

© Bank for International Settlements 2016. All rights reserved. Brief excerpts may be reproduced or translated provided the source is stated.

ISBN 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-616-4 (print)

ISBN 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-617-1 (online)

# Contents

Executive summary ................................................................................................................................. 1

1.    Introduction ......................................................................................................................................... 6

2.    Developments in correspondent banking ................................................................................... 9

    2.1    Concept of correspondent banking .......................................................................................... 9

    2.2    Recent developments in correspondent banking – qualitative analysis ........................11

    2.3    SWIFT data analysis – quantitative analysis ........................................................................13

        2.3.1    Data description ......................................................................................................................13

        2.3.2    Results ........................................................................................................................................14

3.    Potential measures to facilitate correspondent banking services ....................................18

    3.1    General considerations ..................................................................................................................18

    3.2    KYC utilities .......................................................................................................................................19

    3.3    Legal Entity Identifier (LEI) ..........................................................................................................23

        3.3.1    General information on the LEI ..........................................................................................23

        3.3.2    LEI and correspondent banking .......................................................................................24

    3.4    Information-sharing ........................................................................................................................27

    3.5    Payment messages ..........................................................................................................................32

        3.5.1    General considerations .........................................................................................................32

        3.5.2    Message flows .........................................................................................................................33

        3.5.3    Usage of the LEI as additional information in payment messages .......................38

    4.    Conclusions .......................................................................................................................................39

Annex 1 – References ............................................................................................................................41

Annex 2 – Glossary.................................................................................................................................43

Annex 3 – SWIFT data analysis...........................................................................................................47

Annex 4 – Members of the CPMI Working Group on Correspondent Banking .......................58

## Abbreviations

| | |
|---|---|
| AML/CFT | Anti-Money Laundering and Countering the Financing of Terrorism |
| AMLEG | BCBS AML/CFT Expert Group |
| BCBS | Basel Committee on Banking Supervision |
| BIC | Business Identifier Code |
| CBCG | FSB Correspondent Banking Coordination Group |
| CLS | Continuous Linked Settlement |
| CPMI | Committee on Payments and Market Infrastructures |
| ECB | European Central Bank |
| ECC | BIS Economic Consultative Committee |
| FATF | Financial Action Task Force |
| FMI | Financial Market Infrastructure |
| FSB | Financial Stability Board |
| GLEIF | Global LEI Foundation |
| GPFI | Global Partnership for Financial Inclusion |
| G-SIBs | Global Systemically Important Banks |
| ISAE | International Standard on Assurance Engagements |
| ISO | International Organization for Standardization |
| KYC | Know-your-customer |
| LEI | Legal Entity Identifier |
| LEI ROC | Legal Entity Identifier Regulatory Oversight Committee |
| LOU | Local Operating Unit (for the issuance and management of LEIs) |
| OFAC | Office of Foreign Assets Control |
| PMPG | Payments Market Practice Group |
| SME | Small and Medium-sized Enterprise |
| SWIFT | Society for Worldwide Interbank Financial Telecommunication |

# Executive summary

Through correspondent banking relationships, banks can access financial services in different jurisdictions and provide cross-border payment services to their customers, supporting international trade and financial inclusion.

In view of the importance of correspondent banking, the keen interest of central banks in this activity and any threats to its safe and efficient functioning, the Governors of the BIS Economic Consultative Committee (ECC) have mandated the CPMI to produce a report on this issue. In response, the CPMI Working Group on Correspondent Banking has prepared this technical report describing current trends and analysing measures that might alleviate some of the concerns and cost issues related to correspondent banking.

Banks have traditionally maintained broad networks of correspondent banking relationships, but there are growing indications that this situation might be changing. In particular, some banks providing these services are reducing the number of relationships they maintain and are establishing few new ones. The impact of this trend is uneven across jurisdictions and banks. As a result, some respondent banks are likely to maintain relationships, whereas others might risk being cut off from international payment networks. This implies a threat that cross-border payment networks might fragment and that the range of available options for these transactions could narrow.

In addition, an analysis using SWIFT data shows that there seems to be a trend towards concentration in correspondent banking activities.

Rising costs and uncertainty about how far customer due diligence should go in order to ensure regulatory compliance (ie to what extent banks need to know their customers' customers – the so-called KYCC) are cited by banks as among the main reasons for cutting back their correspondent relationships. To avoid penalties and related reputational damage, correspondent banks have developed an increased sensitivity to the risks associated with correspondent banking. As a consequence, they have cut back services for respondent banks that (i) do not generate sufficient volumes to overcome compliance costs; (ii) are located in jurisdictions perceived as too risky; (iii) provide payment services to customers about which the necessary information for an adequate risk assessment is not available; or (iv) offer products or services or have customers that pose a higher risk for anti-money laundering/combating the financing of terrorism (AML/CFT) and are therefore more difficult to manage.

The regulatory framework is taken as given in this report, as are in particular the AML/CFT requirements and the related implementing legislation and regulations in different jurisdictions. It is acknowledged that these requirements, as agreed by the competent authorities, along with strict implementation, are necessary to prevent and detect criminal activities and ensure a healthy financial system.

The working group limited its analysis to measures that could help improve the efficiency of procedures, reduce compliance costs and help address perceived uncertainty, without altering the applicable rules and the basic channels for correspondent banking services between correspondent and respondent banks. The group analysed in detail some potential measures and translated them into five recommendations.

An earlier version of this report was issued for consultation in October 2015. This final version of the report has been revised in the light of public comments received during the consultation, which are published on the BIS website[1], and further interactions with relevant stakeholders. The major changes in this final report relative to the consultative report include the following:

---

[1]    www.bis.org/cpmi/publ/comments/d136/overview.htm.

(i)      Recommendation on the use of "know your customer" (KYC) utilities

Many of the comments pointed out that there is currently no standardisation in the type and format of information in different KYC utilities and that such inconsistencies in the gathering of information limit the value of KYC utilities.

Therefore, the CPMI has decided to enhance the previous recommendation by inviting relevant standard setters such as the International Organization for Standardization (ISO) to consider defining a standardised minimum set of information and data (including the format) that all utilities should collect and that all banks have to be ready to provide to other banks which require the information and data.

In addition, many of the comments argued that, for KYC utilities to be more effective, in addition to standardising the data and formats, it would be necessary that banks have some assurances from relevant authorities (such as the regulatory, supervisory or law-enforcement authorities) with respect to the appropriateness of and reliance upon any such utility for the purposes of AML/CFT compliance.

Therefore, the authorities with responsibility for AML/CFT (ie the Financial Action Task Force (FATF) and the Basel Committee on Banking Supervision AML/CFT Expert Group (AMLEG)) are invited to consider developing a set of issues that financial institutions should consider when using KYC utilities, to support an appropriate use of these utilities.

(ii)      Recommendation on the use of the Legal Entity Identifier (LEI) in correspondent banking

All authorities and relevant stakeholders are invited to consider promoting BIC-to-LEI mapping facilities, which allow for an easy mapping of routing information available in the payment message to the relevant LEI. In addition, relevant authorities (eg the LEI Regulatory Oversight Committee (LEI ROC) and AMLEG) are encouraged to elaborate further as to what extent banks can rely on the LEI as a means of accessing reliable information to support customer due diligence in correspondent banking.

(iii)      Recommendation on information-sharing initiatives

Many of the comments sought a further clarification on data privacy concerns in the area of correspondent banking and highlighted the potential conflicts between the sharing of relevant information across jurisdictions and existing national data privacy regulations.

Therefore, the FATF and AMLEG are invited to further explore ways to tackle obstacles to information-sharing, with the aim of identifying potential best practices (in the enterprise-wide context, among financial institutions not part of the same financial group, and between the public and the private sector).

(iv)      Recommendation on payment messages

The majority of the comments validated the argument that both methods (ie the serial MT 103 method and the cover MT 202 COV method) can be used in full compliance with AML/CFT as well as relevant regulatory requirements when all data fields are accurately populated in a payment message.

Therefore, the CPMI decided to modify the initial recommendation and leave the decision to individual banks as to which method should be used. Given the importance of ensuring the transparency and accuracy of information in payment messages, the CPMI has decided to invite the relevant stakeholders (ie the Wolfsberg Group and the Payments Market Practice Group (PMPG)) to review their principles governing the use-cases for payment messages, what information should be included and which data fields should be used. In addition, the AMLEG is invited to consider developing further guidance on supervisors' role in ensuring that banks meet FATF Recommendations and guidance on the quality of payment message content.

(v)    Recommendation on the use of the LEI as additional information in payment messages

Before the use of LEIs becomes widespread or even compulsory for banks and corporate customers, relevant stakeholders could start analysing how the LEI might be used on an optional basis in a more structured way within the current relevant MT messages (ie MT 103 and MT 202 COV). Therefore, relevant stakeholders (eg the PMPG) should work to define a common market practice for how to include the LEI in the current relevant payment messages without changing the current message structure.

Also, as part of a potential future migration to message formats based on the ISO 20022 standard, relevant stakeholders (ie ISO and SWIFT) are encouraged to consider developing dedicated codes or data items for the inclusion of the LEI in these payment messages.

The CPMI believes that its recommendations might alleviate some of the costs and concerns connected with correspondent banking activities. However, the members are aware and would like to stress that, in isolation, these measures will not resolve all the issues. The CPMI acknowledges that the issues surrounding the withdrawal from correspondent banking are very complex and that costs related to AML/CFT compliance are only one of the elements that have to be considered in order to understand recent trends. Those include business considerations as well as economies of scope and scale issues. Limiting information challenges through the use of enhanced technical tools will only address a part of AML/CFT compliance costs but this will not resolve issues such as uncertainty about how far customer due diligence should go. In particular, the proposed measures will not immediately help banks without access to correspondent banking services to gain such access.

As a next step before any potential implementation, these measures should be further analysed by all relevant authorities and stakeholders in order to gauge the potential impact of each measure and to avoid unintended consequences. The CPMI expects that the relevant stakeholders will initiate any necessary reviews or investigations in the light of the five recommendations as soon as possible.

The CPMI will (i) encourage, mainly through the participation of CPMI members in the FSB Correspondent Banking Coordination Group, the review or investigation of the recommendations by the relevant stakeholders and (ii) from the technical perspective of payment systems, facilitate the implementation by contributing to the work or workstreams of the relevant stakeholders, possibly through participation in such work or workstreams.

## Recommendations:

- **Recommendation on the use of "know your customer" (KYC) utilities**: The use of KYC utilities by respondent and correspondent banks – provided that they store at least a minimum set of up-to-date and accurate information – could be supported in general as an effective means of reducing the burden of compliance with customer due diligence requirements for banks active in the correspondent banking business. Relevant standard setters such as the International Organization for Standardization (ISO) may wish to consider defining a standardised minimum set of information and data (including the format) that all utilities should collect and that all banks must be ready to provide to other banks which require the information and data.

  In addition to standardising information and data with a view to making KYC utilities more effective in reducing the customer due diligence costs associated with correspondent banking, the authorities with responsibility for anti-money laundering/combating the financing of terrorism (AML/CFT) (ie the Financial Action Task Force (FATF) and the Basel Committee on Banking Supervision AML/CFT Expert Group (AMLEG)) are invited to consider developing a set of issues that financial institutions should consider when using KYC utilities, to support an appropriate use of these utilities.

- **Recommendation on the use of the Legal Entity Identifier (LEI) in correspondent banking**: In addition to the general promotion of LEIs for legal entities, relevant stakeholders may consider specifically promoting the use of the LEI for all banks involved in correspondent banking as a means of identification that should be provided in KYC utilities and information-sharing arrangements. In a cross-border context, this measure should ideally be coordinated and applied simultaneously in a large number of jurisdictions. All authorities and relevant stakeholders may wish to consider promoting BIC-to-LEI mapping facilities, which allow for routing information available in the payment message to be easily mapped into the relevant LEI. In addition, the relevant authorities (eg the LEI Regulatory Oversight Committee (LEI ROC) and AMLEG) are encouraged to elaborate further as to what extent banks can rely on the LEI as a means of accessing reliable information to support customer due diligence in correspondent banking.

- **Recommendation on information-sharing initiatives**: The work already conducted by the authorities with responsibility for AML/CFT (ie the FATF and AMLEG) is very much appreciated. It is recommended that the FATF and AMLEG be invited to (i) provide additional clarity on due diligence recommendations for upstream banks, in particular to what extent banks need to know their customers' customers ("KYCC"); and (ii) further explore ways to tackle obstacles to information-sharing, with the aim of identifying potential best practices (in the enterprise-wide context, among financial institutions not part of the same financial group, and between the public and the private sector).

  To facilitate compliance with FATF customer due diligence recommendations, (i) the use of information-sharing mechanisms (if they exist in a given jurisdiction and data privacy laws allow this) for knowing your customers' customers could be promoted as the first source of information by default, which (ii) could be complemented bilaterally with enhanced information should there be a need.

  In order to support information-sharing in general, the respondent bank may include provisions in its contractual framework with its customers (eg in the terms and conditions or in a supplementary agreement) which allow the bank to provide such general information on request to other banks for AML/CFT compliance purposes.

- **Recommendation on payment messages**: It is recommended that banks decide individually which payment method best meets their own and their clients' needs and agree with other banks involved on the method to be used.

  The relevant stakeholders (ie the Wolfsberg Group and the Payments Market Practice Group (PMPG)) are invited to review their principles governing the use-cases for payment messages, such as the PMPG's market practice guidelines and white papers. The documents should include information about the data that should be contained in payment messages as well as the data fields that should be used to provide relevant information for conducting customer due diligence. In addition, the AMLEG is invited to consider further developing guidance on supervisors' role in ensuring that banks meet FATF Recommendations and guidance on the quality of payment message content.

- **Recommendation on the use of the LEI as additional information in payment messages**: The use of the LEI as additional information in payment messages should be possible on an optional basis in the current relevant payment messages (ie MT 202 COV and MT 103). To allow for the optional usage of the LEI, relevant stakeholders (eg the PMPG) should work to define a common market practice for how to include the LEI in the current relevant payment messages without changing the current message structure.

  Also, as part of a potential future migration to message formats based on the ISO 20022 standard, relevant stakeholders (ie ISO and SWIFT) are encouraged to consider developing dedicated codes or data items for the inclusion of the LEI in these payment messages.

# 1.    Introduction

Correspondent banking is an essential component of the global payment system, especially for cross-border transactions. Through correspondent banking relationships, banks can access financial services in different jurisdictions and provide cross-border payment services to their customers, supporting, inter alia, international trade and financial inclusion. In addition, most payment solutions that do not involve a bank account at customer level (eg remittances) rely on correspondent banking for the actual transfer of funds. Until recently, banks have maintained a broad network of correspondent relationships, but there are growing indications that this situation might be changing. In particular, some banks providing these services are cutting back the number of relationships they maintain and are establishing few new ones.

In view of the importance of correspondent banking, the keen interest of central banks in this activity and any threats to its safe and efficient functioning, the ECC Governors have mandated the CPMI to produce a report on this issue, especially as regards potential measures to ensure an efficient provision of cross-border payment services globally. This report has been prepared by a designated CPMI Working Group on Correspondent Banking, which was set up to meet the ECC mandate, and has a technical character.

The main aim of this technical report is to elaborate on the payment system aspects of correspondent banking and to assess, from a technical perspective, the advantages and limitations of several measures that could facilitate the provision of correspondent banking services.

The following caveats need to be highlighted:

- Participants in the CPMI working group gathered mainly qualitative information through interviews with selected institutions within their countries. The group did not conduct interviews with institutions in non-CPMI jurisdictions, some of which may be among the most affected by the withdrawal from correspondent banking.

- On an exceptional basis, SWIFT provided selected members of the CPMI working group with transaction data for an analysis on developments in correspondent banking (see Section 2.3 for the analysis).

- It needs to be highlighted that, before any potential implementation, these measures should be further analysed by all relevant authorities and stakeholders in order to gauge the potential impact of each measure and to avoid any unintended consequences.

Some of the recent work and current initiatives in the area of correspondent banking are covered in Box 1.

---

Box 1

### Initiatives on correspondent banking

Recent work and current initiatives in the field of correspondent banking by different international bodies and institutions include the following:

- **The Financial Stability Board (FSB)** is closely cooperating with other international organisations and with national jurisdictions that are members of the FSB and its Regional Consultative Groups to assess and address the decline in correspondent banking, given the importance of correspondent banking for international payments and that, in the extreme case, the loss of access to such services can affect the functioning of local banking systems, create financial exclusion and drive some payment flows underground.

