## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>       v.<br><br>BANK OF AMERICA, N.A.,<br><br>    Defendant. | Case No. 25-cv-8520 (JSR) |
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>       v.<br><br>THE BANK OF NEW YORK MELLON CORP.,<br><br>    Defendant. | Case No. 25-cv-8525 (JSR) |

## PLAINTIFF JANE DOE'S SUPPLEMENTAL MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT THE BANK OF NEW YORK MELLON CORP.'S
## <u>MOTION TO DISMISS</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

    I.  BNY, AS A CORRESPONDENT BANK, IS SUBJECT TO THE SAME DUE
        DILIGENCE REQUIREMENTS AS ALL FINANCIAL INSTITUTIONS. ................... 3

    II.  DOE HAS PROPERLY PLED CLAIMS UNDER THE TVPA. ...................................... 5

        A.  The Amended Complaint States a Claim for TVPA Participation Liability
            (Count I). ................................................................................................... 5

        B.  The Amended Complaint States a Claim for Obstruction of TVPA
            Enforcement (Count IV). ............................................................................ 12

    III. DOE HAS PROPERLY PLED HER NEGLIGENCE CLAIMS. ..................................... 14

CONCLUSION.............................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*City of Almaty v. Sater*,
   503 F. Supp. 3d 51 (S.D.N.Y. 2020) ........................................................... 15

*Defer LP v. Raymond James Fin., Inc.*,
   654 F. Supp. 2d 204 (S.D.N.Y. 2009) ........................................................ 11

*Deutsche Doe 1 v. Deutsche Bank Aktiengesellschaft*,
   671 F. Supp. 3d 387 (S.D.N.Y. 2023) ................................................. passim

*Dubai Islamic Bank v. Citibank, N.A.*,
   126 F. Supp. 2d 659 (S.D.N.Y. 2000) ......................................................... 3

*G.G. v. Salesforce.com, Inc.*,
   76 F.4th 544 (7th Cir. 2023) ...................................................................... 10

*In re Alstom SA*,
   454 F. Supp. 2d 187 (S.D.N.Y. 2006) ........................................................ 11

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ......................................................................... 2

*In re Marsh & Mclennan Cos., Inc. Secur. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ........................................................ 11

*Meyer v. Kalanick*,
   174 F. Supp. 3d 817 (S.D.N.Y. 2016) ........................................................ 13

*Nantong Sanhai Garment Co. v. Fab Mill Inc.*,
   2022 WL 540756 (S.D.N.Y. Feb. 23, 2022) ......................................... 8, 11

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019) ........................................................ 11

*Simcuski v. Saeli*,
   377 N.E.2d 713 (N.Y. 1978) ...................................................................... 14

*Tew v. Chase Manhattan Bank, N.A.*,
   728 F. Supp. 1551 (S.D. Fla. 1990) ............................................................. 4

*United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*,
   354 F. Supp. 3d 396 (S.D.N.Y. 2018) .......................................................... 2

*United States v. Abrams*,
   543 F. Supp. 1184 (S.D.N.Y. 1982) .......................................................... 13

*United States v. Gray*,
   642 F.3d 371 (2d Cir. 2011) ...................................................................... 13

*Villalobos v. Telemundo Network Grp. LLC*,
   2025 WL 2687948 (S.D.N.Y. Sept. 19, 2025) ............................................. 9

*Wei Su v. Sotheby's Inc.*,
   2022 WL 14118016 (S.D.N.Y. Oct. 24, 2022) ........................................................ 14

*Zillow, Inc. v. Cap. One Bank, N.A.*,
   2021 WL 412488 (S.D.N.Y. Feb. 5, 2021) .......................................................... 2

*Zimmerman v. Poly Prep Country Day Sch.*,
   888 F. Supp. 2d 317 (E.D.N.Y. 2012) ............................................................ 14

*Zumpano v. Quinn*,
   849 N.E.2d 926 (N.Y. 2006) ...................................................................... 15

