UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
JANE DOE, individually and on behalf :
of all others similarly situated,    :
                                     :
    Plaintiff,                        :
                                     :
       -v-                       :
                                     :
BANK OF AMERICA, N.A.,               :
                                     :
    Defendant.                        :
------------------------------------x
JANE DOE, individually and on behalf :
of all others similarly situated,    :
                                     :
    Plaintiff,                        :
                                     :
       -v-                       :
                                     :
THE BANK OF NEW YORK MELLON CORP.,   :
                                     :
    Defendant.                        :
------------------------------------x

OPINION AND ORDER

25-cv-8520 (JSR)

25-cv-8525 (JSR)

JED S. RAKOFF, U.S.D.J.:

    In these two putative class actions, consolidated on consent for pretrial purposes, pseudonymous plaintiffs allege that two major financial institutions -- Bank of America, N.A. ("Bank of America") and The Bank of New York Mellon Corporation ("BNY") -- knowingly participated in, and benefited from, the sex trafficking enterprise masterminded by Jeffrey Epstein. Each "Jane Doe" plaintiff -- to whom this Opinion and Order will refer as "BOA Jane Doe" and "BNY Jane Doe," respectively -- asserts claims under the federal Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591 et seq., as well as negligence claims under New York law.

1

On November 13, 2025, each defendant moved to dismiss the complaint against it. See Doe v. Bank of America, N.A., ECF No. 38; Doe v. Bank of N.Y. Mellon Corp., ECF No. 29. The motions were fully briefed on December 8, 2025, and the Court held oral argument on December 15, 2025. See Doe v. Bank of America, N.A., ECF Nos. 39 ("BOA MOL"), 44 ("BOA Opp'n"), 48 ("BOA Reply"); Doe v. Bank of N.Y. Mellon Corp., ECF Nos. 30 ("BNY MOL"), 38 ("BNY Opp'n"), 42 ("BNY Reply"). At the conclusion of oral argument, the Court, taking account of how many of the plaintiffs' allegations were conclusory but also recognizing that an initial leave to amend a complaint should be liberally granted, see Fed. R. Civ. P. 15(a)(2), held defendants' motions to dismiss in abeyance and granted plaintiffs the opportunity to amend their complaints, which plaintiffs did on December 29, 2025. See Doe v. Bank of America, N.A., ECF No. 50 ("BOA Am. Compl."); Doe v. Bank of N.Y. Mellon Corp., ECF No. 45 ("BNY Am. Compl."). Thereafter, the parties, in response to the amendments, supplemented their briefing on the motions to dismiss. See Doe v. Bank of America, N.A., ECF Nos. 62 ("BOA Supp. Br."), 65 ("BOA Supp. Opp'n"); Doe v. Bank of N.Y. Mellon Corp., ECF Nos. 55 ("BNY Supp. Br."), 59 ("BNY Supp. Opp'n").

After careful consideration, the Court, on January 29, 2026, entered a "bottom-line" Order in which it (1) granted in part and denied in part Bank of America's motion to dismiss and (2) granted BNY's motion to dismiss in its entirety. See Doe v. Bank of America, N.A., ECF No. 70; Doe v. Bank of N.Y. Mellon Corp., ECF No. 64. This

Opinion and Order sets forth the reasons for the Court's determinations.

## I.   Factual Allegations

For the purpose of deciding defendants' motions, the Court assumes the truth of the non-conclusory allegations in the amended complaints. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

These actions are among the numerous cases that have arisen from the conduct of Jeffrey Epstein, "the world's most infamous sexual predator." See BOA Am. Compl. ¶ 1; BNY Am. Compl. ¶ 1. In brief, plaintiffs allege that defendants benefited from providing financial services to Epstein and his associates in ways that, as defendants knew or should have known, furthered Epstein's sex trafficking operation and thereby injured plaintiffs and the class of Epstein's victims that they seek to represent.

The amended complaints contain numerous allegations common to both defendants, so the Court discusses those allegations first before turning to the allegations specific to each defendant.

### A.   Allegations Relating to Both Defendants

Plaintiffs allege that more than $1 billion flowed into and out of Epstein's accounts at large financial institutions, including the two defendants here. BOA Am. Compl. ¶ 2; BNY Am. Compl. ¶ 3. Defendants "knowingly and intentionally benefited from the assistance and support [they] provided to Epstein, including from fees, referrals, and the development and preservation of relationships" with Epstein and his wealthy associates. BOA Am. Compl. ¶ 5; BNY Am. Compl. ¶ 9. This,

plaintiffs allege, was despite the defendants' suspecting and recklessly disregarding that some of these transfers were in furtherance of Epstein's sexual misconduct. BOA Am. Compl. ¶¶ 3-4; BNY Am. Compl. ¶¶ 4-6. Moreover, defendants "knowingly and fraudulently concealed" their knowledge and conduct by, among other things, failing to submit Suspicious Activity Reports ("SARs") that they were legally required to file with regulators. See BOA Am. Compl. ¶ 12; BNY Am. Compl. ¶ 21.[1]

The amended complaints describe Epstein's sex trafficking operations at length. See BOA Am. Compl. ¶¶ 26-52; BNY Am. Compl. ¶¶ 37-75. But since Epstein's grotesque misconduct has elsewhere been

---

[1] Under relevant laws and regulations, SARs are highly confidential documents that are not commonly disclosed without government consent. Accordingly, on November 26, 2025, the Court, at plaintiffs' request, solicited the views of relevant federal regulators as to whether Bank of America and BNY were prohibited from producing SARs and associated materials to plaintiffs in these cases. Exercising their exemptive authority, the regulators subsequently authorized the banks to disclose the requested materials to plaintiffs, subject to certain conditions. Partly as a result, plaintiffs' amended complaints, portions of which were redacted in the public filings, refer in their unredacted forms to certain SARs and related materials that defendants disclosed pursuant to the regulators' exercise of exemptive authority. But the Court was furnished with unredacted copies of plaintiffs' amended complaints, and it is those that the Court has here considered in ruling on defendants' motions. To the very limited extent that this Opinion and Order discusses the contents of any documents produced under the regulators' exemptive authority, the Court hereby exercises its "unfettered discretion," to which all parties consented and of which the governmental agencies were made aware, to disclose such information "in connection with any motion, application, or proceeding that may result in an order and/or decision by the Court." See Protective Order, Doe v. Bank of America, N.A., ECF No. 36 ¶ 10; Doe v. Bank of N.Y. Mellon Corp., ECF No. 26 ¶ 10; see also Gov't of U.S. Virgin Islands v. JPMorgan Chase Bank, N.A., --- F. Supp. 3d ---, 2025 WL 2990412, at *6 (S.D.N.Y. Oct. 24, 2025) (discussing analogous protective order).

widely recounted, including in other decisions of this Court, see, e.g., Doe 1 v. Deutsche Bank Aktiengesellschaft ("Deutsche Bank"), 671 F. Supp. 3d 387, 396-400 (S.D.N.Y. 2023), the Court here provides only a brief summary:

From the early 1990s through the summer of 2019, Epstein recruited numerous young women and girls from around the world to engage in commercial sex acts. He sexually abused them, threatened them with physical and reputational harm if they did not comply with his demands, falsely promised to further their career and educational aspirations, and exploited their vulnerabilities by threatening to deny them such necessities as housing, food, and clothing. BOA Am. Compl. ¶ 26; BNY Am. Compl. ¶ 37. The sexual abuse that Epstein perpetrated took place at his townhouse in New York, his mansion in Palm Beach, Florida, and his private island in the U.S. Virgin Islands, among other places, and Epstein transported his victims across state lines and national boundaries. BOA Am. Compl. ¶¶ 27, 35; BNY Am. Compl. ¶¶ 38, 46. To perpetrate and conceal his sex trafficking venture, Epstein availed himself of the services of so-called "in-house" attorneys and accountants, as well as other accomplices who procured his victims. See BOA Am. Compl. ¶¶ 36-38, 44-52; BNY Am. Compl. ¶¶ 47-51, 67-75. Epstein and his co-conspirators referred to their sex trafficking venture as an "organization," although it did not take the form of any single legal entity. BOA Am. Compl. ¶ 36; BNY Am. Compl. ¶ 47.