    At the November 2015 Antalya Summit, the G20 Leaders approved the FSB four-point action plan to assess and address the decline in correspondent banking. Under the plan, the FSB, in partnership with other organisations, will coordinate work on the four-point action plan to: (1) further examine the dimensions and

---

implications of the issue, including improving data collection on the scale of withdrawal, its causes and effects; (2) clarify regulatory expectations, including through guidance by the FATF; (3) expand domestic capacity-building in jurisdictions that are home to affected respondent banks; and (4) strengthen tools for customer due diligence by correspondent banks.

In March 2016, given the importance and multifaceted nature of the issue, the FSB created a Correspondent Banking Coordination Group (CBCG) to maintain impetus in delivering on the action plan and to provide efficient high-level coordination, identifying in a timely way if there are gaps or overlaps in the work. The FSB also created four workstreams of technical experts to coordinate at a more detailed level on a day-to-day basis the work to take forward each of the four action points. The workstreams report periodically into the CBCG and are steered by the CBCG.

- **The World Bank** is conducting surveys to better understand the evolution and drivers of bank account closures or restrictions, in the context of correspondent banking relationships and money and value transfer services (remittances). Under the G20's Global Partnership for Financial Inclusion (GPFI), the World Bank collected information on whether and why banks are terminating or restricting business relationships with remittance service providers. With support from the FSB and CPMI, the World Bank led another survey to obtain data on whether correspondent banking relationships are being terminated or restricted, the net effect of these developments and the underlying causes. This data-gathering included non-CPMI jurisdictions.

  In November 2015, the World Bank published the results of the survey on correspondent banking relationships. The survey results were accompanied by the results of the GPFI-commissioned survey on remittance service providers.

- **The Financial Action Task Force (FATF)** issued three subsequent public statements on de-risking in October 2014, in June 2015 and in October 2015 in order to clarify its approach to "de-risking", which is based on the risk-based approach as a central element of the FATF Recommendations. The risk-based approach requires financial institutions to identify, assess and understand their money laundering and terrorist financing risks, and implement AML/CFT measures that are commensurate with the risks identified. The June 2015 public statement on "de-risking" provides additional clarification on customer due diligence for correspondent banking relationships: "[...] When establishing correspondent banking relationships, banks are required to perform normal customer due diligence on the respondent bank. Additionally, banks are required to gather sufficient information about the respondent bank to understand the respondent bank's business, reputation and the quality of its supervision, including whether it has been subject to a money laundering or terrorist financing investigation or regulatory action, and to assess the respondent bank's AML/CFT controls. Although there will be exceptions in high risk scenarios, the FATF Recommendations do not require banks to perform, as a matter of course, normal customer due diligence on the customers of their respondent banks when establishing and maintaining correspondent banking relationships[...]".

  In October 2015, the FATF issued a public statement which confirms that de-risking will remain a priority for FATF; highlights the FATF's ongoing work to clarify regulatory expectations to ensure that AML/CFT measures are being implemented in line with its risk-based approach; and reiterates its commitment to continuing engagement with other international bodies, countries, the private sector and civil society on this important issue. The FATF is developing a guidance on correspondent banking and remittances whose main objective is to clarify the applicable FATF requirements. In order to facilitate coordination and engagement with other interested international bodies, the FATF invited the Secretariats of the CPMI and the FSB to the meetings of its Policy Development Group (February and June 2016) and dialogue with the private sector (April 2016) where the issue was discussed.

  In addition, FATF recently completed work of particular relevance to de-risking: guidance on the risk-based approach for effective supervision and enforcement by AML/CFT supervisors of the financial sector and law enforcement (October 2015), guidance for risk-based approach for money or value transfer services (February 2016) and best practices on combating the abuse of non-profit organisations (June 2015).

- **The Basel Committee on Banking Supervision (BCBS)** published in January 2014 its *Sound management of risks related to money laundering and financing of terrorism*, which contains an annex on correspondent banking (including money laundering/financing of terrorism risk assessments and customer due diligence requirements in correspondent banking). In February 2016, the BCBS released an expanded version of these

> guidelines with a new annex – the *General guide to account opening*. Previously in 2009, the BCBS had published a document setting out the *Due diligence and transparency regarding cover payment messages related to cross-border wire transfers*, which is relevant in the matter of payment messages used for correspondent business.

Closer coordination between the various workstreams and the relevant authorities has been established since the publication of the consultative version of this report in October 2015, and includes the development of the FSB Correspondent Banking Coordination Group and the participation of the secretariats of the FSB and CPMI in the FATF Policy Development Group meetings and the annual FATF Private Sector Consultative Forum (see Box 1). Taking into account the complexity of this topic, such liaison will continue to be essential in order to understand the many issues involved and to avoid a duplication of work.

This technical report is organised as follows: after this introduction, Section 2 provides some basic definitions and outlines the main types of correspondent banking arrangements. It then summarises recent developments from qualitative and quantitative perspectives and touches on the underlying drivers. Section 3 sets out various measures that could facilitate correspondent banking, and weighs up their advantages and limitations. The final section concludes with proposed next steps.

# 2. Developments in correspondent banking

## 2.1 Concept of correspondent banking

Correspondent banking can be defined, in general terms as "an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks".[2] The ECB uses a similar basic definition in its correspondent banking survey, referring to "agreements or contractual relationships between banks to provide payment services for each other".[3] A more detailed definition by the Wolfsberg Group[4] establishes that "[c]orrespondent Banking is the provision of a current or other liability account, and related services, to another financial institution, including affiliates, used for the execution of third-party payments and trade finance, as well as its own cash clearing, liquidity management and short-term borrowing or investment needs in a particular currency".[5] At the most basic level, correspondent banking requires the opening of accounts by respondent banks in the correspondent banks' books and the exchange of messages to settle transactions by crediting and debiting those accounts.

All these definitions highlight the main components of correspondent banking: a bilateral agreement between two banks by which one of them provides services to the other; the opening of accounts (by the respondent in the books of the correspondent) for the provision of services and the importance of payment services as a core function of correspondent banking. As the ECB definition highlights, these relationships are frequently reciprocal, in that each institution provides services to the other, normally in different currencies. Correspondent banking is especially important for cross-border transactions, as its importance for domestic payments within a single jurisdiction has diminished greatly due to the use of financial market infrastructures. On a cross-border level, however, correspondent banking is essential for customer payments and for the access of banks themselves to foreign financial systems for services and products that may not be available in the banks' own jurisdictions. This report analyses only cross-border correspondent banking activities[6] with a focus on payment aspects.

Figure 1 sketches out the main flows involved in correspondent banking payments and the interplay between correspondent banking services and payment systems. It shows the settlement of a payment from bank A to bank C via a correspondent bank. As banks A and C do not hold accounts with each other, they use the services of bank B as intermediary. In one case, bank B transfers the payment to C using correspondent banking only, whereas in the other, bank B uses a payment system in which both B and C participate for transferring the payment. A, B and C would normally be located in two or more

---

[2]   CPMI, *A glossary of terms used in payments and settlement systems*, March 2003 (updated June 2015), www.bis.org/cpmi/publ/d00b.htm?m=3%7C16%7C266.

[3]   ECB, *Ninth survey on correspondent banking in euro*, February 2015, www.ecb.europa.eu/pub/pdf/other/surveycorrespondentbankingineuro201502.en.pdf.

[4]   The Wolfsberg Group is an association of 13 global banks which aims to develop guidance and frameworks for the management of financial crime risks with respect to KYC, AML and CFT policies.

[5]   The Wolfsberg Group, "*Wolfsberg Anti-Money Laundering Principles for Correspondent Banking*", 2014, www.wolfsberg-principles.com/pdf/home/Wolfsberg-Correspondent-Banking-Principles-2014.pdf.

[6]   Some innovative payment service providers, including non-banks, offer services that could be an alternative to correspondent banking for specific types of retail payment. These types of service and provider have been analysed in previous CPMI reports (*Innovations in retail payments* (2012) and *Non-banks in retail payments* (2014)). The recent CPMI report on *Digital currencies* (2015) mentions that a decentralised payment mechanism based on the use of a distributed ledger has the potential to facilitate certain cross-border transactions, and possibly make them faster and less expensive for end users such as consumers and merchants, by in part eliminating the intermediary banks in the payment chain. In addition, the CPMI intends to analyse the technical and infrastructure aspects of distributed ledger technology and related digital innovations in view of their potential impact on payment services and systems. This analysis may include their potential relevance and implications for international payments.

different jurisdictions and there could be other banks involved on the sending and receiving sides (as intermediaries in the correspondent banking chain).



Figure 1

**Payments settled via correspondent banking**

1.  Debiting of payer's account with bank A
2.  Crediting of bank B's mirror account with bank A, which is kept for accounting purposes
3.  Payment message from bank A to bank B via telecommunication network
4.  Debiting of bank A's account with bank B (loro account)

| **A. Use correspondent bank only** | **B. Involvement of payment system** |
|---|---|
| 5.  Crediting of bank C's account with bank B | 5.  Payment message from bank B to payment system |
| 6.  Payment message from bank B to bank C via telecommunication network | 6.  Settlement via payment system |
| 7.  Debiting of bank's B mirror account with bank C, which is kept for accounting purposes | 7.  Payment message from payment system to bank C |
| 8.  Crediting of receiver's account with bank C | 8.  Crediting of receiver's account with bank C |

Source: ECB, *Ninth survey on correspondent banking in euro*, 2015, adapted from Danmarks Nationalbank, *Payment systems in Denmark*, 2005.

Correspondent banking may include various services, such as international funds transfers, cash management services, check clearing, loans and letters of credit or foreign exchange services. There are several ways of providing these services:

- In traditional correspondent banking, a respondent bank enters into an agreement with the correspondent bank in order to execute payments on behalf of the respondent bank and its customers. The respondent bank's customers do not have direct access to the correspondent account, but they transact business indirectly.

- Nested correspondent banking refers to the use of a bank's correspondent relationship by a number of respondent banks. The latter have no direct account relationship with the correspondent bank but conduct business through their relationships with the bank's direct respondent bank to execute transactions and obtain access to other financial services (eg a local bank conducts correspondent banking business indirectly via its regional savings bank).

- Payable-through accounts, also known as "pass-through" or "pass-by" accounts, are similar to nested correspondent banking but, in this case, the respondent bank allows its customers to directly access the correspondent account to conduct business on their own behalf.

As correspondent banking services are a key element in cross-border transactions, they might be expected to grow in parallel with the expansion of international trade and cross-border financial activity.

## 2.2    Recent developments in correspondent banking – qualitative analysis

During the informal fact-finding carried out by the CPMI working group and the public consultation of the earlier version of this report, the following trends were identified:[7]

- Cutbacks in the number of relationships: Correspondent banking relationships are being reduced in number, especially for respondent banks that (i) do not generate sufficient volumes to recover compliance costs; (ii) are located in jurisdictions perceived to be too risky; (iii) provide payment services to customers about which the necessary information for an adequate risk assessment is not available; or (iv) offer products or services or have customers that pose a higher risk for AML/CFT and therefore are more difficult to manage. As regards (iv), comments received during the public consultation argued that some decisions by correspondent banks to withdraw services to certain respondent banks are made following specific risk assessments of an individual respondent, which may include factors in addition to jurisdiction. This may suggest that some amount of de-risking may be occuring because banks are carrying out the requirements of the AML/CFT regime and thereby mitigating their exposure to AML/CFT risks that cannot be managed effectively.

- Changes in relationships: Those types of correspondent banking service that are perceived to have higher associated risks (nested correspondent banking, payable-through accounts) are being scaled back, so that traditional correspondent banking clearly predominates in the remaining relationships. These remaining relationships are often retained only to support the cross-selling of other products to respondent banks (ie the profit is made in other business areas and correspondent services are considered as a necessary ancillary service).

- Concentration of relationships: Cutbacks in the number of relationships as well as changes in their nature have resulted in a significant concentration of relationships in a relatively small number of service-providing institutions that increasingly dominate this market. In addition, a concentration of correspondent banking activities within affiliated banks was observed.

- Difficulties in establishing or maintaining the correspondent banking relationships necessary for participation in financial market infrastructures (FMIs): Banks that are members of multicurrency FMIs may employ a correspondent bank for cash settlements. Difficulties in establishing or maintaining correspondent banking relationships may make the maintenance of a backup correspondent relationship more burdensome. This is particularly relevant for multicurrency FMIs whose participants may need a number of correspondent banking relationships. For instance, CLS, a multicurrency FMI handling cross-border payments, reports that some participants have had difficulties in establishing alternative (backup) correspondent banking relationships.

- Increasing costs: The establishment and maintenance of a correspondent banking relationship are perceived to be increasingly costly both for correspondent and respondent banks.

- Cutbacks to correspondent banking services in specific foreign currencies: Some correspondent banks are increasingly reluctant to provide correspondent banking services in certain foreign currencies in which the perceived risk of economic sanctions, the regulatory burden related to

---

[7]    See Section 2.3 for a quantitative analysis of SWIFT data.

AML/CFT or the uncertainties related to the implementation of these requirements and the potential reputational risk in case of non-compliance seem to be higher. There are indications that correspondent banking activities in US dollars are increasingly concentrated in US banks and that non-US banks are increasingly withdrawing from providing services in this currency except for some ancillary services. Simultaneously, the very same non-US correspondent banks might still be willing to provide correspondent banking services in their domestic currency.

• Geographical imbalances: Not all jurisdictions and currencies are affected equally. Respondent banks, in particular smaller banks located in jurisdictions perceived to be too risky, are especially affected by the reduction in the number of relationships.

What are the drivers that can explain these recent trends? From the demand side, at least some respondent banks are actively reducing the number of correspondent banking relationships in order to reduce their own risk management work, simplify reporting of intraday liquidity, concentrate their payment channels and cut costs. However, a significant demand for these services still seems to exist.

Most of the drivers seem to derive from the supply side (ie correspondent banks providing the service to respondent banks). One of the main drivers seems to be the growing tendency for banks to assess the profitability of their business lines, customers and even jurisdictions in a world where the cost of correspondent banking has increased and capital and liquidity are scarcer and more expensive. While the correspondent banking business seems profitable in aggregate, parts of this business are not and, as a result, correspondent banks have been dropping their less profitable customers or jurisdictions. This is especially true where the business returns do not justify the cost of investment. According to the correspondent banks interviewed for this report, the most common cause for this reduction of profitability is the increasing cost of regulatory compliance, especially in relation to AML/CFT regulation. According to anecdotal evidence, these costs have reached such a level that, for certain financial institutions, there is no business justification for continuing to engage in correspondent banking. In addition to the increased compliance costs, interviewed banks also mentioned the high degree of uncertainty as to what exactly constitutes compliance with the requirements in order to avoid penalties and related reputational damage. For example, some of the interviewed banks believe that it is necessary to "know your customers' customers (KYCC)", and there seems to be a degree of uncertainty as to when this is necessary and how detailed this knowledge should be. This uncertainty increases the difficulty of measuring the risks associated with correspondent banking and might be leading to the abandonment of some relationships. However, not all the causes seem to be directly related to increasing regulatory costs: the general trend of financial institutions to downsize and deleverage in the wake of the financial crisis seems to be behind the decisions of some correspondent banks to eliminate or scale back this line of business, particularly if it is not considered a core activity. Also, country risk (geopolitical and financial) may have increased, so that the rising costs may be due partly to the application of existing policies to a larger number of high-risk countries, not just to higher enforcement activity and penalties.[8]

In summary, increasing costs, regulatory requirements and an increased perception of risk are reducing the profit margins associated with this activity in some countries and/or with some customers and could be making this line of business increasingly unappealing to a growing number of correspondent banks. In particular, this is a business highly influenced by economies of scale, where banks are struggling to make returns when the business volumes in certain jurisdictions and/or with certain customers are not considered to justify the compliance costs involved. The perception is that this line of business has shifted from being a low-risk/low-margin segment to a high-risk/low-margin one.

---

[8]  From the regulatory side, no significant changes in AML/CFT have been introduced recently and banks are expected to continue applying a risk-based approach for their customer due diligence in relation to AML/CFT. There are indications, however, that in some instances the perception of the ML-FT risks associated with activities, such as correspondent banking, is changing. The term "de-risking" is commonly used to refer to those instances in which banks adopt "increasingly stringent financial crime-related policies to reduce their exposure to potential money laundering, terrorist financing, corruption and sanctions risk" (see Wolfsberg Group et al, *De-risking: Global Impact and Unintended Consequences for Exclusion and Stability*, 2014).

Not all correspondent banks are reacting in the same way and not all respondent banks are being affected equally by these developments.