**Statutes**

12 C.F.R. § 21.11(d) ................................................................................ 7

18 U.S.C § 1505 ................................................................................... 13

18 U.S.C § 1591 ............................................................................... 1, 12

18 U.S.C. § 1510 .................................................................................. 13

18 U.S.C. § 1519 .................................................................................. 13

18 U.S.C. § 1595 .................................................................................... 1

## INTRODUCTION

Plaintiff Jane Doe ("Doe") brings two claims under the Trafficking Victims Protection Act ("TVPA"): (1) a claim under § 1591(a)(2) that BNY participated (i.e., "assisted" or "facilitated") in Epstein's sex-trafficking; and (2) a claim under § 1591(d) that BNY obstructed enforcement of the TVPA. TVPA § 1595 provides a civil cause of action for sex trafficking victims, like Doe, against those, like BNY, who either violate or "knowingly benefit[] . . . financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). The statute defines participation as "knowingly assisting, supporting, or facilitating a violation." 18 U.S.C § 1591(e)(4).

BNY again attempts to downplay its role in Jeffrey Epstein's sex-trafficking operation by claiming it was only a correspondent bank. *See* ECF No. 56 ("Supp."). But correspondent banks, like banks generally, have the obligation to Know Your Customer ("KYC"), including their depositors, and (perhaps most important) to file suspicious activity reports ("SARs") when they process suspicious transactions. BNY does not actually contest these obligations. Nor can BNY contest (particularly at this stage) that it benefited from the services it provided to Epstein, his entities, agents, and co-conspirators. Nor is there any doubt that BNY's services "assisted" and "facilitated" Epstein.

With respect to Plaintiff's TVPA participation claim, the question for BNY, as for all of Epstein's banks, comes down to what did it know and when did it know it. Doe has pled that BNY knew, should have known, and recklessly disregarded the fact that Epstein was a sex trafficker using BNY's banking services to facilitate that sex trafficking. ECF No. 46 ("Amended Complaint" or "AC") ¶¶ 2, 4–6, 12, 183–203, 217–19. Questions concerning a party's knowledge

1

or state of mind are generally not suitable for resolution at the motion to dismiss stage. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009). To defeat BNY's motion to dismiss, Doe does not have to prove her case. Doe's burden at this stage is at most only to convince the Court that her allegations are plausible. *See Zillow, Inc. v. Cap. One Bank, N.A.*, 2021 WL 412488, at *3 (S.D.N.Y. Feb. 5, 2021) ("The complaint must contain sufficient factual allegations to nudge a claim across the line from conceivable to plausible." (internal quotation marks omitted)).

The issue is even simpler with respect to Doe's obstruction claim. Section 1591(d) broadly provides: "Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement" of the TVPA violates the TVPA. Doe alleges that BNY concealed its transfers to, from, or for the benefit of Epstein, his agents, entities, and co-conspirators, including by failing to timely file required SARs, and thereby obstructed and interfered with the enforcement of § 1591.

At a minimum, there can be no doubt that an important purpose of the SARs requirement is to alert law enforcement to a violation of § 1591 and thereby enable enforcement of that section. *United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396, 438 (S.D.N.Y. 2018); AC ¶¶ 4, 12, 113, 137, 151–64, 178–203. Nor is there any dispute that BNY failed to file SARs ██████████████████—many years after BNY engaged in the transfers to, from, and for the benefit of Epstein and his sex-trafficking venture. If, as alleged, BNY was obligated, but failed to file SARs contemporaneously with its transfers, that failure obstructed or interfered with the enforcement of § 1591, making BNY a perpetrator as well as a participant for § 1591(d) purposes. *See* ██████████████ ("Ex. A"); ██████████████ ("Ex. B"); ██████████████ ("Ex. C"); ██████████████ ("Ex. D") (References to "Ex." are to exhibits to the Declaration of

Andrew Villacastin, filed concurrently hereto).[1]