In 2006, Epstein was arrested in Florida in connection with allegations that he had sexually abused more than thirty children in

his Palm Beach mansion. BOA Am. Compl. ¶ 32; BNY Am. Compl. ¶ 43. He subsequently pled guilty to two felonies, was required to register as a sex offender, and was briefly incarcerated. BOA Am. Compl. ¶ 33; BNY Am. Compl. ¶ 44. He entered into a non-prosecution agreement with the United States Attorney's Office for the Southern District of Florida that, inter alia, barred that office from prosecuting Epstein for violations of the TVPA and for other sex offenses. BOA Am. Compl. ¶ 33; BNY Am. Compl. ¶ 44.

More than a decade later, on July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a two-count, sealed indictment charging Epstein with TVPA conspiracy and substantive sex trafficking. See United States v. Epstein, No. 19 Cr. 490 (S.D.N.Y.); BOA Am. Compl. ¶ 39; BNY Am. Compl. ¶ 52. Epstein was arrested pursuant to that indictment on July 8, 2019, was detained, and was found dead from apparent suicide in the Metropolitan Correctional Center on August 10, 2019. BOA Am. Compl. ¶¶ 40-41; BNY Am. Compl. ¶¶ 53-54. One of his primary co-conspirators, Ghislaine Maxwell, was charged in July 2020 with federal sex trafficking crimes; a jury convicted her on five counts in December 2021, and she was sentenced to a substantial prison term that she is now serving. See United States v. Maxwell, No. 20 Cr. 330 (S.D.N.Y.); BOA Am. Compl. ¶¶ 42-43; BNY Am. Compl. ¶¶ 55-65.

Plaintiffs allege that defendants knew or should have known of Epstein's misconduct and recklessly chose to disregard it even while continuing to provide him with substantial banking services that

assisted his misconduct. In support of these assertions, plaintiffs cite dozens of media reports and lawsuits concerning Epstein's conduct, beginning as early as 2002 and continuing through the date of Epstein's death. See BOA Am. Compl. ¶¶ 53-91; BNY Am. Compl. ¶¶ 76-110. In addition, plaintiffs allege, defendants were aware of Epstein's suspicious relationships with numerous associates, including not only Maxwell but also, in particular, Jean-Luc Brunel, a French "model scout" who allegedly recruited victims for Epstein via a modeling agency called MC2 that Epstein and Brunel established. BOA Am. Compl. ¶¶ 130-146; BNY Am. Compl. ¶¶ 114-136. The amended complaints allege that defendants continued banking Epstein, his co-conspirators, and entities associated with him despite defendants' knowledge of his misconduct and despite the growing suspicions that their services were being used by Epstein to help further that misconduct. BOA Am. Compl. ¶ 92; BNY Am. Compl. ¶ 113.

In the latter regard, the amended complaints allege, inter alia, that defendants failed to comply with relevant regulatory obligations. Specifically, federal bank secrecy laws and regulations "require financial institutions to monitor for and report potentially suspicious activity related to human trafficking." BOA Am. Compl. ¶ 190; BNY Am. Compl. ¶ 161. Banks are also legally obligated to conduct due diligence on their customers, a process that entails review of, among other things, "media reports, news articles," and "transactions or activity that [a bank] considers unusual or potentially suspicious." BOA Am. Compl. ¶¶ 191-192; BNY Am. Compl.

¶¶ 162–164.[2]  Through  this  process,  plaintiffs  allege,  defendants
"learned  and  disregarded  or  should  have  learned  of  Epstein's  sex
trafficking  venture,"  the  roles  played  by  certain  of  his  co-
conspirators,  and  defendants'  own  involvement.  BOA  Am.  Compl.  ¶¶  193,
195;  BNY  Am.  Compl.  ¶¶  165–166.  Plaintiffs  further  allege  that  the
banks  recognized  but  failed  to  timely  report  certain  suspicious
transactions  involving  Epstein,  his  co-conspirators,  and  his  victims.
See  BOA  Am.  Compl.  ¶¶  341–352;  BNY  Am.  Compl.  ¶¶  182–203,  240,  249.

B.    Additional Allegations Specific to Bank of America

In  addition  to  the  allegations  that  are  common  to  both  amended
complaints,  each  amended  complaint  contains  defendant-specific
allegations.  The  amended  complaint  against  Bank  of  America  alleges
that  the  bank  provided  non-routine  services  that  facilitated  Epstein's
sex  trafficking  venture  (including  the  trafficking  of  BOA  Jane  Doe),
that  it  had  actual  and  constructive  knowledge  of  that  venture  and  some
of  its  activities,  that  it  benefited  from  its  relationship  with  Epstein
and  its  provision  of  services  to  him,  and  that  it  failed  to  make
required  regulatory  filings.

Overall,  the  amended  complaint  alleges  that  Bank  of  America
provided  "financial  support,  assistance,  and  facilitation  to  Epstein's
sex  trafficking"  from  as  early  as  2001  to  as  late  as  2019.  BOA  Am.
Compl.  ¶  4.  During  this  period,  the  amended  complaint  alleges,  Bank

---

[2] Except where otherwise indicated, all quotations in this Opinion and
Order omit citations, quotation marks, footnotes, brackets, ellipses,
and other alterations in source material.

of America opened and maintained accounts for Epstein, his entities
and agents, and BOA Jane Doe, even though the bank was on notice for
many years prior of the many allegations of sex trafficking that had
been lodged against Epstein and his co-conspirators. Id. ¶¶ 4, 6, 95-
113, 120-129. The amended complaint also alleges that Bank of America
also provided banking services to Brunel's supposed modeling agency,
MC2, and that Epstein and Brunel used MC2's business operating account
at Bank of America to fund and conceal their sex trafficking
enterprise. Id. ¶¶ 6(h), 130-142, 326-340.

The amended complaint asserts that Bank of America provided
services connected to Epstein's trafficking of representative
plaintiff BOA Jane Doe. See id. ¶¶ 197-237. According to the amended
complaint, BOA Jane Doe was living in Russia when she met Epstein in
2011. Id. ¶ 197. From 2011 through 2019, Epstein sexually abused BOA
Jane Doe on at least a hundred occasions, including by means of
forcible rape and forcible touching. Id. ¶ 200. Moreover, Epstein
transported BOA Jane Doe from New York to other states for her to
engage in commercial sex acts. Id. ¶ 203. Yet, Bank of America, despite
its prior knowledge of Epstein's first conviction and of widespread
accusations of his sexual misconduct, in 2013 opened an account in the
name of BOA Jane Doe at the direction of Epstein's associates. Id.
¶ 208. Although BOA Jane Doe barely spoke English, had no prior income
or wealth, had no ability to earn legitimate income in the United
States, and was the citizen of a country identified as "High Risk" for
sex trafficking, id. ¶ 209, Bank of America treated BOA Jane Doe as a

"Preferred Customer" and provided her with premier services not ordinarily available to customers of her means, id. ¶ 210. Epstein and his associates wired tens of thousands of dollars into BOA Jane Doe's account, id. ¶¶ 211-222, 231, and they used the account in BOA Jane Doe's name "to make transfers unrelated to [BOA] Jane Doe without any apparent legitimate purpose and contrary to what the Bank knew would be typical transfers," id. ¶ 223.

As to the sources of Bank of America's knowledge of Epstein's sex trafficking venture, the amended complaint points not only to numerous publicly available media reports but also to the knowledge of an employee, Paul Morris, who in 2016 joined Merrill Lynch, a wholly owned subsidiary of Bank of America, after having previously served as one of Epstein's bankers at JPMorgan Chase and Deutsche Bank. See id. ¶ 86. According to the amended complaint, "Morris had actual knowledge of Epstein's sex crimes and use of various financial institutions to fuel and legitimize his sex-trafficking operation," id. ¶ 150, including knowledge of the fact that Epstein financed MC2 and used it in furtherance of his sex trafficking venture, id. ¶¶ 148-163. Moreover, around the time that Morris became a Bank of America employee, at least ten Epstein-connected accounts were opened at Merrill Lynch. Id. ¶¶ 164-166. "Epstein's relationship with Morris went beyond a typical client-banker relationship," id. ¶ 167, with Morris frequently meeting with Epstein and with Epstein referring "wealthy and influential acquaintances" to the bank, id. ¶¶ 167-168.