Some correspondent banks are specialising in the provision of correspondent banking services as a source of profit, and are thus focusing on respondent banks that provide a business volume that is sufficient to justify the increasing costs (including fixed costs) and which are located in jurisdictions perceived to constitute an acceptable level of risk. These banks consider the increased complexity in the correspondent banking business as a challenge but at the same time as an opportunity to increase their competitive advantage. However, the majority of institutions seem to be maintaining existing correspondent banking services only insofar as these services are necessary to serve the needs of corporate customers for cross-border payments and trade finance or to support the cross-selling of other products to respondent banks (ie the profit is made in other business areas and correspondent services are considered as a necessary ancillary service) or to preserve reciprocity in their correspondent relationships. As a result, respondent banks that fit within any of these business strategies are likely to maintain relationships, whereas others might risk being cut off from the international payment networks. Banks which might risk losing access to correspondent services tend to be smaller institutions that do not generate volumes considered to be sufficient, that are located in jurisdictions perceived to be too risky, that are not part of an international group or that provide payment services to customers about which the necessary information for an adequate risk assessment is not available.[9] This trend implies a risk that cross-border payment systems will fragment, reducing the available options for these transactions.

This division of banks into groups that are more likely to maintain correspondent relationships, and those that are not, could also explain the apparent contradiction between the observed cutbacks in relationships and declining margins in parts of the market. Usually a cutback in relationships would give banks specialised in providing correspondent banking services substantial market power, but the decline in profit margins shows that such banks are unable to pass increased compliance costs on to their respondent banks. This in turn suggests that the market is still competitive or that compliance risks are not adequately priced. Consequently, competition may still be quite vigorous in some segments of the market (relatively larger players, low-risk jurisdictions) but at the same time supply (at any price) may have been reduced or completely shut off for other players (smaller institutions, high-risk jurisdictions), which might effectively isolate these players from the international markets.

All in all, it seems that many of the correspondent service-providing banks interviewed in the CPMI jurisdictions are adapting their business model by taking into account the increasing costs, the regulatory and risk management considerations, although some have exited the market voluntarily because of the lack of a business case. Despite these changes on the supply side, most banks are able to obtain cross-border payment services. Nevertheless, banks in some jurisdictions have lost their ability to make cross-border payments. As mentioned above, however, this evolution in correspondent banking seems to have most severely affected smaller banks and/or banks that are located in jurisdictions considered to be too risky.

## 2.3    SWIFT data analysis[10] – quantitative analysis

### 2.3.1    Data description

In this analysis, monthly transaction data, provided by SWIFT on an exceptional basis, are used to analyse developments in correspondent banking quantitatively from 2011 to 2015. The data set includes message

---

[9]    Some institutions report providing correspondent banking services only to affiliates within their banking group.

[10]    Data relating to SWIFT messaging flows is published with permission of S.W.I.F.T. SCRL. SWIFT © 2016. All rights reserved. Because financial institutions have multiple means to exchange information about their financial transactions, SWIFT statistics

types MT 103 and MT 202, as well as subtypes. The data contain sent and received volumes and nominal values for each country pair (corridor). The nominal values have been converted to US dollars using daily exchange rates. The data include the number of active correspondents for each corridor in a given month. They also contain the currency and message type of volumes and nominal values for each corridor. For confidentiality reasons, data for corridors with fewer than three transactions or three correspondents are not disclosed.

The data set comprises more than 200 countries and territories, which are grouped by continents and regions using data from the United Nations Statistics Division in the following analysis.[11] The number of corridors showing payment activity is about one fourth of the theoretical number of corridors, with a slight decline from roughly 13,000 in 2011 to 12,600 corridors in 2015.

As SWIFT is the most commonly used standard for cross-border payments, the data presumably capture a very large part of correspondent banking activity. The data deliver an accurate picture of the actual payment traffic between jurisdictions; however, they do not differentiate payments cleared via correspondent banking arrangements from those sent via transnational financial market infrastructures, such as TARGET2.

## 2.3.2    Results

When looking at aggregated data, the dominance of high-traffic corridors might mask developments within other corridors and even entire regions with less significant activity. Graph 1 shows that payment traffic is concentrated in the triangle linking Europe (without Eastern Europe) with Asia and North America. Therefore, the overall development can bias the picture, as regional and national developments can differ substantially.[12]

---

on financial flows do not represent complete market or industry statistics. SWIFT disclaims all liability for any decisions based, in full or in part, on SWIFT statistics, and for their consequences.

This work is a product of the staff of Deutsche Bundesbank. The findings, interpretations, and conclusions expressed in this work do not necessarily reflect the views of Deutsche Bundesbank. Deutsche Bundesbank does not guarantee the accuracy of the data included in this work. Significant input has been provided by SWIFT, the National Bank of Belgium and the Bank of Mexico.

[11]    See United Nations Statistics Division, http://unstats.un.org/unsd/methods/m49/m49regin.htm.

[12]    See Graph 8 and Table 1 in Annex 3.

Aggregate volume by region[1]

2014; index                                                                                      Graph 1



[1]  Regional grouping as defined by the United Nations Statistics Division.

Sources: Deutsche Bundesbank; SWIFT Watch.

Overall volumes increased from 2011 to 2015 (see Graph 2). This is still consistent with reports of de-risking in correspondent banking, since payments are most likely switched to other channels after account closures. If payments are rerouted through third countries, this could even lead to an increase in correspondent banking activity. Graph 2 also shows a clear downward trend in the number of active correspondents across regions. Active correspondents are correspondents active across all corridors, ie correspondents active in more than one corridor are counted several times. Taken together, the falling number of active correspondents and the rise in volume suggest that concentration in correspondent banking has increased, as discussed in Annex 3.

Number of active correspondents over all corridors

Three-month moving averages                                                          Graph 2



Sources: Deutsche Bundesbank; SWIFT Watch.

The downward trend in the number of active correspondent banks is confirmed in most cases at the regional level, although with uneven dynamics, as can be seen from Graphs 3a and b. The graphs show active correspondents per region and yearly changes in the number of active correspondents. Graph 3b shows that the most pronounced absolute decline in active correspondents has occurred in European regions. Significant declines occurred in 2012, 2014 and 2015, while 2013 was often characterised by steady or even increasing developments.

For African regions, the picture is mixed, with pronounced declines in Northern Africa and partly in Southern Africa, but substantial increases in other regions. The Americas saw significant declines in the number of correspondents with exception of Central America. Asian regions experienced declines in 2012, but mostly increasing numbers thereafter. As an exception, Western Asia encountered significant reductions in correspondent banking relationships over the full period, which can be attributed partly to developments in Syria. In Europe, active correspondents fell steadily over time. This is likely to relate to the sovereign debt crisis, which also caused two southern European countries to introduce capital controls. In part, the developments across Europe could also be explained by some large banks starting to move away from correspondent banking to payment systems for low-volume/high-value payments following the introduction of SEPA. The most pronounced relative decline of active correspondents has occurred in Oceanian regions. Compared with other regions, the absolute number of correspondents in Oceania is lower, causing higher relative changes if the number of active correspondents falls.

Active correspondents across all corridors per region[1]

Monthly averages, thousands                                                                    Graph 3a



[1] Grouping of continents and regions according to the United Nations Statistics Division.

Source: SWIFT Watch.



Yearly changes of active correspondents across all corridors per region[1]

In per cent                                                                          Graph 3b



[1] Grouping of continents and regions according to the United Nations Statistics division.

Source: SWIFT Watch.

Consistent with a plethora of factors affecting correspondent banking relationships, the regional differences shown here make it difficult to disentangle the effects of de-risking from other causes. Such might include declining economic activity, external shocks, adverse developments in financial markets, consolidation of the banking system, cost considerations, sanctions that affect financial flows and/or trade, capital controls, geopolitical reasons and other policies affecting cross-border capital movements.

Overall, the analysis shows that there has been a trend towards concentration in correspondent banking activity as measured by payment traffic. This is consistent with findings from survey data by the World Bank (2015). Detailed results can be found in Annex 3.

# 3.     Potential measures to facilitate correspondent banking services

## 3.1     General considerations

In view of the trends described above, several measures that could facilitate compliance with regulatory requirements applicable to correspondent banking services have been identified. This section elaborates on the advantages and limitations of these measures, leading to the identification of several potential high-level recommendations that could facilitate the provision of correspondent banking services. These potential measures are: (i) Know-your-customer (KYC) utilities; (ii) increased use of the LEI; (iii) information-sharing initiatives; (iv) payment messages; and (v) use of the LEI as additional information in payment messages.

The analysis below aims to describe these potential measures and explains how they could help to increase the efficiency of procedures and reduce compliance costs without altering the applicable rules and the basic channels for correspondent banking services between correspondent and respondent banks. In addition, the existing regulatory framework is taken as given. Although these measures might alleviate some of the costs and concerns connected with correspondent banking, it needs to be stressed that, in isolation, they will not resolve all the issues. The issues surrounding the withdrawal from correspondent banking are very complex and costs related to AML/CFT compliance are only one of the elements that have to be considered in order to understand recent trends. Those include business considerations as well as economies of scope and scale issues. Limiting information challenges through the use of enhanced technical tools will only address a part of AML/CFT compliance costs but this will not resolve issues such as uncertainty about how far customer due diligence should go. In particular, the proposed measures will not immediately help banks without access to correspondent banking services to gain such access.

It can be argued that the industry itself should manage its costs and revenues, and identify and implement solutions that will increase the efficiency of correspondent banking as necessary. However, the smooth functioning of the international correspondent banking market is essential to facilitate global trade and financial transactions across jurisdictions. Since individual banks' decisions to withdraw from correspondent banking can disrupt the functioning of the entire market, their individual decisions may entail a negative externality for the correspondent banking network. At the same time, individual actors may face a considerable degree of uncertainty and high investment costs with regard to implementing dedicated solutions. Moreover, they may encounter a substantial coordination problem, as there might be a first-mover disadvantage in implementing some of these measures.

As a result, public authorities, as well as other relevant stakeholders (eg the Wolfsberg Group and PMPG[13]), may wish to promote the implementation of these solutions to reduce the uncertainty and to solve the coordination problem, thereby contributing to an increase in the overall efficiency of correspondent banking so as to reduce negative externalities. It has to be stressed, however, that as a next step before any potential implementation, these measures should be further analysed by all relevant authorities and stakeholders in order to gauge the potential impact of each measure and to avoid unintended consequences.

---

[13]     The Payments Market Practice Group (PMPG) is an independent body of payments experts from Asia-Pacific, Europe and North America which acts as an independent advisory group. The PMPG aims, inter alia, to take stock of payments market practices across regions, discuss, explain and document market practice issues and recommend market practices and best practices, business responsibilities and rules.

## 3.2     KYC utilities

Know-your-customer (KYC) due diligence is an essential element of banking, including correspondent banking. Customer due diligence is applied by all banks providing a service in the correspondent banking chain to the institutions or customers with which they directly interact. This section focuses on the KYC activities performed by correspondent banks on their respondent banks (KYC activities performed by respondent banks on their customers are not specific to correspondent banking and are not covered in this section).[14]

Customer due diligence requires that correspondent banks identify and understand their respondents' banking activities and know if the respondents maintain additional correspondent banking relationships.[15] This process often leads to a massive exchange of documents. According to SWIFT, the 7,000 banks that use the SWIFT network for correspondent banking have more than 1 million individual relationships, so the number of documents exchanged is presumably much higher.[16]

This setup creates several problems: first, the same or very similar information needs to be sent to all correspondents; second, correspondents may have differing information requirements, as this is a risk-based process that is not standardised. Finally, it has to be taken into account not only that information is exchanged at the outset of a relationship, but that continuous updates are necessary. As a result, the KYC due diligence process is complex, costly, time-consuming and labour-intensive.

To improve this situation, several providers have developed or are developing KYC utilities, with the aim of storing customer due diligence information in a single repository. These utilities may help correspondent banks to identify and mitigate the risks associated with respondent banks. Respondent banks would access such a utility to provide the initial information and then provide updates as necessary in line with a standardised template, whereas correspondent banks would access it to retrieve the necessary information. Information-providing banks (respondents) maintain full control over their data and determine which banks have access to it.

The use of KYC utilities would provide several advantages: (i) the number of times a bank must send the same information could be greatly reduced; (ii) the accuracy and consistency of the information could improve, as banks would maintain only one set of updated information; (iii) the use of a single template might promote the standardisation of the information that banks provide to other institutions as a starting point for KYC obligations; (iv) the use of a central KYC utility might speed up the process; and (v) costs could be reduced thanks to a lesser amount of documentation being exchanged. In view of this, authorities may wish to promote the use of KYC utilities.

Banks' costs could be further reduced if they were able to place more reliance on KYC utilities so that they could undertake fewer checks of the quality of data held in the utilities. One way to achieve this might be to establish some form of independent standard to set out what systems and controls such utilities should have to ensure that the data they hold are accurate and to facilitate some form of external accreditation process to test compliance with this standard. It is unlikely that central banks could do this

---

[14]   Current expectations in correspondent banking include that correspondent banks extend their customer due diligence on respondent banks (KYC) to include also a deeper monitoring and understanding of the underlying correspondent banking transactions and possibly the identities of the originator and final beneficiary. This approach is informally referred to as "know your customer's customer" ("KYCC"). These types of expectation are covered in Section 3.4 on information-sharing arrangements.

[15]   The customer due diligence process should not be a "paper-gathering exercise" but a real assessment of ML risk (see BCBS, *Sound management of risks related to money laundering and financing of terrorism*, 2014, Annex 2).

[16]   SWIFT KYC registry factsheet, December 2014, http://complianceservices.swift.com/sites/complianceservices/files/kyc_registry_factsheet_december_2014.pdf.

but there could be a role for other authorities, industry bodies or external auditors in facilitating this to be agreed, eg ISO or ISAE standards.

In summary, the information in this type of utility might be a good starting point for KYC due diligence processes by correspondent banks. Box 2 includes a brief description of some KYC utilities as examples.[17]

---

Box 2

## A brief description of some KYC utilities

### Bankers Almanac

This utility focuses on KYC by financial institutions and is therefore designed to meet the needs of correspondent banking. In order to be included, financial institutions must be able to demonstrate a legitimate physical address, appropriate licences and a confirmation that they are regulated by a regulator of international repute. Ahead of publication, all data collected are quality-assured by a content team at Bankers Almanac.

### Depository Trust & Clearing Cooperation (DTCC) – Clarient Entity Hub

The Clarient Entity Hub went live in February 2015. The scope of this utility is broad and covers investment managers, hedge funds, corporates and banks. It allows for a secure upload, storage, categorisation and distribution of data. The provider of the data has the right to grant access to its data and therefore always controls on a granular level who has access to the information. Clarient Entity Hub facilitates standardisation and at the same time provides the flexibility to share documents above and beyond Clarient's standards on a bilateral basis. Clarient supports the sharing and management of different types of data and documents such as KYC, TAX, Ops data and other client related documentation. Clarient leverages current compliant reference data from DTCC's established set of customer reference data services. The information provided is validated by Clarient in order to produce the so-called "golden record". This verification is done by linking each data element to evidentiary documentation. In case inconsistencies are detected these are flagged to the customer for checking.

### KYC.com (Markit/Genpact)

The Markit/Genpact service, KYC.com, was launched in May 2014. This service covers financial institutions, investment advisors, asset managers, corporates and regulated and unregulated funds. It builds on expertise and technologies offered by Markit and Genpact, including Genpact's Remediation as a service platform, and Markit's Counterparty Manager Service, ISDA Amend and Tax Utility. The service standardises and centralises the collection and management of KYC data for financial institutions in order to streamline customer onboarding. Entities are identified once, globally, and reviewed according to an industry-defined policy standard. This policy standard has been developed, reviewed and accepted by subscribing banks, which include 10 of the G14 banks which are currently contracting with the KYC service. Legal entity data and documents that banks require from their customers in order to conduct business and comply with KYC and anti-money laundering regulations are collected, enriched and centrally administered. Access to up-to-date customer reference data is provided due to proactive data revalidation on regular schedules (ie annual refresh cycles).

### SWIFT KYC Registry

The SWIFT KYC Registry went live in December 2014. It focuses on banks active in correspondent banking, but not on customers. The SWIFT KYC Registry allows banks active in correspondent banking to use a central utility to provide information needed for compliance requirements. This information can be used by correspondent banks to conduct adequate due diligence with regard to their customers (ie the respective respondent bank). All information stored is checked and validated by a dedicated operational team at SWIFT. Each bank that provides data always retains the ownership of its data. Other banks can only access the data of another bank when permission to do so has been granted by the data-owning party. In addition, SWIFT is also introducing the so-called SWIFT Profile. This profile provides a standardised portrait of a bank's traffic activity with sanctioned or high-risk countries (as per FATF/OFAC/EU

---

[17]     Box 2 is meant to be illustrative and is by no means exhaustive.

lists) on SWIFT. Banks can share this profile with selected counterparties by using the SWIFT KYC Registry. Additional services (either provided by SWIFT or by third parties) will be added to the SWIFT KYC Registry in the coming months.