# ARGUMENT

## I.    BNY, AS A CORRESPONDENT BANK, IS SUBJECT TO THE SAME DUE DILIGENCE REQUIREMENTS AS ALL FINANCIAL INSTITUTIONS.

Contrary to BNY's argument (Supp. at 4), nothing in the TVPA requires a direct customer relationship to establish liability. Correspondent banks, like BNY, are subject to the same anti-money laundering ("AML"), KYC, including know your customer's customer, due diligence, monitoring requirements, and the requirement to file SARs where they know, suspect, or have reason to suspect the funds derived from illegal activities like sex trafficking. *See* Opp. at 23 n.19; AC ¶¶ 139–60, 240. Any due diligence would have revealed that both Deutsche Bank and Epstein were "high-risk" customers and required additional safeguards and monitoring. Indeed, at all relevant times, Deutsche Bank was the subject of multiple consent orders, *id.* ¶¶ 230–33, and Epstein was a convicted sex offender and a known sex trafficker, *id.* ¶¶ 76–113.[2] Correspondent banks, like any other financial institution, are accountable for failing to fulfill these legal duties. *See* ECF No. 38 ("Opp.") at 23 n.19; AC ¶¶ 65, 126, 139–67, 240, 260; *see also Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 667 (S.D.N.Y. 2000) (denying motion to dismiss where plaintiff alleged that a correspondent bank breached its "legal duty to detect, stop, and refrain from participating in, a scheme to steal and launder hundreds of millions of dollars."); *Tew*

---

[1] On a motion to dismiss, a court may consider documents "incorporated by reference" in the complaint and documents that are "integral to the complaint." *Revitalizing Auto Cmtys. Envtl. Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 436 (2d Cir. 2024).

[2] BNY cites regulatory guidance that suggests a correspondent bank's due diligence obligations may be difficult to fulfill (Supp. at 7–8), but the guidance makes clear that correspondent banks are expected to "extend their customer due diligence on respondent banks (KYC) to include also a deeper monitoring and understanding of the underlying correspondent banking transactions and possibly the identities of the originator and final beneficiary." Comm. on Payments and Market Infrastructures, *Correspondent banking* 19 n.14, BANK FOR INT'L SETTLEMENTS (July 2016) ("Ex. H") (referenced at AC ¶ 150).

*v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1567 (S.D. Fla. 1990) ("Imposing liability upon clearing banks who discover a fraud and conceal their knowledge will [] effectively serve the purposes of deterring future fraud and compensating victims.").

Although BNY claims ██████████████████████████████ (Supp. at 9),[3] it is anything but, given that the AC alleges BNY already knew about Epstein, his trafficking operation, and the red-flag transactions flowing in and out of Epstein-related accounts. AC ¶¶ 43–45, 50–112, 114–34, 138–65. As a recent Congressional letter notes: a 2019 filing by BNY "flagged 270 suspicious wire transfers totaling $378 million in and out Epstein's accounts at BNY," which "were authorized by Epstein or parties directly associated with his accounts at BNY and did not have a clearly verifiable business purpose."[4] Despite these red flags, the letter states, BNY "reported these transactions to the U.S. government only after Epstein was arrested on federal sex trafficking charges," raising "serious concerns that BNY may have violated federal anti-money laundering laws that require financial institutions to conduct due diligence on customer relationships and report suspicious activity to the U.S. government in a timely fashion." Ex. F at 1. The Congressional letter asserts that BNY failed to comply with the very same AML and SAR requirements Doe alleges in her Amended Complaint.

---

[3] Under BNY's theory, financial institutions charged with monitoring for money laundering and sex trafficking could ignore red flags until the perpetrator was publicly arrested. Such an interpretation defeats the entire purpose of the regulatory scheme.

[4] U.S. Senate Committee on Finance, *Letter to Robin Vince, Chief Executive Officer, BNY Mellon from Senator Wyden* (Jan. 15, 2026) ("Ex. E"), at 1 (referenced at AC ¶ 10 n.2); *see also* David Voreacos, *BNY's $378 Million of Epstein Transfers Draws Senator's Scrutiny*, BLOOMBERG (Jan. 15, 2026) ("Ex. F"). Notably, similar letters were sent to non-correspondent banking institutions, such as Bank of America, JP Morgan Chase, and Deutsche Bank (AC ¶ 4 n.2), further belying BNY's argument that it is not subject to the same requirements as traditional financial institutions.