The amended complaint also points to what it characterizes as the bank's failure to properly scrutinize suspicious transactions involving Epstein's own accounts. For example, Leon Black, who the amended complaint characterizes as "a billionaire and one [of Bank of America's] wealthiest clients," at one point transferred some $170 million to Epstein "without any known or apparent lawful or business reason or justification." Id. ¶¶ 4, 6(g), 255-258. The amended complaint further alleges that "investment gains were never received back to Black from any of the alleged investment companies set up by Epstein." Id. ¶ 252. The amended complaint alleges in addition that Black used his Bank of America accounts to make millions of dollars in payments to Epstein's victims, id. ¶¶ 260-281, and that the bank purposely avoided subjecting these suspicious transactions to greater scrutiny that would have revealed their improper purpose. See id. ¶¶ 114-118, 245-247.

Additionally, the amended complaint alleges that Bank of America knowingly and intentionally failed to timely file SARs that the bank was legally obligated to file. Id. ¶¶ 5, 6(i). It alleges that the bank only very belatedly reported numerous suspicious transactions, including more than "65 wire transactions totaling [$]208,000 . . . that [Bank of America] facilitated between Epstein and [BOA] Jane Doe" over a period of years. See id. ¶ 227-230. Moreover, the bank did not timely report the aforementioned suspicious transactions involving Black. Id. ¶¶ 255-259, 264-281. The amended complaint characterizes Bank of America's failure to report these and other suspicious

transactions as one of the "non-routine" services that Bank of America provided Epstein. See id. ¶¶ 294-317.

The amended complaint finally alleges that, in connection with the conduct summarized above, Bank of America knowingly and intentionally benefited from the services it provided to Epstein, including in the forms of "fees, referrals, and the development and preservation of relationships" with clients and potential clients, including Black. Id. ¶¶ 5, 282-286.

C.    Additional Allegations Specific to BNY

The amended complaint against BNY contains far fewer defendant-specific allegations than the amended complaint against Bank of America. Such allegations fall basically into three categories:

First, BNY Jane Doe alleges that BNY "processed at least $600 million of suspicious wire transfers" and "maintained at least twelve accounts for Epstein and his known entities and agents" between 2013 and 2019. BNY Am. Compl. ¶¶ 5, 10(f), 11, 12. BNY Jane Doe alleges that BNY, acting as a correspondent or clearing bank, processed transfers between Epstein's accounts as well as between Epstein-affiliated accounts and third parties. Id. ¶ 12. The amended complaint specifically alleges that BNY processed approximately $1.4 million in "suspicious wires" from the accounts of "Epstein-related entities" to "various third parties"; it goes on to allege that a majority of these and other suspicious wires "were made for the benefit of young women." Id. According to the amended complaint, these and other transactions that BNY processed went beyond the services that BNY routinely offered

as a clearing bank. See id. ¶¶ 168-204. Moreover, the substantial transfers that BNY processed were often in whole-number increments. See id. ¶¶ 171, 179-180, 183, 186-191. Citing a series of SARs that BNY filed after Epstein's death, the amended complaint alleges that BNY should have found many of these transactions suspicious at the time it processed them, either because of the nature of the transactions or because of media reports about Epstein's and his co-conspirators' conduct. E.g., id. ¶¶ 184-203.

As to BNY Jane Doe personally, the amended complaint alleges that she "was paid directly from accounts in Jeffrey Epstein's personal name via wire transfers that were processed by BNY." Id. ¶ 216. According to the amended complaint, the transactions involving BNY Jane Doe were among many transfers that BNY "knew and should have known" were suspicious because they involved Epstein's co-conspirators, were made for the benefit of Eastern European women, or had no apparent lawful purpose. Id. ¶¶ 216-219.

Second, BNY Jane Doe alleges that, in 2009, a former BNY subsidiary called Mellon United National Bank extended a line of credit to MC2, the so-called modeling agency that Brunel operated for the benefit of Epstein's sex trafficking venture, and that MC2 "would have collapsed due to lack of liquidity" if the line of credit had not been provided. See id. ¶¶ 10(d), 13, 117, 251, 258. The amended complaint alleges that Mellon United National Bank required Epstein to personally guarantee the line of credit. Id. ¶ 10(d), 117-118, 125-126. Based on these and other allegations, the amended complaint continues, BNY knew

or should have known about the relationships among Epstein, Brunel, and MC2. See id. ¶¶ 114-137, 165-167. In fact, the amended complaint alleges, SARs that BNY filed in the wake of Epstein's death included the names of victims who were recruited by Brunel and MC2. Id. ¶ 253.

Third, BNY Jane Doe alleges that BNY failed to conduct due-diligence and know-your-customer processes regarding the Epstein-related transactions that the bank processed. Id. ¶¶ 236-249. Specifically, the amended complaint alleges, BNY had access to "all the same information that Deutsche Bank had about Jeffrey Epstein," id. ¶ 241, and could have, under the USA Patriot Act, requested further information from that bank about Epstein's suspicious activities, id. ¶ 249. It also alleges that BNY repeatedly failed to timely file SARs concerning transactions involving Epstein and his associates. Id. ¶¶ 183-203, 216-219, 259-261.

## II. Plaintiffs' Claims

Based on the allegations summarized above, the amended complaints assert the same six claims against each defendant. Four of those claims (Counts One through Four) arise under the TVPA and are for (1) violating the TVPA by participating in Epstein's sex trafficking venture and benefiting thereby, BOA Am. Compl. ¶¶ 375-396; BNY Am. Compl. ¶¶ 281-302 (Count One); (2) violating the TVPA by perpetrating sex trafficking, BOA Am. Compl. ¶¶ 397-409; BNY Am. Compl. ¶¶ 303-315 (Count Two); (3) aiding, abetting, and inducing TVPA violations, BOA Am. Compl. ¶¶ 410-425; BNY Am. Compl. ¶¶ 316-331 (Count Three); and (4) obstructing the enforcement of the TVPA, BOA Am. Compl. ¶¶ 426-

444; BNY Am. Compl. ¶¶ 332-351 (Count Four). Plaintiffs' remaining claims sound in negligence and are governed by New York state law. Count Five asserts a claim for negligent failure to exercise reasonable care to prevent physical harm, BOA Am. Compl. ¶¶ 445-457; BNY Am. Compl. ¶¶ 352-364, and Count Six asserts a claim for negligent failure to exercise reasonable care as a banking institution, BOA Am. Compl. ¶¶ 458-478; BNY Am. Compl. ¶¶ 365-385. Each amended complaint seeks monetary damages, including punitive and exemplary damages, as well as attorneys' fees, costs, and other relief. See BOA Am. Compl. at 114-15; BNY Am. Compl. at 93.

III. Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

Because Rule 12(b)(6) "assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it," Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006), courts may only consider materials beyond the four corners of a pleading in certain limited circumstances.[3] A

---

[3] Apart from these circumstances, a court must either exclude extrinsic materials from its consideration or convert the motion to dismiss into

pleading is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018). Here, such documents include the various SARs cited in the amended complaints.

Where a motion to dismiss is granted under Rule 12(b)(6), "leave to amend the complaint should be refused only if there is no basis for concluding that plaintiff can state a claim and thus permitting an amendment would be futile." 5B Fed. Prac. & Proc. Civ. § 1357 (4th ed. 2025); see also, e.g., Porat v. Lincoln Towers Cmty. Ass'n, 464 F.3d 274, 276 (2d Cir. 2006). Here, however, after being apprised of defendant's stated grounds for dismissal, both plaintiffs were given leave to amend, which they did.