*Thomson Reuters Accelus*

Accelus Org ID went live in March 2014. The customer records cover hedge funds, asset managers, corporations and banks active in correspondent banking. The customers submit documentation and actively authorise access to the information. A party always keeps full control and visibility over who can access and view the respective party's documents. Accelus Org ID validates the information, adds public data and scores the customers according to risks. Accelus Org ID protects data privacy in a secure environment with constant monitoring to ensure that records are up-to-date and information is accurate. With regard to correspondent banking, Accelus Org ID standardises document requirements through its globally agreed KYC policy and alignment with the Wolfsberg principles.

Source: Publicly available information.

In principle, the implementation of KYC utilities is a positive development. However, there are some limitations that have to be acknowledged:

- KYC utilities may facilitate access to a basic set of information, but they do not alter the basic responsibility of correspondent banks to perform due diligence on their customers (ie the respondent banks). Correspondent banks cannot simply delegate their responsibility as KYC utilities cannot perform customer due diligence on behalf of third parties, and the ultimate responsibility always lies with the correspondent banks. Thus, even if KYC due diligence procedures are facilitated, resources will still be necessary for the analysis and management of the risks involved in a relationship.[18]

- KYC utilities use agreed templates, but templates differ across utilities. Currently, there is no standardised set of information that should be included in KYC utilities. Usually, information requirements in KYC utilities are based on a combination of an analysis by the utility providers based on legal requirements across jurisdictions and discussions with correspondent banks.

- KYC utilities may not collect all the information that a correspondent needs for its internal assessment. Additionally, these processes cannot be easily standardised, as they are risk-based. The data stored in a KYC utility would need to be complemented with additional data transmitted bilaterally, and thus these utilities should be seen more as a useful starting point for customer due diligence obligations rather than as eliminating the need for customer due diligence by the correspondent bank.

- KYC utilities need to be updated routinely by the respondent bank with fresh and accurate information in order to remain useful to the correspondent bank for the ongoing monitoring of an existing relationship or for the opening of a new relationship. Providers of the KYC utilities need to set adequate parameters regarding which events will trigger a requirement to update information.

- The privacy laws of some jurisdictions may prohibit sharing, storing or mining of basic information in KYC utilities, such as other correspondent relationships and details of geographical areas served. Operators of KYC utilities need to check carefully and in line with applicable laws what information should and could be shared in the KYC utilities, especially when information is transmitted across borders.

---

[18]    FATF Recommendation 17 sets conditions for "Reliance on third parties" to perform certain customer due diligence measures and states that "Where such reliance is permitted, the ultimate responsibility for CDD measures remains with the financial institution relying on the third party." As a result, correspondent banks are sometimes reluctant to use KYC utilities. However, KYC utilities may facilitate access to a basic set of information, and they might in some cases also provide an independent source of verification, which could help the correspondent perform customer due diligence on its own responsibility.

- Additionally, to the extent that some institutions are not participating in any utility, there would be a need to maintain bilateral exchanges of information. In order to increase efficiency, both respondent and correspondent banks need to have access to a utility with a broad coverage of relevant participants. While KYC utilities may facilitate customer due diligence on respondent banks, they may not address all information needs related to where a respondent does business and with whom (see Section 3.4 for an analysis of these problems).

In summary, KYC utilities are a promising tool for speeding up KYC compliance and cutting its costs. However, as mentioned above, there is currently no standardisation in the type and format of information that is gathered in KYC utilities. This inconsistent gathering of information limits the value of KYC utilities. Although a complete standardisation of the information in KYC utilities seems unfeasible (especially due to the risk-based approach for AML/CFT), relevant standard setters such as ISO may wish to consider defining a standardised minimum set of information and data (including the format) that any bank should be ready to provide to banks requiring the information for correspondent banking activities via KYC utilities.

As it seems unlikely that any single utility will emerge catering to all segments and use-cases, a standardisation of the baseline data set(s) and documents maintained in such utilities may lead to further efficiencies. This standardised minimum set of information could be augmented bilaterally as necessary to cater for specific information needs for correspondent banks depending on the specific nature of each client and the type of business they are engaged in.

Also, for KYC utilities to be more effective, in addition to standardisation, it would be necessary that banks have some assurances from the relevant authorities (such as the regulatory, supervisory or law-enforcement authorities) with respect to the appropriateness of, and reliance upon, any such utility for the purposes of AML/CFT compliance. If it is not clear to what extent banks can rely on the information provided in KYC utilities, banks might deem it necessary to continue to conduct their own individual customer due diligence data-gathering, negating the value of KYC utilities, consequently losing much of the incentive to invest in, and to use, utilities.

As mentioned above, banks cannot simply delegate their responsibility for conducting customer due diligence as KYC utilities cannot perform customer due diligence on behalf of third parties and the ultimate responsibility always lies with the correspondent banks. Nevertheless, more clarity about the extent of reliance that is permissible will be essential if utilities are to reach their full potential, and this is within the purview of regulators, supervisors and other relevant authorities.

**Recommendation:** The use of KYC utilities by respondent and correspondent banks – provided that they store at least a minimum set of up-to-date and accurate information – could be supported in general as an effective means of reducing the burden of compliance with customer due diligence requirements for banks active in the correspondent banking business. Relevant standard setters such as the International Organization for Standardization (ISO) may wish to consider defining a standardised minimum set of information and data (including the format) that all utilities should collect and that all banks must be ready to provide to other banks which require the information and data.

In addition to standardising information and data with a view to making KYC utilities more effective in reducing the customer due diligence costs associated with correspondent banking, the authorities with responsibility for AML/CFT (ie the FATF and AMLEG) are invited to consider developing a set of issues that financial institutions should consider when using KYC utilities, to support an appropriate use of these utilities.

## 3.3    Legal Entity Identifier (LEI)

### 3.3.1    General information on the LEI

In the wake of the financial crisis, the importance and advantages of an unambiguous Legal Entity Identifier (LEI) became clear. Authorities worldwide were unable to clearly identify parties to transactions across markets, products and regions, making it difficult to identify trends, evaluate emerging risks, including systemic risk, and take appropriate corrective action. Consequently, authorities, in close collaboration with the private sector, have developed a framework that allows for the unambiguous identification of entities through the issuance of unique LEIs, which may be also used for reporting and other regulatory purposes in the various jurisdictions.

---

Box 3

**Basic background information on the LEI and current issuance status**

The LEI (ISO standard 17442:2012) is a 20-digit alphanumeric reference code for the purpose of unambiguously identifying legal entities that engage in financial transactions. Each LEI is assigned to a unique legal entity and each legal entity may have only one LEI. The LEI code is associated with reference data, currently including basic identification information, such as:

-     The official name of the legal entity as recorded in the business registry or with the fund manager for collective investment vehicles, or otherwise in the entity's constituting documents. The official name is recorded in the local language and character set. The reference data also include, as applicable, additional legal names (for instance, in other languages) and transliterated names in Roman characters.

-     Two addresses: (i) The address and the country of legal formation of the legal entity and (ii) the address of the headquarters of the legal entity or the address of the fund manager. Addresses are structured, with separate fields for the street address, city, region, country and postal code. The country is represented by the 2-character ISO 3166-1 country code of the country. Each of these addresses can be repeated in several languages, as necessary, with languages identified by an IETF Language Code conforming to [RFC4646].

-     Other information such as the legal form of the entity, as well as the name of the business registry in which the entity was formed and the identifier of the entity in the business registry, when applicable. Additional information also applies for entities that have merged or ceased to exist for other reasons.

-     Information on the status of the record, including the level of validation that could be performed by the relevant Local Operating Unit of the Global LEI System (in particular, whether there was sufficient information contained in authoritative public sources to corroborate the information that the submitter has provided for the record) and the date of the last update.

On 10 March 2016, the LEI Regulatory Oversight Committee (LEI ROC) published its final report on *Collecting data on direct and ultimate parents of legal entities in the Global LEI System – Phase 1*.[19] The collection of this information, based on accounting definitions, will start around end-2016. The records will specify whether these relationships were fully corroborated by consolidated financial statements, other documents supporting the preparation of consolidated financial statements, or regulatory filings. Entities will have the option to opt out for reasons listed in the report, such as legal obstacles that prevent them from providing or publishing this information, and these reasons will be disclosed in the LEI record of the entity. The LEI ROC will work on expanding the scope of relationship data in future phases.

    It is important to highlight that the LEI is envisaged for the unambiguous identification of legal entities (and legal arrangements such as trusts), but is not applicable to natural persons, except for individuals acting in a business capacity.[20] The Charter of the LEI ROC envisages that the Global LEI System will be used by the private sector to

---

[19]    See www.leiroc.org/publications/gls/lou_20161003-1.pdf.

[20]    The LEI ROC specified in a statement of 30 September 2015 the conditions under which individuals acting in a business capacity were eligible for an LEI (www.leiroc.org/publications/gls/lou_20150930-1.pdf).

support improved risk management and increased operational efficiency, among other uses. It is not used as a routing code for cross-border payments (instead, the Business Identifier Code (BIC) is widely used for this purpose).

LEIs are issued in various jurisdictions through Local Operating Units (LOUs), which issue LEIs against a fee and validate the reference data upon issuance and following periodic certifications. LOUs make the LEIs and the associated reference data publicly available free of charge. Once a legal entity has obtained an LEI, it cannot obtain another, but it can transfer the maintenance of its code from one LOU to another. The coordination of the LEI system on a global basis is done via the GLEIF (Global LEI Foundation),[21] established in 2014 as a not-for-profit organisation, which is responsible for ensuring "the application of uniform global operational standards and protocols that deliver global uniqueness of the LEI, seamless access to the global LEI and to high quality reference data for users".[22] The GLEIF supports the maintenance of the centralised database of identifiers and related reference data. The GLEIF is itself under the oversight of the LEI ROC, a group of over 70 public authorities from more than 40 countries.

As of end-April 2016, more than 430,000 entities from 195 countries had obtained LEIs from 29 operational LOUs endorsed for issuing globally compatible codes after meeting defined standards.[23] The LEI is used in rules and regulations covering 40 jurisdictions, mainly for derivatives transaction reporting but also for banking and insurance supervision and securities regulations (eg the European Banking Authority (EBA) recommends the LEI as a unique identification code for supervisory purposes for every credit and financial institution in the European Union).[24]

## 3.3.2    LEI and correspondent banking

Correspondent banking requires a robust mechanism for identifying the parties involved in payment processing for a variety of reasons: risk management, regulatory requirements and in particular the smooth processing (eg clear routing information to ensure straight through processing). Whereas the BIC is the de facto standard for the latter, one of the elements that can be considered for the first two reasons, especially to facilitate AML/CFT screening, may be the use of the LEI as a means of identifying the parties to a transaction. The LEI system focuses on providing a standardised identification and a centralised database from which information can be retrieved easily. It does not process or record financial transactions. Although the LEI system has not been designed to facilitate AML/CFT compliance in correspondent banking, its use may bring some benefits in this area:

- The LEI may be used to improve the effectiveness of some of the measures described in this report. In particular, KYC utilities and information-sharing mechanisms described in Sections 3.2 and 3.4 require an unambiguous identification of the banks or customers included in the respective databases. Rather than developing a specific standard for this purpose, the LEI could be promoted as an efficient global standard for these utilities.

- The LEI's widespread use could help financial institutions to identify specific entities unambiguously and increase the effectiveness of automatic screening packages, particularly for identifying sanctioned entities (eg by reducing the number of "false positives" when screening names and addresses that only partially match the data of a given entity).

- It could also facilitate the consolidation of information received in financial intelligence units, by identifying transactions of the same entity reported by different financial institutions more easily.

---

[21]   See www.gleif.org/en.

[22]   See Article 6 of the GLEIF Statutes. For a summary of how the Master Agreement between the GLEIF and LOUs supports the role of the GLEIF for data quality and operational oversight of the system, see Section 2.1 of the LEI ROC Progress report for 2015 (www.leiroc.org/publications/gls/lou_20151105-1.pdf). The Master Agreement documentation is available on the GLEIF website.

[23]   See www.leiroc.org/index.htm.

[24]   See www.leiroc.org/lei/uses.htm.

- The LEI could also become an option for supporting the implementation of specific FATF recommendations, such as recommendation 16[25] on the provision of originator and beneficiary information in payment messages.[26] The information required by this recommendation could be communicated in different ways, but the LEI's use within payment messages when the originator and/or beneficiary are legal entities might be an additional way of complying with the requirement in the future.

Nevertheless, it should be noted that the LEI is not a panacea for cross-border correspondent banking services. In particular, the following limitations need to be highlighted:

- The LEI was not designed to be used for AML/CFT purposes.[27] Therefore, it needs to be investigated in more detail how far banks can rely on the (information provided with the) LEI with regard to AML/CFT screening. This point will become even more vital as the LEI gains wider acceptance.

- The LEI does not apply to natural persons (except individuals acting in business capacity), and so alternative means of ensuring a clear identification of natural persons in line with the FATF recommendations[28] are needed in correspondent banking transactions. These methods will also need to comply with data protection legislation.

- It is envisaged that from 2017 the LEI will start providing information on ownership and relationships between legal entities.[29] This information, however, will also be limited to legal entities, and will thus generally not cover the identification of natural persons as beneficial owners of legal entities, which is one of the main aims of AML/CFT requirements.

- The use of the LEI is helpful as a way of unambiguously identifying legal entities and avoiding confusion, but the standard is not geared towards the identification of counterparties from an AML perspective. The LEI's use might facilitate some of the customer due diligence processes (eg by determining more easily that an entity is already a customer and by avoiding the duplication of customer due diligence efforts and records) but, at this point in time, the use of the LEI is not a substitute for customer due diligence, and banks remain responsible for adequate customer due diligence, given that the LEI system was not designed as a means of performing customer due diligence on behalf of third parties. However, the addition of new data raises the question of the potential use of the information in the LEI System to support some AML/CFT-related customer due diligence, including the extent to which users can rely on the verifications performed in the system, for instance to implement BCBS guidance recommending that correspondent banks collect and regularly update "the group to which the respondent bank belongs, and the jurisdictions in which subsidiaries and branches of the group may be located".[30]

- Up to now, it has not been foreseen that the payment messages used in the correspondent banking business (eg MT 103 or equivalents) would include either a dedicated field/line or a

---

[25] FATF recommendation 16: "Countries should ensure that financial institutions include required and accurate originator information, and required beneficiary information, on wire transfers and related messages, and that the information remains with the wire transfer or related message throughout the payment chain".

[26] Section 3.5.3 elaborates on the potential use of the LEI in payment messages.

[27] The LEI was designed to be used when legal entity identification is needed. The GLEIF statutes state that the LEI is a reference code for uniquely legally distinct entities that engage in financial transactions. Thus, if it is capable of identifying legal entities that are behind the entities engaging in payment transactions, the LEI could be used for AML/CFT purposes.

[28] See FATF recommendations INR16.

[29] The LEI ROC also published on 19 October 2015 a consultation document on including data on branches in the Global LEI System.

[30] BCBS, *Guidelines on Sound management of risks related to money laundering and financing of terrorism*, February 2016, Annex II, §7 (b).

dedicated code for including the LEI in the payment messages (see Section 3.5). Moreover, the routing of payments is based on BICs; currently other information that provides for adequate customer due diligence is included within the payment message (ie the information included is in line with the FATF recommendations).

Considering the above advantages and limitations, the following can be concluded:

- The use of the LEI to identify the banks involved in a correspondent banking relationship may not seem to pose an unsurmountable challenge, as the number of entities involved is limited and, in any case, some banks are likely to obtain an LEI code for other purposes (eg for regulatory reporting and reporting of OTC derivatives to trade repositories). This would promote the usage of the LEI and contribute to the aim of clearly identifying parties to transactions across markets, products and regions. The additional benefits, however, would be limited, as the counterparties are usually well known to each other and other identifiers are needed in any case for routing purposes (eg the BIC).

- Whereas the LEI aims at unambiguously identifying legal entities, BICs are the cornerstone of the global payments network. Therefore, the IT applications of banks active in correspondent banking business are programmed around BICs. Banks send messages to each other by populating the payment message with the relevant BICs. While an entity can have multiple BICs to serve various technical and organisational requirements, its LEI is unique and exclusive. By using BIC-to-LEI mapping utilities, it is possible to map the information of BICs and LEIs by linking legal entity information with routing information in payment messages. This ensures an unambiguous and efficient identification of the banks involved in the payment chain at any time. The SWIFTRef Entity Plus directory is a mapping utility that cross–references BIC to LEI for entities that have both.