## II.    DOE HAS PROPERLY PLED CLAIMS UNDER THE TVPA.

### A. The Amended Complaint States a Claim for TVPA Participation Liability (Count I).

In *Doe 1 v. Deutsche Bank Aktiengesellschaft*, the Court found similar allegations by another Epstein victim, including delay in filing SARs, failure to implement oversight, and permitting unusually large transfers, sufficient to plead the defendant bank's participation in Epstein's sex-trafficking venture. 671 F. Supp. 3d 387, 405 (S.D.N.Y. 2023) ("*Deutsche Bank/JP Morgan*"). The same is true here: BNY delayed filing SARs for years despite having actual and constructive knowledge that its accounts were being used to further Epstein's sex-trafficking venture. Each of these facts are alleged here.

#### 1.    BNY Facilitated and Supported Epstein's Sex-Trafficking Venture.

BNY facilitated Epstein's sex-trafficking venture by: (1) ███████████████████ ████████████████ from Epstein's accounts; (2) opening and ███████████████ ████████████████████████████████████████ without the required due diligence or monitoring; (3) extending a credit line to MC2, a modeling agency used by Brunel and Epstein to lure young girls into Epstein's sex-trafficking venture without the required due diligence or monitoring; (4) making a wire transfer in the amount of $7.4 million from Epstein's account to his known co-conspirator Ghislaine Maxwell with no apparent lawful or business reason or justification; (5) making numerous transfers between Epstein's accounts with no apparent lawful or business purpose; (6) failing to timely file required SARs, until years after the suspicious activity. AC ¶¶ 2–6, 10–13, 113, 151–64, 178–203, 217–19, 250–63.

Throughout its supplemental briefing, BNY ignores the AC's allegations, and the reasonable inferences in Doe's favor that can be drawn from them. Instead, BNY improperly relies on alleged contrary facts and inferences. For example:

1. BNY argues that payments for the benefit of victims were isolated and do not evidence participation under the TVPA. Supp. at 6. But these payments were far from isolated. ███████████████ ████████████████ Epstein's payments were constant and the very mechanism by which Epstein controlled his victims, coerced them to perform commercial sex acts, and bought their silence. AC ¶ 168. For example, an ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████. *Id.* ¶¶ 12(c), 193; Ex. C at BNYM-SDNYLIT-W-000000071–72.

BNY admits ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████[5] AC ¶ 194; Ex. C at BNYM-SDNYLIT-

W-000000071–72. These transactions exhibited ████████████████████████

████████████████ AC ¶ 198. This information was known to BNY for years ████████

████████████████████████████. BNY also made ████████████████

██████████████████████████████ ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████[7]

---

[5] BNY attempts to minimize the pervasiveness of Epstein's use of BNY to ████████████████
        ██████ by making the factual assertion (inappropriate at the stage of this proceeding) that ████████████████████████████████████████████. Supp. at 6 n.3.
Even if it were ████████████, ████████████████, it would still mean that BNY made ████████████████████████
                                                                      BNY does not
(because it cannot) identify any lawful or business purpose for any of the suspicious wires.
[6] It is unclear whether the subjects of each SAR were separate transactions or overlapping, an issue of fact that is more appropriate for a later stage of the proceeding.
[7] These same transactions are the subject of an investigation by the U.S. Senate Committee on Finance, announced on January 15, 2026. U.S. Senate Committee on Finance, *Letter to BNY CEO Robin Vince from Senator Wyden* (Jan. 15, 2026) ("Ex. E"), at 1.

2. BNY also disregards its facilitation of transactions that supported the concealment of Epstein's sex-trafficking venture, including ██████████████████████████████████ ██████████████████████████████████████. AC ¶ 186; Ex. A at BNYM-SDNYLIT-W-000000012.

3. Contrary to BNY's argument (Supp. at 5),[8] ████████████████████████████ were improper, indicative of Epstein's crimes, and directly furthered his sex-trafficking. AC ¶¶ 171, 184. These transactions were made without any apparent legitimate or business purpose and raised red flags at the time that they were made. *Id.* ¶¶ 171–73. These same suspicious transactions are the subject of a Senate investigation into financial institutions that facilitated Epstein's sex-trafficking. Ex. E at 1.