IV.  Analysis

The Court begins by describing the framework that Congress created for civil claims under the TVPA. It then analyzes each of plaintiffs' TVPA claims, concluding that only BOA Jane Doe's civil participation and obstruction claims are plausibly stated. Finally, the Court assesses plaintiffs' state-law negligence claims, holding that they are time-barred and that plaintiffs' allegations are insufficient to warrant the application of equitable estoppel.

---

a motion for summary judgment and provide the parties with an opportunity to conduct relevant discovery and submit supporting evidence. See Fed. R. Civ. P. 12(d).

A.    Trafficking Victims Protection Act Claims

When initially enacted in 2000, the TVPA imposed only criminal liability on sex traffickers. See Pub. L. 108-193, § 4(a)(4). But in 2003, Congress created a civil cause of action under the TVPA. Specifically, Congress provided that "[a]n individual who is a victim of [a TVPA violation] may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." 18 U.S.C. § 1595(a). Civil claims under the TVPA must be brought no later than ten years after a cause of action arises or ten years after a minor victim reaches eighteen years of age, whichever is later. Id. § 1595(c).

Section 1595(a) thus creates civil liability for two kinds of defendants, parallelling the two kinds of criminal liability set forth in § 1591(a)(1) and (a)(2).

The first, a TVPA "perpetrator," is someone who, as set forth in § 1591(a)(1), is an individual or entity that "recruit[ed], harbor[ed], transport[ed], provid[ed], obtain[ed], advertise[d], maintain[ed], patroniz[ed], or solicit[ed] by any means" a sex trafficking victim. A sex trafficking victim, in turn, is effectively defined as someone who was caused to have sex by the perpetrator's use of force, threats of force, fraud, coercion, or any combination

17

thereof, or who was under the age of 18 when induced by the perpetrator to have sex. Id.

The second kind of defendant reached by § 1595(a), which in this respect parallels § 1591(a)(2), is a TVPA "participant," that is, a person or entity that "knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that [defendant] knew or should have known has engaged in an act in violation of [the TVPA]." Id. § 1595(a).

In Count One of each amended complaint, the plaintiffs assert that the banks fall into this second kind of civil defendant, that is, that the banks were participants in, and knowingly benefited from, what they knew or should have known was Epstein's sex trafficking venture. But in the next two counts, the plaintiffs go further and assert that defendants were themselves perpetrators of sex trafficking (Count Two) or were direct aiders-and-abetters of such perpetrators, namely, Epstein (Count Three). Finally, in Count Four, plaintiffs bring a different kind of Section 1595(a) claim, contending that defendants have civil liability for directly violating 18 U.S.C. § 1591(d), which criminalizes "obstruct[ing], attempt[ing] to obstruct, or in any way interfer[ing] with or prevent[ing] the enforcement of [the TVPA]." The Court considers each of these theories in turn.

Count One: Participant Liability

The gravamen of Count One of the amended complaints is that each defendant "participated in Jeffrey Epstein's sex-trafficking venture,

18

in violation of 18 U.S.C. § 1591(a)(2)." Deutsche Bank, 671 F. Supp. 3d at 405. This claim involves three elements: first, that the defendant participated in a commercial sex trafficking venture; second, that the defendant knew or should have known that the venture either involved the perpetrator's use of force, the threat of force, fraud, or coercion to cause the victims to participate in sex or that the venture involved sex with victims who were under the age of 18; and third, that the defendant benefited from its participation in the venture. See generally id. The Court discusses each of these elements as applied to each of the defendants.

a. Participation

Participation, for purposes of a claim under Section 1595(a), requires allegations of "specific conduct that furthered the sex trafficking venture," that is, allegations of conduct that amounts to "more than just passive facilitation" and, instead, reaches "some level of active engagement." Deutsche Bank, 671 F. Supp. 3d at 405 (collecting cases). This Court has previously assumed, without deciding, that, in the banking context, "active engagement" requires a financial institution to provide more than its usual routine services. Id.; see also Mueller v. Deutsche Bank Aktiengesellschaft, 777 F. Supp. 3d 329, 338 (S.D.N.Y. 2025) (finding complaint lacked allegations "that the defendants provided anything other than routine financial services . . . or that they provided services or support that w[ere] tailored" to sex traffickers). The Court adopts that standard here, both because it is implicit in the requirement of § 1595

19

that the defendant "knowingly benefit[]" from participation in a sex trafficking venture and because anything less would impose an almost impossible burden on banks in connection with the huge volume of routine services they daily provide on a computerized basis.

The amended complaint against Bank of America plainly alleges the provision of non-routine services that facilitated Epstein's sex trafficking venture. To begin with, the amended complaint alleges that Bank of America gave preferential treatment to BOA Jane Doe by, among other things, providing her with premier services and facilitating the transfer of tens of thousands of dollars into and out of her account, all notwithstanding the facts that the bank had every reason to know that BOA Jane Doe had no ability to earn legitimate income in the United States and that Epstein, who arranged the set up of the account and was involved in the transfers, had already been convicted of sex crimes involving underage girls. See BOA Am. Compl. ¶¶ 6(f), 52, 197-237, 301, 311, 314, 333.

Going further, the amended complaint contains numerous allegations that Bank of America provided banking services to Epstein and to individuals and entities purportedly associated with his sex trafficking venture, such as, for example, the "modeling agency" MC2, notwithstanding circumstances that the bank allegedly knew were suspicious and non-routine. Further, the amended complaint alleges that Bank of America intentionally delayed filing SARs concerning Epstein's activities. See id. ¶¶ 6, 227-230, 254-280, 294-301, 305-314. This Court has previously held that intentionally facilitating

suspicious account transfers and failing to file SARs are among the ways that banks can go "beyond merely providing their usual services to Jeffrey Epstein and his affiliated entities." Deutsche Bank, 671 F. Supp. 3d at 406.

For the foregoing reasons, the amended complaint against Bank of America satisfies the participation element of Count One.

The same cannot be said, however, of the amended complaint against BNY. Critically, BNY largely functioned as a correspondent or clearing bank that had much less direct involvement with Epstein or his victims.[4] Thus, although the amended complaint alleges that BNY maintained accounts for, and processed hundreds of millions of dollars

---

[4] The parties vigorously dispute whether BNY's status as a correspondent bank that did not have direct customer relationships with Epstein and his entities should affect the Court's analysis. Citing a guidance document incorporated by reference into the amended complaint, BNY argues that it was not under an obligation to perform "customer due diligence on the customers of their respondent banks when establishing and maintaining correspondent bank relationships." BNY Supp. Br. at 7-8. BNY Jane Doe responds that correspondent banks such as BNY are "subject to the same due diligence requirements as all financial institutions." See BNY Supp. Opp'n at 3-4. But the guidance document on which both parties rely, which was issued by a foreign financial institution, is not binding on this Court and does not, in any case, purport to describe correspondent banks' obligations in reference to the TVPA. See Bank of Int'l Settlements, Correspondent Banking (July 2016), https://www.bis.org/cpmi/publ/d147.pdf (cited at BNY Am. Compl. ¶ 150). Moreover, the cases cited by plaintiff concern common law torts, not TVPA participation. See Dubai Islamic Bank v. Citibank, N.A., 126 F. Supp. 2d 659, 667 (S.D.N.Y. 2000) (denying motion to dismiss negligence claim against correspondent bank); Tew v. Chase Manhattan Bank, N.A., 728 F. Supp. 1551, 1567 (S.D. Fla. 1990) (denying motion to dismiss fraudulent concealment and misrepresentation claim against clearing bank). Suffice to say, whatever the legal obligations of a correspondent bank, in this case the routine services provided by BNY cannot plausibly be read to put BNY on notice of Epstein's misconduct in the same way as Bank of America's much more direct and special services did.