- The use of the LEI to identify a bank's customer seems much more challenging, as the sheer number of legal persons/corporates concerned is vastly higher than that of the correspondent banks involved. Moreover, so far, information on the industrial sector code is not provided within the LEI. These challenges also highlight the potential benefits, as a clear identification of originator and beneficiary would be advantageous to all involved banks, although it has to be acknowledged that these benefits would be limited to the identification of legal entities. Furthermore, the current design of payment messages such as MT 103 (or equivalents) does not foresee the provision of the LEI in fields containing information on the ordering customer/final beneficiary but is geared rather to the provision of other information in line with FATF recommendation 16. Therefore, the current message design provides for the information needed to identify each and every customer – corporates as well as natural persons – without the need to specify an LEI. Nevertheless, the LEI would offer a unique identifier associated with standardised reference data that could support automation.

In a nutshell, the increased use of the LEI in correspondent banking services is seen as a positive development that might well be used in combination with some of the measures described in Sections 3.2 and 3.4 of this report, which focus on the provision of information. In addition, as outlined in Section 3.5.3, the LEI may be used as additional information in payment messages on an optional basis. It is expected that, especially due to forthcoming regulatory requirements, the future use of the LEI will increase significantly in various segments of the financial markets.

The LEI's use in correspondent banking could benefit from the increased use of the standard in other segments of the financial markets and could in turn reinforce the worldwide demand for the LEI. Any requirement or recommendation to use the LEI in cross-border correspondent banking should be coordinated in order to be effective and to solve potential coordination problems. However, it should be noted that the LEI is a means of identification, not a routing criterion in the payment chain, and cannot substitute for the BIC without very significant changes to banks' payment applications. By using mapping

facilities to allow for the easy mapping of routing information in payment messages to the relevant LEI, banks will always be in a position to retrieve the corresponding LEI when only the BIC is provided.

With regard to the identification of customers and especially for corporates, using the LEI for the identification of the ordering customer and the final beneficiary could also be encouraged as discussed in Section 3.5.3.

Nevertheless, as outlined above, it should be acknowledged that there is no LEI for individuals[31] and that, currently, sufficient information for customer due diligence can already be provided in the message without including the LEI. Therefore, in order to avoid any unintended consequences, it seems advisable to await the wider use of the LEI by such entities before considering any mandatory changes to the information that should be included in a message (see also Section 3.5.3 on the usage of the LEI as additional information in the payment message).

Finally, it is acknowledged that the LEI's use as a means of identification will not totally solve the challenges associated with correspondent banking, especially as it generally does not cover individuals, although it could improve the effectiveness of some measures (in the same way as KYC utilities or information-sharing initiatives), at the same time reinforcing other public policy objectives related to the use of the LEI in other areas.

**Recommendation**: In addition to the general promotion of LEIs for legal entities, relevant stakeholders may consider specifically promoting the use of the LEI for all banks involved in correspondent banking as a means of identification that should be provided in KYC utilities and information-sharing arrangements. In a cross-border context, this measure should ideally be coordinated and applied simultaneously in a large number of jurisdictions. All authorities and relevant stakeholders may wish to consider promoting BIC-to-LEI mapping facilities, which allow for routing information available in the payment message to be easily mapped into the relevant LEI. In addition, the relevant authorities (eg the LEI ROC and AMLEG) are encouraged to elaborate further as to what extent banks can rely on the LEI as a means of accessing reliable information to support customer due diligence in correspondent banking.

## 3.4    Information-sharing

Under certain circumstances, such as with jurisdictions or customers that are seen as higher risk for money laundering, the correspondent bank's due diligence obligations may go beyond KYC on the respondent bank (ie the direct customer of the correspondent bank). In some cases, correspondent banks would need to know with whom and where its respondent does business, possibly including the identity of its respondent bank's customers, both at account and payment level. Consequently, correspondent banks should monitor and thoroughly understand the underlying transactions. Correspondent banks need strong activity monitoring systems to detect suspicious transactions and may need access to extended information on the originators and beneficiaries related to such transactions. Authorities expect a correspondent bank to conduct sufficient due diligence to understand and mitigate risk and, at times, this may entail a better understanding of whom its customer does business with and where (including when a bank is acting as intermediary). A correspondent bank's efforts to obtain information on its customer's customer are informally referred to as "KYCC" (know your customer's customer).[32] Although there will be exceptions in high-risk scenarios, the FATF Recommendations do not require banks to perform, as a matter of course, customer due diligence on the customers of their respondent banks when establishing and

---

[31]    In a statement published on 30 September 2015, the LEI ROC clarified that individuals conducting business may be issued an LEI provided that certain conditions are met. However, it is currently not foreseen that individuals would be identified by means of LEIs.

[32]    See FATF, "De-risking; Global Impact and unintended consequences for exclusion and stability", a discussion paper prepared for use by the October 2014 FATF Plenary and associated working groups: "In addition, an increasing expectation that banks providing correspondent services must 'Know your Customer's Customer' has added a further level of complexity and difficulty."

maintaining correspondent banking relationships. However, banks still lack clarity with regard to the exceptions in high risk scenarios.

The additional due diligence conducted for some higher-risk customers increases the security of correspondent banking, but it also increases the complexity of AML/CFT procedures, owing to the following main difficulties and consequences:

- The most significant problem is that this expectation may implicitly entail that respondent banks are in a position to easily provide additional transaction and customer information to correspondent banks. In many jurisdictions, however, these requirements can conflict with data privacy laws. If respondent banks cannot provide additional information on customers and specific transactions for this reason, correspondent banks may have no alternative but to block or reject suspicious transactions. This could eventually lead to the termination of some correspondent banking relationships, particularly in jurisdictions with restrictive data privacy laws. Therefore, data protection authorities also play an important role in this process, and the FATF has already had some engagement with them on these issues. A further clarification on data privacy concerns in the area of correspondent banking seems necessary, including a review of a potential impact of data privacy laws on correspondent banking activities and the interaction and consistency between AML/CFT requirements and data privacy issues.

- Even if correspondent banks have access to additional information on specific transactions, it is very difficult in many cases for an upstream bank to check the identities and purpose of the transactions, as they have no direct contact with the customers, who are also normally located abroad. With the exception of a clear match with identities or jurisdictions included in a few well known international lists,[33] a correspondent bank may find it difficult to obtain reasonable assurance about a transaction's legitimacy. This introduces an element of uncertainty that makes this type of due diligence process difficult to fulfil. Taking into account the uncertainty and the difficulty involved in evaluating risks, some banks may decide to withdraw from correspondent banking altogether, or terminate relationships with respondent banks that generate low volumes of operations or are located in jurisdictions perceived as high risk.

- As many respondent banks have multiple correspondent relationships, there will be a significant duplication of costs, as they will likely have to report bilaterally to several correspondent banks about specific customers.

- As many customers operate through a variety of different entities, a correspondent bank seeking information on a particular customer will get only a partial view of the customer's business profile (as information on payments made by the customer will be limited to the customer's activities with the respondent bank providing the information).

The problems above create an environment with considerable inefficiencies and uncertainty. Moreover, it seems that the biggest problem in this respect is the uncertainty of the banks involved in correspondent banking on what exactly is expected by the relevant authorities in order to comply fully with the current national regulatory framework. In order to improve the situation and to provide more clarity, the competent international bodies are working extensively on this issue. In particular, the FATF (the international standard setter in the field of AML/CFT measures), has issued public statements on de-risking and has also issued a number of guidance and best practices to inform risk-based decision-making (see Box 1).

In October 2015, the FATF issued the "Guidance for a risk-based approach: effective supervision and enforcement by AML/CFT supervisors of the financial sector and law enforcement". This guidance reiterates the existing expectation that regulators and supervisors should use a risk-based approach when

---

[33] Eg the OFAC (Office of Foreign Assets Control) list in the United States, the, the EU sanctions list, the Consolidated United Nations Security Council Sanctions List and the FATF list of high-risk and non-cooperative jurisdictions.

supervising financial institutions' compliance with AML/CFT measures. This is not a "zero failure" or "zero tolerance" approach which means that, when failures are detected, regulators and supervisors should apply actions that are appropriate and proportionate, taking into account the nature of the failure. Regulators and supervisors should also ensure that financial institutions are taking a risk-based approach to implementing AML/CFT measures, without prejudice to rules-based measures such as targeted financial sanctions. Implementation by financial institutions should be aimed at managing (not avoiding) risks. What is not in line with the FATF standards is the wholesale cutting loose of entire countries and classes of customer, without taking into account, seriously and comprehensively, their level of money laundering and terrorist financing risk and applicable risk mitigation measures for those countries and for customers within a particular sector.

Additionally, the BCBS through its AML/CFT Expert Group has developed guidance on compliance with the FATF recommendations from a supervisory point of view. It might be appropriate to encourage current work by the FATF and the BCBS to increase clarity in this area, given that some of the factors that are lessening the attractiveness of the correspondent banking business relate to the uncertainties around due diligence vis-à-vis the respondent banks' customers, and that the BCBS is developing the relevant FATF recommendations from a supervisory point of view.

In parallel to the ongoing work of the FATF and other relevant bodies, several measures might be considered, including some already being implemented in certain jurisdictions. These could include:

- More widespread use of the LEI to unambiguously identify corporate customers (see Section 3.3).

- Banks could include in their contracts with direct customers for cross-border payment services the option of forwarding relevant information to correspondent/intermediary banks. If authorised by the direct customers and if permitted by data privacy rules, this might facilitate information-sharing between banks, and hence faster investigations and payments processing.

- An initiative worth mentioning in this area is the development of centralised databases for AML/CFT purposes, in which banks would provide information on the identities, business and transactions of their customers active in cross-border payment services. These could help reduce duplicated reporting, as respondent banks would then send such information only to the database, where it could be accessed by all correspondent banks and authorities with a legitimate interest. Centralised databases could also provide correspondent banks with updated and better information, as the transactions related to an individual customer reported by several respondent banks could be aggregated, creating a more comprehensive customer business profile. The management of the highly confidential information stored in such a database might require the support of a public authority, which could also increase the confidence of correspondent banks and their authorities in the reliability of the information. The creation of an information-sharing mechanism for centralising and sharing due diligence information might be an adequate solution for jurisdictions where banks face difficulties in opening or maintaining correspondent banking services with other jurisdictions. An example of such a database, in an early stage of development, is the one under development in Mexico to provide information to foreign correspondent banks and improve transaction flows (see Box 4).

Box 4

## Mexican initiative on information-sharing

A centralised database is currently under construction into which Mexican banks will be required to report all cross-border transactions. Banks will also be able to report information on their customers. Thus, the centralised database will consist of two main components: (i) a transactional component with aggregated information of cross-border transactions initiated by customers; and (ii) a customer due diligence component with information on each individual customer. The level of information required for each customer will depend on the aggregated number and value of its transactions.

Domestic authorities could query the database to identify originators and obtain some aggregated data on their transactions. Correspondent banks would thus have access to an adequate subset of information about the respondent bank's customers for which they have processed transactions. Originators would be required to agree to share information.

Domestic authorities would be involved in the regulation and oversight of the database, which would include requirements on information verification to make the database useful for correspondent banks and their authorities. The figure below shows how such central utility might be used.



There are initiatives with certain similarities but also with significant differences in relation to the scope and level of detail of the information stored. In the United States, for example, Section 314(b) of the USA Patriot Act is a voluntary programme that provides financial institutions with the ability to share information with one another, under a safe harbour that offers protections from liability, in order to better identify and report potential money laundering or terrorist activities. This programme is, however, limited to domestic entities and does not contemplate cross-border sharing of information. In other jurisdictions,

such as Turkey, data privacy laws seem to be an unsurmountable obstacle for the implementation of similar initiatives. Within the EU, different laws and the implementation of the 1995 Data Protection Directive have led to different data protection levels. Also in the EU, the Fourth Anti-Money Laundering Directive (AMLD4) has been adopted with the aim of strengthening the EU AML framework in line with the recently reshaped international AML standards. The directive will, for the first time, oblige EU member states to keep central registers of information on the ultimate beneficial owners of corporate and other legal entities, as well as trusts. The central registers will be accessible to the authorities and their financial intelligence units (without restriction), to "obliged entities" (such as banks conducting customer due diligence), and also to the public in the case of "legitimate interest". Member states will have two years to transpose the anti-money laundering directive into their national law.

Information-sharing mechanisms could increase the efficiency of procedures and may increase confidence by correspondent banks on the availability of information, reducing the cost of "KYCC" due diligence processes. They face, however, several obstacles and limitations:

- Information-sharing might help to reduce costs but it needs to be kept in mind that correspondent banks always remain responsible for performing adequate due diligence. Information-sharing mechanisms do not alter these basic responsibilities.

- The most important obstacle is compliance with data protection and data privacy laws and regulations. As mentioned above, the communication of transaction or customer information to an information-sharing database might not be allowed in many jurisdictions under various regulations for data protection or for certain persons or entities depending on data privacy laws.

- These databases may or may not include information on suspicious transactions. Its potential inclusion is intended to help banks differentiate between customers, ultimately benefiting the innocent. However, false positives (eg due to identical names), available to banks on a mass scale globally, may mistakenly link innocent customers to illicit or undesirable activity. This may result in certain customers or institutions being broadly denied services due to the shared information/shared concern. This, in turn, could result in restrictions on the provision of payment services even to entirely innocent customers and to the respondent bank and could eventually lead to a complete loss of its correspondent relationships.

- Currently, there is less clarity about the type of data that information-sharing mechanisms could store and distribute. Relevant authorities may wish to increase clarity in this area, to the extent possible, so that information-sharing mechanisms can be a useful source of information.

- The concentration of confidential information in a single repository requires that operational risks be adequately managed to address hacking threats that could lead to leakages of information (which could cause serious reputational and legal problems).

- Furthermore, the establishment of such databases might be quite costly.

In conclusion, compliance with "KYCC" due diligence expectations is a complex issue. Obvious measures for improvement are difficult to identify from a technical perspective and these activities cannot be easily outsourced, because responsibility for due diligence always remains with the banks.

Further FATF work in close cooperation with other relevant authorities in this field may help to diminish the uncertainties that correspondent banks are currently facing. Data protection authorities also play an important role in this process, and the FATF has already had some engagement with them on these issues.[34] A continuing dialogue between the national AML/CFT and data protection authorities is important to ensure consistent application of requirements in practice. The topic of information-sharing was also

---

[34] The FATF organised a one-day seminar (hosted by the European Commission in Brussels on 25 March 2014) with data protection authorities and representatives from financial institutions to exchange views on the interplay between data protection laws and AML/CFT requirements, to identify commonalities, including existing good practice, and to foster a dialogue between all relevant experts and the national, supranational and international level.

discussed in depth by the FATF with a wide variety of private sector participants under the aegis of the recent Private Sector Consultative Forum held by the FATF in April 2016. The forum discussed a number of challenges to effective sharing of AML/CFT information, including inconsistent legal frameworks for data protection and privacy across different jurisdictions and possible practical and policy solutions to overcoming barriers to the effective sharing of AML/CFT information. Building on these insights, the FATF will continue to explore ways to tackle barriers to information-sharing and facilitate better implementation of the requirements in this area. At the same time, some technical improvements (eg information-sharing mechanisms) could also support more efficient processes for information exchange – provided that data privacy laws permit this.

**Recommendation**: The work already conducted by the authorities with responsibility for AML/CFT (ie the FATF and AMLEG) is very much appreciated. It is recommended that the FATF and AMLEG be invited to (i) provide additional clarity on due diligence recommendations for upstream banks, in particular to what extent banks need to know their customers' customers ("KYCC"); and (ii) further explore ways to tackle obstacles to information-sharing, with the aim of identifying potential best practices (in the enterprise-wide context, among financial institutions not part of the same financial group, and between the public and the private sector).

To facilitate compliance with FATF customer due diligence recommendations, (i) the use of information-sharing mechanisms (if they exist in a given jurisdiction and data privacy laws allow this) for knowing your customers' customers could be promoted as the first source of information by default, which (ii) could be complemented bilaterally with enhanced information should there be a need.

In order to support information-sharing in general, the respondent bank may include provisions in its contractual framework with its customers (eg in the terms and conditions or in a supplementary agreement) which allow the bank to provide such general information on request to other banks for AML/CFT compliance purposes.