4. Failures to monitor, conduct AML, or file SARs do not constitute "passive nonfeasance." *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 406. The transfers ██████████████████ ████████████████████ reported information that was available to the Bank long before ██████████████████████████████████████████████████ AC ¶¶ 50, 77, 78, 88, 153–54, 183–203, 254, 259–61. ██████████████████████████████████████████ ██████████████████████████ 12 C.F.R. § 21.11(d).

5. BNY facilitated Epstein's sex-trafficking venture through its relationship with MC2 and Jean-Luc Brunel. AC ¶ 250. BNY extended a credit line to MC2, on which Epstein was the primary signatory.[9] *Id.* ¶ 251. Those funds were used to fund Epstein's sex-trafficking venture with Brunel,

---

[8] BNY claims that transfers between accounts are not "inherently improper" (Supp. at 5), but that is not the standard. FinCEN, *Reporting Suspicious Activity* ("Ex. G") (defining suspicious activity); *see also* AC ¶ 153.

[9] BNY's loan to MC2 that was guaranteed by Epstein at the Bank's request was not "a routine loan" (Supp. at 3), which the Bank would have known had it completed the required due diligence

and entice and silence young victims, through the fraudulent pretense of opportunities at a modeling agency. *Id.* 251–52. Epstein secured the credit line to MC2 and was responsible for withdrawing funds from and replenishing the credit line. *Id.* Indeed, as evidenced by ███████ ████████████████████████████████████████████, countless women were abused by Epstein through MC2. *Id.* ¶ 253.

6. BNY is also liable for the acts of its wholly-owned subsidiary. "[C]ourts will disregard the corporate form, or ... pierce the corporate veil, whenever necessary to prevent fraud or to achieve equity." *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, 2022 WL 540756, at *1 (S.D.N.Y. Feb. 23, 2022) (internal citation omitted). The inquiry into whether BNY had control over its wholly-owned subsidiary Mellon United National Bank that warrants piercing the corporate veil is premature at this stage of the litigation. *See id.* Holding BNY liable for Mellon United National Bank's acts is also warranted because Mellon United National Bank was acting as its agent. At a minimum, BNY was required to file SARs for its subsidiary's transactions as evidenced by BNY's SARs after Epstein's arrest.

    2.  <u>BNY Knew, Should Have Known, and Recklessly Disregarded that Epstein was Engaged in Sex Trafficking.</u>

Knowledge under the TVPA applies to the venture, not to any particular victim. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 407. To satisfy this element, Doe must show only that BNY "[knew], or recklessly disregarded, that force, fraud, or coercion was used in the particular sex-trafficking venture that it is alleged to have participated in." *Id.* at 406.

Tellingly, BNY not only processed hundreds of millions of dollars of transfers to, from, and on behalf of Epstein throughout its relationship with Epstein and Deutsche Bank but also

---

on related account parties. FFIEC, *BSA/AML Manual: Risks Associated With Money Laundering and Terrorist Financing* (last accessed Jan. 17, 2026) ("Ex. I").

continued processing hundreds of millions of dollars of transfers *after* it knew several other institutions closed Epstein's accounts because it was profitable for BNY to do so. *See* AC ¶¶ 10(f), 239–41, 257.

BNY argues that Doe's reliance on public reporting about Epstein's sex-trafficking does not give rise to the "specific awareness" required in *Villalobos v. Telemundo Network Grp. LLC*, 2025 WL 2687948, at *4 (S.D.N.Y. Sept. 19, 2025), and discounts publicly available information because it was not "specific to BNY." Supp. at 9. Unlike *Villalobos*, where the plaintiff did not identify any "red flags" that informed the defendants about sex trafficking as opposed to general sexual misconduct, the AC, ███████████████████████, identified several known markers of trafficking, including (a) ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ with no stated or apparent lawful or business purpose (Ex. C at BNYM-SDNYLIT-W-000000071-72; *see also* AC ¶¶ 193–99) (b) ██████████████████████

████████████ and without any apparent lawful or business purpose (Ex. B);[10] (c) a $7.4 million transfer from Epstein's account to his known co-conspirator Ghislaine Maxwell; and (d) many transfers between Epstein's account of large dollar amounts in whole numbers with no apparent lawful or business purpose. AC ¶¶ 12–13. As this Court previously ruled, defendant's awareness of Epstein's convictions for sex crimes, along with allegations that defendant ignored red flags suggesting that Epstein operated a sex-trafficking venture, such as the "large and

---

[10] BNY claims that these █████████████ (Supp. at 6 n.2) because the ████████████████, alone, is routine. But it was not the ████████████ ████ Other factors included BNY's knowledge of Epstein's sex crimes, his crimes against Eastern European women, and his relationship to MC2 and Brunel. BNY had an obligation to monitor and report these transactions.

suspicious payments" to young women identified here, demonstrates knowledge. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 407.