in wire transfers on behalf of, Epstein and his associates, the amended complaint does not contain facts sufficient to allege that these were non-routine services. As one of the world's largest correspondent banks, BNY provided these services to other financial institutions pursuant to clearing or correspondent agreements. See, e.g., BNY Am. Compl. ¶¶ 5-6, 12, 146, 169, 192. Unlike the amended complaint against Bank of America (and the allegations against JPMorgan Chase and Deutsche Bank that the Court previously found sufficient to survive motions to dismiss, see Deutsche Bank, 617 F. Supp. 3d at 405-06), the amended complaint against BNY does not allege that BNY provided Epstein with any non-routine services or that, indeed, any BNY employee played any role in structuring Epstein-related accounts or transfers or even communicated with Epstein. See BNY Supp. Br. at 4-5. Moreover, the bulk of the transfers to which the amended complaint points were between Epstein-related accounts, and the amended complaint does not explain, except in conclusory terms, how such transfers furthered Epstein's sex trafficking venture or were other than routine and essentially automatic. See BNY Am. Compl. ¶ 185. As for the relatively small number of transactions involving women who were allegedly victims of, or otherwise connected to, Epstein's sex trafficking venture, the amended complaint contains no allegations that BNY, in its role as a correspondent bank, processed these transactions in a non-routine fashion or with knowledge that the payments would assist, support, or facilitate sex trafficking. See, e.g., id. ¶ 216 (alleging only that transfers from Epstein to BNY Jane Doe were "processed by" BNY). Thus,

the amended complaint alleges that BNY engaged in "passive facilitation," but not in the "active engagement" that the Court concludes is required to satisfy the participation element of a TVPA participation claim.

As for the amended complaint's allegations concerning the line of credit that Mellon United National Bank, a former BNY subsidiary, extended to MC2, these are also insufficient to establish the participation element. As a threshold matter, BNY argues that Mellon United National Bank's conduct cannot be imputed to BNY because the amended complaint lacks allegations sufficient to pierce the so-called corporate veil between the two entities. BNY Supp. Br. at 2-3. BNY Jane Doe responds that it is premature for the Court to resolve, at this stage of the litigation, whether Mellon United National Bank's conduct can be imputed to BNY. BNY Supp. Opp'n at 8. If the Court had to reach that question at this time, the Court might well be skeptical of BNY Jane Doe's position because the amended complaint provides no basis for the Court to infer that BNY "exercised complete domination" over Mellon United National Bank and that "such domination was used to commit a fraud or wrong that injured" her. See, e.g., Doheny v. Int'l Bus. Machs., Corp., 714 F. Supp. 3d 342, 373-75 (S.D.N.Y. 2024) (dismissing claims against parent entity where complaint lacked allegations sufficient to pierce corporate veil). But the Court need not decide the issue now, because even were BNY Jane Doe correct that BNY is responsible for Mellon United National Bank's conduct, the amended complaint does not allege that the line of credit that was

extended to MC2 was a non-routine service. At most, the amended complaint alleges that, by extending the line of credit to MC2 under a personal guarantee from Epstein, Mellon United National Bank engaged in "passive facilitation" of Epstein's sex trafficking venture, which, as previously noted, is insufficient in itself to sustain the participation element of Count One. See Deutsche Bank, 671 F. Supp. 3d at 405.

That leaves, finally, the amended complaint's allegations that BNY failed to conduct appropriate due diligence regarding the Epstein-related transactions that it processed and, likewise, that it failed to timely file SARs concerning those transactions. BNY argues that these allegations amount to, at most, "passive nonfeasance," which is insufficient to establish the participation element. BNY Supp. Br. at 7-9 (citing G.G. v. Salesforce.com, Inc., 76 F.4th 544, 562-64 (7th Cir. 2023)). BNY Jane Doe responds by pointing out that this Court previously found the participation element satisfied where a bank "delayed filing suspicious activity reports concerning Epstein's activities" and "failed to implement oversight imposed by" a bank committee. BNY Supp. Opp'n at 7 (citing Deutsche Bank, 671 F. Supp. 3d at 405-06). But the Court reached that conclusion in the context of allegations that the defendant bank not only "willfully" failed to comply with its regulatory obligations but also actively "structured" Epstein-related transactions to keep them from appearing suspicious. See Deutsche Bank, 671 F. Supp. 3d at 405-06. Such allegations are absent from the amended complaint against BNY.

Thus, the Court concludes that BNY Jane Doe has failed to establish the first element of her TVPA participation claim against BNY. While the Court is doubtful that BNY Jane Doe's amended complaint satisfies either of the other two elements of Count One, it need not reach them, as the failure to satisfy the first element is a sufficient basis to dismiss Count One of BNY Jane Doe's amended complaint.

      b.   Knowledge

Since, as described above, Count One of BOA Jane Doe's amended complaint adequately alleges active participation in Epstein's sex trafficking venture, the Court moves on to the second element, i.e., whether the amended complaint adequately alleges that Bank of America either knew or should have known that Epstein's venture used force, the threat of force, fraud, coercion, or some combination of the same to cause its victims to submit to sex, or that the victims who submitted to sex were under the age of 18. "Should have known" -- the language of § 1595(a) -- normally suggests negligence, and BOA Jane Doe so argues. But Bank of America contends that civil liability for a criminal offense should, at least in the context of the TVPA, be taken to require, if not actual knowledge, at least reckless disregard. But the express language of § 1595 cannot so facilely be ignored, and the Court now holds that "should have known" in the usual sense of negligence is sufficient. Nevertheless, the Court further holds that BOA Jane Doe's amended complaint satisfies even the higher standard of reckless disregard.

It should also be noted that the Court previously held that a defendant's knowledge or reckless disregard of the fact that force, fraud, or coercion was used in the "sex-trafficking venture that it is alleged to have participated in" does not require that the defendant know or recklessly disregard the fact that the force, fraud, or coercion was used with respect to plaintiff herself. Deutsche Bank, 671 F. Supp. 3d at 406. In reaching that conclusion, the Court reasoned that Section 1591(a)(2) expressly defines the scope of liability under the TVPA in terms of a defendant's having knowingly benefited from "participation in a venture" that has trafficked plaintiff, not in terms of a defendant's having knowingly benefited from participation in the trafficking of plaintiff personally. Id. Upon careful consideration, the Court declines Bank of America's invitation to disturb its prior conclusions in this regard. See BOA MOL at 9-10 & n.3. Nevertheless, once again, even if Bank of America's construction were accepted, it would be satisfied by the allegations in the amended complaint against the Bank.

The amended complaint plausibly alleges that Bank of America recklessly disregarded in several ways information suggesting that Epstein's venture was engaged in sex trafficking. First, the amended complaint chronicles the many publicly available media reports, which drew in turn on such sources as police reports as well as public complaints in civil lawsuits, that characterized Epstein as a "serial sexual abuser and trafficker, including detailed reports making it clear that his operation depended on his accessing . . . large amounts

of cash." E.g., BOA Am. Compl. ¶ 58; see also id. ¶¶ 70-74, 78-81, 83, 87, 90-91. Bank of America attempts to minimize the amended complaint's sources as "news articles and gossip columns" that merely asserted that "Epstein surrounded himself with women and was a registered sex offender," BOA Supp. Br. at 10-11, but that mischaracterizes the materials cited in the amended complaint, which, as indicated above, provided considerable details about Epstein's gross improprieties. While Bank of America was not required to automatically credit unproven allegations in civil lawsuits, the amended complaint plausibly asserts that the bank turned a blind eye to these repeated, detailed allegations, some emanating from police reports widely circulated in the press, by utterly failing to engage in due diligence about them. See, e.g., BOA Am. Compl. ¶¶ 194-196.