## 3.5    Payment messages

### 3.5.1    General considerations

As described in Section 2.1, correspondent banking transactions are channelled and settled through a chain of bilateral relationships between respondent and correspondent banks (sometimes also involving payment systems[35]). This section focuses on the payment message flows and formats. It describes the payment processes commonly used in correspondent banking, discusses some of the features and characteristics of the different messaging methods, and identifies potential issues that might be considered by the industry and authorities with a view to facilitating cross-border correspondent banking services.

In general, SWIFT message formats are non-proprietary and can also be used over other networks. However, the network used in the overwhelming majority of correspondent banking relationships is the SWIFT network. Accordingly, the description below focuses on SWIFT message formats and assumes that respondent and correspondent banks, as well as any intermediary institution, have access to the SWIFT network and use its SWIFT message formats for correspondent banking activities.

---

[35]     In general, the working group focused on cross-border payments. However, the complete payment chain of cross-border correspondent banking payments may also include transfers between institutions in a single jurisdiction, which usually take place through payment systems. Payment systems may also be used in some cases to transfer payments through different jurisdictions.

### 3.5.2    Message flows

A simple cross-border correspondent transaction would entail a payment from a customer of the respondent bank to a customer of the correspondent bank in a different jurisdiction. These customers can be individuals, small or medium-sized enterprises (SMEs), corporates, public sector agencies or other financial institutions. In its simplest form, the respondent has a direct bilateral account relationship with the correspondent, and thus the payment information and the settlement instruction can travel in a single message. The SWIFT standard for these customer payment messages is the MT 103.[36, 37] Figure 2 below provides a generic overview of a simple cross-border transaction.



Figure 2

**A simple cross-border correspondent transaction**

However, in many cases the respondent bank originating the payment does not have a direct bilateral account relationship with the correspondent bank receiving the payment. In these cases, it is necessary to find a chain of one or more intermediary banks to transmit the funds from the originating bank to the receiving bank. These intermediary institutions also provide correspondent banking services to the other banks in the chain. These types of relationships are very common in cross-border correspondent banking. Payment chains can be quite long, involving banks in more than two jurisdictions.

There are two basic ways of channelling a correspondent banking transaction through the SWIFT network when the originating institution has no direct bilateral account relationship with the receiving bank: the **serial method** and the **cover method**. It needs to be emphasised that both methods can be

---

36    For examples of MT 103, see www.swift.com.

37    In addition to the MT message types, there are equivalent MX message types. The MX equivalent for the MT 103 is the pacs.008 (credit transfer message). However, MT message formats are normally used in correspondent banking.

used in full compliance with AML/CFT as well as relevant regulatory requirements provided that all relevant data fields of the respective payment message are accurately populated.

- The **serial method** involves sending an MT 103 (or equivalent) from the originating bank to the receiving bank through one or more intermediaries. This method is just an extended concatenation of simple transactions between respondent and correspondent banks (as outlined above), each pair having a direct account relationship. The payment information and the settlement instruction travel together in the MT 103 message and there exists a direct account relationship[38] between each connected pair of banks in the payment chain (see Figure 3 below).



Figure 3

A correspondent transaction using the serial method

- The **cover method** decouples the settlement from the payment information. The MT 103 with the payment information is sent directly through the SWIFT network from the originating bank to the receiving bank, whereas the settlement instruction (the cover payment) is sent via intermediary banks through the path of direct correspondent banking relationships.

    Traditionally, cover payments were made using the MT 202 format (the standard SWIFT interbank transfer message). This message, however, was not designed to carry detailed information on the ordering customer and final beneficiary of the transfer (ie the customers of the first and last banks in the chain, see Figure 4 below). As a result, intermediary banks were not able to screen these transactions properly according to AML/CFT and sanctions requirements, and they could even remain unaware that the MT 202 interbank transfer was related to a commercial correspondent banking payment.

    To tackle this problem, a common effort of SWIFT, banks involved in correspondent banking activities and authorities took place to devise a solution that would allow all banks in the payment chain to conduct proper screening of correspondent banking transactions. These efforts

---

[38]    The usage of payment systems is not considered for reasons of simplicity.

resulted in the MT 202 COV, a new message standard for interbank transfers related to correspondent banking cover payments that was implemented in the 2009 standards release. The main advantages of the MT 202 COV are that (i) it allows the principle of making cover payments by using interbank transfer messages to be maintained (which was the prevalent approach at that time), and (ii) it is designed to carry all the necessary details about the identities of the ordering customer and the final beneficiary as well as other information on the payment that are included in the underlying MT 103 message. Therefore, if the code "COV" is used in field 119 of the message user header, it is mandatory to fill in an additional sequence in the message to include a copy of selected fields from the underlying customer credit transfer (ie the MT 103). The adoption of the MT 202 COV has led to a ban on the use of plain MT 202 messages in correspondent banking whenever an underlying customer transaction is involved.[39]



Figure 4

A correspondent transaction using the cover method

* The information on the underlying customer credit transfer is also provided, e.g. for the reason of regulatory screening requirements, AML controls, etc.

It needs to be emphasised again that both methods, ie the serial MT 103 and the cover MT 202 COV methods, can be used in full compliance with AML/CFT as well as relevant regulatory requirements. When all relevant data fields are accurately populated, both the serial method and the cover method provide all banks involved with the necessary information about the payment, allowing them to conduct an adequate screening of the transaction and fulfil all regulatory requirements.

---

[39]   Note that the introduction of the MT 202 COV has not led to the abandonment of the MT 202 interbank transfer message, which remains appropriate for pure interbank transactions (ie those unrelated to commercial correspondent banking services). Details of MT 202 as well as MT 202 COV usage can be found in the SWIFT User Handbook.

Payment message standards were endorsed by the Wolfsberg Group to enhance transparency regarding parties to transactions in international payments. The four payment message standards endorsed by the Wolfsberg Group state that (i) financial institutions should not omit, delete, or alter information in payment messages or orders for the purpose of avoiding detection of that information by any other financial institutions in the payment process; (ii) financial institutions should not use any particular payment message for the purpose of avoiding detection of information by any other financial institutions in the payment process; (iii) subject to applicable laws, financial institutions should cooperate as fully as practicable with other financial institutions in the payment process when requesting to provide information about the parties involved; and (iv) financial institutions should strongly encourage their correspondent banks to observe these principles.[40]

There are, however, some potential issues that need to be taken into account:

- Ensuring the availability of all necessary information within the payment message

From the perspective of AML/CFT compliance, it is of the utmost importance to ensure that all necessary information is accurately included in a payment message, regardless of the method used (either serial or cover). Any perceived difference in AML/CFT risk does not lie in the method used, but in the party that supplies (or does not supply) the required information in such a payment message.

When using the MT 202 COV, the originating bank must correctly flag the MT 202 message as a cover message and ensure that all information relevant for AML/CFT procedures is provided.[41] If the originating bank does not provide this information – perhaps as a result of technical problems or even with fraudulent intent – the other banks in the payment chain will not receive all relevant information. Moreover, since an MT 202 payment without the cover indicator is a simple interbank payment, the intermediary banks will accept the MT 202 and be unaware that relevant information is missing. Therefore, the risk exists that a bank could unknowingly accept a message without complete information. In this case, the intermediary bank might not be able to fulfil its regulatory obligations.

Likewise, when using the MT 103 in the serial method, the risk that a bank is unaware of inaccurate or missing information may also arise because using the MT 103 in the serial method itself does not provide any assurance against deceptive practices or fraudulent intent. Although it is possible to determine that a mandatory field in a MT 103 payment message is missing (if the message is sent via SWIFTNet FIN it will be rejected by SWIFT), it is a completely different exercise to seek to determine whether the information in the fields of ordering customer or beneficiary customer is accurate, especially for intermediary institutions.

Regardless of the method used, it is of the utmost importance for banks engaged in correspondent banking activities to ensure that all necessary information in order to comply with the relevant FATF recommendations (especially FATF recommendation 16) is available within a payment message.[42] In this regard, originating banks are in the best position to ensure that payment messages properly reflect the identity of a payment originator. Likewise, beneficiary banks are in the best position to know whether a payment message accurately identifies the beneficiary.

The PMPG has published different market practice guidelines as well as white papers with regard to information in payment messages, such as its guidelines for use of the MT 202 COV (see above), guidelines for the use of expanded US wire formats, guidelines for use of remt.001 in support of cross-border payment processes, guidelines to comply with FATF SRVII, market practice guidelines to comply

---

[40]    See www.wolfsberg-principles.com/pdf/standards/Wolfsberg_NYCH_Statement_on_Payment_Message_Standards_(2007).pdf.

[41]    The PMPG has published "Guidelines for use of the MT 202 COV", www.swift.com/about-us/community/swift-advisory-groups/payments-market-practice-group/document-centre.

[42]    The PMPG has published "Market practice guidelines to comply with FATF Recommendation 16", www.swift.com/about-us/community/swift-advisory-groups/payments-market-practice-group/document-centre.

with FATF recommendation 16 (see above) and white papers on extended remittance information (ERI) and payment notification as well as the use of an IBAN in international payments.[43] It seems that the guidance provided by the PMPG is granular enough and it will be regularly reviewed by the PMPG using the community feedback as input. If a bank does not accurately populate a payment message, other banks may take this into account when assessing the correspondent banking relationship.[44]

- Fees and costs

By current market practice, banks do not deduct fees from MT 202/MT 202 COV messages. Thus, for payments sent with the MT 202 COV method, banks involved in the payment chain (eg as intermediaries) do not deduct additional fees. With regard to MT 103, according to the current market practice, a fee is typically deducted from the payment amount by each intermediary bank so that, in such cases, the beneficiary does not receive the full amount of the original payment order.

Besides the fees charged, other cost elements also need to be considered when assessing the costs of each payment method. For example, when the cover method is used, two SWIFT messages need to be sent by the originating bank and two messages need to be processed by the receiving bank. It is worth noting here that most of the costs involved in correspondent banking arise not from the actual payments processing but from compliance and IT work on system modifications.

As comprehensive cost calculations can only be done at the level of individual banks, it is not possible to say a priori which payment method is cheaper. Some banks that provided comments for this report have suggested that the differences in costs between the two methods have been exaggerated and have not been the key determinants in deciding which method is used.

- Message flow

In general, the cover method is considered to be faster. Nevertheless, when using the cover method, two separate flows exist. On the one hand, this means that the receiving bank is aware that it will receive funds and, should the bank not receive the expected funds via MT 202 COV, it can then investigate. On the other hand, depending on the commercial policies of a receiving bank, this knowledge either allows the customer account to be credited sooner or it might put the bank under pressure – for competitive reasons – to credit the sum to the account of its customer before it actually receives the funds (eg in the case of large corporates). This might be especially critical in cases where the beneficiary bank has received the MT 103 but the MT 202 COV is stopped or rejected by one of the banks involved in the payment chain due to compliance concerns. Therefore, banks need to ensure that appropriate unwinding procedures are in place to reverse a credit on the account should the need arise. Moreover, as mentioned above, the receiving bank always needs to "match" both message flows.

According to information received during the consultation process of this report, clearing systems limitations as well as time zone considerations necessitate that both the serial MT 103 and the cover MT 202 COV methods remain relevant, as (i) clearing systems in some jurisdictions do not support all the charge code options (eg OUR) and hence the serial method cannot provide a full value transfer, and (ii) the use of the serial method has a potential impact on the ability to provide same-day value into some markets (eg payments into Asia from outside of Asia).

- Payment advice

In the case of the serial MT 103, the information and the settlement reach the receiving bank at the same time, eliminating any lag between the information and settlement. It needs to be acknowledged that, in

---

[43] These documents are available in the PMPG's website, www.swift.com/about-us/community/swift-advisory-groups/payments-market-practice-group/document-centre.

[44] See www.wolfsberg-principles.com/pdf/home/Wolfsberg-Anti-Money-Laundering-Questionnaire-2014.pdf.

this case, the receiving bank will not be aware that a payment is coming until the MT 103 is processed by all intermediary banks. This potential drawback can be solved – if need be – through alternative means.[45]

Taking into account the above features and characteristics of both methods, banks involved in correspondent banking activities need to decide individually which method best meets their needs. In order to fulfil all obligations with regard to AML/CFT it is crucial that the message used is accurately populated – the message type used is not critical.

Moreover, it needs to be acknowledged that, if banks that have the intention to engage in deceptive practices, it is almost impossible for correspondent banks, especially for intermediary institutions, to detect this – irrespective of the method used. For instance, a bank that deliberately chooses the MT 202 instead of the MT 202 COV in order to avoid including additional information about the transaction is unlikely to be any more "honest" when using a serial MT 103.

**Recommendation**: It is recommended that banks decide individually which payment method best meets their own and their clients' needs and agree with other banks involved on the method to be used.

The relevant stakeholders (ie the Wolfsberg Group and the PMPG) are invited to review their principles governing the use-cases for payment messages, such as the PMPG's market practice guidelines and white papers.[46] The documents should include information about the data that should be contained in payment messages as well as the data fields that should be used to provide relevant information for conducting customer due diligence. In addition, the AMLEG is invited to consider further developing guidance on supervisors' role in ensuring that banks meet FATF Recommendations and guidance on the quality of payment message content.

### 3.5.3    Usage of the LEI as additional information in payment messages

Currently, payment messages include neither a dedicated code nor a dedicated line/field for the LEI. The LEI can be used in free format fields, but no validations apply in order to check whether an LEI is included and whether it is syntactically correct. However, in the long term, an effort by the industry to evaluate the inclusion of the LEI in payment messages could be undertaken to ensure unambiguous identification of parties to payment transactions. Moreover, as payment messages evolve, a discussion on the development of such dedicated codes or data items for the LEI should take place when changes in payment message formats would need to be discussed anyway, as the LEI would promote the unambiguous identification of parties to a transaction.[47] This might be the case, for example, when at some point in the future ISO 20022-compliant message formats are considered for use in correspondent banking,[48] as such a change would in any case imply changes to bank IT systems.

Meanwhile, as the use of LEIs becomes widespread or even compulsory for banks as well as for corporate customers (see Section 3.3 for a detailed discussion of LEI usage), relevant stakeholders (eg the PMPG) may wish to analyse how the LEI can be used on an optional basis in a more structured way within the current relevant MT messages (ie MT 103 and MT 202 COV).

---

[45]    For example, SWIFT FINInform, a service within the SWIFT network, allows a copy of a message to be sent to specific third parties following predefined rules. If need be, this can be used to send a copy of an MT 103 that will be processed following the serial method to the receiving bank. This copy ensures the accuracy of the information and it would preannounce the reception of a payment in the same way as the MT 103 does in the cover method. When using the SWIFT FINInform service, the receiving bank needs to ensure that adequate procedures are in place in order to avoid an erroneous double-processing of the MT 103.

[46]    See www.swift.com/about-us/community/swift-advisory-groups/payments-market-practice-group/document-centre.

[47]    As mentioned in Section 3.3, it needs to be kept in mind that in general no LEI for individuals exists.

[48]    In the area of securities messages, however, the LEI can be used as a party identifier across ISO 15022 category 5 messages.

In principle, various options for including the LEI in the payment message exist: (i) development of specific data fields and their inclusion in message formats used for correspondent banking transactions, such as the MT 103 or MT 202 COV (and equivalents) or (ii) the use of a dedicated code for the LEI within the payment message or (iii) the development of a market practice in which the LEI can be included in an existing field of the payment message. However, owing to the fact that in the long term there will be a move from MT to (ISO 20022-compliant) MX message formats, this solution should have only very limited impact with regard to the necessary investments.

As part of the future migration to message formats based on the ISO 20022 standard, relevant stakeholders (ie ISO and SWIFT) might wish to consider developing dedicated codes or data items for the structured inclusion of the LEI in payment messages.

In the meantime, the use of the LEI in payment messages could be allowed on an optional basis in other standards for those who want to use it earlier. In order to ensure an efficient processing of payment messages in a cross-border context, the optional use of the LEI in payment messages may need to be simultaneously introduced in a harmonised way in many jurisdictions.

Finally, if the LEI were included on an optional basis in payment messages, it would need to be clarified in advance how to deal with any contradictions between the LEI and other party references (eg an account number) included in the payment message.

All in all, due to its limitations and the high transition costs, it seems premature to promote a requirement for the mandatory inclusion of the LEI in payment messages.

**Recommendation**: The use of the LEI as additional information in payment messages should be possible on an optional basis in the current relevant payment messages (ie MT 202 COV and MT 103). To allow for the optional usage of the LEI, relevant stakeholders (eg the PMPG) should work to define a common market practice for how to include the LEI in the current relevant payment messages without changing the current message structure.