Moreover, the public reports BNY seeks to dismiss are the type of allegation that courts have deemed constitute constructive knowledge of sex-trafficking. *See, e.g.*, *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 555 (7th Cir. 2023) (allegations of awareness were sufficient where the defendant was in business with a company "publicly identified ... as the biggest and most notorious sex trafficking and pimping website in the United States") (internal quotation marks omitted)). Contrary to BNY's assertion (Supp. at 13), Doe does not rely solely on two press articles to establish BNY's knowledge. The AC details a well-documented, years-long public record regarding Epstein's sex-trafficking operation known to BNY before and during the time it processed suspicious Epstein-related transactions. AC ¶¶ 76–113. This record includes hundreds of pages of police reports detailing sex trafficking of minors, Epstein's non-prosecution agreement with the U.S. Department of Justice, his guilty plea and registration as a high-risk sex offender, dozens of public civil lawsuits detailing Epstein's sex trafficking, media coverage regarding ongoing federal investigations, and years of reporting linking Epstein's financial activity to his trafficking scheme. *Id.*

BNY's involvement in securing financing for MC2 through its subsidiary Mellon United National Bank is yet another means by which knowledge can be imputed to BNY. BNY feigns ignorance of MC2's connection to Epstein's illicit activities, arguing that no reporting connected them before the line of credit was extended in 2009. Supp. at 9–10. That is false. MC2's Financial Controller testified not only that BNY knew of Epstein's relationship, but also that BNY refused to extend a credit line unless Epstein, a known sex offender, guaranteed it. *Id.* ¶¶ 127, 255–57.

Moreover, public press and police reports linked Epstein and Jean-Luc Brunel as early as 2005, and Brunel's sex crimes have been widely reported since at least 1988. *See* AC ¶¶ 119–24.

In any event, BNY's general argument that Mellon United National Bank's knowledge cannot be imputed to BNY is inaccurate. Supp. at 10. The securities fraud cases BNY cites require pleading scienter that is more demanding than the knowledge, constructive knowledge, and reckless disregard standards applicable here. *Compare Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283 (S.D.N.Y. 2019); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204 (S.D.N.Y. 2009) *with Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 406. Further, the knowledge required for securities fraud often involves internal information that would be extremely difficult for a parent company to learn about a subsidiary, but here, the knowledge required involves allegations about the world's most publicized sex-trafficking operation, and the combined business dealings with people and entities who facilitated that sex trafficking.

And even BNY's securities cases recognize that there may be imputation of a subsidiary's knowledge to its parents where there are "allegations as to the existence of an agency relationship or other foundations to premise vicarious liability." *Defer LP*, 654 F. Supp. 2d at 218; *see also In re Marsh & Mclennan Cos., Inc. Secur. Litig.*, 501 F. Supp. 2d 452, 482 (S.D.N.Y. 2006) (imputing scienter of subsidiary to parent when plaintiff's factual allegations established that parent was familiar with subsidiary's operations and misconduct). Here, Doe alleges that Mellon United National Bank was a wholly-owned subsidiary of BNY and that it was acting for the benefit of BNY. AC ¶¶ 117, 255, 257. In any event, the relationship between the subsidiary and the parent is inherently fact-based and inappropriate for decision on a motion to dismiss. *See Nantong Sanhai Garment Co.*, 2022 WL 540756, at *1; *see also In re Alstom SA*, 454 F. Supp. 2d 187, 215 (S.D.N.Y. 2006) (denying dismissal despite complaint's failure to identify by name claim of veil-

piercing liability).