Second, the amended complaint also alleges that Bank of America recklessly disregarded "numerous red flags associated with Epstein's accounts, which all suggested that Jeffrey Epstein operated a sex-trafficking venture." See Deutsche Bank, 671 F. Supp. 3d at 407. One such red flag that related to BOA Jane Doe, among others, was banking activity involving an address on East 66th Street in New York City that, among other things, was allegedly "used to house dozens and dozens of trafficking victims. See, e.g., BOA Am. Compl. ¶¶ 52, 225, 301, 311. While Bank of America may not have known this, what it did know was that it was to an entity at this address that BOA Jane Doe's account made allegedly unexplained monthly payments. BOA Am. Compl. ¶ 225. More generally, the way large transfers passed in and out of

an account allegedly owned by an impecunious young woman was surely enough to arouse suspicions and require inquiries, none of which Bank of America undertook. See BOA Am. Compl. ¶¶ 211-224, 226, 231. This was equally true of, for example, transfer of tens of millions of dollars from Black to Epstein, see id. ¶¶ 248-258; the payments made by Black to victims of Epstein, see id. ¶¶ 260-272, 308-310; other wire transfers involving Epstein's victims, some of whom were also Bank of America customers, see id. ¶¶ 295-307, 313; and suspicious transactions in MC2's operating account, see id. ¶¶ 326-340.

Third, BOA Jane Doe has plausibly alleged that at least one Bank of America employee, Morris, had direct personal knowledge of Epstein's sex trafficking venture and that there is a basis for the Court to impute Morris' knowledge to the bank. The amended complaint refers to documentary evidence that Morris "knew of Epstein's crimes and the risks of banking with him" by 2011, if not earlier. See id. ¶ 152 (reproducing January 3, 2011, memorandum stating that Epstein "may be under investigation for other sex crimes, including child trafficking"); see also id. ¶¶ 149-150, 162. Because Morris' duties on behalf of Bank of America allegedly included serving as a private banker for Epstein-connected entities, see id. ¶¶ 163-164, Morris' knowledge of Epstein's conduct was "material to those duties" and thus may be imputed to the bank. See Deutsche Bank, 671 F. Supp. 3d at 407 (quoting Apollo Fuel Oil v. United States, 195 F.3d 74, 76 (2d Cir. 1999)).

For these reasons, the Court concludes that the amended complaint filed by BOA Jane Doe satisfies the knowledge element of her TVPA participation claim.

       c.   Benefit

The third and final element of a TVPA participation claim requires a plaintiff to allege that a defendant knowingly benefitted from its participation in the sex trafficking venture. Like the defendants in prior cases concerning Epstein's sex trafficking, Bank of America does not contest "that [it] received fees and other revenue from providing services to Jeffrey Epstein and his affiliated entities." _Deutsche Bank_, 671 F. Supp. 3d at 409; _see generally_ BOA Supp. Br. at 13-14. But also like prior defendants, Bank of America contends that the benefit element of BOA Jane Doe's TVPA participation claim requires her to allege that the bank obtained a benefit while "knowing it is in return for [the defendant's] facilitation of sex trafficking," BOA Supp. Br. at 13, in other words, a knowing _quid pro quo_.

In an earlier case, the Court assumed _arguendo_, without deciding, that Bank of America's position might be correct, _see_ _Deutsche Bank_, 671 F. Supp. 3d at 409; but the Court now holds that allegations that the bank knowingly received revenue from its participation in generally assisting a venture that it knew, or should have known, involved sex trafficking (as defined in § 1591) are sufficient to satisfy this element. Congress did not draft Section 1595(a) to require an explicit "quid pro quo," something that Congress has done in drafting other statutes. _See, e.g._, _United States v. Benjamin_, 95 F.4th 60, 65-68 (2d

Cir. 2024) (reversing dismissal of indictment where statutory language required proof of "quid pro quo"). All that Congress provided in § 1595(a) was that a defendant must knowingly benefit from participation in what it knew or should have known was a forbidden venture. Hence, the Court does not read the TVPA to require allegations of a "causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit." <u>Contra</u> <u>Geiss v. Weinstein Co. Holdings LLC</u>, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019).

Applying the proper standard here, the amended complaint against Bank of America sufficiently alleges facts proving the element of knowing benefit. Indeed, it comes close to meeting even defendant's suggested "quid pro quo" requirement. The amended complaint contains numerous allegations that Epstein and those associated with him would not have conducted business with the bank were it not for its facilitation of Epstein's sex trafficking. <u>See</u> BOA Am. Compl. ¶¶ 340-363. To begin with, the amended complaint alleges that Bank of America knowingly received "interest, commissions, service fees, and other financial benefits" from servicing Epstein and his associates, and it alleges that Epstein "provided those financial benefits to [Bank of America] precisely because it was facilitating his sex-trafficking venture." <u>Id.</u> ¶ 362. The amended complaint further alleges that Bank of America "knew that if it flagged any of [Epstein's suspicious] transactions, it would have lost Epstein's business," <u>id.</u> ¶ 353, as well as losing the business of wealthy individuals connected to Epstein, <u>id.</u> For example, the bank knew that, if it inquired into the

suspicious transfers between Black and Epstein, "it would lose the Black-related accounts and the financial benefits attached to handling those accounts," id. ¶ 355, and the amended complaint alleges that, "[r]ather than losing Black's or Maxwell's business, [Bank of America] deliberately failed to monitor their account activity or file SARs," id. ¶ 357. While these allegations are hotly disputed, they are assumed to be true for the purpose of deciding Bank of America's motion and they sufficiently establish the benefit element.

> d.    Conclusion

For the foregoing reasons, the Court concludes that the amended complaint against Bank of America states a claim for civil participation liability under the TVPA, but that the amended complaint against BNY fails to do so.

Count Two: Perpetrator Liability

Separate from their Count One claim under the TVPA's civil participation provision, the amended complaints assert in Count Two that each defendant is also liable under the TVPA as a direct perpetrator of sex trafficking. As the Court noted above, under 18 U.S.C. §§ 1591(a)(1) and 1595(a), a TVPA victim may bring a civil action against a defendant who knowingly "in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" who is forced to engage in a commercial sex act or, in the case of an underage victim, is caused to engage in such an act. See Deutsche Bank, 671 F. Supp. 3d at 409-10.

Here, plaintiffs have not adequately alleged that either Bank of America or BNY was a knowing perpetrator of sex trafficking. In fact, in their most recent briefs, plaintiffs declined to defend the merits of Count Two in the face of defendants' motions to dismiss. See BOA Opp'n at 16 n.16; BNY Opp'n at 18 n.15. Although plaintiffs did not delete this count from the amended complaints, their supplemental briefs do not so much as mention it. See generally BOA Supp. Opp'n; BNY Supp. Opp'n. The Court therefore deems Count Two abandoned.

Furthermore, even had plaintiffs not effectively abandoned Count Two despite including it in their amended complaints, the position they previously took in trying to defend it in connection with the original complaints is untenable. Plaintiffs there argued that Count Two should survive because they have alleged at least one TVPA violation and Section 1595 "doesn't distinguish between different violations" of the TVPA. BOA Opp'n at 16 n.14 (quoting Bensky v. Indyke, 743 F. Supp. 3d 586, 599 (S.D.N.Y. 2024)); BNY Opp'n at 18 n.15 (same). As plaintiffs note, another court in this District has held that if a complaint "plausibly alleges one [TVPA] violation, the § 1595 claim survives, and the Court need not address" other alleged violations at the motion-to-dismiss stage. Bensky, 743 F. Supp. 3d at 599. This Court respectfully disagrees because, as the Supreme Court has held, Rule 12(b)(6) is an "important mechanism for weeding out meritless claims," and allowing a claim to remain in a case merely because a plaintiff may have plausibly asserted a different violation

of the same statute would undermine the rule's purpose. See Fifth
Third Bancorp v. Dudenhoffer, 573 U.S. 409, 425 (2014).

For these reasons, Count Two of each amended complaint fails to
state a claim.

Count Three: Aiding and Abetting

In Count Three, plaintiffs, largely relying on 18 U.S.C. § 2,
assert that Bank of America and BNY, by aiding and abetting Epstein's
sex trafficking venture, are liable as perpetrators. See BOA Am. Compl.
¶¶ 410-425; BNY Am. Compl. ¶¶ 316-331. But 18 U.S.C. § 2, a criminal
statute, has no application to civil claims brought under § 1595(a).
See BOA MOL at 20-21; BNY MOL at 18. As with Count Two, plaintiffs no
longer defend this count on its merits and abandon it entirely in
their supplemental briefing. See generally BOA Supp. Opp'n; BNY Supp.
Opp'n.