Also, as part of a potential future migration to message formats based on the ISO 20022 standard, relevant stakeholders (ie ISO and SWIFT) are encouraged to consider developing dedicated codes or data items for the inclusion of the LEI in these payment messages.

## 4.    Conclusions

Correspondent banking services are an essential component of the global payment system, especially for cross-border transactions. There seems to be a variety of reasons for the general decline in correspondent banking relationships reported by many stakeholders. Often cited by correspondent banks as reasons for this decline are compliance with AML/CFT regulations, an increased perception of risk and some uncertainties on the potential impact of non-compliance.

The impact of this trend is uneven across jurisdictions and banks. Some correspondent banks specialise in the for-profit provision of correspondent banking services, and thus focus on respondent banks with business volumes that justify the rising costs. Others apparently maintain existing correspondent banking services only as far as these services support the cross-selling of other products. Some relationships are maintained or terminated according to the perceived degree of risk in the respondent bank's jurisdiction. As a result, some respondent banks might risk being cut off from the international payment networks. This trend implies a risk that cross-border payment systems will become fragmented, reducing the options available for these transactions.

The working group limited its analysis to several measures that could help to improve efficiency of procedures while reducing compliance costs and perceived uncertainties, without altering the applicable rules and the basic channels for correspondent banking between correspondent and respondent banks. The potential measures were translated into five recommendations.

The CPMI believes that its recommendations might alleviate some of the costs and concerns connected with correspondent banking activities. However, the members are aware and would like to stress that, in isolation, these measures will not resolve all the issues. The CPMI acknowledges that the issues surrounding the withdrawal from correspondent banking are very complex and that costs related to AML/CFT compliance are only one of the elements that have to be considered in order to understand recent trends. Those include business considerations as well as economies of scope and scale issues. Limiting information challenges through the use of enhanced technical tools will only address a part of AML/CFT compliance costs but this will not resolve issues such as uncertainty about how far customer due diligence should go. In particular, the proposed measures will not immediately help banks without access to correspondent banking services to gain such access.

Measures that could facilitate the provision of correspondent banking services analysed in this report relate to: (i) Know-your-customer (KYC) utilities; (ii) increased use of the LEI; (iii) information-sharing initiatives; (iv) payment messages; and (v) use of the LEI as additional information in payment messages.

As a next step before any potential implementation, these measures should be further analysed by all relevant authorities and stakeholders in order to gauge the potential impact of each measure and to avoid unintended consequences. The CPMI expects that the relevant stakeholders will initiate any necessary reviews or investigations in the light of the five recommendations as soon as possible.

The CPMI will (i) encourage, mainly through the participation of CPMI members in the FSB Correspondent Banking Coordination Group, the review or investigation of the recommendations by the relevant stakeholders and (ii) from the technical perspective of payment systems, facilitate the implementation by contributing to the work or workstreams of the relevant stakeholders, possibly through participation in such work or workstreams.

# Annex 1 – References

Basel Committee on Banking Supervision (2009): *Due diligence and transparency regarding cover payment messages related to cross-border wire transfers*, www.bis.org/publ/bcbs154.pdf.

——— (2014): *Sound management of risks related to money laundering and financing of terrorism*, www.bis.org/publ/bcbs275.pdf.

——— (2016): *General guide to account opening*, www.bis.org/bcbs/publ/d353.pdf.

Committee on Payments and Market Infrastructures (2015): *A glossary of terms used in payments and settlement systems*, www.bis.org/cpmi/publ/d00b.htm?m=3%7C16%7C266.

European Central Bank (2015): *Ninth survey on correspondent banking in euro*, 2014, www.ecb.europa.eu/pub/pdf/other/surveycorrespondentbankingineuro201502.en.pdf.

Financial Action Task Force (2012): *International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation*, www.fatf-gafi.org/media/fatf/documents/recommendations/pdfs/FATF_Recommendations.pdf.

——— (2014): *Risk-Based Approach for the Banking Sector*, www.fatf-gafi.org/media/fatf/documents/reports/Risk-Based-Approach-Banking-Sector.pdf.

——— (2015): *FATF clarifies risk-based approach: case-by-case, not wholesale de-risking*, www.fatf-gafi.org/topics/fatfgeneral/documents/rba-and-de-risking.html.

——— (2015): *Dialogue with the Private Sector – FATF Private Sector Consultative Forum Meeting*, Brussels, 26–27 March 2015, www.fatf-gafi.org/documents/documents/private-sector-forum-march-2015.html.

——— (2015): *Drivers for "de-risking" go beyond anti-money laundering / terrorist financing*, www.fatf-gafi.org/topics/fatfrecommendations/documents/derisking-goes-beyond-amlcft.html.

——— (2015): *Guidance for a risk-based approach: effective supervision and enforcement by AML/CFT supervisors of the financial sector and law enforcement*, www.fatf-gafi.org/media/fatf/documents/reports/RBA-Effective-supervision-and-enforcement.pdf.

——— (2016) *Guidance for risk-based approach for money or value transfer services*, www.fatf-gafi.org/media/fatf/documents/reports/Guidance-RBA-money-value-transfer-services.pdf.

Financial Stability Board (2015): *Report to the G20 on actions taken to assess and address the decline in correspondent banking*, www.fsb.org/wp-content/uploads/Correspondent-banking-report-to-G20-Summit.pdf.

Legal Entity Identifier Regulatory Oversight Committee (2016): *Collecting data on direct and ultimate parents of legal entities in the Global LEI System – Phase 1*, www.leiroc.org/publications/gls/lou_20161003-1.pdf.

Payments Market Practice Group (2010): *Guidelines for use of the MT 202 COV*, www.swift.com/about-us/community/swift-advisory-groups/payments-market-practice-group/document-centre.

——— (2015): *Market practice guidelines to comply with FATF Recommendation 16*, www.swift.com/about-us/community/swift-advisory-groups/payments-market-practice-group/document-centre

The Wolfsberg Group (2007): *Wolfsberg Group, Clearing House Statement on Payment Message Standards*, www.wolfsberg-principles.com/pdf/standards/Wolfsberg_NYCH_Statement_on_Payment_Message_Standards_(2007).pdf.

——— (2014): *Anti-Money Laundering Questionnaire*, www.wolfsberg-principles.com/pdf/diligence/Wolfsberg-Anti-Money-Laundering-Questionnaire.pdf.

———— (2014): *Wolfsberg Anti-Money Laundering Principles for Correspondent Banking*, www.wolfsberg-principles.com/pdf/home/Wolfsberg-Correspondent-Banking-Principles-2014.pdf.

Various contributors (eg BBA and Wolfsberg Group) (2014): *De-risking; global impact and unintended consequences for exclusion and stability*; paper prepared for use by the October 2014 FATF Plenary and associated working groups.

World Bank (2015): *Withdrawal from correspondent banking: where, why, and what to do about it*, http://documents.worldbank.org/curated/en/2015/11/25481335/withdraw-correspondent-banking.

## Annex 2 – Glossary

Glossary

| Terms | Definition |
|---|---|
| Beneficiary | Beneficiary refers to the natural or legal person or legal arrangement who is identified by the originator as the receiver of the requested wire transfer.[49] |
| Beneficiary financial institution | Beneficiary financial institution refers to the financial institution which receives the wire transfer from the ordering financial institution directly or through an intermediary financial institution and makes the funds available to the beneficiary.[50] |
| BIC | BIC is the international ISO standard ISO 9362:2014. This standard specifies the elements and structure of a universal identifier code, the business identifier code (BIC), for financial and non-financial institutions, for which such an international identifier is required to facilitate automated processing of information for financial services. |
| | The BIC is used for addressing messages, routing business transactions and identifying business parties. |
| | SWIFT in its role of ISO registration authority issues BICs to financial and non-financial institutions. The BIC is used in financial transactions, client and counterparty databases, compliance documents and many others.[51] |
| Correspondent banking | Correspondent banking is an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks. Such arrangements may also be known as agency relationships in some domestic contexts. In international banking, balances held for a foreign respondent bank may be used to settle foreign exchange transactions. Reciprocal correspondent banking relationships may involve the use of so-called nostro and vostro accounts to settle foreign exchange transactions.[52] |
| | *Note: For the purpose of this report, correspondent banking is considered as the provision of cross-border payment services only.* |

---

[49] See "The FATF Recommendations", Glossary, February 2012.

[50] See "The FATF Recommendations", Glossary, February 2012.

[51] See www.swift.com.

[52] See BIS, CPSS Glossary, March 2003.

| | |
|---|---|
| Cover Payment | Cover payment refers to a wire transfer that combines a payment message sent directly by the ordering financial institution to the beneficiary financial institution with the routing of the funding instruction (the cover) from the ordering financial institution to the beneficiary financial institution through one or more intermediary financial institutions.[53] An MT202 COV shall be used.[54] |
| Customer due diligence (CDD) | In line with FATF Recommendation 10, CDD measures to be taken are as follows: |
| | (a)   Identifying the customer and verifying that customer's identity using reliable, independent source documents, data or information. |
| | (b)   Identifying the beneficial owner, and taking reasonable measures to verify the identity of the beneficial owner, such that the financial institution is satisfied that it knows who the beneficial owner is. For legal persons and arrangements this should include financial institutions understanding the ownership and control structure of the customer. |
| | (c)   Understanding and, as appropriate, obtaining information on the purpose and intended nature of the business relationship. |
| | (d)   Conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of that relationship to ensure that the transactions being conducted are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds. |
| | Financial institutions should be required to apply each of the CDD measures under (a) to (d) above, but should determine the extent of such measures using a risk-based approach (RBA) in accordance with the Interpretive Notes to FATF Recommendation 10 and to Recommendation 1.[55] |
| Intermediary financial institution | Intermediary financial institution refers to a financial institution in a serial or cover payment chain that receives and transmits a wire transfer on behalf of the ordering financial institution and the beneficiary financial institution, or another intermediary financial institution.[56] |
| Legal Entity Identifier (LEI) | The Legal Entity Identifier (LEI) is a 20-digit, alphanumeric code designed to uniquely identify legally distinct entities that engage in financial transactions.[57] |

---

[53]   See "The FATF Recommendations", Glossary, February 2012.

[54]   See www.swift.com.

[55]   See "The FATF Recommendations", February 2012.

[56]   See "The FATF Recommendations", Glossary, February 2012.

[57]   See www.leiroc.org.

| | |
|---|---|
| MT 103 | The MT 103 allows the exchange of single customer credit transfers. The MT 103 can be straight through processable if the message is properly formatted according to pre-agreed bilateral/multilateral rules.[58] |
| MT 103 STP | The MT 103 STP is a general use message, ie no registration in a message user group is necessary to send and receive this message. It allows the exchange of single customer credit transfers using a restricted set of fields and format options of the core MT 103 to make it straight through processable. The MT 103 STP is a compatible subset of the core MT 103 that is documented separately.<br><br>The differences with the core MT 103 are, inter alia:<br><br>• appropriate MT 103 STP format validation is triggered by the code STP in the validation flag field 119 ({3:{119: STP}}) of the user header of the message (block 3);<br><br>• fields 52, 54, 55, 56 and 57 may only be used with letter option A;<br><br>• field 53 may only be used with letter options A and B; and<br><br>• field 51A is not used in MT 103 STP.<br><br>This message may only be used on the SWIFTNet FIN network since it requires special validation.[59] |
| MT 202 | The MT 202 is a general financial institution transfer.<br><br>This message is sent by or on behalf of the ordering institution directly, or through correspondent(s), to the financial institution of the beneficiary institution.<br><br>It is used to order the movement of funds to the beneficiary institution.<br><br>This message may also be sent to a financial institution servicing multiple accounts for the sender to transfer funds between these accounts. In addition it can be sent to a financial institution to debit an account of the sender serviced by the receiver and to credit an account, owned by the sender at an institution specified in field 57a.<br><br>This message must not be used to order the movement of funds related to an underlying customer credit transfer that was sent with the cover method. For these payments the MT 202 COV or MT 205 COV must be used.[60] |

---

[58]   See www.swift.com.

[59]   See www.swift.com.

[60]   See www2.swift.com/uhbonline/books/hub/httoc.htm.

| MT 202 COV | This message is sent by or on behalf of the ordering institution directly, or through correspondent(s), to the financial institution of the beneficiary institution. It must only be used to order the movement of funds related to an underlying customer credit transfer that was sent with the cover method. The message contains a mandatory sequence to include information on an underlying customer credit transfer. |
|---|---|
| | Guidelines for the use of the message have been published by the Payments Market Practice Group (PMPG).[61] |
| | The MT 202 COV must not be used for any other interbank transfer. For these transfers the MT 202 must be used.[62] |
| Ordering financial institution | Ordering financial institution refers to the financial institution which initiates the wire transfer and transfers the funds upon receiving the request for a wire transfer on behalf of the originator.[63] |
| Originator | Originator refers to the account holder who allows the wire transfer from that account, or where there is no account, the natural or legal person that places the order with the ordering financial institution to perform the wire transfer.[64] |
| Serial payment | Serial payment refers to a direct sequential chain of payment where the wire transfer and accompanying payment message travel together from the ordering financial institution to the beneficiary financial institution directly or through one or more intermediary financial institutions (eg correspondent banks).[65] |
| Upstream bank | An upstream bank is a bank that provides correspondent banking services to another bank. Therefore, an upstream bank has to ensure that it fulfils all requirements with respect to customer due diligence. |
| Wire transfer | Wire transfer refers to any transaction carried out on behalf of an originator through a financial institution by electronic means with a view to making an amount of funds available to a beneficiary person at a beneficiary financial institution, irrespective of whether the originator and the beneficiary are the same person.[66] |

---

[61]    See www.pmpg.info.

[62]    See www2.swift.com/uhbonline/books/public/en_uk/us2m_20140725/index.htm?subpage=ahg.htm.

[63]    See "The FATF Recommendations", Glossary, February 2012.

[64]    See "The FATF Recommendations", Glossary, February 2012.

[65]    See "The FATF Recommendations", Glossary, February 2012.

[66]    See "The FATF Recommendations", Glossary, February 2012.

## Annex 3 – SWIFT data analysis

Data for overall value and volume show no clear trend in correspondent banking activity (Graph 4). The volume of payments sent increased between 2011 and 2015, while the value of payments declined after 2011, with no clear emerging trend relationship thereafter. Encouragingly, overall cross-border payments were stable. The number of active correspondents, meanwhile, has fallen over time, which, together with developments in value and volume, points to increased concentration in correspondent banking activity.

Correspondent payments

January 2011 = 100, three-month moving averages                                            Graph 4



Sources: Deutsche Bundesbank; SWIFT Watch.

Graph 5 shows transaction values for different message types. Interbank payments (MT 202) make up by far the largest share of payments and drive the overall value trend, albeit with relatively high volatility.

Monthly transaction value by message type

January 2011 = 100 in sum                                                                  Graph 5



Source: SWIFT Watch.

However, as shown in Graph 6, in terms of volume, customer payments (MT 103) account for the largest share of transactions and drive the overall volume trend. This also means, unsurprisingly, that the average value of customer payments is much lower than that of interbank payments. To avoid double-counting, MT 202 COV transactions are excluded in the reminder of the analysis, as they cannot be separated from their underlying MT 103 payments.

Monthly transaction volume by message type

Millions Graph 6



Source: SWIFT Watch.

In Graph 7, volumes of cross-border payments are depicted for different currencies. US dollar and euro payments make up the majority of transactions. Their evolution, however, looks rather different. While payments in US dollars have been increasing over time, payments in euros have seen a slight decline. For payments in British pounds and other currencies, there has been an upturn over time.

Transaction volume by currency

Millions Graph 7



Source: SWIFT Watch.

Correspondent banking activity is unevenly distributed across regions. Graph 8 shows payment values and active correspondents by region. The bulk of transaction values are sent between Europe (excluding Eastern Europe) and North America, followed by Asia and the Americas and Asia and Europe. Activity to and from Africa and Oceania is small by comparison. When looking at active correspondents,

the picture changes. The predominant channel is now between Europe and Asia. The dynamics are stable over time, as changes over time are negligible compared with overall numbers on an aggregate level.

Aggregate by region[1]

2014; index                                                                                                    Graph 8



[1] Regional grouping as defined by the United Nations Statistics Division.

Sources: Deutsche Bundesbank; SWIFT Watch.

The comparison of corridors by the number of active correspondents (Graph 9) also shows a highly uneven distribution. Corridors with up to 10 correspondents make up the vast majority of corridors. Very few corridors have more than 1,000 correspondents.

Corridors by average number of active correspondents

Number of active correspondents, annual averages                                                               Graph 9



Sources: Deutsche Bundesbank; SWIFT Watch.