       3.   <u>BNY Benefitted Directly From Epstein's Sex-Trafficking Venture.</u>

BNY undisputably earned fees from its relationship with Epstein and reasonably could have expected other financial benefits. *See Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 408 ("JP Morgan and Deutsche Bank do not contest that they received fees and other revenue from providing services to Jeffrey Epstein and his affiliated entities."). Epstein's purchase of millions of dollars of BNY shares is one of many benefits that BNY reaped from its relationship with Epstein. *See* AC ¶¶ 2, 181, 204, 233, 264–70. BNY argues that Doe does not sufficiently allege that Epstein's purchase of BNY stock constituted a benefit because Doe did not allege BNY knew about the stock purchase. Supp. at 12. But it is indisputable that millions of dollars of stock purchases are a benefit to the Bank. Here, as in *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 408, BNY ignored warning signs of sex trafficking when committed by a high net worth individual to continue reaping financial benefits like stock purchases, connections to other high net worth individuals, and client referrals.

**B. The Amended Complaint States a Claim for Obstruction of TVPA Enforcement (Count IV).**

As Doe and this Court have explained, the TVPA *does* authorize a private right of action for obstruction. Opp. at 16 (citing *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 409). Section 1591(d) broadly provides that "[w]hoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of" § 1591 violates the TVPA. 18 U.S.C. § 1591(d). Where a bank is obligated to file timely SARs but knowingly and intentionally fails to do so while processing transactions for the benefit of a sex-trafficking venture, that failure itself obstructs and interferes with the enforcement of § 1591. In that circumstance, the bank is a perpetrator of a TVPA violation for purposes of civil liability under § 1595(a), in addition to a knowing participant.

That is precisely what Doe pleads here, as she alleges that BNY knew of Epstein's sex-trafficking operation (AC ¶¶ 43–45, 52–56, 76–113, 114–37, 138–67, 336, 343–45) and intentionally chose not to timely report suspicious activities related to Epstein, or his known entities or agents (*id.* ¶¶ 4, 43–45, 170, 204, 265–69, 337–42, 346) and, again, at this stage, the Court must draw all reasonable inferences in Doe's favor. *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 820 (S.D.N.Y. 2016) (Rakoff, J.).

Unlike the participation provision in § 1591(a) or other obstruction statutes like 18 U.S.C § 1505, § 1591(d) does not contain a knowledge requirement, let alone that such knowledge be tied to an "investigation" or "proceeding." This is consistent with how courts in this Circuit interpret similar obstruction statutes. *See, e.g.*, *United States v. Gray*, 642 F.3d 371, 378 (2d Cir. 2011) (rejecting similar argument because "knowledge of a pending federal investigation or proceeding is not an element of the obstruction crime" under 18 U.S.C. § 1519); *United States v. Abrams*, 543 F. Supp. 1184, 1187 (S.D.N.Y. 1982) (holding similarly as to 18 U.S.C. § 1510). Even if knowledge of an investigation was required, Doe's knowledge allegations satisfy that standard here, and are similar to those this Court found sufficient in *Deutsche Bank*. *Compare* AC ¶¶ 43–45, 52–56, 76–167, 430–33, 436–38; *with* DB FAC ¶¶ 42–46, 60–63, 188–99, 212–13, 445–48 (cited by *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 409). Any state of mind requirement is easily satisfied by the many red flags, suspicious transfers, and public reports that BNY knew about—and BNY's failure to timely file required SARs.

BNY's argument that the obstruction claim fails because BNY eventually ███████████ ████████████████████ (Supp. at 13) is wrong. That BNY ███████████████ does not negate Doe's allegations that BNY delayed filing SARs for years, enabling the continuation of the trafficking (and benefit) to BNY. AC ¶¶ 4, 43–45, 170, 204, 265–69, 337–42, 346.

### III.    DOE HAS PROPERLY PLED HER NEGLIGENCE CLAIMS.

Doe's claims are timely under the doctrine of equitable estoppel, which applies where the "plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action," including where third parties act in concert with the defendant. *See* Opp. at 19 (quoting *Simcuski v. Saeli*, 377 N.E.2d 713, 716 (N.Y. 1978)); *Wei Su v. Sotheby's Inc.*, 2022 WL 14118016, at *10 (S.D.N.Y. Oct. 24, 2022). In *Zimmerman v. Poly Prep Country Day Sch.*, the court found that that the defendant school's misrepresentations—such as maintaining that the abuser was in "good standing"—could have led plaintiffs' parents to believe that the school was unaware of the sexual abuse and therefore not liable. 888 F. Supp. 2d 317, 341 (E.D.N.Y. 2012).