Even had plaintiffs not abandoned their claim for aiding and
abetting, this Court has already held that "[t]he TVPA does not provide
civil liability for aiding and abetting" because such liability "should
not be inferred when a statute does not expressly provide for it," and
there is no indication that Congress, when it enacted the TVPA's civil
cause of action, intended to create liability for aiding and abetting.
See Deutsche Bank, 671 F. Supp. 3d at 410-11. The Court hereby
reaffirms its prior analysis and, accordingly, holds that Count Three
of each amended complaint fails to state a claim.[5]

_____

[5] For the same reasons as with respect to Count Two, the Court declines
to adopt plaintiffs' fallback position that Count Three should be

Count Four: Obstruction of TVPA Enforcement

Count Four asserts that defendants knowingly and intentionally obstructed the enforcement of the TVPA in violation of §§ 1591(d) and 1595, principally by failing to timely file SARs concerning suspicious transactions related to Epstein, his associates, and his victims like the plaintiffs here. BOA Am. Compl. ¶¶ 426-444; BNY Am. Compl. ¶¶ 332-351; see 18 U.S.C. § 1591(d).

As a threshold matter, defendants contend that § 1595 does not create a private right of action for obstruction because the only "victim" of any obstruction of enforcement is the government. See BOA Suppl. Br. at 14; BNY Suppl. Br. at 13. But this Court has previously held otherwise. See Deutsche Bank, 671 F. Supp. 3d at 409. Upon revisiting the question, the Court reaffirms its analysis. "While 18 U.S.C. § 1595(a) does not define 'victim,' a different section of the federal criminal code . . . defines a 'crime victim' as 'a person directly and proximately harmed as a result of the commission of a Federal offense.' This definition accords with ordinary usage, which recognizes as a victim 'one that is injured, destroyed, or sacrificed under any of various conditions.' Thus, the 'victims' of one who obstructs the enforcement of the TVPA include not just the government, but also include those who suffered harm because the government's enforcement efforts were hindered." Id.

---

permitted to survive to the extent that plaintiffs have stated a claim for at least one violation of the TVPA.

To assert a claim for obstruction under the TVPA, a plaintiff must show that a defendant (1) knew of an effort to enforce the TVPA and (2) intentionally obstructed or attempted to obstruct that enforcement effort. See United States v. Farah, 766 F.3d 599, 612 (6th Cir. 2014); Deutsche Bank, 671 F. Supp. 3d at 409.[6] Because Congress enacted Section 1591(d) in 2008 and did not give that provision retroactive effect, the investigations in Florida that resulted in Epstein's 2006 guilty plea and his 2007 non-prosecution agreement there cannot support plaintiffs' claim for obstruction. Hence, the only relevant TVPA enforcement effort discussed in the amended complaints is the investigation in the Southern District of New York that resulted in Epstein's 2019 indictment and arrest. See BOA Reply at 8. The amended complaints do not plausibly allege that defendants knew about that investigation before it became public, but they do

---

[6] Plaintiffs contend that they need not allege defendants' knowledge of a particular investigation or proceeding in order to assert a claim for TVPA obstruction because Section 1591(d) does not contain a knowledge requirement. BOA Supp. Opp'n at 12-13; BNY Supp. Opp'n at 13. Plaintiffs attempt to distinguish Farah, arguing that the court in that case "relied upon" 18 U.S.C. § 1505 rather than Section 1591(d), but that is incorrect. See Farah, 766 F.3d at 611 (describing elements of "Farah's conviction for obstructing or attempting to obstruct the child sex trafficking laws," i.e., the TVPA). Moreover, plaintiffs ignore the "longstanding presumption, traceable to the common law" that, in enacting criminal statutes, "Congress intends to require a defendant to possess a culpable mental state," and, absent contrary language in the civil provision (such as with regard to certain other § 1595 violations), this carries over to civil claims predicated on the criminal violation. See Rehaif v. United States, 588 U.S. 225, 228-29 (2019). Upon careful consideration of the parties' arguments, the Court reaffirms its prior analysis of the elements of a civil claim for TVPA obstruction. See Deutsche Bank, 671 F. Supp. 3d at 409; see also Doe 3 v. Indyke, No. 24 Civ. 1204, 2025 WL 2403193, at *7 (S.D.N.Y. Aug. 19, 2025) (adopting same analysis).

plausibly allege that -- in light of the intense publicity surrounding Epstein's indictment, arrest, and death -- defendants knew about that investigation once it was publicized. See BOA Am. Compl. ¶¶ 39-41, 93; BNY Am. Compl. ¶¶ 52-54, 111, 336.

The question before the Court, then, is whether the amended complaints plausibly allege that defendants intentionally obstructed or attempted to obstruct the 2019 investigation once it became public. See Farah, 766 F.3d at 612. The amended complaint against Bank of America clearly contains allegations to this effect. See BOA Am. Compl. ¶¶ 343-357 (alleging that Bank of America "intentionally" and "deliberately" failed to timely file SARs, including in and after 2019), ¶¶ 433-434. Accordingly, the Court concludes that the amended complaint against Bank of America states a claim for TVPA obstruction.

In contrast, the amended complaint against BNY does not allege, except in conclusory language, that BNY acted "intentionally" or "purposeful[ly]" in failing to file SARs. See BNY Am. Compl. ¶¶ 341-349; see also id. ¶¶ 178, 183-203 (alleging that BNY knew of its obligations and describing SARs filed in and after 2019). As BNY argues, see BNY Suppl. Br. at 13, it is not plausible to infer from the amended complaint's allegations that, to the extent that BNY untimely filed SARs, it did so to intentionally obstruct the investigation that became public in 2019. In fact, the amended complaint alleges that, on August 8, 2019, BNY filed a SAR in which it reported several hundred suspicious transfers, which were made over a period of more than six years and between accounts related to

Epstein. BNY Am. Compl. ¶ 184. That filing -- barely a month after Epstein's arrest -- is inconsistent with the theory that BNY acted to intentionally obstruct the investigation of TVPRA violations being conducted in the Southern District of New York even after that investigation became known. Hence, because the amended complaint's conclusory statements are undermined by the facts alleged to support them, the Court concludes that the amended complaint against BNY does not state a claim for TVPA obstruction.[7]

### B. Counts Five and Six: Negligence Claims

In Counts Five and Six, plaintiffs assert claims for negligence under New York common law. Count Five alleges that defendants negligently failed to exercise reasonable care to prevent physical harm to plaintiffs. Specifically, plaintiffs assert that, by providing financial and other support for Epstein's sex trafficking venture, defendants "set forces in motion that directly and proximately injured and caused physical harm" to plaintiffs. BOA Am. Compl. ¶ 448; BNY Am. Compl. ¶ 355. In Count Six, plaintiffs assert that defendants provided non-routine banking services to Epstein and his co-conspirators, deliberately ignored information concerning Epstein's sex trafficking

---

[7] To be sure, the amended complaint against Bank of America also contains allegations that the bank filed its first Epstein-related SAR shortly after Epstein's arrest. See BOA Am. Compl. ¶ 257. What distinguishes the two amended complaints, however, is (1) that the amended complaint against BNY fails to allege, in more than conclusory fashion, that the bank deliberately failed to abide by its regulatory obligations, and (2) that the amended complaint against Bank of America plausibly alleges that the bank continued to delay filing Epstein-related SARs even with regard to the same entities on whose transactions it reported shortly after Epstein's arrest. See id. ¶ 258.

venture, and failed to comply with regulatory obligations, thereby breaching the duty of care that they owed plaintiffs. BOA Am. Compl. ¶¶ 460-470; BNY Am. Compl. ¶¶ 369-377.