As a measure for concentration among correspondents, we use volume-to-correspondents as a proxy (Graph 10). The indicator gives the average volume by active correspondent. Therefore, an increase can be attributed either to increasing volumes or a declining number of active correspondents. The indicator shows a rising tendency, especially in the Americas. The same dynamics are at play for the indicator for value-to-correspondents (not shown). This points to heightened concentration in

correspondent banking. However, this trend might also be driven by other factors, such as the increase in customer payments and average payment size.

Indicator volumes to correspondents[1]                                    Graph 10



¹ Grouping of continents and regions according to the United Nations Statistics Division.

Source: SWIFT Watch.

The finding of increased concentration is also visible for concentration across corridors. As shown in Graph 11, the distribution of active correspondent paths among corridors, measured by the Gini coefficient, is highly uneven and concentration slightly increases over time. The same is true for the Gini coefficient regarding volume and value across corridors (not shown).

Gini coefficient on number of active correspondents per corridor

Three-month moving average                                              Graph 11



Sources: Deutsche Bundesbank; SWIFT Watch.

Table 1 shows changes in the number of correspondents, volume and value by countries. The development differs substantially and is uneven across countries and regions (also see Graph 12).

Developments by country from 2012 to 2015[1]

Table 1

| Country | Change in number of active correspondents | Change in volume | Change in value |
|---|---|---|---|
| Afghanistan | −6.9% | −27.7% | −22.3% |
| Albania | −5.8% | 21.1% | −19.5% |
| Algeria | −4.4% | 26.2% | −7.6% |
| Andorra | −8.1% | 14.2% | −23.3% |
| Angola | 1.3% | −9.7% | −10.5% |
| Argentina | −13.4% | 50.5% | 12.0% |
| Armenia | 0.8% | 5.3% | −12.5% |
| Aruba | −15.4% | 9.1% | −18.2% |
| Australia | −0.2% | 7.4% | 33.4% |
| Austria | −6.8% | −5.9% | −15.9% |
| Azerbaijan | −1.3% | 3.5% | −13.8% |
| Bahamas | 1.7% | 26.2% | −29.7% |
| Bahrain | −9.3% | 3.3% | −16.8% |
| Bangladesh | 8.7% | 52.0% | 59.6% |
| Barbados | −1.0% | 16.6% | −58.3% |
| Belarus | −6.8% | 11.2% | −24.3% |
| Belgium | −2.1% | −13.2% | −15.5% |
| Belize | −7.3% | 2.4% | 1.5% |
| Benin | −1.9% | 48.4% | 48.7% |
| Bermuda | −11.1% | −9.6% | −32.4% |
| Bhutan | 7.1% | 28.8% | 117.3% |
| Bolivia | −1.2% | 12.1% | −39.8% |
| Bonaire, Sint Eustatius and Saba | 0.4% | 19.4% | −45.8% |
| Bosnia and Herzegovina | −6.7% | 15.7% | −24.5% |
| Botswana | −2.8% | 8.6% | 7.0% |
| Brazil | 0.1% | 7.8% | −6.6% |
| Brunei | 5.2% | 2.3% | −10.1% |
| Bulgaria | 1.0% | 31.6% | −14.8% |
| Burkina Faso | −3.4% | −9.9% | 19.3% |
| Burundi | 5.1% | 23.1% | −23.7% |
| Cambodia | 15.0% | 43.3% | 136.2% |
| Cameroon | 3.5% | −3.0% | −1.1% |
| Canada | −1.0% | 18.3% | 28.7% |
| Cape Verde | 11.0% | 11.3% | −1.3% |
| Cayman Islands | −6.8% | 4.5% | 21.6% |

| Country | Change in number of active correspondents | Change in volume | Change in value |
|---|---|---|---|
| Central African Republic | –11.4% | 1.0% | –30.9% |
| Chad | –6.3% | 21.8% | –53.5% |
| Chile | 0.6% | 7.1% | 14.0% |
| China | 7.1% | 31.9% | 60.9% |
| Chinese Taipei | 5.7% | 14.0% | 55.2% |
| Colombia | –5.4% | 0.5% | 13.8% |
| Comoros | 4.4% | 24.6% | 1.9% |
| Congo | 26.6% | 30.4% | –1.7% |
| Congo Democratic Republic | 8.5% | 24.8% | 307.7% |
| Costa Rica | –3.8% | 5.5% | 81.0% |
| Cote d'Ivoire | 13.2% | 35.0% | 33.9% |
| Croatia | –9.8% | 7.6% | –27.9% |
| Cuba | –9.5% | –9.3% | –26.0% |
| Curacao | –7.3% | –5.3% | –18.2% |
| Cyprus | –29.3% | –46.7% | –67.4% |
| Czech Republic | 2.7% | –26.4% | 3.2% |
| Denmark | –6.1% | 5.2% | –27.3% |
| Djibouti | 8.3% | 48.2% | 45.4% |
| Dominica | –2.1% | –6.6% | –58.0% |
| Dominican Republic | 3.2% | 27.3% | 18.4% |
| Ecuador | –2.1% | –4.6% | 13.3% |
| Egypt | –12.9% | –2.5% | –15.6% |
| El Salvador | 10.3% | 30.8% | 24.2% |
| Equatorial Guinea | 21.0% | –4.0% | –59.2% |
| Eritrea | –8.6% | –38.7% | –22.5% |
| Estonia | 4.2% | 16.3% | –20.5% |
| Ethiopia | 0.9% | 35.4% | –24.5% |
| Faeroe Islands | –18.4% | –33.8% | –3.6% |
| Falkland Islands | –9.5% | 73.8% | –41.1% |
| Fiji | –1.5% | 18.8% | 114.2% |
| Finland | –0.5% | –13.6% | –4.8% |
| France | –1.5% | –8.0% | –3.7% |
| French Polynesia | –5.2% | 1.7% | –34.0% |
| Gabon | 7.2% | 1.8% | –13.2% |
| Gambia | –18.4% | 17.5% | 2.0% |
| Georgia | 12.9% | 24.4% | –12.6% |
| Germany | –3.2% | –8.2% | –16.2% |
| Ghana | –4.8% | –7.7% | 19.2% |
| Gibraltar | –6.2% | 28.3% | 29.7% |
| Greece | –46.7% | –33.8% | –66.1% |
| Greenland | –0.2% | 192.4% | 8.1% |

| Country | Change in number of active correspondents | Change in volume | Change in value |
|---|---|---|---|
| Grenada | 1.6% | 13.0% | −13.5% |
| Guatemala | −2.0% | 48.4% | 16.2% |
| Guernsey | −1.5% | 18.0% | −35.8% |
| Guinea | 8.2% | 22.4% | −18.7% |
| Guinea-Bissau | 14.0% | 73.0% | 45.2% |
| Guyana | 2.2% | 0.5% | −29.5% |
| Haiti | 1.4% | 15.5% | 6.6% |
| Honduras | −5.5% | 22.3% | 20.9% |
| Hong Kong SAR | 2.3% | 24.2% | 51.3% |
| Hungary | −8.0% | −2.2% | −19.4% |
| Iceland | −13.9% | 26.4% | 46.1% |
| India | 2.5% | 25.3% | 4.9% |
| Indonesia | −4.0% | −2.7% | 128.2% |
| Iran | −17.9% | 53.2% | −47.7% |
| Iraq | −1.0% | 21.2% | −12.2% |
| Ireland | −6.5% | −3.5% | −51.3% |
| Isle of Man | −16.8% | 83.8% | −52.9% |
| Israel | −3.5% | 9.5% | 6.0% |
| Italy | −16.7% | −8.1% | 1.8% |
| Jamaica | −5.1% | 19.7% | −0.4% |
| Japan | −3.5% | −0.5% | 15.4% |
| Jersey | −13.9% | −1.9% | −22.7% |
| Jordan | −11.2% | −7.3% | −34.0% |
| Kazakhstan | −3.1% | 15.8% | 13.8% |
| Kenya | 8.0% | 33.7% | 3.2% |
| Kiribati | 10.6% | 8.3% | 8.5% |
| Kuwait | 3.9% | 18.6% | 12.1% |
| Kyrgyz Republic | 2.1% | 8.8% | 26.7% |
| Laos | 6.0% | 43.5% | −70.3% |
| Latvia | −10.6% | −25.6% | −27.9% |
| Lebanon | −9.0% | 5.2% | −10.2% |
| Lesotho | −4.3% | 96.6% | 47.1% |
| Liberia | −13.1% | 23.2% | 16.3% |
| Libya | −23.7% | −22.6% | −22.3% |
| Liechtenstein | 6.4% | 0.0% | 5.1% |
| Lithuania | −25.2% | 0.7% | −22.9% |
| Luxembourg | 2.6% | 24.5% | −26.3% |
| Macao | 1.5% | 24.8% | 40.2% |
| Macedonia | −4.6% | 14.0% | −53.4% |
| Madagascar | −16.5% | 11.4% | 30.0% |
| Malawi | 7.9% | 31.3% | 50.1% |

| Country | Change in number of active correspondents | Change in volume | Change in value |
|---|---|---|---|
| Malaysia | 1.2% | 4.1% | −3.6% |
| Maldives | −5.8% | 21.2% | 148.3% |
| Mali | 4.6% | 28.9% | 13.3% |
| Malta | 5.0% | 11.9% | −23.7% |
| Mauritania | 12.9% | 11.2% | −18.7% |
| Mauritius | 2.7% | 23.3% | 9.4% |
| Mexico | 9.9% | 32.8% | −13.3% |
| Moldova | −3.5% | 3.0% | −28.2% |
| Mongolia | 12.3% | −8.1% | −21.2% |
| Montenegro | 9.1% | 14.8% | −6.8% |
| Morocco | −1.2% | 12.9% | −9.4% |
| Mozambique | 1.2% | 25.1% | 19.7% |
| Myanmar | 236.9% | 147.6% | 139.5% |
| Namibia | −6.6% | 13.7% | 64.9% |
| Nepal | 7.8% | 69.3% | 44.0% |
| Netherlands | −11.0% | −44.9% | −22.2% |
| New Caledonia | −21.3% | −6.5% | −13.6% |
| New Zealand | −2.1% | 18.3% | 5.8% |
| Nicaragua | 1.9% | 23.9% | −2.6% |
| Niger | −2.7% | 31.5% | −0.3% |
| Nigeria | 11.6% | −25.1% | −4.8% |
| North Korea | −71.9% | −78.2% | −92.4% |
| Norway | −5.8% | 14.2% | −26.0% |
| Oman | −6.5% | 12.1% | 18.6% |
| Pakistan | −5.1% | 27.2% | 26.0% |
| Panama | 8.4% | 13.4% | −6.5% |
| Papua New Guinea | −11.6% | 31.6% | −13.4% |
| Paraguay | −8.7% | 6.5% | 37.5% |
| Peru | −3.0% | 9.6% | 38.1% |
| Philippines | −7.2% | 19.7% | 16.4% |
| Poland | −8.8% | 12.8% | 8.1% |
| Portugal | −4.8% | −9.5% | −31.1% |
| Qatar | 2.0% | 47.8% | −22.1% |
| Romania | −3.7% | 2.0% | −19.7% |
| Russia | −13.7% | 4.1% | −25.9% |
| Rwanda | 6.2% | −9.9% | −27.2% |
| Samoa | 4.5% | 25.5% | 44.5% |
| San Marino | −25.3% | 99.7% | −48.9% |
| Sao Tome and Principe | −11.6% | 43.2% | −55.8% |
| Saudi Arabia | −5.6% | 8.8% | 3.8% |
| Senegal | −1.3% | 23.9% | 94.8% |

| Country | Change in number of active correspondents | Change in volume | Change in value |
|---|---|---|---|
| Serbia | −19.0% | −56.1% | −53.1% |
| Seychelles | −12.7% | 0.4% | 28.2% |
| Sierra Leone | −3.8% | 33.8% | 41.3% |
| Singapore | 3.1% | 19.9% | 17.8% |
| Slovakia | −4.8% | −63.9% | −6.4% |
| Slovenia | −0.3% | 25.5% | 19.5% |
| Solomon Islands | −18.3% | 8.7% | −8.7% |
| South Africa | 1.5% | 5.6% | −0.5% |
| South Korea | 3.7% | 16.0% | 13.2% |
| South Sudan | 57.5% | −22.2% | −40.7% |
| Spain | −13.9% | −11.7% | −9.5% |
| Sri Lanka | −2.2% | 21.9% | −21.1% |
| St Lucia | 7.9% | 17.6% | −26.3% |
| St Vincent and the Grenadines | −6.7% | 0.0% | −5.3% |
| Sudan | −48.3% | −15.2% | 12.3% |
| Suriname | −4.0% | −3.6% | −1.9% |
| Swaziland | −6.4% | 53.3% | 56.6% |
| Sweden | −1.9% | 10.4% | −20.9% |
| Switzerland | −9.1% | 12.5% | 3.1% |
| Syria | −55.0% | −49.1% | −78.0% |
| Tajikistan | 15.0% | −12.0% | 34.7% |
| Tanzania | 5.4% | 21.6% | 38.3% |
| Thailand | 2.7% | 15.0% | 3.9% |
| Timor Leste | −16.6% | −16.3% | −63.6% |
| Togo | 1.5% | 50.2% | 26.6% |
| Tonga | −8.3% | 3.2% | −15.9% |
| Trinidad and Tobago | −3.5% | 15.1% | −10.0% |
| Tunisia | −6.6% | 7.9% | −35.7% |
| Turkey | 3.9% | 27.9% | 16.8% |
| Turkmenistan | 6.2% | 152.0% | −14.7% |
| Turks and Caicos Islands | −10.4% | 19.4% | −8.9% |
| Tuvalu | −15.5% | 47.7% | 12.0% |
| Uganda | 13.3% | 117.6% | 39.0% |
| Ukraine | −28.4% | −17.8% | −62.6% |
| United Arab Emirates | −1.5% | 21.5% | 40.7% |
| United Kingdom | 0.5% | 14.4% | −3.8% |
| United States | 5.4% | 20.0% | 28.1% |
| Uruguay | −4.3% | 11.7% | 4.7% |
| Uzbekistan | −8.7% | −11.3% | −27.1% |
| Vanuatu | −4.2% | −1.7% | −33.2% |
| Vatican City State | −13.2% | −17.9% | −87.4% |

| Country | Change in number of active correspondents | Change in volume | Change in value |
|---|---|---|---|
| Venezuela | −35.9% | −50.8% | −49.1% |
| Vietnam | 3.5% | 41.5% | 52.0% |
| Yemen | −28.7% | −53.9% | −41.2% |
| Zambia | 4.2% | 26.0% | 26.9% |
| Zimbabwe | −10.0% | 1.2% | −23.9% |

1  Some small countries and territories, as well as countries with missing data, were excluded. 2012 was used as the base year.

Sources: Deutsche Bundesbank; SWIFT Watch.

Developments by country

Change from 2012 to 2015, in per cent                                                    Graph 12



Number of active correspondents

Volume

>25
0 to 25
−25 to 0
<−25
NA

Value

Sources: Deutsche Bundesbank; SWIFT Watch.

# Annex 4 – Members of the CPMI Working Group on Correspondent Banking

| | |
|---|---|
| Chairman | Jochen Metzger |
| | Deutsche Bundesbank |
| | |
| Members | |
| National Bank of Belgium | Pierre Gourdin |
| European Central Bank | Dieter Reichwein |
| Bank of France | Adrien Delcroix |
| Deutsche Bundesbank | Roland Neuschwander |
| Bank of Japan | Fusako Watanabe |
| Bank of Korea | Jinman Choi |
| Bank of Mexico | Miguel Díaz |
| Netherlands Bank | Jurgen Spaanderman (until January 2016) |
| | Annemarie Hondius (from February 2016) |
| Sveriges Riksbank | Felice Marlor |
| Swiss National Bank | Martin Blättler |
| Central Bank of the Republic of Turkey | Kenan Koc |
| Bank of England | Justin Jakobs |
| Board of Governors of the Federal Reserve System | Jeffrey Marquardt |
| | Koko Ives |
| CPMI Secretariat | Carlos Conesa (until July 2015) |
| | Yuuki Shimizu |

Significant contributions were also made by Tim Masela (South African Reserve Bank), Lee Davis (Board of Governors of the Federal Reserve System), Anja Hartmann, Ralf Schmidt, Mark Zanger, Jan Paulick (Deutsche Bundesbank), Nikolai Boeckx (National Bank of Belgium), Ayşe Sungur, Andreas Freitag, Alan Villegas Sanchez and Amy Wood (Bank for International Settlements).