Like the defendant in *Zimmerman*, BNY made misrepresentations and engaged in affirmative acts of concealment that prevented Doe (and other class members) from understanding that she may have claims against the Bank. AC ¶¶ 18–25. This included misrepresenting its role as limited to routine banking services, resisting cooperation with law enforcement and Congressional investigations, negotiating confidential settlements with known Epstein victims with non-disclosure agreements limiting what the victims could say about the Bank's conduct,[11] and failing to file legally required SARs. AC ¶¶ 4, 20–21, 170, 292, 337–42, 346. These actions, combined with Epstein and his co-conspirators' broader scheme of coercion—including threats to Doe's immigration status and economic pressure—impeded Doe's ability to discover the Bank's wrongful conduct through reasonable diligence. *Id.* ¶¶ 18, 22, 23, 28, 213–14. Taken together, these allegations are sufficient to establish equitable estoppel at the pleading stage. *See Zimmerman*, 888 F. Supp. 2d at 341; *City of Almaty v. Sater*, 503 F. Supp. 3d 51, 66–68 (S.D.N.Y.

---

[11] Doe disputes BNY's assertion that its allegation regarding confidential settlements is not well grounded in fact. Regardless, the veracity of that allegation has no bearing on whether Doe's claims are timely under the doctrine of equitable estoppel.

2020) (confidential settlement agreements, combined with other deceptive conduct, supported equitable estoppel at the pleading stage).[12]

Also, Doe has adequately alleged that BNY owed her a duty, and that it proximately caused her injuries. AC ¶¶ 205, 216–19, 354–58, 360–61, 367–79. Contrary to BNY's contention (Supp. at 15), BNY's status as a clearing or correspondent bank does not absolve it of liability for non-routine services, and Doe plausibly alleges that BNY's services were far from routine. *See* AC ¶¶ 168–205, 216–263; *see also* Opp at 23 n.19 *and* Section I above. BNY is also incorrect to suggest that Doe must allege ███████████████████████. Supp. at 15. It is sufficient to allege that BNY knew or should have known that its non-routine banking services sustained a sex-trafficking venture that foreseeably harmed her. *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 415 (holding that "constructive knowledge plausibly makes harm to plaintiffs and other victims of Epstein's sex-trafficking a natural and foreseeable consequence"). Doe more than satisfies that standard here. In any event, Doe does allege that █████████████████████████████ ███████████████. AC ¶ 216.

## CONCLUSION

For the foregoing reasons, and the reasons stated in Doe's Opposition, the Court should deny BNY's Motion to Dismiss in its entirety.

---

[12] *Zumpano v. Quinn*, 849 N.E.2d 926 (N.Y. 2006) is inapposite because the plaintiffs there were aware that the abusers were employees of the defendants and thus could have brought suit or investigated sooner. *Id.* at 929. Here, Doe had no reason to suspect that a financial institution operating behind the scenes was facilitating the sex-trafficking venture that injured her.

Dated: January 20, 2026

Respectfully submitted,

*/s/ David Boies*
David Boies
Andrew Villacastin
Rachael Schafer
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com
Email: avillacastin@bsfllp.com
Email: rschafer@bsfllp.com

Sigrid McCawley
Daniel Crispino
Megan Nyman
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com
Email: dcrispino@bsfllp.com
Email: mnyman@bsfllp.com

Bradley J. Edwards
Brittany N. Henderson
Dean Kaire
Edwards Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954) 524-2822
Email: brad@cvlf.com
Email: brittany@cvlf.com
Email: dean@cvlf.com

*Counsel for Plaintiff Jane Doe*

16

## <u>CERTIFICATE OF COMPLIANCE</u>

I, David Boies, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing Memorandum of Law was prepared using Microsoft Word and complies with Rule 2(e) of this Court's Individual Rules and Local Rule 7.1(c).

*/s/ David Boies*