Under New York law, each of these claims is subject to a three-year statute of limitations. CPLR § 214(5) (providing three-year statute of limitations for actions to recover damages for personal injury). A cause of action for negligence "accrues when the acts or omissions constituting the negligence produce the injury." Reznor v. J. Artist Mgmt., Inc., 365 F. Supp. 2d 565, 579 (S.D.N.Y. 2005).

Plaintiffs' negligence claims are thus facially time-barred because their injuries -- that is, Epstein's sexual abuse of them -- occurred no later than 2019, the year in which Epstein was arrested in New York and died. See BOA MOL at 22-23; BNY MOL at 21.

Plaintiffs contend, however, that their claims are not time-barred because defendants are equitably estopped from asserting the statute of limitations as a defense. See BOA Am. Compl. ¶¶ 10-16 & n.3; BNY Am. Compl. ¶¶ 18-25 & n.4. Moreover, plaintiffs argue, claims such as Counts Five and Six should only be dismissed as time-barred where "it appears beyond doubt that [plaintiffs] can prove no set of facts" supporting tolling. BOA Opp'n at 17 (quoting Ortiz v. Cornetta, 867 F.2d 146, 148 (2d Cir. 1989)); BNY Opp'n at 18-19.

In New York, equitable estoppel "applies where it would be unjust to allow a defendant to assert a statute of limitations defense."

_Zumpano v. Quinn_, 6 N.Y.3d 666, 673 (2006).[8] It is an "extraordinary remedy," _Pulver v. Dougherty_, 58 A.D.3d 978, 979 (3d Dep't 2009), that is to be "invoked sparingly and only under exceptional circumstances," _Gross v. N.Y.C. Health & Hosps. Corp._, 122 A.D.2d 793, 794 (2d Dep't 1986). In order to invoke equitable estoppel, a plaintiff must show that she has been "induced by fraud, misrepresentations, or deception to refrain from filing a timely action." _Zumpano_, 6 N.Y.3d at 674.[9] "Moreover, the plaintiff must demonstrate reasonable reliance on the

---

[8] BNY Jane Doe contends that _Zumpano_ is inapplicable because "the plaintiffs there were aware that abusers were employees of the defendants and thus could have brought suit or investigated sooner," whereas BNY Jane Doe "had no reason to suspect that a financial institution operating behind the scenes was facilitating the sex-trafficking venture that injured her." BNY Supp. Opp'n at 15 n.12. But _Zumpano_'s reasoning is not limited in this manner. To be sure, in that case the Court of Appeals cited the plaintiffs' awareness that their abusers were defendants' employees as evidence that they "could have brought actions" or "at least investigated whether a basis for such actions existed sooner." 6 N.Y.3d at 706. But the Court of Appeals' broader holding was that plaintiffs must "establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit," a rule that does not turn on the existence (or absence) of employer-employee relationships. See _id._

[9] The amended complaints gesture, in footnotes, to the alternative argument that the banks' "wrongdoing is inherently self-concealing such that Doe need not plead any affirmative actions" by the banks. BOA Am. Compl. ¶ 16 n.3; BNY Am. Compl. ¶ 25 n.4. But plaintiffs' briefs make no mention of this argument and appear to have abandoned it. In any event, "[w]hether New York recognizes equitable estoppel based on a 'self-concealing' act is an unsettled question," and the Second Circuit has recently declined to "adopt the exception to excuse [plaintiffs] from" the "well-established requirement of New York law" that they must allege "an act of deception, separate from the ones for which they sue, on which an equitable estoppel could be based." _Koenigsberg v. Bd. of Trs. of Columbia Univ. in City of N.Y._, No. 24-2519-cv, 2025 WL 1540252, at *3 (2d Cir. May 30, 2025). This Court likewise declines to read an exception for inherently self-concealing behavior into New York law, at least in the context of this case.

defendant's misrepresentations." Id. These showings must be made in some detail because, as the New York Court of Appeals has held, it is "fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit." Id. (emphasis added); see also Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 442-43 (S.D.N.Y. 2014).

Here, plaintiffs have not made "sufficient factual allegations that each of the requirements of equitable estoppel is satisfied." See Sejin Precision Indus. Co., Ltd. v. Citibank, N.A., 235 F. Supp. 3d 542, 553 (S.D.N.Y. 2016). This is true in at least four respects:

First, the amended complaints refer generically to "affirmative misrepresentations" made by defendants, BOA Am. Compl. ¶ 10; BNY Am. Compl. ¶ 18, but the amended complaints do not specify any such misrepresentations or even indicate in what contexts such misrepresentations were purportedly made. That distinguishes these cases from those cited by plaintiffs, such as Zimmerman v. Poly Prep Country Day School, 888 F. Supp. 2d 317, 341-42 (E.D.N.Y. 2012), where the plaintiffs alleged that the defendant affirmatively misrepresented certain specified facts regarding their abuser's standing as the defendant's employee.

Second, the amended complaints allege that various named and unnamed associates of Epstein attempted to prevent Doe and other victims "from learning of the [banks'] role" in Epstein's sex trafficking venture and "from commencing suit," BOA Am. Compl. ¶¶ 13-14; BNY Am. Compl. ¶¶ 23-24, but the amended complaints do not offer

any basis for imputing these individuals' alleged conduct to defendants.

Third, to the extent that the amended complaints allege that defendants intentionally failed to file SARs or take other steps required by banking regulations, such omissions are categorically not "affirmative" actions on the part of defendants that may justify the application of equitable estoppel. See Sejin Precision Indus., 235 F. Supp. 3d at 553. The New York Court of Appeals has specifically held that "[i]t is not enough that plaintiffs alleged defendants were aware of [underlying misconduct] and remained silent about it" or failed to "report abuse by [sex offenders] to law enforcement officials." Zumpano, 6 N.Y.3d at 674.

Fourth, plaintiffs allege that both defendants "negotiated with known victims of Epstein's sex trafficking to settle claims" and "secure non-disclosure agreements limiting what the victims could say." BOA Am. Compl. ¶ 13; BNY Am. Compl. ¶ 21. Even assuming, arguendo, that such evidence would be admissible for purposes of plaintiffs' equitable estoppel arguments, the New York Court of Appeals has expressly held that a defendant's making "private payments to [victims] so that the charges would not be publicized" is insufficient to establish equitable estoppel. Id. at 675; cf. City of Almaty v. Sater, 503 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (holding that "a confidential settlement agreement that prevents one's wrongdoing from coming to light does not, by itself, amount to the sort of active concealment necessary for equitable estoppel" but declining to dismiss

untimely claims in light of "a broad pattern of deceptive conduct designed to frustrate" plaintiffs from bringing suit).

Because plaintiffs have now had an opportunity to amend their pleadings in response to defendants' tolling arguments, the Court concludes that they can plead no set of facts supporting tolling. See Ortiz, 867 F.2d at 148. The Court therefore determines that Counts Five and Six are time-barred. Accordingly, it need not (and does not) reach the merits of these claims.

V.    Conclusion

For the foregoing reasons, BOA Jane Doe has stated a claim against Bank of America for TVPA participation and TVPA obstruction, but not for TVPA perpetration, aiding and abetting a violation of the TVPA, or negligence. Accordingly, the Court hereby reaffirms its "bottom-line" Order of January 29, 2026, granting Bank of America's motion to dismiss Counts Two, Three, Five, and Six but denying that motion as to Counts One and Four. Further, because BNY Jane Doe has not stated any of her claims against BNY, the Court reaffirms the portion of the same Order granting in full BNY's motion to dismiss the amended complaint against it. And because the Court has already afforded plaintiffs an opportunity to amend their complaints, the Court reconfirms that it dismisses with prejudice Counts Two, Three, Five, and Six of the action against Bank of America and the entirety of the action against BNY. See, e.g., Sprague v. Salisbury Bank & Tr. Co., 969 F.3d 95, 101 (2d Cir. 2020).

The Clerk of Court is respectfully directed to enter final judgment in No. 25 Civ. 8525, dismissing with prejudice the case against The Bank of New York Mellon Corporation, and to close that case.

SO ORDERED.

New York, New York
February  11 , 2026

JED S. RAKOFF, U.S.D.J.